## UNITED STATES COURT OF INTERNATIONAL TRADE

TERNIUM MEXICO, S.A. DE C.V.,

                              **Plaintiff,**

      v.

UNITED STATES,

                              **Defendant.**

**Court No. 25-00236**

## PUBLIC VERSION

**Business Proprietary Information has been deleted from Pages 19, 20, and 34.**

## COMPLAINT

Plaintiff Ternium Mexico, S.A. de C.V. ("Ternium" or "Plaintiff"), by and through the undersigned counsel, White & Case LLP, brings this Complaint against the United States, and alleges and states as follows:

### ADMINISTRATIVE DECISION TO BE REVIEWED

1.    Plaintiff contests the final determination issued by the International Trade Administration of the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of certain corrosion-resistant steel products ("CORE") from Mexico (C-201-864). The period of investigation ("POI") was January 1, 2023, through December 31, 2023. Notice of Commerce's final affirmative determination was published in the *Federal Register* on August 29, 2025. *See Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 42,229 (Dep't Commerce Aug. 29, 2025) ("*Final Determination*"); *see also id.*, accompanying Issues and Decision Memorandum ("*I&D Memo*").

## JURISDICTION

2.      The U.S. Court of International Trade (the "Court") has jurisdiction over this action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c).  Plaintiff has complied with the notice requirements pursuant to 19 U.S.C. § 1516a(g)(3)(B).

## NAME AND STANDING OF PLAINTIFF

3.      Ternium is a Mexican producer and exporter of CORE.  Ternium actively participated in Commerce's CVD investigation that resulted in the contested *Final Determination*.  Ternium therefore is an "interested party" within the meaning of 19 U.S.C. § 1677(9)(A) and has standing to bring this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).  Plaintiff is entitled to commence this civil action pursuant to 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

4.      The *Final Determination* was published in the *Federal Register* on August 29, 2025.  *See Final Determination*.  The *Final Determination* involves a "free trade area country" within the meaning of 19 U.S.C. § 1516a(f)(9)(B) and § 1516a(g).  Plaintiff filed its Notice of Intent to Seek Judicial Review with the U.S. and Mexican Secretaries to the United States-Mexico-Canada Agreement ("USMCA") on September 18, 2025, which is within the deadline prescribed by 19 U.S.C. § 1516a(g)(3)(B) (*i.e.*, within 20 days after the date the contested determination was published in the *Federal Register*).  *See* Letter from Ternium Mexico, S.A. de C.V.; to Vidya Desai, United States Secretary, USMCA Secretariat, and Luis Gutierrez Reyes, Mexico Secretary, TMEC Secretariat; re: *Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination – Notice of Intent to Commence Judicial Review* (Sep. 18, 2025).  Plaintiff filed the Summons on October 28, 2025, which is within the deadline prescribed by 19 U.S.C. § 1516a(a)(5)(A) (*i.e.*, within 30 days of the 31st day after the date the contested determination was published in the *Federal Register*).  *See* Summons, ECF No. 1, Oct. 28, 2025.

131346734

Plaintiff is filing this Complaint on November 26, 2025, which is within the deadline prescribed by 19 U.S.C. § 1516a(a)(2)(A) (*i.e.*, within 30 days following the filing of the Summons). Therefore, this action is timely.

## STANDARD OF REVIEW

5.    When reviewing a final determination issued by Commerce in a CVD investigation, the Court will sustain Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM S.p.A. v. United States,* 582 F.3d 1336, 1339 (Fed. Cir. 2009) ("*PAM*"); *see also Micron Tech. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)) ("*Micron Tech.*"). The Court must determine "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted).

6.    The Court will also hold unlawful any determination found "to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(ii). In addition, Commerce's administrative decisions are subject to the Administrative Procedure Act ("APA"), which requires the Court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency acted in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp.

3d 1283, 1292 (Ct. Int'l Trade 2019) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## PROCEDURAL HISTORY AND BACKGROUND

7.    Paragraphs 8 through 42 and 51 through 53 provide the procedural history and background regarding the Bancomext financial factoring program ("Bancomext Factoring Program") and the NAFIN financial factoring program ("NAFIN Factoring Program") (collectively, "Factoring Programs"). Paragraphs 43 through 53 provide the procedural history and background regarding the provision of mining rights for less than adequate remuneration ("Mining Rights for LTAR").

### Petition

8.    On September 5, 2024, Steel Dynamics, Inc., Nucor Corporation, United States Steel Corporation, Wheeling-Nippon Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners") filed a petition for antidumping duty ("ADD") and CVD measures on imports of certain CORE from various countries, including Mexico. *See* Letter from Petitioners, to Sec'y Commerce and Sec'y Int'l Trade Commission, re: *Petitions for the Imposition of Antidumping and Countervailing Duties: Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Turkey, the United Arab Emirates, and the Socialist Republic of Vietnam* (Sep. 5, 2024) ("*Petition*"). Commerce initiated the CVD investigation on October 2, 2024. *See Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 80,204 (Dep't Commerce Oct. 2, 2024) ("*Initiation Notice*").

9.    In the *Petition*, Petitioners alleged that *El Banco Nacional de Comercio Exterior S.N.C.* (*i.e.*, National Exterior Commerce Bank) ("Bancomext") provided countervailable loans to

4

qualifying Mexican companies. *See Petition* at Volume XIV – Information Related to Countervailable Subsidies Provided to Mexican Producers of the Subject Merchandise at 8-10.

10.     On October 16, 2024, Commerce issued the initial CVD questionnaire to Ternium and Galvasid S.A. de C.V. ("Galvasid"), the mandatory respondents in the CVD investigation. *See* Letter from Stephen Bailey, Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance; to Aristeo López, Embassy of Mexico; re: *Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Countervailing Duty Questionnaire*, (Oct. 16, 2024) ("*Initial Questionnaire*"). Section III of the *Initial Questionnaire* requested various categories of information from Ternium. *See Initial Questionnaire* at III-1 - III-31.

Questionnaire Responses on the Bancomext Factoring Program

11.     Section III of the *Initial Questionnaire* contained a subsection for "Loans and Credit" and requested that Ternium respond to specific questions about "Bancomext Financing." *See Initial Questionnaire* at Section III-8.

12.     In its response to the *Initial Questionnaire*, Ternium stated that its "only financial relationship with Bancomext during the POI relate{d} to a financial product offered by Bancomext for '*factoraje*' (*i.e.*, factoring or securitization of sales receivables)." Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to Section III of the Questionnaire* (Dec. 5, 2024) at Program-Specific Questions at 8 (bracketing omitted) ("*Initial Response*"). Ternium also explained that the Bancomext Factoring Program "allow{ed} Ternium Mexico to receive advance payments from certain domestic customers through Bancomext's specialized electronic platform." *Id.* at Program-Specific Questions at 9 (bracketing omitted).

13.     In its response to Commerce's second supplemental questionnaire, Ternium provided a loan template showing "all payments related to all invoices paid under the factoring arrangements

5

with Bancomext during the POI."  Letter from Ternium Mexico, S.A. de C.V., to Acting Sec'y

Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to Second*

*Supplemental Section III Questionnaire* (Jan. 21, 2025) at 6, Ex. Supp2. 10 ("*2ⁿᵈ Supp. QR*").  The

loan template contained (1) the name of the customer ("*cliente*"), (2) the total amount invoiced by

Ternium to the customer ("*Valor Total Factura para el Pago*"), (3) the financial cost deducted

from the invoiced amount ("*Diferencia entre factura y pago recibido*"), (4) the ratio of the financial

cost to the invoice value ("*% importe de intereses entre el importe factura*"), (5) the date of receipt

of payment ("*Fecha de pago a Ternium*"), and (6) the total amount received by Ternium ("*Monto*

*del Pago recibido*").  *See id.* at Ex. Supp2. 10.

14.    Ternium also provided documentation for a sample transaction paid through the

Bancomext platform ("Bancomext Sample Transaction"), as well as "a Bancomext brochure

explaining the primary elements and requirements of the Bancomext factoring program" and

demonstrating that the maximum term for payment of invoices under the Bancomext Factoring

was 180 days.  *Id.* at 8; *see also id.* at Ex. Supp2. 12, Ex. Supp2. 13 at 7, 18.

15.    Commerce did not request additional information about the Bancomext Factoring Program.

<u>Questionnaire Responses on the NAFIN Factoring Program</u>

16.    Although the financing programs offered by the *Nacional Financiera, S.N.C.* (*i.e.*,

Development Banking Institution) ("NAFIN") were not among the programs for which Petitioners

alleged the elements of a subsidy, or on which Commerce initiated the CVD investigation, in its

*Initial Response* Ternium disclosed that it had entered into a factoring agreement with NAFIN,

which was in force during the POI.  *See Initial Response* at Program-Specific Questions at 44, Ex.

32; *see also Petition* at Volume XIV; *Certain-Corrosion Resistant Steel Products from Mexico* (C-

201-864) (Dep't Commerce Sep. 25, 2024) ("*Initiation Checklist*").  Ternium explained that the

NAFIN Factoring Program "allow{ed} Ternium Mexico to receive advance payments from certain

domestic customers through NAFIN's 'Cadenas productivas' platform" and that "{t}he funds are provided by NAFIN or other banks, in which case NAFIN is only an intermediary." *Initial Response* at Program-Specific Questions at 49 (bracketing omitted).

17.    In the *2nd Supp. QR*, as it did for the Bancomext Factoring Program, Ternium provided a loan template showing all "invoices paid to Ternium Mexico under the factoring arrangements with NAFIN during the POI." *2nd Supp. QR* at 9, Ex. Supp2. 17.  The loan template contained (1) the name of the customer ("*cliente*"), (2) the total amount invoiced by Ternium to the customer ("*Valor Total Factura para el Pago*"), (3) the financial cost deducted from the invoiced amount ("*Diferencia entre factura y pago recibido*"), (4) the ratio of the financial cost to the invoice value ("*% importe de intereses entre el importe factura*"), (5) the date of receipt of payment ("*Fecha de pago a Ternium*"), and (6) the total amount received by Ternium ("*Monto del Pago recibido*"). *See id.*

18.    Commerce did not request Ternium to provide additional information about the NAFIN Factoring Program.

*Preliminary Determination*

19.    In the *Preliminary Determination*, Commerce determined a 1.56% *ad valorem* net countervailable subsidy rate due entirely to the Bancomext Factoring Program.  *See* Memorandum to The File; from Drew Jackson, International Trade Compliance Analyst, AD/CVD Operations; re: *Preliminary Determination Calculations for Ternium Mexico S.A. de C.V.* (Feb. 3, 2025) at 4 ("*Preliminary Calculation Memo*").  Despite record evidence showing that the maximum payment period under the Bancomext Factoring Program was 180 days (instead of 365 days), Commerce preliminarily determined that "the interest payment charged by Bancomext reflected a payment period of 365 days." *Preliminary Calculation Memo* at 3; *see also 2nd Supp. QR* at Ex. Supp2. 13 at 6, 8, 12.

7

20.     In the *Preliminary Determination*, Commerce did not analyze the NAFIN Factoring Program.  Instead, it stated that it "will continue to examine the loan and will include an analysis of the program in a post-preliminary determination memorandum."  *Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 90 Fed. Reg. 9,226 (Dep't Commerce Feb. 10, 2025), accompanying Decision Memorandum at 4 ("*PDM*").

Ministerial Error Allegation

21.     On February 18, 2025, Ternium filed a ministerial error allegation regarding Commerce's treatment of the payment period for the Bancomext Factoring Program.  Ternium explained that Commerce erred in its calculation of the benefit from this program because it relied on the incorrect number of days (*i.e.*, 365 instead of 180) to determine the benchmark interest payments.  *See* Letter from Ternium Mexico, S.A. de C.V., to Acting Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Allegation of Significant Ministerial Error Contained in the Preliminary Determination* (Feb. 18, 2025) ("*Ministerial Error Allegation*").

22.     Ternium pointed to record documentation for the Bancomext Sample Transaction paid through the Bancomext platform, which demonstrated that the financial cost that was discounted from the invoiced amount represented the ratio of the financial cost to the invoice value (reported in column "*% importe de intereses entre el importe factura*" in Ex. Supp2. 10).  Ternium explained that this ratio was calculated by dividing the discount amount by the total invoiced amount.  In other words, this was the ratio of the discount to the total principal – not the annual interest rate.  *Id.* at 4.  Ternium also pointed to "a Bancomext brochure" that "explain{ed} the primary elements and requirements of the Bancomext factoring program" and demonstrated that the "'{m}aximum

term for payment of invoices' under the Bancomext Factoring {was} '180 days.'" *Id.* at 4 (quoting *2ⁿᵈ Supp. QR* at Ex. Supp2. 13 at 7, 18).

23.    Because of its mistake, Commerce compared the actual cost of the Bancomext Factoring Program (which is limited to invoices with payment terms under 180 days) to the cost of a commercial credit outstanding for 365 days – thereby more than doubling the benchmark cost and, therefore, the calculated subsidy.  Ternium explained that correcting this error would have resulted in a countervailable subsidy rate below *de minimis* level (*i.e.*, 0.46%).  *See id.* at 5-6.

24.    In its ministerial error memorandum, Commerce replied that Ternium's "allegations {did not} meet the definition of a ministerial error" and made no changes to the *Preliminary Determination*.  Memorandum to Eric Greynolds, Director, Office IV, AD/CVD Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Allegations of Significant Ministerial Errors in the Preliminary Determination* (Mar. 14, 2025) at 3 ("*Ministerial Error Memorandum*").  Commerce explained that its "decision to use 365 days as the number of days on which Ternium's Bancomext loans accrued is supported by the record evidence that Ternium supplied to Commerce." *Id.* at 4.

25.    Doing so, Commerce misunderstood how the Bancomext Factoring Program works and disregarded the record information provided by Ternium showing that the maximum payment period under the Bancomext Factoring Program was 180 days – instead of 365 days.  Notably, although Commerce relied on the documentation provided by Ternium for the Bancomext Sample Transaction (*i.e.*, Ex. Supp2. 12 (page 4)) to support its calculation of the interest payment amount in the *Ministerial Error Memorandum*, it did not rely on the correct interest rate or the correct payment term of the Bancomext Sample Transaction, which were both reflected on the same page

of the source documents provided by Ternium.  *See id.* at 4; *see also 2ⁿᵈ Supp. QR* at Ex. Supp2.

12 at 2, 4.

*Post-Preliminary Determination* Questionnaires and
Clarifying Information on the Factoring Programs

26.     Despite Ternium's ministerial error allegation demonstrating Commerce's

misunderstanding of the issue regarding the Bancomext Factoring Program, Commerce did not

ask questions about this program in any of the **five** questionnaires issued after the *Preliminary*

*Determination*.  *See* Letter from Stephen Bailey, Program Manager, AD/CVD Operations, Office

IV, Enforcement and Compliance, to Ternium Mexico, S.A. de C.V.; re: *Countervailing Duty*

*Investigation of Corrosion Resistant Steel Products from Mexico: Supplemental Questionnaire for*

*Ternium Mexico, S.A. de C.V.* (June 25, 2025) ("*June 25 SQ*"); *see also* Letter from Stephen Bailey,

Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance; to Ternium

Mexico, S.A. de C.V.; re: *Countervailing Duty Investigation of Corrosion Resistant Steel Products*

*from Mexico: Supplemental Questionnaire for Ternium Mexico, S.A. de C.V.* (June 24, 2025)

("*June 24 SQ*"); Letter from Stephen Bailey, Program Manager, AD/CVD Operations, Office IV,

Enforcement and Compliance; to Ternium Mexico, S.A. de C.V.; re: *Countervailing Duty*

*Investigation of Corrosion Resistant Steel Products from Mexico: New Subsidy Allegation*

*Supplemental Questionnaire* (June 5, 2025) ("*June 5 SQ*"); Memorandum to The File; from Maria

Theresa Aymerich, International Trade Compliance Analyst, AD/CVD Operations, Office IV; re:

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico:*

*Request for New Subsidy Allegation Benchmarks* (May 27, 2025) ("*May 27 Benchmarks Memo*");

Letter from Stephen Bailey, Program Manager, AD/CVD Operations, Office IV, Enforcement and

Compliance; to Ternium Mexico, S.A. de C.V.; re: *Countervailing Duty Investigation of Corrosion*

10

*Resistant Steel Products from Mexico: New Subsidy Allegation Questionnaire* (Apr. 24, 2025) ("*April 24 SQ*").

27.    Likewise, Commerce did not ask Ternium for additional information about the NAFIN Factoring Program in any of the five questionnaires issued after the *Preliminary Determination* despite Commerce's stated intention to "continue to examine" the program.  *PDM* at 4; *see also June 25 SQ*; *June 24 SQ*; *June 5 SQ*; *May 27 Benchmarks Memo*; *April 24 SQ*.

28.    Counsel for Ternium contacted Commerce officials repeatedly asking for guidance on how to provide clarifying information ahead of the on-site verification so that Commerce could verify the information and accurately calculate any benefit from the Factoring Programs in the final determination.  *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Case Brief* (Aug. 8, 2025) ("*Ternium Original Case Brief*") at Attachment 1 ("*Aff. of Luca Bertazzo*").  Commerce provided no guidance on how to provide clarifying information about the Factoring Programs.

29.    On June 16, 2025, Ternium submitted clarifying information regarding the Bancomext Factoring Program in response to a supplemental questionnaire related to other issues.  *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to New Subsidy Allegation Supplemental Questionnaire* (June 16, 2025) at 5, Ex. Supp. NSA-3 ("*NSA Supp. QR*").  Specifically, Ternium provided an amended loan template for the Bancomext Factoring Program, which included (1) the specific number of days in which each "loan" was outstanding, and (2) the specific interest rate applicable to each invoice.  *See id* at Ex. Supp. NSA-3.  Moreover, the *NSA Supp. QR* included an introductory paragraph explaining the clarifying information that Ternium was providing and why it was doing so.

30.    Likewise, on July 1, 2025, Ternium submitted explanatory information regarding the NAFIN Factoring Program in a supplemental questionnaire related to other issues.  *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico:  Response to the Supplemental Questionnaire* (July 1, 2025) at 5-7, Ex. Supp3-2 ("*3rd Supp. QR*").  As in the case of the clarifying information regarding the Bancomext Factoring Program, Ternium provided an amended loan template for the NAFIN Factoring Program, which included (1) the specific number of days in which each "loan" was outstanding, and (2) the specific interest rate applicable to each invoice.  *Id.* at Ex. Supp3-2.  As in the case with the *NSA Supp. QR*, the *3rd Supp. QR* included an introductory paragraph explaining the clarifying information that Ternium was providing and why it was doing so.

31.    Commerce did not ask any follow-up questions about the explanatory information provided by Ternium on the Factoring Programs.

<u>Commerce's Rejection of the Clarifying Information on the Bancomext Factoring Program</u>
<u>**During** Verification</u>

32.    The clarifying information on the Bancomext Factoring Program provided in the *NSA Supp. QR* on June 16, 2025, remained on the record for almost a month.  On the afternoon of July 10, 2025, **after** the initiation of the on-site verification and **after** Ternium had presented its minor corrections at the beginning of verification, Commerce issued a letter stating that it was rejecting the clarifying information regarding the Bancomext Factoring Program as it was "new factual information" ("NFI") that "was not requested by Commerce."  Memorandum from Maria Theresa Aymerich, International Trade Compliance Analyst, AD/CVD Operations, Office IV; to Ternium Mexico, S.A. de C.V.; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Rejection of Ternium Mexico, S.A. de C.V. Submission* (July 18, 2025) ("*Bancomext Rejection Memo*").  Under Commerce's direction, Ternium resubmitted its *NSA*

*Supp. QR* without the clarifying information on the Bancomext Factoring Program. *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Redacted Version of Response to New Subsidy Allegation Supplemental Response* (July 16, 2025).

<u>Commerce's Refusal to Verify the Factoring Programs</u>

33.    As soon as it became aware of Commerce's decision to reject the clarifying information regarding the Bancomext Factoring Program, counsel for Ternium contacted Commerce officials, who indicated that Ternium would be given an opportunity to present information on the Bancomext Factoring Program (as well as the NAFIN Factoring Program) as a minor correction. *See Ternium Original Case Brief* at *Aff. of Luca Bertazzo*. This discussion was later memorialized in an *ex parte* memorandum issued by Commerce on July 30, 2025. *See* Memorandum to The File, re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Telephone Discussion with Counsel to Ternium Mexico, S.A. de C.V.* (July 30, 2025).

34.    Despite Commerce's commitment and Ternium's several attempts to provide information on the Bancomext Factoring Program (as well as the NAFIN Factoring Program) as a minor correction on the second (and last) day of verification, Commerce indicated that it would not review or accept any minor corrections related to the Bancomext Factoring Program (or the NAFIN Factoring Program).

35.    Furthermore, the amended loan template for the NAFIN Factoring Program provided in the *3rd Supp. QR* on July 1, 2025, remained on the administrative record during the whole verification. It was rejected only after the filing of Ternium's case brief, which was submitted on August 8, 2025 – almost a month after the verification. *See also* para. 41 below. Thus, Ternium should not have been required to present "minor corrections" regarding the NAFIN Factoring Program. Nevertheless, Commerce did not verify any information related to the NAFIN Factoring Program

at Ternium's verification, nor did Commerce give Ternium the chance to present any minor corrections related to the NAFIN Factoring Program at verification. *See Ternium Original Case Brief* at *Aff. of Luca Bertazzo*.

Verification Report

36.    In the verification report, Commerce stated that Ternium "submitted four corrections to their questionnaire responses that resulted from verification preparation" and that "Commerce accepted two and rejected two of the corrections presented." Memorandum to Eric Greynolds, Director, Office IV; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Verification of the Questionnaire Responses of the Ternium Mexico, S.A. DE C.V.* (July 24, 2025) at 2 ("*Verification Report*"). The *Verification Report* explains that Commerce rejected two minor corrections related to the Factoring Programs because "the proposed revisions included changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate." *Id.* The *Verification Report* further explains that "{g}iven the broad scope of the revisions," Commerce "rejected the proposed corrections" and did not verify the Factoring Programs. *Id.*

37.    This is not an accurate description. After notifying Ternium of its decision to remove the clarifying information regarding the Bancomext Factoring Program from the record ***during*** verification, Commerce refused to review or accept any minor correction related to either Factoring Program at verification and decided not to verify any information regarding either Factoring Program. Indeed, Commerce refused to verify information relating to the Factoring Programs that remained on the record throughout verification, such as the clarifying information on the NAFIN Factoring Program that remained on the record until after the *Ternium Original Case Brief* was submitted. *See Ternium Original Case Brief* at *Aff. of Luca Bertazzo*.

14

*Post-Preliminary Determination*

38.     On July 31, 2025, Commerce issued a *Post-Preliminary Determination*, in which it preliminarily determined to apply adverse facts available ("AFA") to Ternium with regard to benefits received under NAFIN.  *See* Memorandum to Christopher Abbott, Deputy Assistant Secretary for Policy and Negotiations; from Scot Fullerton, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Post-Preliminary Analysis* (July 31, 2025) ("*Post-Preliminary Analysis*").

39.     Commerce maintained that the loan template that Ternium provided for the NAFIN Factoring Program "did not provide requested information on the number of days the loan was outstanding, which was clearly noted as a required column in the Loan Template appendix."  *Post-Preliminary Analysis* at 8.  However, the amended loan template provided by Ternium in the *3ʳᵈ Supp. QR* on July 1, 2025, was part of the administrative record at the time that Commerce issued its *Post-Preliminary Determination*.  And this template showed (1) the number of days in which the "loan" was outstanding, and (2) the interest rate charged for the NAFIN Factoring Program. *See 3ʳᵈ Supp. QR* at Ex. Supp3-2.

131346734

<u>Commerce's Rejection of the Clarifying Information on the NAFIN Factoring Program</u>
<u>*After* Ternium's Case Brief</u>

40.    On August 8, 2025, Ternium filed its affirmative case brief, in which it argued that Commerce improperly rejected the Bancomext Factoring loan template during verification and that Commerce should have permitted Ternium to provide minor corrections relating to the Factoring Programs.  In support of its case brief, Ternium submitted a sworn affidavit made by its counsel present at the on-site verification in addition to other supporting documentation, such as email communications between its counsel and Commerce officials.  *See Ternium Original Case Brief* at *Aff. of Luca Bertazzo*.

41.    On August 12, 2025, Commerce rejected Ternium's case brief because it contained NFI. *See* Letter from Stephen Bailey, Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance; to Ternium, S.A. de C.V.; re: *Countervailing Duty Investigation of Corrosion Resistant Steel Products from Mexico: Rejection of Ternium Mexico, S.A. de C.V.'s Case Brief* (Aug. 12, 2025); *see also* Memorandum to The File; from Paul V. Kebker, International Trade Compliance Analyst, AD/CVD Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (Aug. 12, 2025).   Under Commerce's instructions, Ternium submitted a redacted version of its case brief excluding the portions identified as NFI by Commerce.  *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Redacted Version of Case Brief* (Aug. 14, 2025).

42.    On the same day, Commerce also rejected Ternium's *3rd Supp. QR*, in which it provided the amended loan template regarding the NAFIN Factoring Program.  Commerce stated that it was rejecting the clarifying information because Ternium "provided unsolicited and untimely new factual information."  *See* Memorandum to The File; from Paul V. Kebker, International Trade

Compliance Analyst, AD/CVD Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Rejection of Ternium Mexico, S.A. de C.V. Submission* (Aug. 12, 2025).  Under Commerce's instructions, Ternium submitted a redacted version of its *3rd Supp. QR* excluding the portions identified as NFI by Commerce.  *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Redacted Version of July 1 Response* (Aug. 14, 2025).

<u>Mining Rights for LTAR Program</u>

43.    On April 14, 2025, Commerce initiated an investigation into the provision of Mining Rights for LTAR based on Petitioners' new subsidy allegation ("NSA") that Ternium's cross-owned affiliated mines – Las Encinas, S.A. de C.V. ("Las Encinas") and Consorcio Minero Benito Juárez Peña Colorada, S.A. de C.V. ("Peña Colorada") (collectively, "Mines") – held preferential mining concessions from the Government of Mexico ("GOM").  *See* Memorandum to Eric Greynolds, Director, Office IV, AD/CVD Operations, Office IV; re: *Countervailing Duty Investigation of Corrosion-Resistant Steel Products from Mexico: New Subsidy Allegation* (Apr. 14, 2025) at 2-6 ("*NSA Initiation Memo*"); *see also* Letter from Petitioners, to Sec'y Commerce, re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Petitioners' New Subsidy Allegations* (Jan. 2, 2025) at 2-6 ("*NSA*").  Specifically, Petitioners claimed that because of the Mexican mining laws, Ternium enjoyed a lower cost of production ("COP") and, thus, a cost advantage in the market.  *See NSA Initiation Memo*; *see also NSA* at 2-6.

44.    In response to the multiple questionnaires relating to Petitioners' NSA, Ternium submitted detailed information regarding the mining rights held by the Mines.  *See*, *e.g.*, Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to New Subsidy Allegation Questionnaire* (May 12, 2025) at Ex. NSA-40 ("*NSA Questionnaire Response*"); Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re:

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Response to Request for New Subsidy Allegation Benchmarks* (June 9, 2025) at 3-4, Ex. NSA Benchmarks-1 ("*NSA Benchmark Submission*"); Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to New Subsidy Allegation Supplemental Questionnaire* (June 16, 2025) at 2, Ex. Supp. NSA-1.

45.     At verification, Commerce successfully verified all information submitted by Ternium regarding the Mining Rights for LTAR program, including the unit production costs incurred by the Mines. *See Verification Report* at 7-8.  In the *Verification Report*, Commerce officials "noted no discrepancies" of Ternium's submitted information relating to the Mining Rights for LTAR program. *Id.* at 8.

46.     In the *Post-Preliminary Determination*, Commerce found that "Ternium Mexico's annual per-unit cost to extract iron ore from GOM mines during the POI exceeds the annual, per-unit iron ore benchmark price" and, thus, the program "did not confer a benefit upon Ternium Mexico during the POI." *Post-Preliminary Analysis* at 14.  In its benefit calculation, Commerce considered the annual weighted-average per-unit production cost at each of Ternium's Mines and compared each of the Mine's costs to a "Tier 3" benchmark separately.  *See* Memorandum to The File; from Paul Kebker, International Trade Compliance Analyst, Office IV, AD/CVD Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Post-Preliminary Determination Calculations for Ternium Mexico, S.A. de C.V.* (July 31, 2025) at Attachment I (tab "Mining Rights for LTAR") ("*Post-Preliminary Calculations*").

<u>Commerce's Rejection of Ternium's Rebuttal Brief</u>

47.     On August 8, 2025, Petitioners filed their case brief and alleged that, in the *Post-Preliminary Determination*, Commerce erred in determining that the GOM's Mining Rights for LTAR conferred no benefit to Ternium.  *See* Letter from Petitioners, to Sec'y Commerce, re:

*Certain Corrosion-Resistant Steel Products from Mexico: Petitioners' Case Brief for Issues Related to Ternium* (Aug. 8, 2025) ("*Petitioners' Case Brief*").  Specifically, Petitioners contested the calculation methodology used by Commerce to determine the benefit conferred to Ternium and argued that "Commerce unlawfully offset benefits that Ternium received from iron ore extraction in one location with so-called 'negative benefits' associated with iron ore extraction in a completely separate location."  *Petitioners' Case Brief* at 2 (bracketing omitted).  Petitioners argued that "Commerce should calculate an ad valorum subsidy rate of 0.16 percent to the mining rights for LTAR program . . . {which} represents the benefits Ternium received for iron ore mined at its Peña Colorada mine without an offset for the 'negative benefit' from iron ore extracted from its Las Encinas mine."  *Id.* at 4-5 (bracketing omitted).

48.    Ternium filed its rebuttal brief on August 15, 2025.  *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Rebuttal Brief* (Aug. 15, 2025) ("*Ternium Original Rebuttal Brief*").  Ternium presented four arguments:  (1) the fees charged by the GOM for mining rights were at par or higher than the government fees, taxes, and royalties charged in other countries; (2) even under Commerce's chosen benefit calculation based on a comparison of the COP of iron ore to a Tier 3 benchmark, the record demonstrated that Ternium did not benefit from allegedly receiving Mining Rights for LTAR; (3) should Commerce revise the benefit calculation as suggested by Petitioners, Commerce should do so by considering the weighted-average COP across both Mines, calculating one production cost for the material input (*i.e.*, iron ore) for Ternium as a whole; (4) should Commerce adjust the benefit calculation to account for the weighted-average COP across both Mines, Commerce should adjust the benefit calculation to reflect the fact that [                    ] sold [    ]% of its POI production of iron ore pellets to [

                    ].  *See generally Ternium Original Rebuttal Brief*.

49.    On August 19, 2025, Commerce rejected Ternium's rebuttal brief because it "d{id} not satisfy the requirements for a rebuttal brief in accordance with 19 C.F.R. § 351.309(d)(2), and because it was filed after the deadline for affirmative case briefs."  Letter from Stephen Bailey, Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance; to Ternium Mexico, S.A. de C.V.; re: *Countervailing Duty Investigation of Corrosion Resistant Steel Products from Mexico: Rejection of Ternium Mexico, S.A. de C.V.'s Rebuttal Brief* (Aug. 19, 2025) at 1 ("*Commerce's Rejection of Ternium Rebuttal Brief*").  Commerce specifically requested that Ternium remove the following information from its rebuttal brief: (1) any text regarding whether fees charged by the GOM were at par or higher than government fees, taxes, and royalties charged in other countries; (2) any arguments regarding which benchmark tier should be used in Commerce's benefit calculation for the Mining Rights for LTAR program; (3) any arguments regarding the revision of Commerce's benefit calculation to incorporate weighted-average production costs across both mines to measure the LTAR benefit; (4) any arguments regarding whether Commerce should also adjust the total benefit attributed to Ternium Mexico to account for the fact that [              ] sold [    ] percent of its production to [                  ]; and (5) any arguments regarding the specificity of the Mining Rights for LTAR Program.  *See Commerce's Rejection of Ternium Rebuttal Brief* at 2.  Commerce instructed Ternium to remove these portions of the *Ternium Original Rebuttal Brief* because they contained "an affirmative argument" and were "not a rebuttal to Petitioners' Case Brief."  *Id.*

50.    Ternium explained that "by removing this information and argument{s} from the record and not adjudicating these issues, the Court will have no agency decision to review, and Commerce will have to reconsider these issues again on remand."  Ternium also "contend{ed} that in the interest of administrative efficiency and fairness, Commerce should consider Ternium's argument."  Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain*

131346734

*Corrosion-Resistant Steel Products from Mexico: Redacted Version of Rebuttal Brief* (Aug. 21, 2025) at 3.  Nevertheless, Ternium fully complied with Commerce's instructions and resubmitted a redacted version of its rebuttal brief without any of the arguments indicated by Commerce.  *See id.*

<em>Final Determination</em>

51.    On August 26, 2025, Commerce issued its final affirmative determination, in which it assigned Ternium an *ad valorem* countervailable subsidy rate of 13.26%.  *See Final Determination*.

52.    Commerce assigned Ternium an AFA *ad valorem* rate of 6.55% as to each of the Factoring Programs.  Commerce explained that AFA was warranted because Ternium "did not provide the number of days outstanding as requested in the Loan Appendix, and instead tried to provide this information for all transactions under this program as 'minor' corrections at verification, including trying to provide interest rates that were different from the interest rates provided previously." *I&D Memo* at 11, 13.

53.    In addition, Commerce also assigned Ternium an *ad valorem* subsidy rate of 0.16% for the Mining Rights for LTAR program.  Commerce found that its "calculation in the Post Preliminary Analysis for the Provision of Mining Rights for LTAR program incorrectly incorporated a negative benefit calculated for the Las Encinas mine."  *Id.* at 21.  Specifically, in the *Final Determination*, Commerce "revised {its} subsidy benefit calculation by not offsetting the positive benefit of the Peña Colorada mine with the negative benefit of the Las Encinas mine."  *Id.*

<strong>STATEMENT OF CLAIMS</strong>

**I.    Bancomext Factoring Program**

**COUNT 1: COMMERCE ABUSED ITS DISCRETION BY REJECTING RECORD INFORMATION REGARDING THE BANCOMEXT FACTORING PROGRAM AND DENYING TERNIUM THE OPPORTUNITY TO PRESENT CLARIFYING**

21

INFORMATION AND "MINOR CORRECTIONS."

54.     Paragraphs 8 through 42 and 51 through 53 are incorporated by reference.

55.     Commerce "abuse{s} its discretion in refusing to accept updated data when there {i}s plenty of time for Commerce to verify or consider it." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) ("*Papierfabrik August Koehler*") (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995) ("*NTN Bearing*"); *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("*Timken U.S.*")).   Furthermore, "failure by Commerce to accept corrective information from respondents may be an abuse of discretion because Commerce's duty is to determine . . . margins accurately." *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1335 (Ct. Int'l Trade 2020) ("*Zhejiang Mach. Imp. & Exp.*") (citing *NTN Bearing*, 74 F.3d at 1207-08 and *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1189 (Fed. Cir. 1990) ("*Rhone Poulenc*")).

56.     Here, although Ternium fully cooperated throughout the investigation, Commerce did not give Ternium the opportunity to clarify the record and explain the correct calculation for the Bancomext Factoring Program, even after Ternium submitted ministerial error claims on the same issue and repeatedly contacted Commerce officials asking for guidance on how to provide clarifying information ahead of the on-site verification.   Commerce rejected record information regarding the Bancomext Factoring Program, which had been on the record for almost a month, after the initiation of a two-day verification and after Ternium had presented its minor corrections at the beginning of verification.   Contrary to statements in the *Verification Report*, Commerce did not give Ternium the opportunity to present and explain any minor revisions related to this program.   In addition, Commerce did not verify any information related to the Bancomext Factoring Program at Ternium even though this information had been properly submitted and remained on the record.

57.    Therefore, Commerce abused its discretion by (1) denying Ternium the opportunity to present clarifying information about this program when Commerce had ample time to consider and verify it, (2) rejecting previously submitted information on the Bancomext Factoring Program *after* the start of verification, (3) refusing Ternium an opportunity to present and explain clarifying information regarding this program at verification, and (4) refusing to verify any information related to the Bancomext Factoring Program.  Commerce's abuse of discretion prevents its final determination from being supported by substantial evidence and in accordance with law.

**COUNT 2:  COMMERCE DEPRIVED TERNIUM THE OPPORTUNITY TO PRESENT INFORMATION REGARDING THE BANCOMEXT FACTORING PROGRAM AS A "MINOR CORRECTION" AT VERIFICATION.    IN ADDITION, COMMERCE'S DETERMINATION THAT SUCH INFORMATION WAS NOT MINOR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW.**

58.    Paragraphs 8 through 42 and 51 through 53 are incorporated by reference.

59.    If the Court finds that Commerce properly deprived Ternium of the opportunity to provide clarifying information regarding the Bancomext Factoring Program and properly required Ternium to remove the information from the record, then, in the alternative, Commerce's refusal to review and accept the minor, clarifying revisions to the information regarding the Bancomext Factoring Program as "minor corrections" is an abuse of discretion and is unsupported by the record and not in accordance with law.

60.    In evaluating whether a correction is "minor," Commerce evaluates whether "the correction is clerical or methodological."  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) ("*Goodluck India*").  If an error is not methodological in nature, Commerce considers four factors – specifically, whether (1) it is able to verify the error and is satisfied with the documentary support for the correction; (2) the error calls into question the overall integrity of the respondent's submissions; (3) the correction amounts to a substantial revision of previously

reported data; and (4) the nature of the errors and their effect on the validity of the submission. *See Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1261 (Ct. Int'l Trade 2003) (citing *Certain Fresh Cut Flowers from Colombia; Final Results of Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 42,833 (Dep't Commerce Aug. 19, 1996)) ("*Maui Pineapple*"); *see also Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 35,272 (Dep't Commerce July 2, 2021), accompanying Issues and Decision Memorandum at Comment 1 (citing *Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 59,217 (Dep't Commerce Sept. 27, 2010), accompanying Issues and Decision Memorandum at Comment 10)). In assessing whether a correction is "minor" and should be accepted at verification, Commerce considers clerical errors where doing so "would neither have required beginning anew nor have delayed making the final determination." *NTN Bearing*, 74 F.3d at 1208.

61. Here, the revisions to the Bancomext Factoring Program that Ternium would have presented at verification, if given the chance, were "minor" in nature under Commerce's criteria and clarified information that Ternium already provided. Yet Commerce officials did not permit Ternium to present the Bancomext Factoring information at verification and, therefore, had no basis on which to determine that the information was not "minor."

62. Because the changes that Ternium would have presented would not have fundamentally changed either the scope of the universe of the factoring operations or the total financial cost incurred by Ternium during the POI, Commerce's decision not to permit Ternium to present information on the Bancomext Factoring Program, and not to review and accept the information as a minor correction at verification, is unsupported by substantial evidence and not in accordance with law.

131346734

**COUNT 3: COMMERCE'S FINDING THAT TERNIUM WAS UNCOOPERATIVE WITH RESPECT TO THE BANCOMEXT FACTORING PROGRAM IS NOT SUPPORTED BY THE RECORD. THUS, COMMERCE'S USE OF AFA AS TO THE BANCOMEXT FACTORING PROGRAM IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW.**

63.     Paragraphs 8 through 42, 51 through 53, and 55 through 57 (*i.e.*, Count 1) are incorporated by reference.

64.     A respondent is uncooperative when it chooses not to participate in the proceeding or is unresponsive to Commerce's requests for information. *See e.g., Ansaldo Componenti, S.p.A. v. United States,* 10 C.I.T. 28, 36-37 (U.S. 1986) ("*Ansaldo Componenti*"); *BMW of N. Am. LLC v. United States*, 437 F. Supp. 3d 1336, 1344-45 (Ct. Int'l Trade 2020) ("*BMW of N. Am.*"). Similarly, "{a} party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("*Nippon Steel*").

65.     Ternium actively participated in the CVD investigation; submitted all information requested by Commerce; brought the issue regarding the incorrect calculation for the Bancomext Factoring Program to Commerce's attention in its *Ministerial Error Allegation*; asked repeatedly for Commerce's guidance; and provided clarifying information almost a month before the start of verification, calling attention to what it was doing and why it was doing so. Thus, Commerce's finding that Ternium did not act to the best of its ability with respect to the Bancomext Factoring Program is not supported by the record.

66.     If the Court finds that Commerce properly found that Ternium was uncooperative regarding the Bancomext Factoring Program, then, in the alternative, Commerce's use of AFA is unsupported by the record and not in accordance with law.

67.     FA may be applied only with respect to information that is missing from the record, because the respondent "withholds" it, "significantly impedes" the proceeding, or provides information

that "cannot be verified{.}"  *See* 19 U.S.C. § 1677e(a).  An adverse inference in choosing FA (*i.e.*, applying AFA) may be used only if the respondent "failed to cooperate by not acting to the best of its ability to comply with" Commerce's requests for information.  19 U.S.C. § 1677e(b)(1).  In particular, the standard for determining whether an adverse inference is warranted "does not require perfection and recognizes that mistakes sometimes occur . . . ."  *Nippon Steel*, 337 F.3d at 1382.

68.    In addition, Commerce's choice of AFA may not result in "punitive, aberrational, or uncorroborated margins" because "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate{.}"  *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("*F.Lii de Cecco*").  An AFA rate selected by Commerce "must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'"  *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021) ("*Diamond Sawblades*") (quoting *F.Lii de Cecco*, 216 F.3d at 1032).  Indeed, it is impermissible to use information that is aberrational "based on the nature of the transaction or product involved."  *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1356 (Ct. Int'l Trade 2018) ("*Hyundai Steel*"); *see also Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) ("*Gallant Ocean*") ("This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter . . . future non-compliance.").

69.    Here, Commerce verified information provided by officials of the GOM that the maximum number of days allowable for payment by a buyer on factoring invoices is 180 days.  *See* Memorandum to The File; from Suresh Maniam, Senior International Trade Compliance Analyst, Office I, AD/CVD Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Verification of the Questionnaire Responses of the*

*Government of Mexico* (July 24, 2025) at 4 ("*GOM Verification Report*").  By using 180 days as the maximum discounting term, the countervailable subsidy rate for the Bancomext Factoring Program would have been below *de minimis*.  *See Ministerial Error Allegation* at Attachment 1; *see also Ternium Original Case Brief* at Attachment 2.  The 6.55% subsidy rate selected by Commerce for the Bancomext Factoring Program is unsupported by substantial evidence and not in accordance with law because it is not a "reasonably accurate estimate" of the actual subsidy rate for this program, even with "some built-in increase intended as a deterrent to non-compliance." *Diamond Sawblades*, 986 F.3d at 1367.

70.     Therefore, Commerce's decision to impose a 6.55% rate where the actual subsidy rate (even using FA) is *de minimis* would be not in accordance with 19 U.S.C. § 1677e(b) because the rate selected by Commerce is aberrational and punitive.  *See F.Lii de Cecco,* 216 F.3d at 1032.

## II.     NAFIN Factoring Program

**COUNT 4:   COMMERCE ABUSED ITS DISCRETION BY REJECTING RECORD INFORMATION REGARDING THE NAFIN FACTORING PROGRAM AND DENYING TERNIUM THE OPPORTUNITY TO PRESENT CLARIFYING INFORMATION AND "MINOR CORRECTIONS."**

71.     Paragraphs 8 through 42 and 51 through 53 are incorporated by reference.

72.     Commerce "abuse{s} its discretion in refusing to accept updated data when there {i}s plenty of time for Commerce to verify or consider it." *Papierfabrik August Koehler*, 843 F.3d at 1384 (citing *NTN Bearing*, 74 F.3d at 1207-08; *Timken U.S.*, 434 F.3d at 1353).  Furthermore, "failure by Commerce to accept corrective information from respondents may be an abuse of discretion because Commerce's duty is to determine … margins accurately." *Zhejiang Mach. Imp. & Exp.*, 471 F. Supp. 3d at 1335 (citing *NTN Bearing*, 74 F.3d at 1207-08 and *Rhone Poulenc*, 899 F.2d at 1189).

73.     Here, although Ternium fully cooperated throughout the investigation, Commerce did not

131346734

give Ternium the opportunity to supplement the record and explain the correct calculation for the NAFIN Factoring Program, even after Ternium repeatedly contacted Commerce officials asking for guidance on how to provide clarifying information ahead of the on-site verification. Commerce rejected record information regarding the NAFIN Factoring Program, which remained on the record for more than a month, after Commerce officials completed the on-site verification and after Ternium had submitted its case brief. Contrary to statements in the *Verification Report*, Commerce did not give Ternium the opportunity to present and explain any minor revisions related to this program. In addition, Commerce did not verify any information related to the NAFIN Factoring Program even though this information had been properly submitted and ***was on the record during verification and at the time Ternium submitted its case brief***.

74.    Therefore, Commerce abused its discretion by (1) denying Ternium the opportunity to present clarifying information about this program when Commerce had ample time to consider and verify it, (2) refusing Ternium an opportunity to present and explain clarifying information regarding this program at verification, (3) refusing to verify any information related to the NAFIN Factoring Program that was still on the record at the time of verification, and (4) rejecting previously submitted information on the NAFIN Factoring Program after both verification and the submission of Ternium's case brief. Commerce's abuse of discretion prevents its final determination from being supported by substantial evidence and in accordance with law.

**COUNT 5:  COMMERCE DEPRIVED TERNIUM THE OPPORTUNITY TO PRESENT INFORMATION REGARDING THE NAFIN FACTORING PROGRAM AS A "MINOR CORRECTION" AT VERIFICATION.  IN ADDITION, COMMERCE'S DETERMINATION THAT SUCH INFORMATION WAS NOT MINOR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW.**

75.    Paragraphs 8 through 42 and 51 through 53 are incorporated by reference.

76.    If the Court finds that Commerce properly deprived Ternium of the opportunity to provide

clarifying information regarding the NAFIN Factoring Program and properly required Ternium to remove the information from the record, then, in the alternative, Commerce's refusal to review and accept the minor, clarifying revisions to the information regarding the NAFIN Factoring Program as "minor corrections" is an abuse of discretion and is unsupported by the record and not in accordance with law.

77.     In evaluating whether a correction is "minor," Commerce evaluates whether "the correction is clerical or methodological." *Goodluck India*, 11 F.4th at 1343.  If an error is not methodological in nature, Commerce considers four factors – specifically, whether (1) it is able to verify the error and is satisfied with the documentary support for the correction; (2) the error calls into question the overall integrity of the respondent's submissions; (3) the correction amounts to a substantial revision of previously reported data; and (4) the nature of the errors and their effect on the validity of the submission. *See Maui Pineapple*, 264 F. Supp. 2d at 1261 (citing *Certain Fresh Cut Flowers from Colombia; Final Results of Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 42,833 (Dep't Commerce Aug. 19, 1996)); *see also Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 35,272 (Dep't Commerce July 2, 2021), accompanying Issues and Decision Memorandum at Comment 1 (citing *Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 59,217 (Dep't Commerce Sept. 27, 2010), accompanying Issues and Decision Memorandum at Comment 10)).  In assessing whether a correction is "minor" and should be accepted at verification, Commerce considers clerical errors discovered at any point prior to the final determination where doing so "would neither have required beginning anew nor have delayed making the final determination." *NTN Bearing*, 74 F.3d at 1208.

78.     Here, at verification, Ternium should not have been required to present "minor corrections" regarding the NAFIN Factoring Program because the clarifying information regarding this program was already on the record throughout verification (and remained ***until after Ternium submitted its case brief***).   Nevertheless, the revisions for the NAFIN Factoring Program that Ternium would have presented, if given the chance, were "minor" in nature under Commerce's criteria and clarified information that Ternium already provided.  Yet Commerce officials did not permit Ternium to present the NAFIN Factoring information at verification and, therefore, had no basis on which to determine that the information was not "minor."

79.     Because the changes that Ternium would have presented would not have fundamentally change either the scope of the universe of the factoring operations or the total financial cost incurred by Ternium during the POI, Commerce's decision not to permit Ternium to present clarifying information on the NAFIN Factoring Program, and not to review and accept the information as a minor correction at verification, is unsupported by substantial evidence and not in accordance with law.

**COUNT 6:   COMMERCE'S FINDING THAT TERNIUM WAS UNCOOPERATIVE WITH RESPECT TO THE NAFIN FACTORING PROGRAM IS NOT SUPPORTED BY THE RECORD.  THUS, COMMERCE'S USE OF AFA AS THE NAFIN FACTORING PROGRAM IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW.**

80.     Paragraphs 8 through 42, 51 through 53, and 72 through 74 (*i.e.*, Count 4) are incorporated by reference.

81.     A respondent is uncooperative when it chooses not to participate in the proceeding or is unresponsive to Commerce's requests for information.  *See e.g., Ansaldo Componenti*, 10 C.I.T. at 36-37; *BMW of N. Am.*, 437 F. Supp. 3d at 1344-45.  Similarly, "{a} party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information." *Nippon Steel*, 337 F.3d at 1381.

131346734

82.     Ternium actively participated in the CVD investigation; submitted all information requested by Commerce; asked repeatedly for Commerce's guidance; and provided clarifying information almost a month before the start of verification, calling attention to what it was doing and why it was doing so.  Thus, Commerce's finding that Ternium did not act to the best of its ability with respect to the NAFIN Factoring Program is not supported by the record.

83.     If the Court finds that Commerce properly found that Ternium was uncooperative regarding the NAFIN Factoring Program, then, in the alternative, Commerce's use of AFA is unsupported by the record and not in accordance with law.

84.     FA may be applied only with respect to information that is missing from the record, because the respondent "withholds" it, "significantly impedes" the proceeding, or provides information that "cannot be verified{.}"  *See* 19 U.S.C. § 1677e(a).  An adverse inference in choosing FA (*i.e.*, applying AFA) may be used only if the respondent "failed to cooperate by not acting to the best of its ability to comply with" Commerce's requests for information.  19 U.S.C. § 1677e(b)(1).  In particular, the standard for determining whether an adverse inference is warranted "does not require perfection and recognizes that mistakes sometimes occur . . . ."  *Nippon Steel*, 337 F.3d at 1382.

85.     In addition, Commerce's choice of AFA may not result in "punitive, aberrational, or uncorroborated margins" because "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate{.}"  *F.Lii de Cecco*, 216 F.3d at 1032.  An AFA rate selected by Commerce "must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'"  *Diamond Sawblades*, 986 F.3d at 1367 (quoting *F.Lii de Cecco*, 216 F.3d at 1032).  Indeed, it is impermissible to use information that is aberrational "based on the nature of the transaction or product involved."  *See Hyundai Steel*, 319 F. Supp. 3d at 1356; *see also Gallant Ocean*, 602 F.3d at 1324 ("This court also

perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter . . . future non-compliance.").

86.    Here, record information provided by Ternium regarding the NAFIN Factoring Program, which remained part of the administrative record during verification and until after Ternium filed its case brief, demonstrated that the maximum number of days allowable for payment on a NAFIN factoring invoice is 180 days.  Commerce also verified information provided by GOM officials confirming that the typical maximum number of days allowable for payment on factoring invoices is 180 days.  *See GOM Verification Report* at 4.  By using 180 days as the maximum discounting term, the countervailable subsidy rate for the NAFIN Factoring Program would have been below *de minimis*.  *See Ternium's Original Case Brief* at Attachment 2.  The 6.55% subsidy rate selected by Commerce for the NAFIN Factoring Program is therefore unsupported by substantial evidence and not in accordance because it is not a "reasonably accurate estimate" of the actual subsidy rate for this program, even with "some built-in increase intended as a deterrent to non-compliance." *Diamond Sawblades*, 986 F.3d at 1367.

87.    Therefore, Commerce's decision to impose a 6.55% rate where the actual subsidy rate (even using FA) would be *de minimis* is not in accordance with 19 U.S.C. § 1677e(b) because the rate selected by Commerce is aberrational and punitive.  *See F.Lii de Cecco,* 216 F.3d at 1032.

### III.    <u>Mining Rights for LTAR</u>

**COUNT 7:  COMMERCE ABUSED ITS DISCRETION BY REJECTING TERNIUM'S REBUTTAL BRIEF.**

88.    Paragraphs 43 through 53 are incorporated by reference.

89.    Commerce abused its discretion by rejecting Ternium's rebuttal brief because it deprived Ternium of any forum to present arguments regarding the benefit calculation for the mining rights for LTAR program.   "Generally, the 'prescribed remedy' for a party in disagreement with

Commerce's {determination} is to file a case brief, and that case brief must present *all* arguments that *continue* in the submitter's view to be relevant to Commerce's final determination or final results." *NTSF Seafoods Joint Stock Co. v. United States*, Nos. 20-00104, 20-00105, (Ct. Int'l Trade Apr. 25, 2022) (emphasis in original) (quoting *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1350 (Ct. Int'l Trade 2010)).  However, "{t}he administrative forum in this case proved unavailable because . . . {respondent} had no reason to suspect that the argument would be relevant until after the regulatory case brief deadline that Commerce imposed." *See Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1375 (Ct. Int'l Trade 2024) ("*Neimenggu Fufeng Biotechnologies*").  Thus, instances where a "party ha{s} no opportunity to raise {an} issue before the agency," including where "the agency change{s} its position . . . after the party's case brief {has} been filed," warrants the excusal of the non-exhaustion of administrative remedies. *Neimenggu Fufeng Biotechnologies*, 741 F. Supp. 3d at 1372.

90.    Even "a strict view" of the exhaustion provision cannot compel an outcome that would deprive a party of "a full and fair opportunity to raise {an} issue." *Qingdao Taifa Group Co. v. United States*, 33 C.I.T. 1090, 1093 (2009) ("*Qingdao Taifa Group*").  "This is instead a case where legitimate, prudential concerns warrant both waiver of {respondent}'s failure to exhaust its administrative remedies and a remand to Commerce for further consideration of the issue." *Neimenggu Fufeng Biotechnologies*, 741 F. Supp. 3d at 1376 (citing *ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019)) (internal citations omitted).

91.    Here, Commerce's rejection of Ternium's rebuttal brief  deprived Ternium of the opportunity to raise any rebuttal arguments relating to the benefit calculation of the mining rights for LTAR program at the administrative level.  *See Qingdao Taifa Group*, 33 C.I.T. at 1093. Ternium had no reason to present in its case brief, or at any earlier point in the investigation, the arguments raised in the *Ternium Original Rebuttal Brief* and rejected by Commerce, because

neither Commerce's *Preliminary Determination*, nor its *Post-Preliminary Determination*, provided notice to Ternium that such arguments would be relevant until after the case brief deadline. *See Neimenggu Fufeng Biotechnologies*, 741 F. Supp. 3d at 1375. Commerce's rejection of Ternium's rebuttal brief is therefore an abuse of discretion because Ternium had no opportunity to exhaust its administrative remedies prior to the filing of its rebuttal brief.

**COUNT 8: COMMERCE'S REJECTION OF TERNIUM'S REBUTTAL BRIEF WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW BECAUSE TERNIUM'S REBUTTAL BRIEF RESPONDED DIRECTLY TO ARGUMENTS MADE IN PETITIONERS' CASE BRIEF.**

92.    Paragraphs 43 through 53 are incorporated by reference.

93.    Commerce's rejection of the *Ternium Original Rebuttal Brief* is unsupported by substantial evidence and contrary to law because the arguments that Commerce directed Ternium to remove from the rebuttal brief responded directly to *Petitioners' Case Brief*. "Any interested party or U.S. Government agency may submit a 'rebuttal brief'," which "may respond only to arguments raised in case briefs, should identify the arguments raised in case briefs, and should identify the arguments to which it is responding." 19 C.F.R. § 351.309(d)(1), (2).

94.    Ternium's rebuttal brief included arguments in direct response to Petitioners' allegation that Commerce improperly offset the benefits received by Ternium at its Pena Colorada mine with the "negative benefit" attributable to the Las Encinas mine. *See Petitioners' Case Brief* at 4-5. Ternium rebutted this allegation by claiming that (1) if Commerce revised the benefit calculation as suggested by Petitioners, Commerce should do so by considering the weighted average production cost across both Mines, calculating one production cost for iron ore; and (2) should Commerce adjust the benefit calculation to account for the weighted average production cost across both Mines, Commerce should adjust the benefit calculation to reflect the fact that [

] sold [    ]% of its POI production of iron ore pellets to [                    ]. *See*

*Ternium Original Rebuttal Brief* at 7-10.  Commerce's instruction that Ternium remove these arguments from its rebuttal brief directly disregarded the requirements of 19 C.F.R. § 351.309(d)(2).  Moreover, Commerce cited no relevant evidence that a "reasonable mind might accept as adequate" to support the conclusion that Ternium's rebuttal brief included affirmative arguments that did not rebut the arguments included *Petitioners' Case Brief.  See Micron Tech.*, 117 F.3d at 1393; *see also PAM*, 582 F.3d at 1339.  Commerce's rejection of Ternium's rebuttal brief is therefore unsupported by substantial evidence and not in accordance with law.

## PRAYER FOR RELIEF AND JUDGMENT

WHEREFORE, Plaintiff respectfully requests that the Court:

(A)    Enter judgment in favor of Plaintiff;

(B)    Hold and declare that Commerce abused its discretion in its affirmative CVD determination;

(C)    Hold and declare that Commerce's affirmative CVD determination is unsupported by substantial evidence and otherwise not in accordance with law;

(D)    Remand this matter to Commerce with instructions to issue a revised final CVD determination in conformity with the Court's decision; and

(E)    Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,


/s/ Luca Bertazzo
Gregory J. Spak
Luca Bertazzo
C. Alex Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600


Date: November 26, 2025

## NOTICE TO INTERESTED PARTIES
### TERNIUM MEXICO, S.A. DE C.V. v. UNITED STATES
### CIT Court No. 25-00236

     I, Luca Bertazzo of the law firm White & Case LLP, hereby certify that on November 26, 2025, pursuant to CIT Rule 3(f), I notified all interested parties who were a party to the proceeding below, by mailing copies of the public version of the foregoing Complaint by certified mail, return receipt requested:

Stephanie M. Bell, Esq.
Representative of Nucor Corporation
Wiley Rein LLP
2050 M Street, NW
Washington, DC  20036

Thomas M. Beline, Esq.
Representative of United States Steel Corporation and Wheeling-Nippon Steel, Inc.
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW
Suite 300
Washington, DC  20037

Roger B. Schagrin, Esq.
Representative of Steel Dynamics, Inc., United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy,
Allied Industrial and ServiceWorkers International Union, AFL-CIO, CLC
Schagrin Associates
900 7th Street, NW
Suite 500
Washington, DC  20001

Stephen P. Vaughn, Esq.
Representative of Cleveland-Cliffs Inc.
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006-4706

Jeffrey M. Winton, Esq.
Representative of Galvasid S.A. de C.V
Winton & Chapman PLLC
1100 13th Street NW
Suite 825
Washington, DC  20005

131346734

Aristeo López
Embassy of Mexico
1911 Pennsylvania Avenue, NW
Washington, DC  20006

Antonino Bertoni
Government of Mexico
Ministry of Economy of Mexico
Pachuca 189, Col. Condesa, C.P. 06140, Cuauhtemoc, CDMX

John Anwesen
Representative of Kemper AIP Metals, LLC, Waelzholz Brasmetal Laminação LTDA Lighthill
PC
300 New Jersey Avenue, NW
Suite 300
Washington, D.C.  20001


                                        /s/ Luca Bertazzo
                                        Luca Bertazzo

**CERTIFICATE OF SERVICE**

I, Luca Bertazzo of the law firm White & Case LLP, hereby certify that on November 26, 2025, copies of the public version of the foregoing Complaint were delivered to the following parties by certified mail, return receipt requested:

**UPON THE UNITED STATES:**
Attorney-in-Charge
International Trade Field Office
U.S. Department of Justice
Commercial Litigation Branch
National Courts Section
Room 346
26 Federal Plaza
New York, NY 10278

Jeanne Davidson
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

**UPON THE DEPARTMENT OF COMMERCE:**
Kelly R. Welsh
General Counsel
U.S. Department of Commerce
Mail Stop 5875 HCHB
14th and Constitution Avenue, NW
Washington DC 20230

John D. McInerney
Chief Counsel
Office of the Chief Counsel for Trade Enforcement and Compliance
International Trade Administration
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230

＿＿＿＿＿＿/s/ Luca Bertazzo＿＿＿＿＿＿
Luca Bertazzo

131346734