**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON**

| |
|---|
| TERNIUM MEXICO, S.A. DE C.V., |
| |
| Plaintiff, |
| |
| v. |
| |
| UNITED STATES, |
| |
| Defendant, |
| |
| and |
| |
| UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC. |
| |
| Defendant-Intervenors. |

Court No. 25-00236

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("Court"),

Plaintiff Ternium Mexico, S.A. de C.V. ("Ternium" or "Plaintiff") hereby moves for judgment on

the agency record with respect to its complaint challenging the final determination issued by the

International Trade Administration of the U.S. Department of Commerce ("Commerce") in the

countervailing duty ("CVD") investigation of certain corrosion-resistant steel products ("CORE")

from Mexico (C-201-864).  The period of investigation ("POI") was January 1, 2023, through

December 31, 2023.  Notice of Commerce's final affirmative CVD determination was published

in the *Federal Register* on August 29, 2025.  *See Certain Corrosion-Resistant Steel Products from*

*Mexico*, 90 Fed. Reg. 42,229 (Dep't of Commerce Aug. 29, 2025) ("*Final Determination*"); *see*

132781997

*also* Issues and Decisions Memorandum for the Final Affirmative Determination of Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico (Dep't of Commerce Aug. 25, 2025), available at https://access.trade.gov/public/FRNoticesListLayout.aspx at Bar Code 4815870-02 (last visited on Mar. 28, 2026) ("*Final I&D Memo*").  Notice of the CVD order was published in the *Federal Register* on December 19, 2025.  *See Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam*, 90 Fed. Reg. 59,488 (Dep't of Commerce Dec. 19, 2025) ("*Order*").

As set forth in the accompanying brief in support of this motion, Plaintiff respectfully moves for the Court to hold that (1) Commerce abused its discretion in the affirmative *Final Determination*; and (2) the contested portions of the *Final Determination* are not supported by substantial evidence and are otherwise not in accordance with law.  Plaintiff respectfully requests this Court to grant judgment in its favor and to remand this action to Commerce for disposition consistent with the order and the Court's final opinion.

A proposed order is attached.

Respectfully submitted,


/s/ Gregory J. Spak

Gregory J. Spak
Luca Bertazzo
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Ternium Mexico, S.A. de C.V.*

April 6, 2026

132781997

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON**

| | |
|---|---|
| TERNIUM MEXICO, S.A. DE C.V.,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC.<br><br>    Defendant-Intervenors. | Court No. 25-00236 |

**ORDER**

Upon consideration of Plaintiff's motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, the Court, having reviewed the papers and pleadings on file herein, and after due deliberation, it is hereby:

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that this matter is remanded to the U.S. Department of Commerce for disposition consistent with the Court's final opinion.

**SO ORDERED.**

Dated: _____, 2026      _____
  New York, New York          Leo M. Gordon, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON**

| | |
|---|---|
| TERNIUM MEXICO, S.A. DE C.V.,<br><br>   Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br>and<br><br>UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC.<br><br>   Defendant-Intervenors. | Court No. 25-00236<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Bracketing of confidential information has been deleted from pages 35-36 and 38, and in Attachment 1. |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Luca Bertazzo
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

April 6, 2026

## TABLE OF CONTENTS

I.    STATEMENT PURSUANT TO USCIT R. 56.2(c)...........................................................1

      A.    Administrative Determination Sought to Be Reviewed ...........................................1

      B.    Issues of Law Presented...........................................................................................1

            1.    Did Commerce abuse its discretion by (1) removing and rejecting
                  record information regarding the Factoring Programs, and (2) denying
                  Ternium the opportunity to present clarifying information and minor
                  corrections about these programs?.............................................................1

            2.    Did Commerce comply with the requirement that its decision be
                  supported by substantial evidence and be in accordance with law when
                  it (1) denied Ternium the opportunity to present information regarding
                  the Factoring Programs as a minor correction at verification; and (2)
                  rejected such corrections as not minor?....................................................2

            3.    Was (1) Commerce's finding that Ternium was uncooperative with
                  respect to its reporting of the Factoring Programs; and (2) its use of
                  AFA as to these programs, supported by substantial evidence and
                  otherwise in accordance with law? ...........................................................1

            4.    Did Commerce abuse its discretion by removing and rejecting
                  Ternium's rebuttal brief? ..........................................................................2

            5.    Was Commerce's removal and rejection of Ternium's rebuttal brief
                  supported by substantial evidence and otherwise in accordance with
                  law?............................................................................................................2

      C.    Statement of Jurisdiction.........................................................................................2

II.   STANDARD OF REVIEW ..................................................................................................4

III.  ARGUMENTS.....................................................................................................................7

      A.    Commerce Abused Its Discretion by (1) Removing and Rejecting Record
            Information Regarding the Factoring Programs, and (2) Denying Ternium
            the Opportunity to Present Clarifying Information and Minor Corrections
            about These Programs...............................................................................................8

            1.    An agency abuses its discretion when it denies respondents the
                  opportunity to present clarifying information and minor corrections..........8

            2.    Commerce abused its discretion by removing and rejecting clarifying
                  information regarding the Factoring Programs.........................................11

3.    Commerce abused its discretion by denying Ternium the opportunity to present minor corrections about the Factoring Programs ..........................17

4.    Commerce knowingly calculated inaccurate subsidy rates for the Factoring Programs.....................................................................................19

D.    Commerce's Decision Not to Accept Minor Corrections Relating to the Factoring Programs Was Unsupported by Substantial Evidence and Not in Accordance with Law ........................................................................................20

E.    Commerce's Finding That Ternium Was Uncooperative With Respect to Its Reporting of the Factoring Programs, and Thus Its Use of AFA as to These Programs, Was Unsupported by Substantial Evidence and Not in Accordance with Law. .......................................................................................23

1.    Commerce's use of FA is limited to the specific information that is missing, and its use of an adverse inference must not be punitive and must comply with the statutory hierarchy....................................................23

2.    Commerce's had no legal basis to apply FA as to Ternium's reporting of the Factoring Programs..........................................................................26

3.    Commerce's application of AFA was unwarranted because Ternium cooperated to the best of its ability in the investigation.............................27

4.    The AFA subsidy rate selected by Commerce bears no relation to a subsidy rate as defined under the law because it is aberrational and punitive ....................................................................................................29

F.    Commerce Abused Its Discretion by Removing and Rejecting Ternium's Rebuttal Brief...................................................................................................32

G.    Commerce's Removal and Rejection of Ternium's Rebuttal Brief Was Unsupported by Substantial Evidence and Not in Accordance with Law. ............37

IV.    CONCLUSION AND RELIEF SOUGHT ....................................................................39

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ABB, Inc. v. United States*,
  920 F.3d 811 (Fed. Cir. 2019)...................................................................................................37

*Ansaldo Componenti, S.p.A. v. United States*,
  10 C.I.T. 28, 628 F. Supp. 198 (1986) .....................................................................................24

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984)..................................................................................................5

*Bioparques De Occidente, S.A. de C.V. v. United States*,
  31 F.4th 1336 (Fed. Cir. 2022) .............................................................................................3, 4

*BMW of N. Am. LLC v. United States*,
  437 F. Supp. 3d 1336 (Ct. Int'l Trade 2020) ...........................................................................24

*Canadian Solar Inc. v. United States*,
  537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .........................................................................6, 8

*Chaparral Steel Co. v. United States*,
  901 F.2d 1097 (Fed. Cir. 1990)..............................................................................................6, 8

*China Kingdom Imp. & Exp. Co. v. United States*,
  31 C.I.T. 1329, 507 F. Supp. 2d 1337 (2007)..........................................................................27

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938).....................................................................................................................4

*Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*,
  6 F.3d 1511 (Fed. Cir. 1993).......................................................................................................5

*Delverde, S.r.L. v. United States*,
  202 F.3d 1360 (Fed. Cir. 2000)....................................................................................................5

*Diamond Sawblades Manufacturers' Coalition v. United States*,
  986 F.3d 1351 (Fed. Cir. 2021)...........................................................................................25, 29

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012)..................................................................................................25

*F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
  216 F.3d 1027 (Fed. Cir. 2000)..................................................................................................25

*Fischer S.A. v. United States*,
   34 C.I. T. 334, 700 F. Supp. 2d 1364 (2010) .......................................................................9, 20

*Gallant Ocean (Thailand) Co. v. United States*,
   602 F.3d 1319 (Fed. Cir. 2010)....................................................................................25, 31, 32

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) ...............................................................................7, 10, 20, 22

*Huaiyin Foreign Trade Corp. v. United States*,
   322 F.3d 1369 (Fed. Cir. 2003)....................................................................................................5

*Huvis Corp. v. United States*,
   570 F.3d 1347 (Fed. Cir. 2009).....................................................................................................4

*Hyundai Elec. & Energy Sys. Co. v. United States*,
   15 F.4th 1078 (Fed. Cir. 2021) ..............................................................................................10, 19

*Jiaxing Brother Fastener Co. v. United States*,
   380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ...............................................................................5

*Linyi Chengen Imp. & Exp. Co. v. United States*,
   391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ...............................................................................6

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)........................................................................................................................5

*Maui Pineapple Co. v. United States*,
   264 F. Supp. 2d 1244 (Ct. Int'l Trade 2003) ...........................................................................21

*Micron Tech. v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997)...............................................................................................4, 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins Co.*,
   463 U.S. 29 (1983)......................................................................................................................5, 6

*Neimenggu Fufeng Biotechnologies Co. v. United States*,
   741 F. Supp. 3d 1354 (Ct. Int'l Trade 2024) .......................................................................36, 37

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003)...............................................................................................25, 28

*NSK Corp. v. United States*,
   33 C.I.T. 1185, 637 F. Supp. 2d 1311 (2009) ...............................................................................5

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995).............................................................................................. passim

*NTSF Seafoods Joint Stock Co. v. United States*,
    2022 Ct. Int'l Trade LEXIS 40 (2022)..................................................................36

*Oman Fasteners, LLC v. United States*,
    125 F.4th 1068 (Fed. Cir. 2025) ...............................................................25, 32

*Pakfood Pub. Co. v. United States*,
    724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ........................................................36

*PAM S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)...................................................................4, 38

*Papierfabrik August Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016)...............................................................7, 10, 19

*Qingdao Taifa Group Co. v. United States*,
    33 C.I.T. 1090, 637 F. Supp. 2d 1231 (2009).......................................................37

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990)...................................................................6, 7, 8

*Shandong Huarong Mach. Co. v. United States*,
    30 C.I.T. 1269, 435 F. Supp. 2d 1261 (2006).......................................................24

*Since Hardware (Guangzhou) Co. v. United States*,
    35 C.I.T. 1670 (2011) ...............................................................................27

*Suramerica de Aleaciones Laminadas, CA. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994)........................................................................4

*Timken U.S. Corp. v. United States*,
    434 F.3d 1345 (Fed. Cir. 2006)................................................................ passim

*Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ....................................................6, 10

*Ventura Coastal, LLC v. United States*,
    790 F. Supp. 3d 1361 (Ct. Int'l Trade 2025) .......................................................5

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013).....................................................................6

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011).....................................................................24

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
    471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) ...............................................6, 8, 19

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A)...................................................................................................6

19 U.S.C. § 1516a(a)(2)(A) ......................................................................................2, 4

19 U.S.C. § 1516a(a)(5)(A) ......................................................................................2, 4

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................4

19 U.S.C. § 1516a(b)(1)(B)(ii) ......................................................................................6

19 U.S.C. § 1516a(f)(9)(B) ............................................................................................3

19 U.S.C. § 1516a(g) .....................................................................................................3

19 U.S.C. § 1516a(g)(1)(B) .......................................................................................2, 4

19 U.S.C. § 1516a(g)(3)(A)(i) ..................................................................................2, 3, 4

19 U.S.C. § 1516a(g)(3)(B) .......................................................................................2, 3

19 U.S.C. § 1677e(a)....................................................................................................24

19 U.S.C. § 1677e(a)(l)................................................................................................23

19 U.S.C. § 1677e(a)(2)(D) .........................................................................................27

19 U.S.C. § 1677e(b)(1)...........................................................................................24, 28

19 U.S.C. § 1677e(d)(1)(A) ....................................................................................23. 26, 31

19 U.S.C. § 1677m(i)(l)................................................................................................10

19 C.F.R. § 351.302(d)(1)............................................................................................35

19 C.F.R. § 351.307 .....................................................................................................10

19 C.F.R. § 351.308(i)(2)..........................................................................................26, 31

19 C.F.R. § 351.309(d)(1)............................................................................................37

19 C.F.R. § 351.309(d)(2)......................................................................................35, 37, 38

iv

## LEGISLATIVE MATERIALS

*Uruguay Round Agreements Act*,
 H.R. Rep. No. 103-826(I),
 *reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................................................................24

## ADMINISTRATIVE DETERMINATIONS

*Aluminum Extrusions from Mexico*,
 89 Fed. Reg. 17,387 (Dep't Commerce Mar. 11, 2024),
 and accompanying Preliminary Decision Memorandum.........................................................11

*Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from
 the People's Republic of China*,
 75 Fed. Reg. 59,217 (Dep't Commerce Sep. 27, 2010),
 and accompanying Issues and Decision Memorandum...........................................................21

*Certain Corrosion-Resistant Steel Products from Mexico*,
 90 Fed. Reg. 42,229 (Dep't Commerce Aug. 29, 2025),
 and accompanying Issues & Decision Memorandum.....................................................1, 3, 26

*Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist
 Republic of Vietnam*,
 90 Fed. Reg. 59,488 (Dep't of Commerce Dec. 19, 2025) .......................................................1

*Certain Corrosion-Resistant Steel Products from Mexico*,
 90 Fed. Reg. 9,226 (Dep't of Commerce Feb. 10, 2025),
 and accompanying Preliminary Decision Memorandum................................................ passim

*Certain Cut-to-Length Carbon Steel Plate from Mexico*,
 69 Fed. Reg. 1,972 (Dep't of Commerce Jan. 13, 2004),
 and accompanying Issues and Decision Memorandum...........................................................29

*Certain Fresh Cut Flowers from Colombia*,
 61 Fed. Reg. 42,833 (Dep't Commerce Aug. 19, 1996).........................................................21

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine*,
 86 Fed. Reg. 35,272 (Dep't Commerce July 2, 2021),
 and accompanying Issues and Decision Memorandum...........................................................21

NON-CONFIDENTIAL VERSION

## I.    STATEMENT PURSUANT TO USCIT R. 56.2(c)

### A.    Administrative Determination Sought to Be Reviewed

Plaintiff Ternium Mexico, S.A. de C.V. ("Ternium" or "Plaintiff") contests the final determination issued by the International Trade Administration of the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of certain corrosion-resistant steel products ("CORE") from Mexico (C-201-864). The period of investigation ("POI") was January 1, 2023, through December 31, 2023. Notice of Commerce's final affirmative CVD determination was published in the *Federal Register* on August 29, 2025. *See Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 42,229 (Dep't of Commerce Aug. 29, 2025) ("*Final Determination*"); *see also* Issues and Decisions Memorandum for the Final Affirmative Determination of Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico (Dep't of Commerce Aug. 25, 2025), available at https://access.trade.gov/public/FRNoticesListLayout.aspx at Bar Code 4815870-02 (last visited on Mar. 28, 2026) ("*Final I&D Memo*"). The CVD order was published in the *Federal Register* on December 19, 2025. *See Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam*, 90 Fed. Reg. 59,488 (Dep't of Commerce Dec. 19, 2025) ("*Order*").

### B.    Issues of Law Presented

**1.    Did Commerce abuse its discretion by (1) removing and rejecting record information regarding the Factoring Programs, and (2) denying Ternium the opportunity to present clarifying information and minor corrections about these programs?**

Yes. Commerce's failure to accept corrective information from Ternium represented an abuse of its discretion. Commerce arbitrarily and capriciously (1) denied Ternium the opportunity to present clarifying information about the Bancomext financial factoring program ("Bancomext

1

Factoring Program") and the NAFIN financial factoring program ("NAFIN Factoring Program") (collectively, "Factoring Programs") when Commerce had ample time to consider and verify the information; (2) removed previously submitted information on the Bancomext Factoring Program after the start of a two-day verification and after Ternium had already presented its minor corrections at the beginning of verification; (3) refused Ternium an opportunity to present and explain minor corrections regarding the Factoring Programs at verification despite Commerce officials' assurance of a chance to do so; (4) refused to verify any information about the Factoring Programs at verification, even though properly submitted information on these programs was on the record; and (5) removed previously submitted information on the NAFIN Factoring Program after Ternium's case brief had been filed.

> **2.    Did Commerce comply with the requirement that its decision be supported by substantial evidence and be in accordance with law when it (1) denied Ternium the opportunity to present information regarding the Factoring Programs as a minor correction at verification; and (2) rejected such corrections as not minor?**

No.  Commerce acted arbitrarily and capriciously and abused its discretion by failing to accept corrective information from Ternium.  If the Court finds that Commerce acted properly, then Commerce's refusal to review and accept the minor corrections regarding the Factoring Programs that Ternium attempted to present at verification is unsupported by substantial evidence and not in accordance with law.  The changes that Ternium would have presented, if given the chance, (1) would not have called into question the overall integrity of Ternium's prior submissions; (2) did not amount to a substantial revision of previously reported data; (3) did not fundamentally change either the scope of the universe of the factoring operations or the total financial cost incurred by Ternium during the POI; and (4) would have been verifiable.

2

NON-CONFIDENTIAL VERSION

> **3.**    **Was (1) Commerce's finding that Ternium was uncooperative with respect to its reporting of the Factoring Programs; and (2) its use of AFA as to these programs, supported by substantial evidence and otherwise in accordance with law?**

No. *First*, Ternium actively participated in the CVD investigation and was responsive to all of Commerce's requests for information. Ternium (1) timely submitted all information requested by Commerce in the initial and *seven* supplemental questionnaires; (2) brought the issue regarding the incorrect calculation for the Bancomext Factoring Program to Commerce's attention in a timely-filed *Ministerial Error Allegation* after the *Preliminary Determination* (over *six months* before the *Final Determination*); (3) repeatedly contacted Commerce officials and asked for their guidance in submitting clarifying information; (4) provided clarifying information almost a month before the start of verification, calling attention to the information and explaining the rationale for the clarification; and (5) attempted to present minor corrections on the Factoring Programs after Commerce removed from the record – during verification – the clarifying information it had already submitted. Commerce's finding that Ternium did not act to the best of its ability with respect to the Factoring Programs is unsupported by substantial evidence and not in accordance with law.

*Second*, if the Court finds that Commerce properly found Ternium to be uncooperative, then, in the alternative, Commerce's use of adverse facts available ("AFA") is unsupported by substantial evidence and not in accordance with law. Commerce's decision to impose a 6.55% rate for each of the Factoring Programs – where the actual subsidy rates for these programs was *de minimis* (even using facts available ("FA")) – bears no relation to the subsidy rate for the government's provision of financing (*i.e.*, factoring). Commerce applied a rate that is aberrational, punitive, and not a reasonably accurate estimate of the actual subsidy rates for these programs.

**4.      Did Commerce abuse its discretion by removing and rejecting Ternium's rebuttal brief?**

Yes.   Commerce's decision to remove and reject Ternium's original rebuttal brief ("*Original Rebuttal Brief*"), and treat as new factual information ("NFI") certain portions thereof, was an abuse of discretion.  By rejecting the *Original Rebuttal Brief*, Commerce deprived Ternium of any forum to present arguments regarding the benefit calculation for the mining rights for less than adequate remuneration ("LTAR") program ("Mining Rights for LTAR Program").  Neither Commerce's *Preliminary Determination*, nor its *Post-Preliminary Determination*, provided notice to Ternium that arguments regarding the mining rights program would be relevant until after the case brief deadline.  Ternium had no reason to present the arguments that it raised in its *Original Rebuttal Brief* in its case brief, or at any earlier point in the investigation.  Accordingly, Ternium had no "full and fair" opportunity to exhaust its administrative remedies.

**5.      Was Commerce's removal and rejection of Ternium's rebuttal brief supported by substantial evidence and otherwise in accordance with law?**

No.  Commerce did not provide an adequate explanation to support its conclusion that the *Original Rebuttal Brief* included affirmative arguments that did not rebut the arguments included in Petitioners' case brief.  The arguments that Commerce directed Ternium to remove from the *Original Rebuttal Brief* responded to specific arguments in Petitioners' Case Brief regarding the benefit calculation for the Mining Rights for LTAR Program and, more generally, arguments related to this program.  Thus, Commerce's removal and rejection of the *Original Rebuttal Brief* was not supported by substantial evidence and otherwise not in accordance with law.

**C.      Statement of Jurisdiction**

This action was timely filed and this Court has jurisdiction to review the final determination at issue here.  Ternium commenced this appeal of the *Final Determination* pursuant to 19 U.S.C.

2

§§ 1516a(g)(1)(B), 1516a(g)(3)(A)(i), 1516a(g)(3)(B), 1516a(a)(2)(A), and 1516a(a)(5)(A). *See*

Compl., ECF No. 8, Nov. 26, 2025, at 2-3; *see also* Summons, ECF No. 1, Oct. 28, 2025. The

statute (19 U.S.C. §§ 1516a(g)(3)(A)(i)) permits review of final determinations by Commerce in

cases involving exports from United States-Mexico-Canada Trade Agreement ("USMCA")

countries when review by a binational panel has not been requested.

The Court of Appeals for the Federal Circuit ("Federal Circuit") has made clear that,

pursuant to the special rules applicable to the judicial review of Commerce's determinations

involving exports from free trade area countries (such as Mexico) provided in 19 U.S.C. §

1516a(g), parties may appeal Commerce's final determination involving a free trade area country

*before the order is published*:

> {S}pecial rules are available for review of antidumping duty determinations
> involving free trade area (FTA) countries, of which Mexico is one. "Determination"
> under the FTA rules is defined to include, among others, a B(i) determination. §
> 1516a(g)(1)(B). . . . And, of particular importance here, FTA-country antidumping
> duty review actions are not subject to the rule for non-FTA countries . . . that a party
> cannot challenge an affirmative final antidumping duty determination until after an
> antidumping duty order has been published. ***Reviewability of an FTA country***
> ***affirmative final determination requires no such order; the period of review is***
> ***defined with reference only to "the date on which notice of the determination is***
> ***published in the Federal Register."*** . . . Specifically, the period for filing begins
> on the 31st day after the day of publication of the determination (not an order based
> on it), with a summons due within the next 30 days and a complaint due 30 days
> after the summons, § 1516a(a)(2).

*Bioparques De Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336, 1347 (Fed. Cir. 2022)

("*Bioparques*") (emphasis added).

The *Final Determination* was published in the *Federal Register* on August 29, 2025. *See*

*Final Determination*. The *Final Determination* involves exports from Mexico; that is, a "free trade

area country" within the meaning of 19 U.S.C. § 1516a(f)(9)(B) and § 1516a(g). Ternium filed its

Notice of Intent to Seek Judicial Review with the U.S. and Mexican Secretaries to the USMCA on

September 18, 2025, which is within the deadline prescribed by 19 U.S.C. § 1516a(g)(3)(B) (*i.e.*,

3

within 20 days after the date the contested determination was published in the *Federal Register*). *See* Letter from Ternium Mexico, S.A. de C.V.; to Vidya Desai, United States Secretary, USMCA Secretariat, and Luis Gutierrez Reyes, Mexico Secretary, TMEC Secretariat; re: *Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination – Notice of Intent to Commence Judicial Review* (Sep. 18, 2025).  Ternium filed the Summons on October 28, 2025, which is within the deadline prescribed by 19 U.S.C. § 1516a(a)(5)(A) (*i.e.*, within 30 days of the 31st day after the date the contested determination was published in the *Federal Register*).  *See* Summons, ECF No. 1, Oct. 28, 2025.  Ternium filed its Complaint on November 26, 2025, which is within the deadline prescribed by 19 U.S.C. § 1516a(a)(2)(A) (*i.e.*, within 30 days following the filing of the Summons).  *See* Compl., ECF No. 8, Nov. 26, 2025.

Accordingly, pursuant to 19 U.S.C. §§ 1516a(g)(1)(B), 1516a(g)(3)(A)(i), and the holding in *Bioparques*, this action was timely filed and the Court has jurisdiction to review the final determination at issue here.

## II.    STANDARD OF REVIEW

The Court will find a determination by Commerce to be unlawful if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence "means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Suramerica de Aleaciones Laminadas, CA. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)); *see also PAM S.p.A. v. United States,* 582 F.3d 1336, 1339 (Fed. Cir. 2009) ("*PAM*"); *Micron Tech. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) ("*Micron Tech*").  Commerce must

4

NON-CONFIDENTIAL VERSION

consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States,* 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The Court must determine "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). As a result, a determination that fails "to consider or discuss record evidence which {supports} an alternative conclusion" or "an important aspect of the problem" is not supported by substantial evidence and the "court will not accept" such a determination. *See Jiaxing Brother Fastener Co. v. United States,* 380 F. Supp. 3d 1343, 1356, 1360-61 n.26 (Ct. Int'l Trade 2019) (citations omitted); *see also NSK Corp. v. United States,* 33 C.I.T. 1185, 1190, 637 F. Supp. 2d 1311, 1318 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.* Co., 463 U.S. 29, 43 (1983)).

With respect to whether a decision by Commerce is in accordance with law, the Court "must exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 412 (2024). This means that the Court must employ the "best reading of the statute," which is "the reading the court would have reached if no agency were involved." *Id.* at 400 (internal quotation marks and citation omitted). "In doing so, courts use the traditional tools of statutory interpretation, examining the 'statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Ventura Coastal, LLC v. United States,* 790 F. Supp. 3d 1361, 1367 (Ct. Int'l Trade 2025) (quoting *Delverde, S.r.L. v. United States,* 202 F.3d 1360, 1363 (Fed. Cir. 2000)).

NON-CONFIDENTIAL VERSION

The Court must hold unlawful any determination it finds "to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(ii). Commerce's administrative decisions are also subject to the Administrative Procedure Act ("APA"), which requires the Court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The Court must find that "{a}n agency acted in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1292 (Ct. Int'l Trade 2019) (quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43).

Commerce's principal obligations and "overriding purpose" is to calculate subsidy rates as accurately as possible.  *Canadian Solar Inc. v. United States,* 537 F. Supp. 3d 1380, 1394-95 (Ct. Int'l Trade 2021) ("*Canadian Solar Inc.*") (citing *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1103 (Fed. Cir. 1990); *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2021) ("*Içdaş Celik*"); *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("*Yangzhou Bestpak Gifts & Crafts*") (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("*Rhone Poulenc*")).  As a result, "{f}ailure by Commerce to accept corrective information from respondents may be an abuse of discretion because Commerce's duty is to determine . . . margins accurately."  *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1335 (Ct. Int'l Trade 2020) ("*Zhejiang Mach. Imp. & Exp. Corp.*") (citing *NTN Bearing Corp. v. United*

6

*States*, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995) ("*NTN Bearing*") and *Rhone Poulenc*, 899 F.2d at 1189)).  Commerce's "refusal to consider {respondent}'s request for correction of clerical errors . . . constitute{s} an abuse of discretion." *NTN Bearing*, 74 F.3d at 1208-09.  And, "such corrections are not limited to 'clerical' errors only." *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1357 (Fed. Cir. 2006) ("*Timken U.S.*").  Moreover, the Court must determine that "Commerce abuse{s} its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) ("*Papierfabrik August Koehler*") (internal quotations and citations omitted); *see also Goodluck India Ltd. v. United States,* 11 F.4th 1335, 1342 (Fed. Cir. 2021) ("*Goodluck India*").

## III.    ARGUMENTS

This appeal features the uncommon characteristic of having a significant subsidy rate – 13.26% – nearly completely dependent upon Commerce's decision to remove information from the record.  This information had been on the record for weeks, with one portion removed by Commerce during verification, and a second portion removed by Commerce during briefing.  Commerce refused to verify any information related to the Factoring Programs and then decided to apply complete AFA for the two programs at issue.  These decisions were outcome determinative: the information removed from the record demonstrated the lack of any countervailable subsidy over the *de minimis* level.  Ternium respectfully asks this Court to rule the agency's action illegal, both as an abuse of discretion and an abdication of its statutory obligation to calculate accurate CVD rates.

NON-CONFIDENTIAL VERSION

A.     **Commerce Abused Its Discretion by (1) Removing and Rejecting Record Information Regarding the Factoring Programs, and (2) Denying Ternium the Opportunity to Present Clarifying Information and Minor Corrections about These Programs.**

Ternium made every effort during the course of the investigation to clarify the administrative record with respect to the Factoring Programs and correct Commerce's misunderstanding of these programs as applied in the *Preliminary Determination*. Commerce's rejection of Ternium's multiple attempts to provide clarifying information about the Factoring Programs and denial of the opportunity to present minor corrections relating to these programs at Ternium's on-site verification constitute an abuse of discretion.

1.     **An agency abuses its discretion when it denies respondents the opportunity to present clarifying information and minor corrections**

Among Commerce's principal obligations in administering trade remedy laws is to calculate CVD rates as accurately as possible. The Federal Circuit has referred to Commerce's "duty to determine CVD rates as accurately as possible" as its "overriding purpose" because "CVDs are intended to be remedial rather than punitive in nature." *Canadian Solar Inc,* 537 F. Supp. 3d at 1394-95 (internal citation omitted); *see also Yangzhou Bestpak Gifts & Crafts*, 716 F.3d at 1379 (citing *Rhone Poulenc*, 899 F.2d at 1191). As a result, this Court held that failing "to accept corrective information from respondents may be an abuse of discretion because Commerce's duty is to determine . . . margins accurately." *Zhejiang Mach. Imp. & Exp.*, 471 F. Supp. 3d at 1335 (citing *NTN Bearing*, 74 F.3d at 1207-08; *Rhone Poulenc*, 899 F.2d at 1189).

This Court and the Federal Circuit have repeatedly found that Commerce abuses its discretion when it rejects information to correct data already provided to Commerce or already on the record. In *NTN Bearing*, respondent NTN requested that Commerce correct two clerical errors made in an earlier submission, which caused Commerce to calculate a substantial increase in the margins. *See NTN Bearing*, 74 F.3d at 1205. The Federal Circuit reversed this Court's decision

8

to uphold Commerce's refusal to correct the alleged clerical mistake, even though the deadline for submitting new information had expired at the time NTN made the request. *Id.* at 1205-06. The Federal Circuit held that "{Commerce's} refusal to consider NTN's request for correction of clerical errors . . . constituted an abuse of discretion." *Id.* at 1208-09.

In *Timken U.S.*, the Federal Circuit clarified that its holding in *NTN Bearing* was not limited to Commerce's correction of "clerical" errors. *See Timken U.S.*, 434 F.3d at 1353. Rather, "Commerce is free to correct **any type of importer error** -- clerical, methodology, substantive, or one in judgment -- in the context of making {a} determination{.}" *Id.* (emphasis added).

Applying the Federal Circuit's holdings in *NTN Bearing Corp.* and *Timken U.S.*, this Court held, in *Fischer S.A. v. United States*, that Commerce abused its discretion in refusing to consider pages from respondent Fischer's sales agreement, which established that the margin calculated in the preliminary results was inaccurate. *See Fischer S.A. v. United States*, 34 C.I.T. 334, 345, 700 F. Supp. 2d 1364, 1374 (2010) ("*Fischer*"). In that case, respondent Fischer provided additional pages to a sales agreement as a part of its case brief, which Commerce rejected as untimely-filed NFI. *See id.* at 338, 1373. This Court held, "{o}n the authority of *Timken* and *NTN Bearing*," that Commerce abused its discretion in rejecting the sales agreement pages because:

> (1) no finality concerns demanded exclusion of the additional data at the preliminary results stage; (2) failure to consider the additional pages to correct information already provided was a violation of Commerce's duty to determine Fischer's dumping margin as accurately as possible; {and} (3) **consideration of the additional data is necessary to ensure that the remedial, non-punitive nature of the antidumping laws is not violated by imposition of inaccurately high antidumping duties** on Fischer despite the evidence that was rejected.

*Id.* at 348, 1376 (emphasis added).

The courts have also held that Commerce abuses its discretion when it denies corrections involving an adjustment that does not require beginning anew or delaying the final determination. *See*, *e.g.*, *NTN Bearing*, 74 F.3d at 1208. In other words, the time at which corrections are provided

by a respondent is relevant.  For example, in *Timken U.S.*, the Federal Circuit affirmed this Court's remand of Commerce's final results where the respondent "sought correction of its errors *after Commerce issued the preliminary results, but before it issued the final results*."  *Timken U.S.*, 434 F.3d at 1354.

In *Papierfabrik August Koehler*, the Federal Circuit noted that "{i}n several circumstances, we have held that Commerce abused its discretion in refusing to accept updated data *when there was plenty of time for Commerce to verify or consider it*," but held that Commerce did not abuse its discretion in denying a respondent the opportunity to correct data infected by intentional concealment.  *Papierfabrik August Koehler*, 843 F.3d at 1384 (internal quotations and citations omitted) (emphasis added); *see also Goodluck India*, 11 F.4th at 1342.  In *Içdaş Celik*, this Court rejected respondent's contention that Commerce abused its discretion by refusing to consider the corrective submission because respondent's corrective submission was {f}ar from being a straightforward adjustment," and respondent sought to correct its mistake after Commerce discovered it at verification.  *Içdaş Celik*, 498 F. Supp. 3d at 1362.

Although the statute requires Commerce to conduct verification, it does not establish the specific standards or requirements for doing so.  *See* 19 U.S.C. § 1677m(i)(l).  Commerce retains discretion to determine how it conducts on-site verifications and generally will decline to accept NFI presented at verification.  *See* 19 C.F.R. § 351.307.  However, Commerce must consider information presented at verification "when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record."  *See, Hyundai Elec. & Energy Sys. Co. v. United States,* 15 F.4th 1078, 1089 (Fed. Cir. 2021) ("*Hyundai Elec. & Energy Sys.*").  Accordingly, because Commerce must ensure that the data used to

calculate CVD rates are accurate, it should utilize information presented by a respondent at verification that corrects, corroborates, or clarifies information on the record. If Commerce nevertheless rejects such information under these circumstances, then its rejection is an abuse of discretion.

### 2. Commerce abused its discretion by removing and rejecting clarifying information regarding the Factoring Programs

The Factoring Programs at issue in this case accounted for nearly the entirety of the total calculated subsidy rate (13.10% out of 13.26%). Factoring is a type of financing that allows sellers to receive immediate payment of invoices at a "discount" that reduces the amount of the payment. Commerce considers factoring to provide a benefit if the discount on the receivable is less than a commercial alternative. In other words, if the discount rate offered through the government-sponsored program is less than what a commercial bank would charge for the same type of program, the difference is a benefit to the seller and a potential countervailable subsidy. *See*, *e.g.*, *Aluminum Extrusions from Mexico*, 89 Fed. Reg. 17,387 (Dep't Commerce. Mar. 11, 2024), and accompanying Preliminary Decision Memorandum at 25 – 26.

In its questionnaire responses, Ternium explained that it used the Factoring Programs to receive advance payments from certain customers, which were processed via electronic platforms managed by Bancomext and NAFIN. *See Ternium Mexico's Initial Response to Section III of the Questionnaire*, PD 184 / CD 100 at Bar Code 4676264-02 / 4676134-02 at Program-Specific Questions at 9, 49 (Dec. 5, 2024) ("*Initial Response*"). Ternium provided the loan templates requested by Commerce and submitted information showing that the maximum term for payment of invoices under the Bancomext Factoring Program was 180 days. *See Ternium Mexico's Response to the Second Supplemental Section III Questionnaire*, PD 257 / CD 210, 215, 216 at Bar Code 4702341-01 / 4702303-01, 4702393-06, 47023030-07 at 8, Ex. Supp2. 10, Ex. Supp2.

11

NON-CONFIDENTIAL VERSION

12, Ex. Supp2. 13 at 7, 18 (Jan. 21, 2025) ("*2nd Supp. QR*").  Despite Ternium's attempts to explain the functioning of the Factoring Programs, Commerce misunderstood the loan templates and erred in calculating the benefit from the Bancomext Factoring Program.

In the *Preliminary Determination*, Commerce calculated a 1.56% *ad valorem* net countervailable subsidy rate based entirely on loans offered under the Bancomext Factoring Program.  *See Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 9,226 (Dep't of Commerce Feb. 10, 2025) ("*Preliminary Determination*"); *see also* Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico, available at https://access.trade.gov/public/FRNoticesListLayout.aspx at Bar Code 4709347-02 (last visited on Mar. 29, 2026) at 4 (Feb. 3, 2025) ("*PDM*"); *Preliminary Determination Calculations for Ternium Mexico*, PD 282-83 / CD 233-34 at Bar Code 4711235-01-02 at 4 (Feb. 3, 2025) ("*Preliminary Calculation Memo*").  Despite record evidence showing that the maximum term under the Bancomext Factoring Program was 180 days, Commerce determined that "the interest payment charged by Bancomext reflected a payment period of 365 days."  *Preliminary Calculation Memo* at 3; *see also 2nd Supp. QR* at Ex. Supp2. 13 at 6, 8, 12.  Although Commerce stated that "based on information in Ternium Mexico's questionnaire response, we find that the interest payment charged by Bancomext reflected a payment period of 365 days," it did not point to any evidence on the record to support the 365-day term.  *Preliminary Calculation Memo* at 3.  Because of this mistake, Commerce compared the actual cost of the Bancomext Factoring Program (which was limited to invoices with payment terms under 180 days) to the cost of a commercial credit outstanding for 365 days – thereby more than doubling the benchmark cost and, therefore, the calculated subsidy.  *See Preliminary Calculation Memo* at 4.

12

**NON-CONFIDENTIAL VERSION**

In the *Preliminary* Determination, Commerce did not analyze the NAFIN Factoring Program. Instead, it stated that it would "continue to examine the loan and . . . include an analysis of the program in a post-preliminary determination memorandum." *PDM* at 4.

Throughout the investigation, Ternium made multiple attempts to clarify the information and correct Commerce's misunderstanding about the maximum payment term of 180 days under the Bancomext Factoring Program and, by extension, the NAFIN Factoring Program, which functions in a nearly identical fashion.

*First,* Ternium timely filed a ministerial error allegation regarding Commerce's treatment of the payment period under the Bancomext Factoring Program. *See Ternium Mexico's Allegation of Significant Ministerial Error Contained in the Preliminary Determination*, PD 299 / CD 236-37 at Bar Code 4715621-01 / 4715619-01-02 (Feb 18, 2025) ("*Ministerial Error Allegation*"). Ternium highlighted how record evidence demonstrated that Commerce relied on the incorrect number of days (*i.e.*, 365 instead of 180) to determine the benchmark interest payments. *See id.* In particular, Ternium noted that the sample transaction paid through the Bancomext platform provided by Ternium showed that the financial cost that was discounted from the invoiced amount, represented the ratio of the financial cost to the invoice value – not the annual interest rate. *See id.* (quoting *2nd Supp. QR* at Ex. Supp2. 10 (column "*% importe de intereses entre el importe factura*")). Ternium also explained that this ratio was calculated by dividing the discount amount by the total invoiced amount. *See Ministerial Error Allegation* at 4. Similarly, the "Bancomext brochure" submitted by Ternium proved that the maximum term for payment of all invoices under this program was 180 days (not 365). *Id.* at 4 (quoting *2nd Supp. QR* at Ex. Supp2. 13 at 7, 18). Ternium also provided a revised loan template showing that correcting Commerce's error – using

13

the correct number of days (*i.e.*, 180) – would have resulted in a countervailable subsidy rate below *de minimis* level (*i.e.*, 0.46%). *See id.* at 5-6, Attachment 1.

Commerce made no changes to the *Preliminary Determination* because Ternium Mexico's "allegations {did not} meet the definition of a ministerial error." *Commerce's Ministerial Error Analysis Memorandum*, PD 308 / CD 238 at Bar Code 4732943-01 / 4732941-01 at 3 (Mar. 14, 2025) ("*Ministerial Error Memorandum*"). Commerce stated that its "decision to use 365 days as the number of days on which Ternium's Bancomext loans accrued {was} supported by the record evidence that Ternium supplied to Commerce." *Id.* at 4. However, as Ternium noted in its case brief before the agency, while Commerce relied on the documentation on the record to support its (incorrect) calculation of the interest payment amount in the *Ministerial Error Memorandum* (*i.e.*, Ex. Supp2. 12 (page 4)), Commerce ignored the correct interest rate and the correct payment term, which were both reflected on the same page of the documentation provided by Ternium. *See id.*; *see also 2ⁿᵈ Supp. QR* at Ex. Supp2. 12 at 2, 4.

*Second*, counsel for Ternium contacted Commerce officials repeatedly asking for guidance on how to provide clarifying information ahead of the on-site verification so that Commerce could accurately verify information relating to the Factoring Programs and calculate any benefit derived from these programs in the final determination. *See Ternium Mexico's Original Case Brief*, PD 410 / CD 369-71 at Bar Code 4808246-01 / 4808243-01-03 (Aug. 8, 2025) ("*Original Case Brief*") at Attachment 1 ("*Aff. of Luca Bertazzo*") para. 11, Attachments 5 and 6. Commerce scheduled the Ternium verification for July 10 – 11, 2025; that is, *156* days after Commerce's February 4, 2025, announcement of the preliminary determination and *142* days after Ternium first alerted Commerce of its misinterpretation of the information regarding the Bancomext Factoring in the *Ministerial Error Allegation. See Preliminary Determinations of Countervailing Duty*

14

NON-CONFIDENTIAL VERSION

*Investigations: Corrosion-Resistant Steel Products*, Int'l Trade Admin., U.S. Dep't of Commerce, https://www.trade.gov/preliminary-determinations-countervailing-duty-investigations-corrosion-resistant-steel-products (last visited Mar. 29, 2026); *see also Ministerial Error Allegation*.  In this period, Commerce officials did not respond or provide any guidance to Ternium on how it could provide clarifying information about the Factoring Programs.  *See Aff. of Luca Bertazzo* para. 11, Attachments 5 and 6.

*Third*, given the lack of guidance from Commerce, Ternium submitted clarifying information regarding the Factoring Programs in response to supplemental questionnaires related to other issues ***weeks before the on-site verification***.

After the *Preliminary Determination*, Commerce issued *five* supplemental questionnaires but did not request any additional information about the Factoring Programs.  *See New Subsidy Allegation* ("NSA") *Supplemental Questionnaire to Ternium Mexico*, PD 381 at Bar Code 4783153-01 (June 25, 2025) ("*June 25 SQ*"); *see also Supplemental Questionnaire to Ternium Mexico*, PD 378 at Bar Code 4782291-01 (June 24, 2025) ("*June 24 SQ*"); *NSA Second Supplemental Questionnaire*, PD 369 at Bar Code 4770569-01 (June 5, 2025) ("*June 5 SQ*"); *Commerce's Memorandum for Requesting NSA Benchmarks*, PD 366 at Bar Code 4765864-01 (May 27, 2025) ("*May 27 Benchmarks Request Memo*"); *NSA Questionnaire to Ternium Mexico*, PD 381 at Bar Code 4751803-01 ("*April 24 SQ*").

Because Commerce was still accepting information and the record was open, Ternium provided an amended loan template for the Bancomext Factoring Program on June 16, 2025, which included (1) the number of days in which each "loan" was outstanding, and (2) the specific interest rate applicable to each invoice.  *See Ternium Mexico's NSA Supplemental Questionnaire Response*, PD 375 / CD 315-21 at Bar Code 4779644-01 / 4779627-01-07 at Ex. Supp. NSA-3

15

(June 16, 2025) ("*NSA Supp. QR*").  On the very first page of its response, Ternium also included an introductory paragraph explaining the clarifying information that Ternium was providing and why it was doing so.  *See NSA Supp. QR* at 5, Ex. Supp. NSA-3.  The clarifying information on the Bancomext Factoring Program remained on the record for almost a month – ***24 days*** – until Commerce removed it from the record during the afternoon of July 10, 2025; that is, the first day of Ternium's two-day verification.  *See Commerce's Rejection Memorandum Regarding Bancomext*, PD 396 at Bar Code 4796037-01 (July 18, 2025) ("*Bancomext Rejection Memo*").

On July 1, 2025, Ternium provided an amended loan template for the NAFIN Factoring Program, which included (1) the specific number of days in which each "loan" was outstanding, and (2) the specific interest rate applicable to each invoice.  Like it did for the Bancomext Factoring Program, in the introduction of its response, Ternium explained the clarifying information that it was providing and why it was doing so.  *See Ternium Mexico's Response to the Third Supplemental Questionnaire*, PD 387 / CD 323-27 at Bar Code 4786595-01 / 4786589-01-05 at 5-7, Ex. Supp3-2 (July 1, 2025) ("*3ʳᵈ Supp. QR*").  The clarifying information on the NAFIN Factoring Program remained on the record for over a month – ***43 days*** – until Commerce removed it from the record on August 12, 2025, after Ternium's filing of its case brief on August 8, 2025.  *See Commerce's Memorandum Rejecting Ternium Mexico's Response to the Third Supplemental Questionnaire*, PD 412 at Bar Code 4809401-01 (Aug. 12, 2025) ("*NAFIN Rejection Memo*").

On July 31, 2025, Commerce issued a *Post-Preliminary Determination*, in which it applied AFA to Ternium with regard to benefits received under NAFIN.  *See Post-Preliminary Analysis Calculation Memorandum*, PD 405 / CD 367-68 at Bar Code 4804214-01 / 4804655-01-02 (July 31, 2025) ("*Post-Preliminary Analysis*").  Commerce maintained that the loan template that Ternium provided for the NAFIN Factoring Program in Ex. Supp2. 10 "did not provide requested

16

information on the number of days the loan was outstanding, which was clearly noted as a required column in the Loan Template appendix." *Post-Preliminary Analysis* at 8. This is not an accurate description. At the time that Commerce issued the *Post-Preliminary Determination*, the amended loan template provided by Ternium on July 1, 2025, had been part of the administrative record for a month. *See 3rd Supp. QR* at Ex. Supp3-2. And this template showed both (1) the number of days in which the "loan" was outstanding (*i.e.*, the difference between the day Ternium's invoice was issued and the day Ternium received payment), and (2) the interest rate charged for the NAFIN Factoring Program. *See id.*

*Fourth*, Ternium attempted to present minor corrections on the Factoring Programs on the second (and last) day of verification, but Commerce refused to review or accept any minor corrections on the Factoring Programs and decided not to verify any of the information regarding the Factoring Programs. *See infra* Section III.A.3.

### 3. Commerce abused its discretion by denying Ternium the opportunity to present minor corrections about the Factoring Programs

Ternium submitted clarifying information regarding the Factoring Programs several days – even weeks – before the start of the on-site verification: almost a month before verification the Bancomext Factoring Program, and approximately 10 days before verification for the NAFIN Factoring Program. Petitioners did not comment on the information and Commerce did not ask any follow-up questions. *See supra* Section III.A.2.

During the first day of verification, after Ternium had already presented its minor corrections, Commerce rejected and removed from the record the clarifying information regarding the Bancomext Factoring Program as NFI that "was not requested by Commerce." *Bancomext Rejection Memo; see also Aff. of Luca Bertazzo* para. 2-4, Attachment 1.

As soon as it became aware of Commerce's decision to reject the clarifying information

17

regarding the Bancomext Factoring Program, counsel for Ternium contacted Commerce officials, who indicated that Ternium would be given an opportunity to present information on the Bancomext Factoring Program (as well as the NAFIN Factoring Program) as a minor correction. *See Aff. of Luca Bertazzo* para. 6, Attachment 2; *see also Commerce's Memorandum on the Telephone Discussion with Counsel to Ternium Mexico*, PD 403 at Bar Code 4803338-01 (July 30, 2025). Despite Commerce's commitment and Ternium's several attempts to present minor corrections on the Factoring Programs on the second (and last) day of verification, Commerce indicated that it would not review or accept any minor corrections related to the Factoring Programs. *See Aff. of Luca Bertazzo* para. 12. Commerce also decided not to verify any of the information regarding the Factoring Programs. *See id.*

In the verification report, Commerce stated that Ternium "submitted four corrections to their questionnaire responses that resulted from verification preparation" and that "Commerce accepted two and rejected two of the corrections presented." *Verification Report*, PD 400/CD 365 at Bar Code 4800715-01/4800712-01 at 2 (July 24, 2025) ("*Verification Report*"). The *Verification Report* explained that Commerce rejected two minor corrections related to the Factoring Programs because "the proposed revisions included changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate." *Id.* This is not an accurate description.

*First*, Commerce never provided Ternium the chance to present minor corrections on the Factoring Programs. *See Aff. of Luca Bertazzo* para. 12. *Second*, Ternium attempted to present only one minor correction regarding the Factoring Programs. *See id. at Attachment 3*. *Third*, the revisions that Ternium attempted to present were limited to (1) the addition of the difference between the day Ternium's invoice was issued and the day Ternium received payment from

18

Bancomext or NAFIN; and (2) the amendment of the title of one column to clarify that the figure reported was the ratio of interest to the capital of the invoice, rather that the "interest rate" charged. *See id.*

### 4. Commerce knowingly calculated inaccurate subsidy rates for the Factoring Programs

Commerce officials were aware that Ternium sought to present clarifying information about the Factoring Programs to correct Commerce's subsidy calculation in the *Preliminary Determination*. Ternium timely filed a *Ministerial Error Allegation* and informed Commerce on multiple occasions during the course of the investigation that Commerce had incorrectly calculated subsidy rates associated with the Factoring Programs. Nonetheless, Commerce removed and rejected Ternium's clarifying information and explanations about these programs although they had been first presented almost six months (***156 days***) before the verification and even longer (***188 days***) before the announcement of the *Final Determination*. This rejection was contrary to law and an abuse of discretion. *See, e.g.*, *Timken U.S.*, 434 F.3d at 1354 ("{B}ecause Timken sought correction of its errors after Commerce issued the preliminary results, but before it issued the final results, we conclude that the Court . . . did not err in remanding the case to Commerce for an analysis of Timken's new evidence."); *see also Papierfabrik August Koehler*, 843 F.3d at 1384 ("Commerce abused its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it"). Likewise, Commerce refused to review and accept minor corrections on the Factoring Programs despite the fact that the information presented at verification ***corrected***, corroborated, or ***clarified*** information on the record. *See Hyundai Elec. & Energy Sys.,* 15 F.4th at 1089.

In sum, Commerce failed "to accept corrective information" that would have allowed it to calculate an accurate subsidy rate. *Zhejiang Mach. Imp. & Exp.*, 471 F. Supp. 3d at 1335. The

19

additional information on the Factoring Programs was necessary to ensure that the remedial, non-punitive nature of trade remedy laws was not violated by the imposition of inaccurately high subsidy rates on Ternium.  *See Fischer*, 34 C.I.T. 334 at 348, 700 F. Supp. 2d at 1376.  In other words, Commerce's decision to deny Ternium an opportunity to present clarifying information; its removal and rejection of previously submitted information on the Factoring Programs *after* the start of verification and even *after* the presentation of Ternium's case brief; and its refusal to accept any minor corrections or verify any record information about the Factoring Programs, led Commerce to knowingly calculate inaccurate and punitive subsidy rates as to these programs.

This Court should find that Commerce's refusal to accept and consider Ternium's clarifying information and minor corrections on the Factoring Programs constituted an abuse of discretion.  *See Timken U.S. Corp.*, 434 F.3d at 1357; *see also NTN Bearing Corp.*, 74 F.3d at 1208; *Fischer*, 34 C.I.T. 334 at 348, 700 F. Supp. 2d at 1376.

**D.    Commerce's Decision Not to Accept Minor Corrections Relating to the Factoring Programs Was Unsupported by Substantial Evidence and Not in Accordance with Law**

If this Court finds that Commerce acted properly by requiring Ternium to remove the clarifying information regarding the Factoring Programs from the record and by denying Ternium the opportunity to provide minor corrections on these programs, then Commerce's refusal to review and accept the minor corrections regarding the Factoring Programs is unsupported by the record and not in accordance with law.

In evaluating whether a correction is "minor," Commerce evaluates whether "the correction is clerical or methodological."  *Goodluck India*, 11 F.4th at 1343.  If an error is not methodological in nature, Commerce considers four factors – specifically, whether (1) it is able to verify the error and is satisfied with the documentary support for the correction; (2) the error calls into question the overall integrity of the respondent's submissions; (3) the correction amounts to a

20

substantial revision of previously reported data; and (4) the nature of the errors and their effect on the validity of the submission. *See Maui Pineapple Co. v. United States*, 27 C.I.T. 580, 599-600, 264 F. Supp. 2d 1244, 1261 (2003) (citing *Certain Fresh Cut Flowers from Colombia: Final Results of Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 42,834 (Dep't of Commerce Aug. 19, 1996)) ("*Maui Pineapple*"); *see also Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine*, 86 Fed. Reg. 35,272 (Dep't of Commerce July 2, 2021), accompanying Issues and Decision Memorandum at Cmt. 1 (citing *Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,217 (Dep't of Commerce Sep. 27, 2010), accompanying Issues and Decision Memorandum at Cmt. 10)).  In assessing whether a correction is "minor" and should be accepted at verification, Commerce considers clerical errors where doing so "would neither have required beginning anew nor have delayed making the final determination." *NTN Bearing*, 74 F.3d at 1208.

Here, Commerce never examined Ternium's corrections; nor did it determine whether they were minor based on the factors above.  Despite Commerce's commitment and Ternium's several attempts to present minor corrections on the Factoring Programs, Ternium was never given the chance to present minor corrections related to the Factoring Programs.  *See Aff. of Luca Bertazzo* para. 12.  In the verification report, Commerce stated that Ternium "submitted four corrections to their questionnaire responses that resulted from verification preparation" and that "Commerce accepted two and rejected two of the corrections presented." *Verification Report* at 2.  The *Verification Report* explained that Commerce rejected two minor corrections related to the Factoring Programs because "the proposed revisions included changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate." *Id.* As discussed above, this description is inaccurate.  *See supra* Section III.A.3.

21

Because the minor corrections on the Factoring Programs that Ternium would have presented, if given the chance, were not placed on the record by Commerce, Ternium submitted them with its *Original Case Brief. See Aff. of Luca Bertazzo* para. 9, Attachment 3. This was also removed from the record by Commerce. *See Commerce's Letter Rejecting Ternium Mexico's Original Case Brief*, PD 414 at Bar Code 4809415-01 (Aug. 12, 2025) ("*Original Case Brief Rejection Letter*").

Commerce never determined whether the revisions that Ternium attempted to present were "minor" in nature under Commerce's criteria above. In other words, Commerce never considered whether (1) the information clarified information that Ternium already provided (*i.e.*, the loan templates for the Factoring Programs); (2) Commerce would have been able to verify the error and the documents in support of the correction; (3) the changes would not have fundamentally altered the scope of sales that were subject to the Factoring Programs or the total financial cost incurred by Ternium during the POI; and (4) the corrections amounted to a substantial revision of the previously submitted data given that Ternium only added the difference between the day Ternium's invoice was issued and the day Ternium received payment and amended the title of one column of the loan templates.

Because Commerce officials did not permit Ternium to present the minor corrections relating to either Factoring Program at verification, Commerce had no basis on which to determine that the information was not "minor." *See Goodluck India Ltd.*, 11 F.4th at 1343; *NTN Bearing*, 74 F.3d at 1208. Therefore, Commerce's decision not to permit Ternium to present this information was unsupported by substantial evidence and not in accordance with law.

**NON-CONFIDENTIAL VERSION**

E.     **Commerce's Finding That Ternium Was Uncooperative With Respect to Its Reporting of the Factoring Programs, and Thus Its Use of AFA as to These Programs, Was Unsupported by Substantial Evidence and Not in Accordance with Law.**

The Court should not sustain Commerce's derivation and application of a 6.55% subsidy rate based on AFA for each of the Factoring Programs. Commerce may apply AFA only in specific instances – none of which is applicable in this investigation. Commerce's resort to AFA in this instance is unwarranted because Ternium did not withhold information; did not significantly impede the proceeding, or provide information that could not be verified. The subsidy rate selected by Commerce as AFA must conform with statutory requirements, and Commerce must not apply an adverse inference that results in a "punitive, aberrational, or uncorroborated" rate. Even if the Court finds that Commerce's application of FA was warranted, Commerce's 6.55% AFA rate for each of the Factoring Programs should not be upheld because such rate is punitive and does not reasonably estimate Ternium's actual subsidy rate for these programs, even after taking into account an increase intended as a deterrent for non-compliance. For these reasons, Commerce's application of FA and an adverse inference is unsupported by substantial evidence and otherwise not in accordance with law.

1.     **Commerce's use of FA is limited to the specific information that is missing, and its use of an adverse inference must not be punitive and must comply with the statutory hierarchy**

Commerce's use of FA and adverse inferences are subject to important statutory limitations and qualifications. Specifically, Commerce may only use FA as a substitute for the specific information that is missing from the record. *See* 19 U.S.C. § 1677e(a)(l). Moreover, its use of an adverse inference – even recognizing that AFA is meant to deter noncompliance – may not be punitive. Finally, the subsidy rate selected by Commerce as AFA must conform with the requirements of 19 U.S.C. § 1677e(d)(l)(A). The courts have further elaborated on the legal

23

requirements for Commerce's application of FA and AFA.

FA may be applied only with respect to information that is missing from the record because the respondent "withholds" it, "significantly impedes" the proceeding, or provides information that "cannot be verified{.}" 19 U.S.C. § 1677e(a). In particular, the use of FA is limited to filling the gap "*only* with respect to the specific information that a respondent failed to provide." *Shandong Huarong Mach. Co. v. United States,* 30 C.I.T. 1269*,* 1281, 435 F. Supp. 2d 1261, 1273 (2006) (emphasis added); *see also Zhejiang Dunan Hetian Metal Co. v. United States,* 652 F.3d 1333, 1348 (Fed. Cir. 2011) (holding that "the gap in the record is the quantity" and, therefore, Commerce could apply partial AFA "only in selecting the quantity" of select sales for purposes of calculating the dumping margin). Similarly, the Statement of Administrative Action ("SAA") directs that, in selecting FA, Commerce must "make {its} determination . . . based on all evidence of record, weighing the record evidence to determine *that which is most probative of the issue under consideration*." *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103-826(I), at 869, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 ("SAA") (emphasis added).

An adverse inference in choosing FA (*i.e.*, the application of AFA) may be used only if the respondent "failed to cooperate by not acting to the best of its ability to comply with" Commerce's requests for information. 19 U.S.C. § 1677e(b)(1). This Court has held that a respondent is uncooperative when it chooses not to participate in the proceeding or is unresponsive to Commerce's requests for information. *See*, *e.g., Ansaldo Componenti, S.p.A. v. United States,* 10 C.I.T. 28, 36-37, 628 F. Supp. 198, 205 (1986) ("*Ansaldo Componenti*"); *BMW of N. Am. LLC v. United States*, 437 F. Supp. 3d 1336, 1344-45 (Ct. Int'l Trade 2020) ("*BMW of N. Am.*"). Similarly, the Federal Circuit has explained that "{a} party is uncooperative if it has not acted to the best of

24

its ability to comply with requests for necessary information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("*Nippon Steel*").  However, it has also clarified that the standard for determining whether an adverse inference is warranted "does not require perfection and recognizes that mistakes sometimes occur . . . ." *Nippon Steel*, 337 F.3d at 1382.

The Federal Circuit has "long held that the inference that Commerce may use in selecting from the facts otherwise available must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent for noncompliance." *Oman Fasteners, LLC v. United States,* 125 F.4th 1068, 1086 (Fed. Cir. 2025) ("*Oman Fasteners, LLC*") (citing *Diamond Sawblades Manufacturers' Coalition v. United States,* 986 F.3d 1351, 1367 (Fed. Cir. 2021) ("*Diamond Sawblades*"); *Essar Steel Ltd. v. United States,* 678 F.3d 1268, 1276 (Fed. Cir. 2012); *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) ("*Gallant Ocean (Thailand)*"); *F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("*F.lli de Cecco*")).  Importantly, Commerce's choice of AFA, even taking deterrence into account, must not result in "punitive, aberrational, or uncorroborated margins."  *F.lli de Cecco*, 216 F.3d at 1032; *see also Gallant Ocean (Thailand) Co.*, 602 F.3d at 1324 ("This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter . . . future non-compliance").

Finally, in a CVD proceeding, the statute permits Commerce to select the following as AFA: (1) "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country;" or, if no such rate is available, (2) "a countervailable subsidy rate for a subsidy program from a proceeding that the administering

25

authority considers reasonable to use . . . ." 19 U.S.C. § 1677e(d)(1)(A); *see also* 19 C.F.R. § 351.308(i)(2).

### 2. Commerce's had no legal basis to apply FA as to Ternium's reporting of the Factoring Programs

In the *Final Determination,* Commerce explained that an AFA *ad valorem* subsidy rate of 6.55% was warranted as to Ternium's reporting of each of the Factoring Programs because Ternium "did not provide the number of days outstanding as requested in the Loan Appendix, and instead tried to provide this information for all transactions under this program as 'minor' corrections at verification, including trying to provide interest rates that were different from the interest rates provided previously." *Final I&D Memo* at 11, 13. This explanation misrepresents the record evidence, and – more importantly – does not account for Ternium's repeated attempts to provide clarifying information about the Factoring Programs to Commerce prior to, during, and after Ternium's on-site verification. *See supra* Sections III.A and III.B.

The evidence on the record does not support a finding that Ternium withheld or provided information that could not be verified, warranting a finding of FA – let alone AFA. Rather than withholding information, the record reflects numerous instances in which Ternium attempted to provide clarifying information about the Factoring Programs – including conversations with Commerce officials in which Ternium sought guidance on how this information could be presented and verified. *See NSA Supp. QR; 3rd Supp. QR; see also Aff. of Luca Bertazzo* para. 11, Attachments 5-6. Ternium similarly cannot be said to have "significantly impeded" the investigation where it made every effort to correct Commerce's misunderstanding of the functioning of the Bancomext Factoring Program as applied in the *Preliminary Determination* and assist Commerce officials in accurately calculating subsidy rates for the Factoring Programs in the

26

*Final Determination*. And while the clarifying information and minor corrections that Ternium attempted to submit were not verified by Commerce, this information was readily verifiable.

This Court has found that a "deliberate refusal to subject certain factual information to a verification procedure is not the equivalent of a valid finding that, for purposes of § 1677e(a)(2)(D), such information 'cannot be verified.'" *China Kingdom Imp. & Exp. Co. v. United States*, 31 C.I.T. 1329, 1340, 507 F. Supp. 2d 1337, 1349 n.7 (2007). Rather, Commerce must "make an effort to verify information before it can reasonably be deemed unverifiable." *Since Hardware (Guangzhou) Co. v. United States,* 35 C.I.T. 1670, 1680 (2011). In the instant case, Ternium prepared detailed presentations regarding its use of each of the Factoring Programs ahead of Commerce's on-site verification as requested in the Verification Agenda. As requested therein, Ternium prepared, for each of the Factoring Programs, (1) information on the eligibility criteria, (2) support for the identity of the parties involved in the program and how the payments were booked in Ternium's books and records, (3) proof of payment, and (4) trace packages for the observations selected by Commerce. *Agenda for Verification of Ternium Mexico's Questionnaire Responses*, PD 388 / CD 328 at Bar Code 4787269-01 / 4787268-01 (July 3, 2025) at 8-9. All this information was based on information that was on the record at the start of verification and, in part, remained on the record during verification. Thus, Ternium did not provide information that "cannot be verified" for purposes of 19 U.S.C. § 1677e(a)(2)(D). Nevertheless, Commerce refused to verify any information about the Factoring Programs.

### 3. Commerce's application of AFA was unwarranted because Ternium cooperated to the best of its ability in the investigation

Even if the Court finds that Commerce's resort to FA for the Factoring Programs was warranted, the record does not support Commerce's application of AFA because Ternium

cooperated to the best of its ability to provide Commerce with clarifying information regarding the Factoring Programs throughout the investigation.

In *Nippon Steel*, the Federal Circuit held that an "adverse inference may not be drawn merely from a failure to respond, but ***only*** under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made{.}" *Nippon Steel*, 337 F.3d at 1383 (emphasis added). Based on Ternium's diligent compliance and repeated attempts to provide clarifying information regarding the Factoring Programs, there is no support for Commerce's finding that Ternium did not act to the best of its ability in complying with Commerce's requests. *See Nippon Steel*, 337 F.3d at 1381; 19 U.S.C. § 1677e(b)(1). Commerce did not have adequate legal authority to impose AFA because Ternium (1) actively participated in the investigation; (2) submitted all information requested by Commerce in the initial and ***seven*** supplemental questionnaires; (3) made Commerce aware of the issue regarding the incorrect calculation for the Bancomext Factoring Program in its *Ministerial Error Allegation*; (4) asked repeatedly for Commerce's guidance about how to provide clarifying information regarding the Factoring Programs; (5) provided clarifying information about the Factoring Programs almost a month before the start of verification, calling attention to what Ternium was doing and why it was doing so; (6) was well prepared and actively participated in the on-site verification; and (7) attempted to provide Commerce officials with minor corrections regarding the Factoring Programs at Ternium's verification. *See Aff. of Luca* Bertazzo para. 7-9, 12; *see also NSA Supp. QR; 3rd Supp. QR*.

Based on Ternium's robust participation in this investigation and repeated attempts to provide Commerce with clarifying information regarding the Factoring Programs, substantial

28

evidence does not support Commerce's resort to AFA because Ternium cooperated to the best of its ability.

4.      **The AFA subsidy rate selected by Commerce bears no relation to a subsidy rate as defined under the law because it is aberrational and punitive**

Commerce did not rely on evidence on the record at the time of Commerce's *Final Determination* showing that the maximum discounting term for the Factoring Programs was 180 days.  Using this information would have resulted in Commerce calculating countervailable subsidy rate for each of the Factoring Programs below *de minimis*.  *See Original Case Brief* at Attachment 2.  Rather, Commerce selected a countervailable subsidy rate applied for a program related to export loans (instead of factoring) by the same governmental entity (*i.e.*, Bancomext) in Mexico in an administrative review conducted ***more than twenty years prior***.  This resulted in Commerce assigning AFA subsidy rates of 6.55% to each of the factoring programs.  *See Final Analysis Memorandum*, PD 429/CD 380 at Bar Code 4816753-01/4816749-01-02 at 2 (Aug. 25, 2025) (citing *Certain Cut-to-Length Carbon Steel Plate from Mexico*, 69 Fed. Reg. 1,972 (Dep't of Commerce Jan. 13, 2004), accompanying Issues and Decision Memorandum at Cmt. 4).

Commerce's selection of the 6.55% subsidy rate for both of the Factoring Programs is unsupported by substantial evidence and not in accordance with law because this rate is not a "reasonably accurate estimate" of the actual subsidy rates for these programs, even with "some built-in increase intended as a deterrent to non-compliance." *Diamond Sawblades*, 986 F.3d at 1367.  A "reasonably accurate estimate" of the actual subsidy rates for these programs would be a *de minimis* rate.  Ternium repeatedly provided, and attempted to provide, information notifying Commerce of the appropriate maximum discounting term of 180 days under the Factoring Programs and related subsidy calculation during the course of the investigation.  Even accepting, *arguendo*, that Commerce properly removed and rejected Ternium's filings and properly denied

29

NON-CONFIDENTIAL VERSION

Ternium an opportunity to present minor corrections, record information that Commerce accepted *in this investigation* supported Commerce applying a 180-day maximum discounting term under the Factoring Programs and calculating a *de minimis* subsidy rate. *First*, in *2nd Supp. QR* at Ex. Supp2. 10, Ternium provided a sample transaction of a payment through the Bancomext platform showing that the financial cost that was discounted from the invoiced amount represented the ratio of the financial cost to the invoice value – not the annual interest rate paid by Ternium. *Second*, in *2nd Supp. QR* at Ex. Supp2. 13 at 7, 18, Ternium provided a "Bancomext brochure" demonstrating that the maximum term for payment of invoices under this program was 180 days (not 365). *Third*, in *3rd Supp. QR*, Ternium provided record information regarding the NAFIN Factoring Program, which remained part of the administrative record during verification and until after Ternium filed its case brief, demonstrating that the maximum number of days allowable for payment on a NAFIN factoring invoice was 180 days. *Fourth*, Commerce fully verified information provided by GOM officials confirming that the maximum number of days allowable for payment on factoring invoices was 180 days. *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Verification of the Questionnaire Responses of the Government of Mexico,* PD 400 / CD 366 at Bar Code 4800715-01 / 4801424-01 (July 24, 2025) at 4 ("Officials noted that the maximum number of days allowable for payment by a buyer on an invoice is 180 days. We asked officials how this 180 day is determined. Officials stated that 180 days is a global industry standard. According to officials, *factoring is a short-term financing service associated with invoice payment 180-day maximum* . . . .") (emphasis added).

Rather than drawing from record information in this investigation, Commerce officials applied to both Factoring Programs an AFA subsidy rate originally assigned as to the use of Bancomext export loans – not factoring financing – in the administrative review of the CVD order

30

on *Certain Cut-to-Length Carbon Steel Plate from Mexico*. *See Post-Preliminary Analysis* at 18. Moreover, Commerce made no effort to demonstrate that the Bancomext export loans analyzed in the *Cut-to-Length Carbon Steel Plate from Mexico* investigation constituted "the same or similar program {as the Factoring Programs} in a countervailing duty proceeding involving the same country;" nor did Commerce demonstrate whether the subsidy rate it used was "reasonable" in the absence of comparable subsidy rates. *See* 19 U.S.C. § 1677e(d)(1)(A); *see also* 19 C.F.R. § 351.308(i)(2); *Post-Preliminary Analysis* at 18.

The 6.55% AFA subsidy rates derived from this distinct CVD proceeding assigned by Commerce to the Factoring Programs were ***more than 14 times*** (*i.e.*, 6.55 divided by 0.46 – a ***1,324% increase***) from the actual subsidy rates for these programs. *See Ministerial Error Allegation* at Attachment 1; *Final Analysis Memorandum*. Even taking into account a "built in increase{,}" the exaggeration of Ternium's actual subsidy rate in this case is "far beyond an amount sufficient to deter . . . future non-compliance." *Gallant Ocean (Thailand) Co.*, 602 F.3d at 1324.

In similar instances, the Federal Circuit has found AFA subsidy rates to be punitive and, therefore, unsupported by substantial evidence. For example, in the antidumping duty ("ADD") administrative review underlying *Gallant Ocean (Thailand) Co.,* Commerce applied an AFA dumping margin of 57.64% to the respondent, which was "more than ten times higher than the average dumping margin for cooperating respondents" and "five times higher than the highest rate applied to a cooperating respondent." The Federal Circuit deemed this rate "punitive, aberrational, or uncorroborated, . . . and excessive in view of the cooperative respondents' dumping rates." *Gallant Ocean (Thailand) Co.*, 602 F.3d at 1324. And concluded that "substantial evidence does not support the unreasonably high AFA rate imposed against Gallant." *Id.* at 1325.

31

Similarly, in the ADD administrative review in *Oman Fasteners, LLC,* Commerce had calculated dumping margins of 0.63% to 9.10%, but applied as AFA a dumping margin of 154.33%. *See Oman Fasteners, LLC*, 125 F.4th at 1078, 1085 ("applying an adverse inference to select the {punitive} 154.33% rate was unsupported by the required substantial evidence"). The Federal Circuit found that Commerce's AFA dumping margin of 154.33% constituted "a gross departure from the established principle that Commerce, when applying the adverse-inference provision, must pursue accuracy, with any departure limited to what is needed to deter noncompliance with Commerce rules and orders." *Id.* at 1086.

Much like in *Gallant Ocean (Thailand) Co.* and *Oman Fasteners, LLC*, Commerce's selection of AFA rate of 6.55% as to the Factoring Programs in this investigation is unreasonably high and therefore punitive. Consistent with the Federal Circuit's holdings in these cases, this Court should find that Commerce's selection of AFA rates as to the Factoring Programs is unsupported by substantial evidence and not in accordance with law.

**F.    Commerce Abused Its Discretion by Removing and Rejecting Ternium's Rebuttal Brief.**

Commerce's removal and rejection of Ternium's rebuttal brief deprived Ternium of the opportunity to raise any rebuttal arguments relating to the benefit calculation of the Mining Rights for LTAR Program at the administrative level. Ternium had no reason to present arguments regarding this program in its affirmative case brief, or at any earlier point in the investigation. Commerce abused its discretion by removing and rejecting Ternium's rebuttal brief because it included arguments relating to the Mining Rights for LTAR Program.

On April 14, 2025, Commerce initiated an investigation into the provision of mining rights based on Petitioners' new subsidy allegation ("NSA") that Ternium's cross-owned affiliated mines – Las Encinas, S.A. de C.V. ("Las Encinas") and Consorcio Minero Benito Juárez Peña Colorada,

32

S.A. de C.V. ("Peña Colorada") (collectively, "Mines") – held preferential mining concessions from the Government of Mexico ("GOM"). *See NSA Initiation Memorandum*, PD 314 at Bar Code 4747545-01 at 2-6 (Apr. 14, 2025) ("*NSA Initiation Memo*"); *see also Petitioners' NSA*, PD 217-24 / CD 191-196 at Bar Code 4691116-01-04, 4691123-01-04 / 4691091-01-06 at 2-6 (Jan. 2, 2025) ("*NSA*"). Specifically, Petitioners claimed that because of the Mexican mining laws, Ternium enjoyed a lower cost of production ("COP") and, thus, a cost advantage in the market. *See NSA Initiation Memo*; *see also NSA* at 2-6.

In response to the multiple questionnaires relating to Petitioners' NSA, Ternium submitted detailed information regarding the mining rights held by the Mines. *See Ternium Mexico's Response to NSA Questionnaire*, PD 343-50 / CD 240-92 at Bar Code 4760459-01-08 / 4760353-01-53 at Ex. NSA-40 (May 12, 2025) ("*NSA Questionnaire Response*"); *Ternium Mexico's NSA Benchmarks Submission*, PD 374 / CD 309-12 at Bar Code 4773992-01 / 4773975-01-04 at 3-4, Ex. NSA Benchmarks-1 (June 9, 2025) ("*NSA Benchmarks Submission*"); *NSA Supp. QR* at 2, Ex. Supp. NSA-1.

At verification, Commerce successfully verified all information submitted by Ternium regarding the Mining Rights for LTAR Program, including the unit production costs incurred by the Mines. *See Verification Report* at 7-8. In the *Verification Report*, Commerce officials "noted no discrepancies" of Ternium's submitted information relating to this program. *Id.* at 8.

In the *Post-Preliminary Determination*, Commerce found that "Ternium Mexico's annual per-unit cost to extract iron ore from GOM mines during the POI exceeds the annual, per-unit iron ore benchmark price" and, thus, the program "did not confer a benefit upon Ternium Mexico during the POI." *Post-Preliminary Analysis* at 14. In its benefit calculation, Commerce considered the annual weighted-average per-unit production cost at each of Ternium's Mines and compared

33

each of the Mine's costs to a "Tier 3" benchmark separately. *See Post-Preliminary Analysis* at Attachment I.

On August 8, 2025, Petitioners filed their case brief and alleged that, in the *Post-Preliminary Determination*, Commerce erred in determining that the GOM's Mining Rights for LTAR Program conferred no benefit to Ternium. *See Petitioners' Case Brief*, PD 411 / CD 372 at Bar Code 4808326-01 / 4808320-01 (Aug. 2025) ("*Petitioners' Case Brief*"). Specifically, Petitioners contested the calculation methodology used by Commerce to determine the benefit conferred to Ternium and argued that "Commerce unlawfully offset benefits that Ternium received from iron ore extraction in one location with so-called 'negative benefits' associated with iron ore extraction in a completely separate location." *Petitioners' Case Brief* at 2 (bracketing omitted). Petitioners argued that "Commerce should calculate an ad valorum subsidy rate of 0.16 percent to the mining rights for LTAR program {which} represents the benefits Ternium received for iron ore mined at its Peña Colorada mine without an offset for the 'negative benefit' from iron ore extracted from its Las Encinas mine." *Id.* at 4-5 (bracketing omitted).

Ternium filed its rebuttal brief on August 15, 2025. *See* Letter from Ternium Mexico, S.A. de C.V., to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Rebuttal Brief* (Aug. 15, 2025) ("*Original Rebuttal Brief*"). Ternium presented four arguments in response to the claims raised in *Petitioners' Case Brief*: (1) the fees charged by the GOM for mining rights were at par or higher than the government fees, taxes, and royalties charged in other countries; (2) even under Commerce's chosen benefit calculation based on a comparison of the COP of iron ore to a Tier 3 benchmark, the record demonstrated that Ternium did not benefit from allegedly receiving mining rights for LTAR; (3) should Commerce revise the benefit calculation as suggested by Petitioners, Commerce should do so by considering the weighted-average COP

34

across both Mines, calculating one production cost for the material input (*i.e.*, iron ore) for Ternium as a whole; and (4) should Commerce adjust the benefit calculation to account for the weighted-average COP across both Mines, Commerce should adjust the benefit calculation to reflect the fact that [                    ] sold [    ]% of its POI production of iron ore pellets to [

                    ]. *See generally Original Rebuttal Brief.*

On August 19, 2025, Commerce removed and rejected Ternium's rebuttal brief because it "d{id} not satisfy the requirements for a rebuttal brief in accordance with 19 C.F.R. § 351.309(d)(2), and because it was filed after the deadline for affirmative case briefs." *Commerce's Letter Rejecting Ternium Mexico's Rebuttal Brief*, PD 421 / CD 378 at Bar Code 4812160-01 / 4812159-01 at 1 (Aug. 19, 2025) ("*Rejection of Ternium Rebuttal Brief*") (stating that "{p}ursuant to 19 CFR 351.302(d)(1) and 351.104(a)(2)(ii), we will retain a copy of the rejected document (ACCESS barcodes: 4811617-01, 4811617-02, and 4811628-01) on the record of this proceeding solely to establish and document the basis for rejection." Nonetheless, the *Original Rebuttal Brief* was not included in the PD or CD. Therefore, as directed by the Court, Ternium attaches the *Original Rebuttal Brief* hereto in Attachment 1. *See* ECF No. 37, Mar. 19, 2026.) Commerce specifically requested that Ternium remove the following information from its rebuttal brief: (1) any text regarding whether fees charged by the GOM were at par or higher than government fees, taxes, and royalties charged in other countries; (2) any arguments regarding which benchmark tier should be used in Commerce's benefit calculation for the Mining Rights for LTAR Program; (3) any arguments regarding the revision of Commerce's benefit calculation to incorporate weighted-average production costs across both mines to measure the program benefit; (4) any arguments regarding whether Commerce should also adjust the total benefit attributed to Ternium Mexico to

35

account for the fact that [                    ] sold [    ] % of its production to [                    ]; and (5) any arguments regarding the specificity of the Mining Rights for LTAR Program. *See Rejection of Ternium Rebuttal Brief* at 2. Commerce instructed Ternium to remove these portions of the *Original Rebuttal Brief* because they contained "an affirmative argument" and were "not a rebuttal to Petitioners' Case Brief." *Id.* Ternium complied with Commerce's instructions. *See Ternium Mexico's Resubmitted Rebuttal Brief*, PD 422 / CD 379 at Bar Code 4813018-01 / 4813017-01 (Aug. 19, 2025) ("*Resubmitted Rebuttal Brief*").

"Generally, the 'prescribed remedy' for a party in disagreement with Commerce's {determination} is to file a case brief, and that case brief must present *all* arguments that *continue* in the submitter's view to be relevant to Commerce's final determination or final results." *NTSF Seafoods Joint Stock Co. v. United States*, Nos. 20-00104, 20-00105, 2022 Ct. Int'l Trade LEXIS 40, at *24 (Ct. Int'l Trade Apr. 25, 2022) (emphasis in original) (quoting *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1350 (Ct. Int'l Trade 2010)). However, "{t}he administrative forum in this case proved unavailable because . . . {respondent} had no reason to suspect that the argument would be relevant until after the regulatory case brief deadline that Commerce imposed." *See Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1375 (Ct. Int'l Trade 2024) ("*Neimenggu Fufeng Biotechnologies*"). Thus, instances where a "party ha{s} no opportunity to raise {an} issue before the agency," including where "the agency change{s} its position . . . after the party's case brief {has} been filed," warrants the excusal of the non-exhaustion of administrative remedies. *Neimenggu Fufeng Biotechnologies*, 741 F. Supp. 3d at 1372.

Commerce's removal and rejection of Ternium's *Original Rebuttal Brief*, therefore, constitutes an abuse of discretion because it deprived Ternium of any opportunity to present

36

arguments relating to the Mining Rights for LTAR Program. Neither Commerce's *Preliminary Determination*, nor its *Post-Preliminary Determination*, provided notice to Ternium that arguments relating to the Mining Rights for LTAR Program would be relevant until after the case brief deadline. Even "a strict view" of the exhaustion provision cannot compel an outcome that would deprive a party of "a full and fair opportunity to raise {an} issue." *Qingdao Taifa Group Co. v. United States*, 33 C.I.T. 1090, 1093, 637 F. Supp. 2d 1231, 1236 (2009) ("*Qingdao Taifa Group*"). Accordingly, this is case "where legitimate, prudential concerns warrant both waiver of {respondent}'s failure to exhaust its administrative remedies and a remand to Commerce for further consideration of the issue." *Neimenggu Fufeng Biotechnologies*, 741 F. Supp. 3d at 1376 (citing *ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019)) (internal citations omitted).

### G. Commerce's Removal and Rejection of Ternium's Rebuttal Brief Was Unsupported by Substantial Evidence and Not in Accordance with Law.

Commerce's removal and rejection of the *Original Rebuttal Brief* is unsupported by substantial evidence and contrary to law because the arguments that Commerce directed Ternium to remove from the rebuttal brief responded directly to *Petitioners' Case Brief*.

Pursuant to Commerce's regulations, "any interested party or U.S. Government agency may submit a 'rebuttal brief'," which "may respond only to arguments raised in case briefs, should identify the arguments raised in case briefs, and should identify the arguments to which it is responding." 19 C.F.R. § 351.309(d)(1), (2). Ternium's rebuttal brief included arguments in direct response to Petitioners' allegation that Commerce improperly offset the benefits received by Ternium at its Pena Colorada mine with the "negative benefit" attributable to the Las Encinas mine. *See Petitioners' Case Brief* at 4-5. Ternium rebutted this allegation by claiming that if Commerce revised the benefit calculation as suggested by Petitioners, Commerce should do so by considering the weighted average production cost across both Mines, calculating one production

37

NON-CONFIDENTIAL VERSION

cost for iron ore.    Ternium also argued that, had Commerce agreed with Petitioners, then Commerce should have adjusted the benefit calculation to reflect the fact that [          ] sold [   ]% of its POI production of iron ore pellets to [                    ]. *See Original Rebuttal Brief* at 7-10.  Commerce's instruction that Ternium remove these arguments from its rebuttal brief directly disregarded the requirements of 19 C.F.R. § 351.309(d)(2).  Commerce cited no relevant evidence that a "reasonable mind might accept as adequate" to support the conclusion that Ternium's arguments did not directly rebut the arguments included *Petitioners' Case Brief*.  *See Micron Tech.*, 117 F.3d at 1393; *see also PAM*, 582 F.3d at 1339.

Therefore, Commerce's removal and rejection of Ternium's rebuttal brief is unsupported by substantial evidence and not in accordance with law.

NON-CONFIDENTIAL VERSION

## IV.  CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiff respectfully requests that the Court:

1) Enter judgment in favor of Plaintiff;

2) Hold and declare that Commerce abused its discretion in its *Final Determination*;

3) Hold and declare that Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law;

4) Remand this matter to Commerce with instructions to issue a revised *Final Determination* in conformity with the Court's decision; and

5) Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,


WHITE & CASE LLP

/s/ Gregory J. Spak
Gregory J. Spak
Luca Bertazzo
C. Alex Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Ternium Mexico, S.A. de C.V.*

Date:  April 6, 2026

39

## CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers procedures. The word count for Plaintiff's Rule 56.2 Brief, as computed by the White & Case word processing system (Microsoft® Word for Microsoft 365 MSO), is 12,344.

/s/ Gregory J. Spak

Gregory J. Spak

1

# Attachment 1

 Official Website of the International Trade Administration  Here's how you know

# Confirmation of Electronic Submission

### Case & Segment Info:

Bar Code: **4811628**

Case Number:  C-201-864

Case Title:  Corrosion-Resistant Steel Products From Mexico

Case Segment:  INV - Investigation

### Document Info:

Security Classification:  Public Version

BPI Document Submission Barcode:  4811617

Document Type:  Brief

Filed On Behalf Of (collective entity):  Ternium

Manual Submission:  No

Comments:

| Barcode: | Document Title - Document (Page Count): |
|---|---|
| 4811628-01 | Rebuttal Brief - Ternium - CVD Rebuttal Brief Public.pdf (21) |

### Submitter Info:

Filed By:  jacob.stowell@whitecase.com

Firm/Organization Name:  White & Case LLP

Filed Date-Time Stamp:  8/18/2025 1:26:33 PM

**NOTE:**

**E-File Similar Submission: Use this feature to generate a new barcode for a new submission.**

**Add More Files: Use this feature to retain the same barcode for all parts of the submission.**



**WHITE & CASE**

August 15, 2025

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
**T** +1 202 626 3600

**whitecase.com**

Case No: C-201-864
Total No. of Pages: 21
Investigation
Enforcement and Compliance
AD/CVD Operations: Office IV
Business Proprietary Information has been redacted in the Table of
Contents; on pages 3, 5, and 8-11; and in Attachment 1.

**PUBLIC VERSION**

BY ELECTRONIC FILING

The Honorable Howard W. Lutnick
Acting Secretary of Commerce
Attention:  Enforcement and Compliance
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC  20230

Attention:      Stephen Bailey, Paul Kebker, Maria Teresa Aymerich

**Re: Certain Corrosion-Resistant Steel Products from Mexico:  Rebuttal Brief**

Dear Secretary Lutnick:

On behalf of Ternium Mexico, S.A. de C.V. ("Ternium"), we submit this rebuttal brief in

the above-referenced proceeding pursuant to Commerce's August 1, 2025 memorandum. [1]

---

[1]  *See* Memorandum to:  The File; From:  Paul Kebker, International Trade Compliance Analyst, Office IV, Antidumping and Countervailing Duty Operations; re: *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (August 1, 2025).

WHITE & CASE

The Honorable Howard W. Lutnick
August 15, 2025

This submission contains no new factual information.  Pursuant to 19 C.F.R. § 351.304(a)(1)(i), Ternium requests proprietary treatment of the bracketed business proprietary information ("BPI") contained in this submission.  We describe below the nature of the information for which Ternium requests proprietary treatment and the basis for the request:

- Information Regarding Business or Trade Secrets.  Contained in the brief and attachment.  This information is protected under 19 C.F.R. § 351.105(c)(l).

- Information Regarding Names of Particular Customers or Suppliers. Contained in the brief and attachment.  Protected under 19 C.F.R. § 351.105(c)(6).

- Information Regarding Amounts of Assistance Applied for or Received. Contained in the brief and attachment.  Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information.  Contained in the brief and attachment.  Protected under 19 C.F.R. § 351.105(c)(11).  The BPI includes financial data.

Public disclosure of this BPI would cause substantial harm to the competitive position of Ternium.  The company consents to the release of the BPI contained in this submission, to the extent required by Commerce, under an appropriately issued Administrative Protective Order.

This submission has been served according to the attached Certificate of Service.  As required by 19 C.F.R. § 351.303(c), we will submit and serve the public version of this submission on the next business day.

The Honorable Howard W. Lutnick
August 15, 2025

Please let us know if you have any questions regarding this submission.

Sincerely,

Gregory J. Spak
Luca Bertazzo
Alberto Castillo[*]
Miguel Mayorga[*]

WHITE & CASE LLP

*Counsel to Ternium Mexico, S.A. de C.V.*

---

[*] Not licensed to practice law in the District of Columbia.  Work performed under the supervision of principals of the Firm, members of the District of Columbia Bar.

CERTIFICATION OF LEGAL COUNSEL

I, Gregory J. Spak, with the law firm of White & Case LLP, counsel to Ternium, certify that I have read the attached rebuttal brief, filed on August 15, 2025, pursuant to the Countervailing Duty Investigations of Certain Corrosion-Resistant Steel Products from Mexico, (C-201-864). In my capacity as counsel for this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the antidumping proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date:   August 15, 2025

**Certain Corrosion-Resistant Steel Products from Mexico**
**(C-201-864)**

**CERTIFICATE OF SERVICE**

I, Luca Bertazzo, certify that a copy of the attached submission was served this 18th day of August 2025 according to <u>Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings</u>, 88 Fed. Reg. 67069 (Sep. 29, 2023) and 19 CFR § 351.303(f)(1)(i) and (ii), on the following parties:

Stephanie M Bell, Esq.
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
Email: sbell@wiley.law

Thomas M. Beline, Esq.
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20037
Email: tbeline@cassidylevy.com

Roger B. Schagrin, Esq.
Schagrin Associates
900 7th Street, NW
Suite 500
Washington, DC 20001
Email: rschagrin@schagrinassociates.com

Stephen P. Vaughn, Esq.
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
Email: svaughn@kslaw.com

Jeffrey M. Winton, Esq.
Winton & Chapman PLLC
1100 13th Street NW
Suite 825
Washington, DC 20005
Email: jwinton@jmwinton.com

Aristeo López
Embassy of Mexico
1911 Pennsylvania Avenue, NW
Washington, DC 20006
Email: alopez@naftamexico.net

Antonino Bertoni
Ministry of Economy of Mexico
Pachuca 189, Col. Condesa, C.P. 06140,
Cuauhtemoc, CDMX
Email: antonino.bertoni@economia.gob.mx

John Anwesen
Lighthill PC
300 New Jersey Avenue, NW
Suite 300
Washington, D.C. 20001
Email: j.anwesen@lighthilltrade.com

_____
Luca Bertazzo

UNITED STATES DEPARTMENT OF COMMERCE

Case No. C-201-864
Investigation
POI:  07/01/2023 – 06/30/2024
Enforcement and Compliance
AD/CVD Operations:  Office IV
Business Proprietary Information has been redacted in the Table of
Contents; on pages 3, 5, and 8-11; and in Attachment 1.

**PUBLIC VERSION**

|  |  |
|---|---|
| IN THE MATTER OF: | ) |
|  | ) |
| CERTAIN CORROSION-RESISTANT | ) |
| STEEL PRODUCTS FROM MEXICO | ) |
|  | ) |

**REBUTTAL BRIEF OF
TERNIUM MEXICO S.A. DE C.V.**

Gregory J. Spak
Luca Bertazzo
Alberto Castillo
Miguel Mayorga

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005-3600
(202) 626-3600

*Counsel to Ternium Mexico S.A. de C.V.*

August 15, 2025

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I.    SUMMARY OF THE ISSUE.................................................................................................1

II.   COMMERCE SHOULD CONTINUE TO FIND THAT MINING RIGHTS FOR LTAR DO
NOT CONFER A BENEFIT TO TERNIUM.......................................................................3

      A.     GOM's Fees Are at Par or Higher Than the Government Fees, Taxes, and Royalties
Charged in Other Countries ...................................................................................3

      B.     Commerce's Chosen Benefit Calculation Demonstrates That Ternium Did Not
Benefit Under the Mining Rights for LTAR..........................................................6

III.  COMMERCE SHOULD CONSIDER THE WEIGHTED-AVERAGE PRODUCTION COST
ACROSS BOTH MINES...................................................................................................7

IV.  COMMERCE'S BENEFIT CALCULATION SHOULD ALSO REFLECT [
            ]'S SALE OF [   ]% OF ITS POI PRODUCTION TO [
      ] ..........................................................................................................................10

V.   CONCLUSION..................................................................................................................11

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL STATUTES AND REGULATIONS

19 CFR 351.511(a)(1)................................................................................................................4

Tariff Act § 771(5)(D)(iii) ......................................................................................................4

Tariff Act § 771(5)(E)(iv)........................................................................................................4

### ADMINISTRATIVE DETERMINATIONS

*Phosphate Fertilizers from the Kingdom of Morocco:  Final Affirmative Countervailing Duty Determination*,
86 Fed. Reg. 9482 (Feb. 16, 2021) ...............................................................................8, 9

*Phosphate Fertilizers from the Kingdom of Morocco:  Preliminary Affirmative Countervailing Duty Determination*,
85 Fed. Reg. 76,522 (Nov. 30, 2020)....................................................................................9

### MISCELLANEOUS

*In the Matter of:  Certain Softwood Lumber Products from Canada, Final Affirmative Countervailing Duty Determination*, USA-CDA-2017-1904-02 (NAFTA May 6, 2024) .......7

North American Free Trade Agreement, U.S.-Can.-Mex art. 1904, §§ 2,3
Dec. 17, 1992, 32 I.L.M. 289 (1993) ......................................................................................7

PUBLIC VERSION

On behalf of Ternium S.A. de C.V. ("Ternium"), we submit the following rebuttal brief for consideration by the Department of Commerce ("Commerce") in its final determination in the countervailing duty ("CVD") investigation of corrosion-resistant steel products ("CORE") from Mexico.[1]  This rebuttal brief responds to the case brief submitted by Steel Dynamics, Inc., United States Steel Corporation, Wheeling-Nippon Steel, Inc., and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners").[2]

## I.    SUMMARY OF THE ISSUE

In the *Post-Preliminary Determination*, Commerce properly determined that there was no benefit under the mining rights for less-than-adequate remuneration ("LTAR") program and it should continue to do so in the final determination.[3]  Commerce initiated an investigation into the provision of mining rights for LTAR based on Petitioners' claims that Ternium's cross-owned affiliates Las Encinas, S.A. de C.V. ("Las Encinas") and Consorcio Minero Benito Juárez Peña Colorada, S.A. de C.V. ("Peña Colorada") (collectively, "Mines") held preferential mining concessions from the Government of Mexico ("GOM").[4]  Specifically, Petitioners alleged that because of the Mexican mining laws, Ternium enjoyed a lower cost of production and, thus, a cost

---

[1] *See* Memorandum to:  The File; Through:  Stephen Bailey, Program Manager, Office IV, Antidumping and Countervailing Duty Operations; From:  Paul Kebker, International Trade Compliance Analyst, Office IV, Antidumping and Countervailing Duty Operations; Subject:  Case and Rebuttal Briefing Schedule; re:  *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (August 1, 2025).

[2] *See* Letter from Cassidy Levy Kent (USA) LLP and Schagrin Associates to Sec'y Commerce, re:  *Certain Corrosion-Resistant Steel Products from Mexico:  Petitioners' Case Brief for Issues Related to Ternium* (Aug. 8, 2025) ("Petitioners' Case Brief").

[3] *See* Memorandum to: Christopher Abbot Deputy Assistant Secretary for Policy and Negotiations, From:  Scott Fullerton, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations; Subject:  *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Post-Preliminary Analysis* at 14, Attachment II (July 31, 2025) at 14 ("Post-Preliminary Decision Memorandum").

[4] *See* Memorandum To:  Eric Greynolds, Director, Office IV, AD/CVD Operations, Office IV; Through:  Stephen Bailey, Program Manager, AD/CVD Operations, Office IV; From:  Maria Teresa Aymerich, International Trade Compliance Analyst, AD/CVD Operations, Office IV; Subject:  *Countervailing Duty Investigation of Corrosion-Resistant Steel Products from Mexico:  New Subsidy Allegation* (Apr. 14, 2025) at 2–6 ("NSA Initiation Memo").

advantage in the market.[5]  The natural question is whether Ternium enjoyed a cost advantage because of the amount it pays the GOM for the right to mine.  Although this can be analyzed in different ways, any reasonable analysis leads to the conclusion that the Mexican mining laws did not provide Ternium a benefit.

*First*, the record disproves that the Mines held preferential mining concessions from the GOM by demonstrating that the fees charged by the GOM were at par or higher than the government fees, taxes, and royalties charged in other countries.[6]  This confirms that Ternium did not pay LTAR to the GOM for its mining rights and that the program did not represent a countervailable subsidy.

*Second*, the analysis of the impact of the alleged lower cost of mining rights on Ternium's production costs also confirms that no LTAR benefit was conferred.  As Ternium argued during the investigation,[7] this analysis is less direct because the product Ternium consumes to manufacture CORE – iron ore pellets – is the result of an industrial process in which the iron ore is only one element of the value of the pellets purchased by Ternium.  A lower cost of pellets may have more to do with the efficiency of the pellet production – in which the GOM has no role – and less with the cost of the mining rights.  Nevertheless, the result is the same.  The record shows that Ternium did not pay LTAR for mining rights or the iron ore pellets that resulted from the mining and industrial process.

---

[5] *See id.*

[6] *See* Letter from White & Case LLP to Sec'y Commerce, re:  *Certain Corrosion-Resistant Steel Products from Mexico: Response to New Subsidy Allegation Questionnaire* (May 12, 2025) at Exhibit NSA-2 at 3–4 ("NSA Questionnaire Response"); *see also* Letter from White & Case LLP to Sec'y Commerce, re:  *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico:  Response to Request for New Subsidy Allegation Benchmarks* (June 9, 2025) at 3–4, Exhibit NSA Benchmarks-1 ("NSA Benchmark Submission").

[7] *See* Letter from White & Case LLP to Sec'y Commerce, re:  *Certain Corrosion-Resistant Steel Products from Mexico: Response to Petitioners' New Subsidy Allegations* (Jan. 13, 2025) at 3–4 ("Response to Petrs.' NSA"); NSA Questionnaire Response at Exhibit NSA-2 at 3–4; NSA Benchmark Submission at 3–4, Exhibit NSA Benchmarks-1.

*Lastly*, if Commerce determines that a revision to the benefit calculation is necessary, consistent with its practice, Commerce should consider the weighted-average production cost across both Mines to accurately measure any LTAR benefit.[8]  In addition, Commerce should also adjust the total benefit attributed to Ternium to account for the fact that [               ] sold [   ]% of its production to [                                              ].[9]

## II.   COMMERCE SHOULD CONTINUE TO FIND THAT MINING RIGHTS FOR LTAR DO NOT CONFER A BENEFIT TO TERNIUM

Regardless of how Commerce analyzes the question of whether Ternium's affiliated Mines held preferential mining concessions from the GOM,[10] the record demonstrates that the Mexican mining laws did not provide Ternium a countervailable subsidy and Ternium did not receive a cost advantage.  Commerce recognized this in the *Post-Preliminary Determination*.[11]  Commerce should continue to do so in the final determination and disregard Petitioners' argument regarding zeroing negative benefits.

### A.   GOM's Fees Are at Par or Higher Than the Government Fees, Taxes, and Royalties Charged in Other Countries

Petitioners alleged that Ternium's affiliated Mines held preferential mining concessions from the GOM.[12]  Taking Petitioners' allegation on its face, the record disproves that Ternium paid LTAR for mining rights from the GOM because the fees charged by the GOM during the POI were at par or higher than the government fees, taxes, and royalties charged in other countries.[13]  However, Commerce's benefit analysis did not properly align with Petitioners' allegation because it relied on a comparison of the production cost of the Mines' output (*i.e.*, iron ore) rather than a

---

[8] *See* **Attachment 1**.

[9] *See id.*

[10] *See* NSA Initiation Memo at 2–6.

[11] *See* Post-Preliminary Decision Memorandum at 14.

[12] *See* NSA Initiation Memo at 2–6.

[13] *See* NSA Benchmark Submission at 3–4, Exhibit NSA Benchmarks-1.

comparison of the cost of the "good" or "service" in question (*i.e.*, mining rights).[14]  Should Commerce measure the alleged benefit of this program using Ternium's proposed Tier 2 benchmark reflecting the average of the fees paid for mining rights in other countries,[15] Petitioner's argument regarding negative benefits would be moot.[16]

When it initiated the new subsidy allegation ("NSA"),[17] Commerce consistently described the "Mining Rights for Less-than-Adequate Remuneration (LTAR)" program as the provision of *mining rights* for LTAR based on Petitioners' allegation that Ternium's affiliated Mines held preferential mining concessions from the GOM.[18]  As Ternium explained in its reply to Petitioner's NSA, its NSA Questionnaire Response, and in its NSA Benchmark Submission, mining rights constitute the provision of a good or service pursuant to Section 771(5)(D)(iii) of the Tariff Act and, thus, should be the focus of the benchmark used in Commerce's analysis.[19]  Accordingly, Ternium provided "documentation in support of the fees, taxes, and royalties paid for mining concessions within Mexico and on the world market."[20]  The mining rights Tier 2 benchmark proposed by Ternium demonstrated that Ternium did not pay LTAR to the GOM for its mining rights.  Instead, the fees charged by the GOM during the POI were at par or higher than the

---

[14] *See* Post-Preliminary Decision Memorandum at 14, Attachment II (tab "Mining Rights for LTAR").

[15] *See* NSA Questionnaire Response at Exhibit NSA-2 at 3–4; Exhibit NSA 40; *see also* NSA Benchmark Submission at 3–4, Exhibit NSA Benchmarks-1.

[16] *See* Petitioners' Case Brief at 2–5.

[17] *See* NSA Initiation Memo at 2–6.

[18] *See* NSA Initiation Memo at 3 (citing Petitioners' NSA at 3–4) (for example, "Petitioner claims that during the 2024 period of investigation, two of Ternium's cross-owned affiliates, Peña Colorada and Las Encinas, mined iron ore in Mexico and therefore held *7.5 percent preferential mining concessions* from the GOM . . . . Financial Contribution: The petitioner alleges that *GOM provides mining concessions to Mexican CORE producers*, which constitutes the provision of a good or service pursuant to section 771(5(D)(iii) of the Act. . . . Benefit: The petitioner alleges that this program confers a benefit pursuant to section 771(5)(E)(iv) of the Act and 19 CFR 351.511(a)(1), as *the GOM's granting of mining concessions to Mexican CORE producers constitutes a benefit when granted in exchange for LTAR*.") (emphases added).

[19] *See* Response to Petrs.' NSA at 3–4; NSA Questionnaire Response at Exhibit NSA-2 at 3–4; NSA Benchmark Submission at 3–4, Exhibit NSA Benchmarks-1.

[20] NSA Questionnaire Response at Exhibit NSA-2 at 3–4, Exhibit NSA-40.

-4-

**PUBLIC VERSION**

government fees, taxes, and royalties charged in other countries.[21]  Specifically, the average of the fees, taxes, and royalties paid by mining companies to the respective government was between 2.4% and 5.4%, which was much lower than the total concession fee of 8.0% (mining royalty of 7.5% *plus* tax of 0.5%) paid by Ternium to the GOM during the POI.[22]

In addition, Ternium submits that the use of Tier 3 benchmark focused on the cost of the resulting product – *i.e.*, iron ore pellets produced after the mining activity and through a process in which the GOM has no participation – clouds the issue and risks confusing "subsidies" with private operating efficiencies or competitive advantages.  Indeed, a more efficient mine with higher profits would pay more for mining rights but will also be deemed to receive a higher subsidy, as demonstrated in Commerce's benefit calculation for Ternium.[23]  For instance, Peña Colorada is [                          ] and, thus, [                                    ].  Consequently, Peña Colorada is [                ] and [            ] for mining rights to the GOM (because the [

                        ]).  And yet under Commerce's Tier 3 benchmark analysis, Peña Colorada is deemed to have received a [        ] subsidy than Las Encinas which is [

        ].[24]  This absurd result demonstrates the drawbacks to Commerce's chosen methodology in this case.

Importantly, when conducting the analysis under a Tier 2 benchmark – *i.e.*, relying on the cost of the mining rights themselves in the form of royalty rates – the issue raised by Petitioners regarding negative benefits becomes moot because the price of the mining rights in percentage terms was the same for both Mines during the POI (*i.e.*, 8.0%).

---

[21] *See* NSA Benchmark Submission at Exhibit NSA Benchmarks-1.

[22] *See id.* at 3–4, Exhibit NSA Benchmarks-1; *see also* NSA Questionnaire Response at Exhibit NSA-40.

[23] *See* Post-Preliminary Decision Memorandum at Attachment II (tab "Mining Rights for LTAR").

[24] *See id.* (calculating a benefit in cost of [                        ] for Peña Colorada and a benefit of [
        ] for Las Encinas).

-5-

PUBLIC VERSION

B.     **Commerce's Chosen Benefit Calculation Demonstrates That Ternium Did Not Benefit Under the Mining Rights for LTAR**

Even under Commerce's chosen benefit calculation based on a comparison of the cost of production of iron ore to a Tier 3 benchmark, the record demonstrates that Ternium did not benefit from allegedly receiving mining rights for LTAR. Accordingly, Commerce need not adjust its benefit calculation.

Record evidence demonstrates that Ternium did not benefit from GOM's alleged provision of mining rights for LTAR during the POI. As explained in Ternium's initial reply to Petitioner's NSA, "a recent Mexican law <u>increasing</u> mining concession fees and royalties" did not provide a benefit to Ternium because it was not specific.[25] Ternium's Mines have not "received any preferential treatment or preferential rates for the {mining} concessions compared to other mines in Mexico."[26]

In its subsequent responses to the NSA questionnaires, Ternium submitted detailed information regarding its mining rights in Mexico, demonstrating that it did not receive these rights for LTAR. Ternium explained that it paid an annual special fee for mining rights equal to "7.5% of the positive difference that results from the income of the sale of the minerals extracted from a mining concession minus the authorized deductions."[27] Ternium also provided detailed narrative responses and supporting documentation describing the Mexican mining rights system.[28] Commerce successfully verified this information, including the unit production cost at both Mines and "noted no discrepancies" in its verification report.[29]

---

[25] *See* Response to Petrs.' NSA at 2.

[26] *Id.* at 3.

[27] NSA Questionnaire Response at 6–7.

[28] *See id.* at 1–7, Exhibits NSA-1-17.

[29] Memorandum to: The File, Through: Eric Greynolds, Director, Office IV, Antidumping and Countervailing Duty Operations; From: Sunesh Maniam, Senior International Trade Compliance Analyst, Office I, Antidumping and Countervailing Duty Operations, Maria Teresa Aymerich, International Trade Compliance Analyst, Office IV,

**PUBLIC VERSION**

Based on record evidence, Commerce properly determined in its *Post-Preliminary Determination* that Ternium received no benefits under this program.[30]  To determine this, Commerce "compared Ternium Mexico's price build-up for iron ore it extracted from GOM mines during the POI to the tier-three, per-unit iron ore benchmark price … on an annual basis."[31]  Specifically, Commerce found that "Ternium Mexico's annual per-unit cost to extract iron ore from GOM mines during the POI exceeds the annual, per-unit iron ore benchmark price" and thus the program "did not confer a benefit upon Ternium Mexico during the POI."[32]

In sum, as determined by Commerce in the *Post-Preliminary Determination*, the record demonstrates that Ternium did not receive a benefit through this program during the POI and Commerce need not make any changes to the benefit calculation in the final determination.

## III.    COMMERCE SHOULD CONSIDER THE WEIGHTED-AVERAGE PRODUCTION COST ACROSS BOTH MINES

Should Commerce decide to revise the benefit calculation, it should do so by considering the weighted-average production cost across both Mines, calculating one production cost for the input (*i.e.*, iron ore) for Ternium as a whole, which Commerce can then compare to the Tier 3 benchmark to more accurately measure the benefit under this program.  This approach is consistent with Commerce's practice and renders Petitioners' argument moot.

When determining the production cost of a good, Commerce relies on the weighted-average costs of each input or process involved in the production of the good, using weighted-

---

Antidumping and Countervailing Duty Operations, Paul Kebker International Trade Compliance Analyst, Office IV, Antidumping and Countervailing Duty Operations; Subject: *Verification of the Questionnaire Responses of the Ternium Mexico, S.A. de C.V., re: Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico* at 8 (July 24, 2025) ("Verification Report") (citing Letter from White & Case LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Verification Exhibits* (July 18, 2025) at Exhibits CVD VE-1, CVD VE-7 ("Verification Exhibits")).

[30] Post-Preliminary Decision Memorandum at 14.

[31] *Id.*

[32] *Id.*

PUBLIC VERSION

averages across facilities where necessary to determine the cost of production for the whole company.[33]  For example, in *Phosphate Fertilizers from Morocco*,[34] Commerce's analysis begins with respondent's "total reported mining costs" during the POI across all of respondent's mines, and then Commerce makes necessary adjustments to derive a weighted-average production cost across all of respondent's mines that was then compared to the benchmark.[35]

In the *Post-Preliminary Determination*, Commerce properly found that "Ternium Mexico's annual per-unit cost to extract iron ore from GOM mines during the POI exceeds the annual, per-unit iron ore benchmark price" and, thus, the program "did not confer a benefit upon Ternium Mexico during the POI."[36]  However, rather than considering Ternium's annual weighted-average per-unit production cost across both Mines, Commerce instead considered the annual weighted-average per-unit production cost at **each** of Ternium's Mines (*i.e.*, [     ] USD/MT for Peña Colorada and [     ] USD/MT for Las Encinas) and compared each of the mine's costs to the Tier 3 benchmark separately.[37]  As a final step, Commerce combined the resulting benefit values for each mine to arrive at Ternium's calculated benefit for the program

---

[33] For example, when reporting the cost of production in the antidumping context Commerce asks respondents to report the weighted average cost across the respondent's multiple facilities.  *See* Section D of the Antidumping Questionnaire at Questions I.D ("If more than one unique product produced at a domestic facility falls within the definition of a specific CONNUM, determine first the weighted-average CONNUM specific costs at that facility; then calculate the company-wide weighted-average CONNUM specific costs."), III.C.1("If you produced the merchandise under consideration at more than one domestic facility during the POI, provide a worksheet that demonstrates the method you used to weight-average the production costs of each facility to compute the single weighted average COM (and the individual fields included therein) for the CONNUMs.").

[34] *See* Post-Preliminary Decision Memorandum at 5 n.26 (citing *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (February 16, 2021) ("*Phosphate Fertilizers from Morocco*")).

[35] *See Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 76,522 (Nov. 30, 2020), accompanying Preliminary Calculation Memorandum at 7–8 ("In order to arrive at the cost of mining phosphate rock, we started with OCP's 2019 total reported mining costs …, and deducted the following line items … .  This resulted in the phosphate rock cost (delivered to plant) of … per metric ton."), *initial point of analysis* underlined in final, *Phosphate Fertilizers from Morocco*, accompanying Final Calculation Memorandum at 2 (adding a profit value and removing inland freight costs that were double counted in the calculation).

[36] Post-Preliminary Decision Memorandum at 14.

[37] *Id.* at Attachment II (tab "Mining Rights for LTAR").

-8-

and set any resulting negative margin to zero.[38]

Should Commerce decide to revise the benefit calculation, it should do so consistent with its practice and the description in the *Post-Preliminary Determination* by first determining Ternium's "annual per-unit cost to extract iron ore from GOM mines during the POI," and then comparing this cost to Commerce's chosen Tier 3 benchmark. This approach makes all the more sense in this case where the GOM provided mining rights to the Mines at the same price (8% of the mine's profits).[39] Moreover, it renders Petitioners' argument regarding zeroing negative benefits moot.[40]

Ternium provides in **Attachment 1** a sample calculation worksheet illustrating this adjusted calculation. As shown, after determining the annual weighted-average per unit production cost at each Mine, the next step is to calculate the annual weighted-average production cost across both Mines (*i.e.*, Ternium as a whole) during the POI:[41]

$$\frac{([\quad]USD/MT \times [\quad] MT) + ([\quad]USD/MT \times [\quad] MT)}{([\quad]MT + [\quad]MT)} = [\quad] USD/MT$$

The resulting per-unit cost is [    ] than Commerce's chosen Tier 3 benchmark of [    ] USD/MT.[42] Thus, the record demonstrates that Ternium did not receive a benefit under

---

[38] *Id.* (showing an excel formula that sets negative margin to zero as the final step in the benefit analysis in cell E-49).

[39] NSA Questionnaire Response at 6–7.

[40] Ternium notes that Commerce's practice of zeroing negative benefits has not been universally upheld. *See In the Matter of: Certain Softwood Lumber Products from Canada, Final Affirmative Countervailing Duty Determination*, USA-CDA-2017-1904-02, at 70-71 (NAFTA May 6, 2024) ("When 'negative benefits' are an artifact of how Commerce chose to calculate the benefit, whether there has been a statutorily permitted offset does not apply. The Panel therefore finds that Commerce's use of 'zeroing' negative benefits is not in accordance with law. … Commerce is directed to remove from the formulas the result that if transaction price exceeds the benchmark price the benefit is set to zero."); *see also* North American Free Trade Agreement, U.S.-Can.-Mex., art. 1904, §§ 2,3 Dec. 17, 1992, 32 I.L.M. 289 (1993) ("each Party shall replace judicial review of final antidumping and countervailing duty determinations with binational panel review. … The panel shall apply the standard of review set out in Annex 1911 and the general legal principles that a court of the importing Party otherwise would apply to a review of a determination of the competent investigating authority.").

[41] *See* **Attachment 1**.

[42] *See* Post-Preliminary Decision Memorandum at Attachment II (tab "Mining Rights for LTAR"); *see also* **Attachment 1**.

this program during the POI.

Finally, if Commerce makes this adjustment, the resulting calculation involves only one comparison – *i.e.*, Ternium's annual per unit production cost during the POI – to the Tier 3 benchmark. Petitioners' argument regarding the zeroing of negative benefits becomes irrelevant and Commerce should disregard it. Specifically, as shown in **Attachment 1,** the comparison yields [                   ] and Commerce [                                   ].[43] But, the result of the analysis does not change: Ternium did not receive a benefit under the mining rights at LTAR program during the POI.

## IV.  COMMERCE'S BENEFIT CALCULATION SHOULD ALSO REFLECT [           ]'S   SALE   OF   [  ]%   OF   ITS   POI   PRODUCTION   TO   [                           ]

Should Commerce decide to adjust the benefit calculation as described above, it should also reflect the fact that [                ] sold [   ]% of its POI production of iron ore pellets to [                  ]. Record evidence demonstrates that Ternium [

] of [                ]'s POI production of iron ore pellets.[44] Instead, [   ]% of [

]'s pellets was sold to [                        ], which owns [   ]% of [              ]'s shares.[45] Commerce successfully verified this,[46] but its benefit calculation did not reflect it.[47] Thus, should Commerce decide to adjust the benefit calculation, it should only attribute [     ] of

---

[43] *See* **Attachment 1** (showing an excel formula that sets negative benefits to zero in cell E-57).

[44] *See* Verification Exhibits at Exhibit CVD VE-7 at 82; *see also* Letter from White & Case LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to Section III of the Questionnaire* (Dec. 5, 2024) at Exhibit [              ] 5 ("Initial Response").

[45] *See* Letter from White & Case LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from Mexico: Response to Section III Identifying Affiliated Companies* (October 30, 2024) at 5, n.1, Exhibit 3 at 47 ("Affiliates Response").

[46] *See* Verification Report at 4 ("Ternium Mexico provided its list of subsidiaries. Company officials explained the business activity of each subsidiary and whether it provided inputs or services to Ternium Mexico.").

[47] *See* Post-Preliminary Decision Memorandum at Attachment II (tab "Mining Rights for LTAR" attributing [                                            ]).

PUBLIC VERSION

any purported benefit from [                    ] to Ternium as demonstrated in **Attachment 1**.

## V.   CONCLUSION

Ternium requests that Commerce reject Petitioners' arguments and issue the final determination in this investigation consistent with the above comments and with Ternium's Case Brief.[48]

Sincerely,

Gregory J. Spak
Luca Bertazzo
Alberto Castillo[49]
Miguel Mayorga[50]

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005-3600
(202) 626-3600

*Counsel to Ternium Mexico S.A. de C.V.*

August 15, 2025

---

[48]  *See* Letter from White & Case LLP to Sec'y Commerce, re:  *Certain Corrosion-Resistant Steel Products from Mexico: Redacted Version of Case Brief* (August 14, 2025).

[49]  Not licensed to practice law in the District of Columbia.  Work performed under the supervision of principals of the Firm, members of the District of Columbia Bar.

[50]  Not an attorney and not licensed to practice law in the District of Columbia.  Work performed under the supervision of principals of the Firm, members of the District of Columbia Bar.

# Attachment 1

CORE from Mexico Post-Preliminary Determination (C-201-864)
Investigation
POI: 1/1/2023-12/31/2023
Ternium Mexico
**BUSINESS PROPRIETARY INFORMATION**

**Las Encinas**

|  |  | Amount | | Source |
|---|---|---|---|---|
| [ |  | 40,342,086.88 | USD |  ] |
| [ |  | . |  |  ] |
| [ |  | . |  |  ] |
| [ |  | . |  |  ] |
| [ |  | . |  |  ] |
| [ |  | . |  |  ] |
| [ |  | . |  |  ] |
| [ |  | . |  |  ] |
| [ |  |  |  |  ] |

**Peña Colorada**

|  | Amount | | Source |
|---|---|---|---|
| [ |  |  |  ] |
| [ | 10,512,661.66 | USD |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |

**Weighted-Average Cost and Consolidated Profit**

|  | Amount | | Source |
|---|---|---|---|
| [ | . |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ | 170.98 | USD |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| [ |  |  |  ] |
| P = N/O | CVD rate about mining rights | 0.00% |  |

\* Source: *See* Ternium Mexico's Letter, "Response to New Subsidy Allegation Questionnaire", dated May 12, 2025 (Ternium Mexico's NSAQR)

\*\* Source: *See* Ternium Mexico's Letter, "Response to Request for New Subsidy Allegation Benchmarks," dated June 9, 2025 (Ternium Mexico's Benchmark Submission)

\*\*\* Source: *See* Memorandum, "Verification of the Questionnaire Responses of Ternium Mexico, S.A. de C.V.," dated July 24, 2025 (Ternium Mexico's Verification Report)

\*\*\*\* Source: *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 FR 49935 (July 29, 2016), and accompanying Issues and Decision Memorandum at 16 (*CRS from Russia*)