# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| | ) | |
| TERNIUM MEXICO, S.A. DE C.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PUBLIC VERSION** |
| v. | ) | Court No. 25-00236 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| STEEL DYNAMICS, INC., AND THE UNITED | ) | |
| STEEL, PAPER AND FORESTRY, RUBBER, | ) | |
| MANUFACTURING, ENERGY, ALLIED | ) | |
| INDUSTRIAL AND SERVICE WORKERS | ) | |
| INTERNATIONAL UNION, AFL-CIO, CLC, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
Justin Merhar
Staff Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

Brendan D. Jordan
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

July 6, 2026

*Attorneys for Defendant*

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.      The Administrative Determination Under Review .........................................2

    II.     Issues Presented for Review ........................................................................2

STATEMENT OF FACTS ...........................................................................................3

    I.      Procedural Background.................................................................................3

         A.  Preliminary Determination and Subsequent Administrative Proceedings ..........6

         B.  Post-Preliminary Analysis.........................................................9

         C.  Final Determination ...............................................................12

SUMMARY OF THE ARGUMENT .........................................................................13

ARGUMENT ............................................................................................................14

    I.      Standard of Review.....................................................................................14

    II.    Commerce's Finding That Ternium's Ministerial Error Allegation Did Not Meet The Definition Of A Ministerial Error Was Supported by Substantial Evidence and in Accordance with Law .................................................................15

    III.   Commerce's Decision to Not Accept Unsolicited and Untimely New Factual Information Was Not an Abuse of the Discretion Commerce Possess to Conduct CVD Proceedings.....................................................................................20

    IV.   Commerce's Decision to Use Adverse Facts Available Is Supported by Substantial Evidence and in Accordance with Law .................................................25

         A.  Commerce's Decision to Use Facts Available Is Supported by Substantial Evidence and in Accordance with Law.............................................26

         B.  Commerce's Application of Adverse Facts Available Is Supported by Substantial Evidence and Is in Accordance with Law .....................................27

         C.  The Adverse Facts Available Subsidy Rate Selected Is Supported by Substantial Evidence and in Accordance with Law ..........................................29

V.    Commerce's Rejection and Removal of Ternium's Rebuttal Brief Was Supported by Substantial Evidence, in Accordance with Law, and Was Not an Abuse of Its Discretion ..................................................................................................32

    a.   Ternium Failed to Exhaust Administrative Remedies ......................................32

    b.   Commerce's Rejection and Removal of Ternium's Rebuttal Brief was Supported by Substantial Evidence, Lawful, and Not an Abuse of Discretion 35

CONCLUSION..................................................................................................................37

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*ABB, Inc. v. United States*,
   920 F.3d 811 (Fed. Cir. 2019)......................................................................... 33

*Alloy Piping Prods., Inc. v. United States*,
   201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002) ............................................... 16

*Bonney Forge Corp. v. United States*,
   560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) ............................................... 23

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017)......................................................................... 32

*China Steel Corp. v. United States*,
   393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019) ......................................... 28, 29

*Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
   44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ................................................... 23

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966).......................................................................................... 15

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007)............................................................ 32, 33, 35

*Diamond Sawblades Manufacturers' Coalition v. United States*,
   986 F.3d  (Fed Cir. 2012)................................................................................ 31

*Dongtai Peak Honey Indus. Co. v. United States*,
   777 F.3d 1343 (Fed. Cir. 2015)...................................................................... 22

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010)...................................................................... 33

*Fischer S.A. Comercio v. United States*,
   700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) .............................................. 23

*Godaco Seafood Joint Stock Co. v. United States*,
   435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) .............................................. 20

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) ................................................................. 22, 24

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
   992 F.3d 1348 (Fed. Cir. 2021) ............................................................................. 30, 32

*Husteel Co. v. United States*,
   77 F. Supp. 3d 1286 (Ct. Int'l Trade 2015) ................................................................ 25

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) .................................................................................................... 33

*Micron Tech., Inc. v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997) .................................................................................. 23

*Mittal Steel Point Lisas Ltd. v. United States*,
   548 F.3d 1375 (Fed. Cir. 2008) .................................................................................. 33

*Mukand, Ltd. v. United States*,
   767 F.3d 1300 (Fed. Cir. 2014) .................................................................................. 26

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003) ........................................................................... *passim*

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
   284 F.3d 1261 (Fed. Cir. 2002) .................................................................................. 37

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995) .................................................................................... 19

*NTSF Seafoods Joint Stock Co.*,
   *Slip Op. 22-38*, 2022 WL 1375140 ............................................................................. 34

*Oman Fasteners, LLC v. United States*,
   125 F.4th 1068 (Fed. Cir. 2025) ................................................................................. 15

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009) .................................................................................. 15

*Pastificio Gentile S.r.L v. United States*,
   798 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ............................................................. 30

*Prime Time Commerce LLC v. United States*,
   495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021) ............................................................. 33

*PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012) .................................................................................... 22

iv

*Samsung Electronics Co. Ltd. v. United States*,
72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015) ................................................................. 34

*Sandvik Steel Co. v. United States*,
164 F.3d 596 (Fed. Cir. 1998).................................................................................... 33

*SeAH Steel Corp. v. United States*,
659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) ............................................................. 23

*Stanley Works (Langfang) Fastening Systems Co. v. United States*,
279 F. Supp. 3d 1172 (Ct. Int'l Trade 2021) ............................................................. 33

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005).................................................................................. 15

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
342 F. Supp 2d 1191 (Ct. Int'l Trade 2004) .............................................................. 33

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005) 23

*Timken U.S. Corp. v. United States,*
434 F.3d 1345 (Fed. Cir. 2006)................................................................................... 19

*Tri Union Frozen Prods., Inc. v. United States*,
163 F. Supp. 3d 1255 (2016) ..................................................................................... 20

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009).................................................................................................... 15

*Viet I-Mei Frozen Foods Co. v. United States*,
839 F.3d 1099 (Fed Cir. 2016)................................................................................... 28

**Statutes**

19 U.S.C. § 1516a(b) ...................................................................................................... 15

19 U.S.C. § 1673d(e) ........................................................................................................ 7

19 U.S.C. § 1675(h) .............................................................................................. 16, 17, 18

19 U.S.C. § 1677(5) ..................................................................................................... 6, 13

19 U.S.C. § 1677e(a)..................................................................................................... 26, 27

19 U.S.C. § 1677e(b) .................................................................................................. 27, 29, 30

19 U.S.C. § 1677e(d) .................................................................................................... 29, 30

19 U.S.C. § 1677m(a) ......................................................................................................... 20

19 U.S.C. § 1677m(d) ......................................................................................................... 26

19 U.S.C. § 1677m(e) ......................................................................................................... 20

28 U.S.C. § 2637(d) ........................................................................................................... 32

## Rules

Ct. Int'l Trade R. 56.2 ......................................................................................................... 1

## Regulations

19 C.F.R. § 351.102(b) ....................................................................................................... 20

19 C.F.R. § 351.104(a)................................................................................................... 20, 21

19 C.F.R. § 351.224(b) ....................................................................................................... 16

19 C.F.R. § 351.224(c)........................................................................................................ 16

19 C.F.R. § 351.224(d) ....................................................................................................... 16

19 C.F.R. § 351.224(e)........................................................................................................ 16

19 C.F.R. § 351.224(f) ..................................................................................................... 7, 18

19 C.F.R. § 351.224(g) ......................................................................................................... 7

19 C.F.R. § 351.301 ............................................................................................................ 20

19 C.F.R. § 351.301(c)........................................................................................................ 25

19 C.F.R. § 351.302(d) ............................................................................................. 20, 21, 25

19 C.F.R. § 351.308(j) .............................................................................................. 29, 31, 32

19 C.F.R. § 351.309(c)........................................................................................................ 33, 34

19 C.F.R. § 351.309(d) ............................................................................................... 32, 35

19 C.F.R. § 351.505(a)...................................................................................................... 13


**Administrative Determinations**

*Aluminum Extrusions from Mexico: Final Affirmative Countervailing Duty Determination*, 89
    Fed. Reg. 80,496 (Dep't of Commerce October 3, 2024).......................................... 31

*Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 42,229 (Dep't of
    Commerce Aug. 29, 2025)...................................................................... 2, 12, 13

*Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative
    Countervailing Duty Determination, and Alignment of Final Determination with Final
    Antidumping Duty Determination*, 90 Fed. Reg. 9,226 (February 10, 2025) ............................. 6

*Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist
    Republic of Vietnam*, 90 Fed. Reg. 59,488 (Dep't of Commerce Dec. 19, 2025) ................ 2, 13

*Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist
    Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 80,204
    (Dep't of Commerce Oct. 2, 2024) .......................................................................... 3

*Certain Cut-to-Length Carbon Steel Plate from Mexico: Final Results of Countervailing Duty
    Administrative Review*, 69 Fed. Reg. 1,972 (Dep't of Commerce January 13, 2004).............. 31


**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R.
    Doc. 103-316, Vol. 1 (1994)................................................................................ 30

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| TERNIUM MEXICO, S.A. DE C.V., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES ) | |
| ) | |
| **Defendant,** ) | |
| and ) | **Court No. 25-00236** |
| ) | |
| UNITED STATES STEEL ) | |
| CORPORATION, STEEL DYNAMICS, ) | |
| INC., and THE UNITED STEEL, PAPER ) | |
| AND FORESTRY, RUBBER, ) | |
| MANUFACTURING, ENERGY, ALLIED ) | |
| INDUSTRIAL AND SERVICE ) | |
| WORKERS INTERNATIONAL UNION, ) | |
| AFL-CIO, CLC, ) | |
| ) | |
| **Defendant-Intervenors,** ) | |
| ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment upon the agency record filed by plaintiff Ternium Mexico, S.A. de C.V. (Ternium). Ternium challenges certain aspects of the *Final Determination* of the U.S. Department of Commerce's countervailing duty (CVD) investigation of certain corrosion-resistant steel products (CORE) from Mexico.

1

As we demonstrate below, Commerce's *Final Determination* is supported by substantial evidence and in accordance with law. Accordingly, we respectfully request that the Court deny Ternium's motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.     The Administrative Determination Under Review

The administrative determination under review is *Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 42,229 (Dep't of Commerce Aug. 29, 2025) (Final Determination) (P.R. 431) and accompanying Issues and Decisions Memorandum (Aug. 25, 2025) (IDM) (P.R. 426). The period of investigation (POI) is January 1, 2023, through December 31, 2023. *Id.* The resulting CVD order was published on December 19, 2025. *See Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam*, 90 Fed. Reg. 59,488 (Dep't of Commerce Dec. 19, 2025) (Order).

### II.     Issues Presented for Review

1.     Whether Commerce's finding that Ternium's ministerial error allegation did not meet the definition of a ministerial error is supported by substantial evidence and in accordance with law.

2.     Whether Commerce properly rejected certain questionnaire responses for untimely and unsolicited new factual information from the record.

3.     Whether Commerce's decision to not accept new factual information at verification is supported by substantial evidence, in accordance with law, and not an abuse of discretion.

4.     Whether Commerce's decision to apply AFA to certain financing programs is supported by substantial evidence and in accordance with law.

2

5. Whether Commerce's decision to reject Ternium's rebuttal brief is supported by substantial evidence, in accordance with law, and not an abuse of discretion.

## **STATEMENT OF FACTS**

### **I. Procedural Background**

In September 2024, the petitioners[1] filed a petition with Commerce seeking the imposition of countervailing duties on imports of CORE from Mexico. *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated September 5, 2024 (P.R 1-2, C.R. 1-2).[2] Commerce then initiated a CVD investigation of CORE from Mexico. *See Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 80,204 (Dep't of Commerce Oct. 2, 2024) (Initiation Notice) (P.R. 98).

Commerce selected Galvasid S.A. de C.V. (Galvasid) and Ternium as mandatory respondents for the CVD investigation because they were the two largest producers or exporters of the subject merchandise by volume based on U.S. Customs and Border Protection (CBP) data. *See* Memorandum, "Respondent Selection," dated October 16, 2024 (P.R. 112).

In October 2024, Commerce issued the Initial CVD Questionnaire to the Government of Mexico (GOM), which was responsible for forwarding the questionnaire to Galvasid and Ternium. *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated October 16, 2024

---

[1] The petitioners are Steel Dynamics, Inc. (SDI), Nucor Corporation (Nucor), United States Steel Corporation (U.S. Steel), Wheeling-Nippon Steel, Inc. (Wheeling-Nippon), and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the USW) (collectively, "petitioners").

[2] P.R. denotes citations to the public record index, while C.R. denotes citations to the BPI record index. (ECF No. 22).

(Initial Questionnaire) (P.R. 111). In the Initial Questionnaire, Commerce instructed Ternium to provide certain information on financing from Bancomext, a Mexican state-owned bank and export credit agency. *See id.* at 3-4 (footnotes removed). Commerce further instructed Ternium to respond to all questions in the Standard Questions Appendix and provide an explanation of the loans provided by Bancomext. *Id.*

Relevant here, in response to Commerce's request for information on Bancomext financing, Ternium stated:

> Ternium Mexico also notes that it entered into a [                ] loan agreement ("[          ] Loan Agreement") with Bancomext in 2012 (i.e., outside the POI). Specifically, between 2012 and 2018, Ternium Mexico had a [        ] loan ("[              ] Loan") with Bancomext. In Exhibit 11, Ternium Mexico provides the [              ] Loan Agreement together with all successive amendments.
>
> Because the [              ] Loan is of a recurring nature and was applied for, used, or benefitted from outside the POI, Ternium Mexico submits that no benefit was granted during the POI. Accordingly, Ternium Mexico does not respond to the Standard Questions Appendix, the Loan Benchmark and Loan Guarantee Appendix, and the Loan Template for the [              ] Loan.
>
> Ternium IQR, Program Specific Questions Section of Section III at 8 (C.R. 148).

After reviewing Ternium's initial response, Commerce issued a supplemental questionnaire to Ternium on December 30, 2024. *See* Commerce's Letter, "Supplemental Section III Questionnaire for {Ternium}," dated December 30, 2024 (Ternium SQ1) (P.R. 215, C.R. 190). In the questionnaire, Commerce asked for information regarding Ternium's Bancomext financing and its Nacional Financiera, S.N.C., Development Banking Institution (NAFIN) loans. *Id.* at 6. Specifically, Commerce instructed Ternium to "{p}lease provide the date upon which Ternium Mexico repaid the [              ] Loan in full. If Ternium Mexico did not repay this loan in full prior to the POI, then please respond to the Standard Questions

Appendix, the Loan Benchmark, and Loan Guarantee Appendix, and the Loan Template for the

[                    ] loan." *Id.*

Before Ternium responded to the first supplemental questionnaire, Commerce issued

Ternium a second supplemental questionnaire. *See* Commerce's Letter, "Second Supplemental

Section III Questionnaire for {Ternium}," dated January 10, 2025 (Ternium SQ2) (P.R. 249,

C.R. 201). In this questionnaire, Commerce asked more detailed questions regarding Ternium's

Banconmext financing and NAFIN loan. *See id.* at 5-6. Commerce instructed Ternium to:

"complete a Loan Template in Excel format for all [

] with Bancomext during the POI{;}" provide a translated the [                    ]

Agreement between Ternium and Bancomext; provide an explanation of terms of the [          ]

program; and provide "a list of all invoices/payments submitted to the Bancomext [          ]

program during the POI, including the invoice number, the name of the customer/'purchaser, and

the product sold." *Id.* For the NAFIN Loan, Commerce further instructed Ternium to provide "a

copy of the Loan Template in Excel format for this loan, and any other loans received by Pena

Colorada from NAFIN during the average useful life period." *Id.*

Commerce received Ternium's responses to the two supplemental questionnaires on

January 13, 2026, and January 21, 2026, respectively. *See* Ternium Mexico's Letters, "Response

to Supplemental Section III Questionnaire," dated January 13, 2025 (Ternium SQR1) (P.R. 252,

C.R. 202-09); and "Response to Second Supplemental Section III Questionnaire," dated January

21, 2025 (Ternium SQR2) (P.R. 257, C.R. 210-27). Ternium's responses contained several

deviations from the instructions. First, Ternium's Excel format for the Bancomext financing left

blank the columns entitled "Date of Loan Agreement" and "Life of Loan (days if short-term,

years if long-term)." *See* Ternium SQR2 at Exhibit Supp2. 10 (C.R. 215). Additionally,

5

Ternium reported identical dates for

[                    ] *Id.* Ternium's Excel format for the NAFIN loans also had similar omissions and inaccuracies. *See id.* at Exhibit Supp2. 17 (C.R. 216).

**A.  <u>Preliminary Determination and Subsequent Administrative Proceedings</u>**

Commerce issued its Preliminary Determination on February 10, 2025. *See Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 90 Fed. Reg. 9,226 (February 10, 2025) (Preliminary Determination) (P.R. 284), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 281).  In it, Commerce notified the parties that it would issue a subsequent post-preliminary determination to address (1) Ternium's use of the Manufacturing Industry, Maquiladora and Export Services Program (IMMEX); NAFIN financing; and (2) new subsidy allegations (NSAs) from the petitioners. PDM at 3-4.

In addition, Commerce found that Bancomext  "is an authority pursuant to {19 U.S.C. § 1677(5)(B)(i)}, that financing provided by Bancomext constitutes a financial contribution pursuant to {19 U.S.C. § 1677(5)(D)(i)}, and the financing confers a benefit pursuant to {19 U.S.C. § 1677(5)(E)(ii)}, and is an export subsidy because it is contingent upon export performance . . ." *Id.* at 9-10.  Based on the conclusions regarding Bancomext's programs, Commerce calculated a net countervailable subsidy rate of 1.56 percent *ad valorem* for Ternium. *Id.* at 10.

On February 18, 2025, Ternium sent Commerce a letter alleging a ministerial error in the calculation of Ternium's countervailable subsidy rate in the Preliminary Determination.  *See* Ternium's Letter, "Allegation of Significant Ministerial Error Contained in the Preliminary

Determination," dated February 18, 2025 (Ministerial Error Allegation) (P.R. 299, C.R. 236-37). Specifically, Ternium alleged an error in inputting the number of days to calculate the benefit for the Bancomext financial factoring program. *Id.* at 3.  On March 14, 2025, Commerce responded to Ternium's allegations finding that they did "not constitute significant ministerial errors within the meaning of {19 U.S.C. § 1673d(e)}, {} and 19 CFR 351.224(f) and (g)." *See* Commerce's Letter, "Allegations of Significant Ministerial Errors in the Preliminary Determination," dated March 14, 2025, at 1 (Commerce's Ministerial Response) (P.R. 308, C.R. 238).  Commerce explained that "Commerce's decision to use the interest payment reflecting a payment period of 365 days, rather than 180 days, in its benefit calculation was a methodological choice, and not a ministerial error." *Id.* at 4.  Commerce explained its decision was made based on record evidence stating, "{o}ur decision to use 365 days as the number of days on which Ternium's Bancomext loans accrued is supported by the record evidence that Ternium supplied to Commerce." *Id.* at 4.  Commerce further provided a detailed description of the data used to reach its finding of the accrual period such as an examination of interest paid on loans during the POI found in Exhibit Supp2. 10.  *Id.* at 4 (footnotes removed).

Prior to the release of the Preliminary Determination, petitioners filed timely new subsidy allegations (NSA).  *See* Petitioner's Letter, "Petitioners' New Subsidy Allegations," dated January 2, 2025 (NSA Allegations) (P.R. 217-24, C.R. 191-96).  On April 14, 2025, Commerce initiated an investigation on five NSA programs alleged by the petitioners: (1) Mining Rights for Less-than-Adequate Remuneration (LTAR); (2) GOM's Nonenforcement of Property and Environmental Laws and Failure to Meaningfully Enforce Local Communities' Rights to Compensation; (3) State of Coahuila de Zaragoza - Law of Economic Development; (4) Law for the Promotion of Investments in the State of Jalisco; and (5) Tax Credit for Research and

Development.  *See* Memorandum, "New Subsidy Allegations," dated April 14, 2025 ("NSA Initiation Memorandum") (P.R. 317).  Between April 24, 2025, and June 16, 2025, Commerce issued, and Ternium responded to two questionnaires regarding the NSAs.  *See* Commerce's Letter, "New Subsidy Allegation Questionnaire," dated April 24, 2025 (P.R. 317); Ternium's Letter, "Response to New Subsidy Allegation Questionnaire," dated May 12, 2025 (Ternium NSA Response) (P.R. 343-50, C.R. 240-95); Ternium's Letter, "Ternium Mexico New Subsidy Allegations Supplemental Questionnaire Response," dated June 16, 2025 (Ternium Rejected NSA SQR) (P.R. 375, C.R. 315-21).

On July 10, 2025, Commerce informed Ternium that it was rejecting portions of Ternium's June 16, 2025, NSA supplemental questionnaire response because Ternium had "provided unsolicited new factual information regarding the Bancomext Program."  *See* Commerce's Letter, "{NSA} Supplemental Questionnaire for Ternium," dated July 10, 2025 (NSA Questionnaire Rejection) (P.R. 392); *see also* Ternium Rejected NSA SQR (P.R. 375, C.R. 315-21).  Commerce instructed Ternium on which portions of the brief to remove and provided an opportunity to resubmit without the new factual information.  *Id.*  On July 16, 2025, Ternium resubmitted its supplemental response with the NFI removed as instructed by Commerce.  *See* Ternium's Letter, "Redacted Version of Response to New Subsidy Allegation Supplemental Response," dated July 16, 2025 (Ternium NSA SQR) (P.R. 395, C.R. 342-47).

Commerce issued Ternium a third NSA questionnaire on June 24, 2025, asking whether Ternium received tax savings under the Tax Credit for Research and Development program.  *See* Commerce's Letter, "Supplemental Questionnaire for Ternium Mexico, S.A. de C.V.," dated June 24, 2025 (P.R. 381).  Ternium submitted a response on July 1, 2025, which Commerce rejected on August 12, 2025.  *See* Ternium's Letter, "Response to the Supplemental

Questionnaire," dated July 1, 2025 (Ternium Rejected NSA 2SQR) (P.R. 387, C.R. 323-27); Commerce's Letter, "{NSA} Allegation Supplemental Questionnaire for Ternium," dated August 12, 2025 (Commerce Rejects NSA 2SQR) (P.R. 412).  Commerce explained in its letter that Ternium provided unsolicited and untimely new factual information regarding the NAFIN program and interest rate data for Tenigal S. de R.L. de C.V.'s 2023 short-term loans.  *Id.* Neither the NAFIN information or interest rate data was solicited in Commerce's June 24, 2025, questionnaire, and Commerce highlighted that the NAFIN information was previously requested over five months before, on January 10, 2025.  *Id.*  Commerce instructed Ternium on which portions of the brief to remove and provided an opportunity to resubmit without the new factual information (NFI).  *Id.*

From July 10, 2025 through July 11, 2025, Commerce conducted on-site verification of Ternium's responses regarding the subsidies examined in the Preliminary Determination and its responses regarding the alleged new subsidies.  *See* Memorandum, "Verification of the Questionnaire Responses of Ternium Mexico, S.A. de C.V." dated July 24, 2025 (Ternium Verification Report) (P.R. 400, C.R. 365).  During verification, Ternium submitted four alleged "minor" corrections to their questionnaire responses, of which Commerce accepted two and rejected two.  *Id.* at 2-3.  In its Ternium Verification Report, Commerce provided the reasons for its decision to reject the two proposed corrections, stating that for both proposed revisions, "the proposed revisions included changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate{,}" and that "{g}iven the broad scope of the revisions, {Commerce} rejected the proposed corrections," and did not verify the Bancomext financing information or the NAFIN information.  *Id.*

**B.  <u>Post-Preliminary Analysis</u>**

9

On July 31, 2025, Commerce issued a Post-Preliminary Analysis memorandum regarding certain programs. *See* Memorandum "Post-Preliminary Analysis," dated July 31, 2025 (Post-Preliminary Analysis Memo) (P.R. 405). Relevant to the present case, Commerce made the following determinations:

    a.  Commerce determined to rely on facts otherwise available in making its determination with respect to Ternium Mexico's benefit for the NAFIN program. *Id.* at 8.

    b.  Commerce determined that an adverse inference was warranted because, by not providing information necessary to verify the key components of its NAFIN loan worksheet, despite being asked twice to do so, Ternium Mexico did not cooperate to the best of its ability to comply with the requests for information in the investigation. *Id.*

    c.  Commerce assigned an adverse facts available (AFA) subsidy rate for Ternium under the NAFIN loan program of 6.55 percent *ad valorem*, which is equal to the highest above *de minimis* subsidy rate that Commerce has calculated for the Bancomext loan program. *Id.* at 12.

    d.  Commerce preliminarily determined that the mining rights for LTAR did not confer a benefit upon Ternium for the POI. *Id.* at 14.

Additionally, Commerce provided a detailed explanation of the reasons it applied AFA to Ternium with respect to the NAFIN program, stating that after requests in the initial questionnaire and the following supplemental questionnaire, "Ternium {} provided responses to the Loan Template but with required components of the responses missing. Ternium {} did not provide requested information on the number of days the loan was outstanding, which was

clearly noted as a required column in the Loan Template appendix." *Id.* at 7-8. Further Commerce explained that during verification, Commerce was unable to verify information in Ternium's NAFIN loan worksheet as Ternium "presented information as minor corrections that included, for the first time, the entire column of the number of days outstanding and revised effective interest rates for all of the NAFIN loans on which it paid interest during the POI." *Id.* "[G]iven the 'broad scope of the revisions,'" Commerce found that "the proposed changes were not minor corrections, and therefore, {Commerce} did not conduct any verification procedures related to Ternium Mexico's NAFIN loan worksheet." *Id.*

On August 8, 2025, Commerce received timely filed case briefs from Ternium and the petitioners. *See* Petitioners' Letter, "Case Brief for Issues Related to Ternium," dated August 8, 2025 (Petitioners' Case Brief) (P.R. 411, C.R. 372); Ternium's Letter, "Case Brief," dated August 8, 2025 (Ternium's Rejected Case Brief) (P.R. 410, C.R. 369-71). On August 12, 2025, Commerce rejected Ternium's July 1, 2025, supplemental questionnaire response as well as Ternium's Case Brief because both submissions contained unsolicited new factual information. Commerce gave Ternium until August 14, 2025, to refile its July 1, 2025, supplemental questionnaire response and case brief without the new factual information included and Ternium timely refiled. *See* Commerce's Letters, "New Subsidy Allegation Supplemental Questionnaire for Ternium Mexico, S.A. de C.V.," dated August 12, 2025 (P.R. 412); *see also* "Rejection of Ternium Mexico, S.A. de C.V.'s Case Brief," dated August 12, 2025 (P.R. 414); Ternium's Letter, "Redacted Version of July 1 Response," dated August 14, 2025 (P.R. 418, C.R. 375-76); Ternium's Letter, "Redacted Version of Case Brief," dated August 14, 2025 (Ternium Case Brief) (P.R. 417, C.R. 373-74).

On August 15, 2025, both Ternium and the petitioners submitted rebuttal briefs in the investigation.  *See* Ternium's Letter, "Rebuttal Brief," dated August 15, 2025;[3] Petitioners' Letter, "Petitioners' Rebuttal Brief for Issues Related to Ternium," dated August 15, 2025 (Petitioners' Rebuttal Brief) (P.R. 420, C.R. 377).  On August 19, 2025, Commerce rejected Ternium's August 15, 2025, rebuttal brief because it contained arguments not related to the petitioners' case brief, and Ternium submitted its revised rebuttal brief on August 21, 2025.  *See* Commerce's Letter, "Rejection of Ternium {} Rebuttal Brief," dated August 19, 2025 (Rejection of Ternium Rebuttal Brief) (P.R. 421, C.R. 378); Ternium's Letter, "Redacted Version of Rebuttal Brief," dated August 21, 2025 (Ternium's Rebuttal Brief) (P.R. 422, C.R. 379).

In Commerce's August 19, 2025, rejection letter, Commerce explained that Ternium's rebuttal brief contained affirmative arguments that violated the regulation's requirement that a "rebuttal brief may respond only to arguments raised in case briefs."  Rejection of Ternium Rebuttal Brief at 1 (footnotes omitted).  Specifically, the petitioners' case brief raised the issue of [                                    ] for the Provision of Mining Rights for Less Than Adequate (LTAR) Remuneration program, while Ternium's response argued the broader issue of how to conduct the overall benefit calculation for the Mining Right for LTAR program and the specificity of the program.  *Id.*

### C. **Final Determination**

On August 25, 2025, Commerce published the Final Determination in the CVD investigation into CORE products from Mexico.  *Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 42,229 (Dep't of Commerce Aug. 29, 2025) (final aff. det.) (Final

---

[3] Ternium's rejected August 15, 2026, case brief is not available on ACCESS.  *See* Ternium Brief at Attachment 1.

Determination) (P.R. 431) and accompanying Issues and Decisions Memorandum (Aug. 25, 2025) (IDM) (P.R. 426).  Commerce made the following determinations:

    a.  Commerce continued to apply AFA to determine that Ternium received a benefit under the NAFIN program.  *Id.* at 11.

    b.  After applying AFA, Commerce found that Ternium benefited from the Bancomext program under 19 CFR 351.505(a) and 19 U.S.C. § 1677(5)(E)(ii).  *Id.* at 13.

    c.  Commerce assigned an AFA subsidy rate of 6.55 percent for Ternium Mexico under the NAFIN loan program and factoring financing provided under the Bancomext program.  *Id.* at 16, 18.

    d.  Commerce calculated a final estimated subsidy rate of 13.26 percent for Ternium. Final Determination, 90 Fed. Reg. at 42,230.

The resulting CVD order was published on December 19, 2025.  Order, 90 Fed. Reg. 59,488.

## SUMMARY OF THE ARGUMENT

This Court should sustain Commerce's Final Determination because Commerce acted within its discretion and in accordance with law in controlling the record in this investigation after Ternium twice failed to provide Commerce with information it requested to conduct its investigation.

First, Commerce acted within its discretion and in accordance with law when it concluded that Ternium's ministerial error allegations following the Preliminary Determination failed to meet the definition of a ministerial error because Commerce's calculations of the accrual periods of certain loans was based on record evidence provided by Ternium and not a result of a clerical error.  Certain loan information, such as the dates of loan agreements and the duration of the loans, were in the record and were critical inputs to Commerce's methodology in

calculating Ternium's countervailable subsidy rate. Additionally, Commerce's decision to reject certain untimely filed and unsolicited new factual information by Ternium following the preliminary determination, six months after originally requested, was supported by substantial evidence and in accordance with law. Further, Commerce's decision to decline to accept new factual information offered at verification was also reasonable and in accordance with law as the offered corrections were not minor and would constitute the addition of a new data set to Commerce's calculations.

Commerce's decision to reject Ternium's administrative rebuttal brief following verification is also supported by substantial evidence and in accordance with law as Ternium included affirmative arguments which went beyond the scope of petitioners' case brief.

Finally, Commerce's decision to apply AFA in its Final Determination to certain financing programs was supported by substantial evidence and in accordance with law as Ternium twice failed to provide requested information on the relevant programs. Information regarding the degree to which loans were outstanding was necessary for Commerce's countervailable subsidy rate and was absent from the record due to Ternium's failure to timely submit this requested information.

Accordingly, this Court should deny Ternium's motion for judgment on the record, enter judgment for the Government, and sustain Commerce's Final Determination.

**ARGUMENT**

I.    **Standard of Review**

In reviewing Commerce's antidumping or countervailing duty determinations, the Court of International Trade must sustain any determination, finding or conclusion found by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in

14

accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

The Administrative Procedure Act supplies the standard for whether Commerce abuses its discretion. *See Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025). An abuse of discretion occurs when Commerce's exercise of its discretion rests on a "clear error of judgment in the consideration of the relevant factors" *Id.* (citation omitted); *see also Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) ("An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors.").

II.     **Commerce's Finding That Ternium's Ministerial Error Allegation Did Not Meet The Definition Of A Ministerial Error Was Supported by Substantial Evidence and in Accordance with Law**

Commerce's conclusion that Ternium's ministerial error allegations following the Preliminary Determination did not meet the definition of a ministerial error was supported by substantial evidence and in accordance with law.

15

The statute defines ministerial errors as "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial." 19 U.S.C. § 1675(h).  Consistent with the statute, Commerce promulgated 19 C.F.R. § 351.224, which provides that Commerce will disclose its calculations to parties to the proceeding and that a party to the proceeding to whom Commerce has disclosed its calculations may submit comments concerning any ministerial errors in such calculations within five days after disclosure.  *See* 19 C.F.R. § 351.224(b)-(c).  Commerce requires comments to explain the alleged ministerial error and present the appropriate correction.  *See* 19 C.F.R. § 351.224(d).  Commerce will, if appropriate, correct any ministerial errors by amending the final results of review.  *See* 19 C.F.R. § 351.224(e)).  Commerce will not, however, correct an allegation that relates to a methodological decision because such allegation inherently does not address a ministerial error. *See*, *e.g.*, *Alloy Piping Prods., Inc. v. United States*, 201 F. Supp. 2d 1267, 1285 (Ct. Int'l Trade 2002) ("The error in question must be demonstrated to be a clerical error, not a methodological error, an error in judgment, or a substantive error{.}").

Here, Ternium attempted to raise a ministerial error allegation for the calculation of Ternium's countervailable subsidy rate in the Preliminary Determination.  Ministerial Error Allegation at 2-3.  Ternium disputed the number of days in the accrual period Commerce selected in calculating Ternium's Bancomext financial factoring program.  *Id.* at 3. Specifically, Ternium alleged that in the selection of the days in the accrual period, "Commerce compared the actual cost of the Bancomext financial factoring program (which is limited to invoices with payment terms not to exceed 180 days) to the cost of a commercial credit outstanding for 365 days, thereby more than doubling the benchmark cost and, therefore, the calculated subsidy." *Id.*

16

However, this allegation was not a "clerical error" within the meaning of 19 U.S.C. § 1675(h).  As Commerce explained, the selection of the number of days for calculating Ternium's Bancomext financial factoring program was done deliberately, and thus was a "methodological choice, and not a ministerial error."  Commerce's Ministerial Response at 4.  Commerce was required to make the calculations to the Bancomext financial factoring program because Ternium omitted necessary requested information from its questionnaire responses including data on dates of loan agreements and the life of the loans.  *See* Ternium SQR2 at Exhibit Supp2. 10.  Commerce provided Ternium the specific record evidence, supplied by Ternium, which it used to calculate the program benefits.  Commerce's Ministerial Response at 4.  Specifically, Commerce explained how it compared Ternium's reported interest payments, principal amounts, and interest rate to verify the number of days in the accrual period, stating:

> The data in the "Amount(s) of Interest Paid (Diferencia entre factura y pago recibido)" column of the "Bancomext Financing BPI" tab of the preliminary calculations indicates that Ternium used an accrual period of 365 days to report the amount of interest it paid on its Bancomext loans (see, e.g., cell Q95 of the "Bancomext Financing BPI," where Ternium reported an interest payment of [          ]). For that loan, Bancomext reported a principal amount of [          ] and an interest rate of [     ]. Thus, these three datapoints indicate that Ternium reported its interest payment on this loan using an accrual period of 365 days: ([          ] * [     ]% * ([          ]) = [          ]). Moreover, the source documents associated with this particular Bancomext loan also indicate an interest payment of [          ]. Thus, Commerce reasonably determined that this particular Bancomext loan, and all of Ternium's other Bancomext loans reported to Commerce in Exhibit Supp2.10, utilized an accrual period of 365 days.

*Id.*  In a similar vein, Commerce later explained why information on the number of days certain loans Ternium received were outstanding was critical to the calculation of a countervailable subsidy and was not a "minor" matter.  *See* IDM at 10-13; PDM at 9-10.

17

Thus, Ternium's alleged ministerial errors were not "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like . . ." as specified in the governing authorities, but a deliberate decision by Commerce, supported by record evidence to select 365 days as the accrual period. *See* 19 U.S.C. § 1675(h); 19 C.F.R. § 351.224(f).

Ternium argues that Commerce should have calculated the accrual period amount as 180 days rather than the 365-day period Commerce used. *See* Ternium Case Brief at 13. Ternium argues that since it provided a "Bancomext brochure," which outlined the funding program and, stated a *maximum* term for payment of 180 days, and a sample transaction paid through the Bancomext platform, that Commerce should have deduced the number of days in each loan period. *See* Ternium Case Brief at 13. However, this argument does not render Commerce's method of calculating the missing rates irrational. First, the brochure outlining the funding program provides for a *maximum* offered loan period and does not provide a conclusion on the actual loan period in missing data. *Id.*; *see also* Commerce's Ministerial Response at 4. Second, the inclusion of a third-party brochure does not serve to complete the specific data requested by Commerce and omitted by Ternium. *See id.* Neither does the inclusion of one sample payment make Ternium's missing data set complete. *Id.* Commerce's explanation of the method used to calculate the data and determine an appropriate rate, as explained above, is undisturbed by the existence of a brochure or sample payment. Commerce's Ministerial Response at 4.

Ternium also had multiple opportunities in the initial and supplemental questionnaires to provide Commerce with the information it requested for its Bancomext loans. *See* Initial Questionnaire; Ternium SQ1; Ternium SQ2. As an initial matter, Ternium did not respond to Commerce's first set of questionnaires. *See* Ternium IQR, Program Specific Questions Section

18

of Section III at 8.  In its supplemental response, Ternium omitted specifically requested

information such as "Date of Loan Agreement" and "Life of Loan (days if short-term, years if

long-term)" by leaving the required columns blank.  *See* Ternium SQR2 at Exhibit Supp2. 10.

Additionally, Ternium reported identical dates for [

                                                    ]  *Id*.  Considering this missing information from

Ternium, Commerce utilized the information that had been provided to construct the proper

accrual period for the loans.  Commerce's Ministerial Response at 4.  This includes the

calculation provided to Ternium in response to its ministerial allegations.  *Id.*  Thus, is it clear

that this was not a clerical or arithmetic error, but a methodological decision based on what

information Ternium *did* supply, a decision in which Commerce was well within its authority

and discretion to make.

Further, Ternium's reliance on *Timken* and *NTN Bearing* for the proposition that

Commerce should have added the omitted information is misplaced.  *See* Ternium Brief at 8-10

(citing *Timken U.S. Corp. v. United States,* 434 F.3d 1345, 1353-54 (Fed. Cir. 2006).  Those

cases address circumstances in which a respondent sought to correct inaccurate information

already submitted on the record.  *See Timken*, 434 F.3d at 1350 (reviewing miscategorized sales

information); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1205 (Fed. Cir. 1995)

(reviewing errors related to parts numbers and customer location).  They do not address, as here,

instances where a respondent failed to provide information after being twice solicited to do so.

Ternium omitted whole columns of pertinent loan data.  *See* Ternium SQR2 at Exhibit Supp2.

10.  That is not the same factual situation as in *Timken* and *NTN Bearing*, which sought

corrections to respondents' provided information, not their omissions.  Ternium's expansive

reading of *Timken* and *NTN Bearing*, is not consistent with their holdings and would disrupt

19

Commerce's ability to effectively manage the record by allowing a party to be unresponsive to Commerce's requests so long as they make a "correction" before the final.

III.    **Commerce's Decision to Not Accept Unsolicited and Untimely New Factual Information Was Not an Abuse of the Discretion Commerce Possess to Conduct CVD Proceedings**

Commerce properly exercised its discretion in accordance with statutory authority and its regulations in rejecting Ternium's untimely new factual information.  Commerce's proceedings are governed by timelines set forth in 19 U.S.C. § 1677m(a), (e) and 19 C.F.R. § 351.301.  When a party submits new factual information after the applicable deadline, Commerce may reject the submission and remove it from the record because untimely information is not properly brought before the agency.  *See* 19 C.F.R. §§ 351.302(d)(1)(i); 351.104(a)(2).

Factual information for the purpose of Commerce's proceedings are defined by 19 C.F.R. 351.102(b)(21) which states, in part, "{e}vidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party." 19 C.F.R. 351.102(b)(21)(i). And Commerce's interpretation of what constitutes factual information should be upheld unless an "alternative reading is compelled by the regulation's plain language or by other indications of . . . intent at the time of the regulation's promulgation." *See Godaco Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1357 (Ct. Int'l Trade 2020) (citing *Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255, 1287 (2016)).

Here, Ternium made, and Commerce rejected, two separate submissions which contained unsolicited new factual information, specifically, Ternium's June 16, 2025, NSA supplemental questionnaire response, rejected on July 10, 2025, and Ternium's July 1, 2025, Second NSA supplemental questionnaire response, rejected on August 12, 2025.  *See* Ternium Rejected NSA

20

SQR; NSA Questionnaire Rejection; Ternium Rejected NSA 2SQR; Commerce Rejects NSA 2SQR. In both instances, Commerce provided reasons for rejecting Ternium's unsolicited new factual information.

Commerce's July 10, 2025, letter rejecting Ternium's June 16, 2025, submission explained that "Ternium provided new factual information that was not requested by Commerce. Specifically, on page 5 of the Ternium NSA SQR, Ternium provided unsolicited new factual information regarding the Bancomext Program. Commerce did not ask questions regarding this program and did not otherwise request information regarding Bancomext." NSA Questionnaire Rejection at 1.

Similarly, Commerce's August 12, 2025, letter rejecting Ternium's July 1, 2025, submission explained that "{o}n January 10, 2025, the U.S. Department of Commerce (Commerce) requested additional information regarding the {}NAFIN{} program. On January 21, 2025, Ternium Mexico provided an incomplete response regarding the NAFIN program." Commerce Rejects NSA 2SQR at 1. Commerce further explained that Ternium's July 1, 2025, response was not responsive to the June 24, 2025, questionnaire and the information for the NAFIN program, as previously requested, was five months late. *Id.*

Ternium argues that because of Commerce's "lack of guidance" and because the record was open, Ternium added its amended loan templates to the supplemental responses. *See* Ternium Brief at 15-16. However, that is not the proper way to add information to the record, and Commerce's regulations make clear the procedures for addressing unsolicited and untimely information. *See* 19 C.F.R. § 351.302(d)(1)(i); 19 C.F.R. § 351.104(a)(2). Indeed, Commerce clearly explained its reasons for rejection, stating that "On January 10, 2025, {Commerce} requested additional information regarding {NAFIN} program. On January 21, 2025, Ternium

21

{} provided an incomplete response regarding the NAFIN program… In Ternium Mexico's July 1st Supplemental Response, Ternium {} included some of the previously requested NAFIN program information over 5 months late." *See* Commerce Rejects NSA 2SQR at 1.

As highlighted above, Ternium had two previous opportunities to provide information on the Bancomext financing and NAFIN programs in the initial questionnaire and supplemental questionnaire. *Id.* Ternium failed to do so and instead sought to add the information to the record, five months later. *Id.* Commerce has clear authority and interest in controlling the timeline for the development of the record and possesses discretion to reject submissions that run afoul of Commerce's deadlines. *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) ("{I}t is not for {the parties} to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information.") (citation omitted). Further, Commerce does not abuse its discretion when it uses its discretion to ensure orderly proceedings, as it did here. *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) ("A court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.").

Commerce also acted reasonably and within its discretion in rejecting Ternium's attempt to submit proposed minor corrections to its omissions in the reporting of the Bancomext and NAFIN financing it received. As part of the verification process, Commerce permits parties to submit minor corrections to information already submitted in their questionnaire responses. However, verification is not an opportunity to submit new factual information or corrections deemed not to be minor. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (affirming Commerce's practice "to accept corrective information at verification only

22

for minor corrections to information already on the record."); *see also SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1324 (Ct. Int'l Trade 2023).  This Court has agreed, holding that, while Commerce abuses its discretion by rejecting "corrective information," including submissions "to correct information already provided {to Commerce}" or to "clarif{y} information already in the record," verification does not serve to "fill {} gap{s} caused by {a respondent's} failure to provide a questionnaire response or evidence requested during verification{.}"  *See Fischer S.A. Comercio v. United States*, 700 F. Supp. 2d 1364, 1373, 1377 (Ct. Int'l Trade 2010).  Instead, verification "is intended to test the accuracy of data already submitted, {not} to provide a respondent with an opportunity to submit a new response{.}" *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005).

Further, Commerce has broad authority and discretion to conduct verification.  *See, e.g.*, *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) ("{Verification} rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because {we} might have made a different determination were {we} empowered to do so.") (internal quotation marks omitted); *Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 237 (Ct. Int'l Trade 1999) (Commerce has "broad discretion to fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data.") (citation omitted); *Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303, 1310 (Ct. Int'l Trade 2022) (the Court reviews Commerce's verification procedures for abuse of discretion).

23

Here, at verification, Ternium submitted four proposed minor corrections to their questionnaire responses that arose from verification preparation. Ternium Verification Report at 2. Commerce accepted two of the corrections including one related to certain billing adjustments to sales values and one related to production costs for provision of mining rights for less than adequate remuneration (LTAR) benchmark calculations. *Id.* Commerce explained its reasoning for rejecting the second two submissions as "the proposed revisions included changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate{,}" and that "{g}iven the broad scope of the revisions, {Commerce} rejected the proposed corrections," and did not verify the Bancomext financing information or the NAFIN information. *Id.*

Ternium's claims that Commerce did not assess whether the offered corrections were minor is incorrect. *See* Ternium Brief at 20-21. As Commerce articulated in the verification report, these proposed changes to the NAFIN and Bancomext loan information were not *minor* but applied to "each … transaction" and included "changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate{}" of the respective loan programs. Ternium Verification Report at 2. It was well within Commerce's discretion for Commerce to conclude that these submissions were not "minor" for the purposes of verification. *See Goodluck India*, 11 F.4th at 1343-44. Like *Goodluck India*, where the Court determined that the respondent's offered changes were not minor, the offered corrections here constitute a "systemic change to the entire reported database{,}" and are similarly "not singular, such as a missing word or an error in arithmetic." *Id.* at 1343.

Finally, Ternium throughout its brief appears to imply that the number of days between Commerce's rejection of NFI and the date Ternium introduced the NFI to Commerce poses a

24

problem. *See*, *e.g.*, Ternium Brief at 15-16, 19 (emphasis in original). However, the length of time NFI was on the record before rejection is not relevant. Moreover, Ternium does not identify a particular number of days Commerce needed to reject the NFI by. Indeed, there is no statutory or regulatory requirement imposing a time limit on Commerce's rejection of new factual information. *See* 19 C.F.R. §§ 351.301(c)(1) and 351.302(d)(1)(i)-(ii); *see generally Husteel Co. v. United States*, 77 F. Supp. 3d 1286, 1294-95 (Ct. Int'l Trade 2015). Nor would the time between submission and rejection change the outcome in Commerce's review as the information was improperly submitted per Commerce's regulations, and is properly rejected, whether immediately or any time before the decision. *See generally id.*

### IV.    Commerce's Decision to Use Adverse Facts Available Is Supported by Substantial Evidence and in Accordance with Law

Commerce's determination to apply facts available with an adverse inference in its calculation of the benefit Ternium received under both the NAFIN and Bancomext programs is supported by substantial evidence. Ternium failed to cooperate by not acting to the best of its ability because it did not provide the number of days these loans were outstanding, as requested in the Loan Appendix. Instead, Ternium tried to provide this information as "minor" corrections at verification, along with interest rates that were different from the interest rates provided previously. But Commerce uses the number of days outstanding on the government loan to calculate the amount of interest the respondent would have paid on a comparable loan. Thus, the number of days outstanding and the interest rate are key components that confirm the veracity of the respondent's reported interest payments. Ternium's arguments are unavailing because it did not provide the information that Commerce requested by the deadline for submission, which frustrated Commerce's verification attempts.

### A. Commerce's Decision to Use Facts Available Is Supported by Substantial Evidence and in Accordance with Law

Commerce's use of facts available to fill gaps in the record is supported by substantial evidence.  Under 19 U.S.C. § 1677e(a), where necessary information is not available on the record, or an interested party or any other person (A) withholds information that has been requested, (B) fails to provide such information by the deadlines for submission, (C) significantly impedes a proceeding, or (D) provides such information but the information cannot be verified, Commerce shall use the facts otherwise available in reaching the applicable determination.  *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (Commerce shall fill in gaps of information with facts otherwise available that the respondent fails to provide by submission deadlines); *see also Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304 (Fed. Cir. 2014).  However, before applying facts available, Commerce must give parties an opportunity to remedy or explain the deficiency.  19 U.S.C. § 1677m(d); *Mukand*, 767 F.3d at 1306.

Similar to *Nippon Steel*, in this case Ternium failed to timely provide requested information after Commerce requested it in both an initial questionnaire and supplemental questionnaire.  In the initial questionnaire, Commerce instructed Ternium to describe any assistance it received, directly or indirectly, from the GOM (or entities owned directly, in whole or in part, by the GOM or any provincial or local government), including the amounts, date of receipt, purpose and terms, and to answer all questions in the appropriate appendices.  *See* Initial Questionnaire at Section III, pp. 10.  Ternium self-reported that it and its cross-owned affiliates, Techgen and Peña Colorada, received financing through NAFIN that was outstanding during the POI, but Ternium did not provide completed loan templates for the firms as they were instructed.  *See* Ternium IQR at Item F, "Other Subsidies."  Ternium also reported that it received financing

26

through Bancomext that was outstanding during the POI but did not provide a completed Loan Template appendix as was instructed. *See* Ternium IQR at Section III, pp. 8.

Commerce then gave Ternium an opportunity to remedy the deficiency by issuing supplemental questionnaires asking Ternium to complete the loan template for all loans or other forms of financing it received. *See* Ternium SQ2 at 5-6; *Id*. at Item 13. In response, Ternium provided answers to the loan template but with required components still missing. *See* Ternium SQR2 at Exhibits Supp. 2.10, 2.15, Supp. 2.16, and Supp. 2.17. Ternium did not provide requested information on the number of days the loans were outstanding, which was noted as a required column in the loan template appendix. *Id*. Thus, during verification, Commerce was unable to verify information in Ternium's NAFIN and Bancomext loan worksheets. *See* Ternium Verification Report at 2-3 and 6-7.

Because Ternium did not provide the information that Commerce could verify, Commerce's use of facts available to fill the informational gap left by Ternium and reach the applicable determination was supported by substantial evidence and in accordance with the statute. 19 U.S.C. § 1677e(a)(2)(D).

### B.    Commerce's Application of Adverse Facts Available Is Supported by Substantial Evidence and Is in Accordance with Law

Commerce's application of an adverse inference was also reasonable because Ternium failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information. If Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. 19 U.S.C. § 1677e(b); *see Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (compliance with the best of its ability standard is determined by whether the respondent

27

has given its maximum effort "to provide Commerce with full and complete answers to all inquiries in an investigation"); *see also Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1104 (Fed Cir. 2016); *China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1334 (Ct. Int'l Trade 2019).  The statute does not contain a motivation or intent element, nor does it require evidence of bad faith; "inadequate inquiries" alone may demonstrate a failure to cooperate. *See Nippon Steel*, 337 F.3d at 1382-83.

Ternium did not cooperate to the best of its ability because it did not exert maximum effort to provide responses to the required sections of the loan template. *See* Ternium SQR2 at Exhibits Supp. 2.10, 2.15, Supp. 2.16, and Supp. 2.17.  Rather, Ternium presented the previously requested information as proposed minor corrections at verification that included, for the first time, the entire Loan Template appendix column noting the number of days outstanding, as well as revised effective interest rates for all the Bancomext and NAFIN financing on which it paid interest during the POI.  *See* Ternium Verification Report at 2-3.  At verification, Commerce found that given the "broad scope of the revisions," the proposed changes for both programs were not minor corrections and therefore Commerce did not conduct verification procedures related to Ternium's Bancomext and NAFIN loan worksheets.  *See id*.

Similar to *China Steel*, Ternium did not provide requested information by the deadline. *China Steel*, 393 F. Supp. 3d at 1334.  In *China Steel*, in response to Commerce's initial questionnaire response, China Steel provided information on its cost reporting method and cost data file that contained several errors. When given a chance to correct that information through a supplemental questionnaire, China Steel provided the information requested along with "additional, unrequested, revisions to its cost data file." *Id*.  This Court held that Commerce's use of adverse facts available was reasonable because China Steel failed "to accurately report

28

data from records that were in its possession." *Id*. Similarly here, Ternium provided incomplete information in response to Commerce's initial questionnaire. When given the chance to remedy the error in a supplemental questionnaire, Ternium still did not provide answers to all of the requested information. Instead, Ternium waited to present this information as "minor corrections" at verification, along with interest rates that were different from those provided previously. If Ternium was acting to the best of its ability, the requested Loan Template information that they were later able to present during verification would have been presented in a timely manner. 19 U.S.C. § 1677e(b); *see also Nippon Steel*, 337 F.3d at 1383 (explaining that an adverse inference may be drawn in circumstances where Commerce could reasonably expect more forthcoming responses to have been made). Thus, because Ternium did not act to the best of its ability, Commerce reasonably applied AFA.

### C. The Adverse Facts Available Subsidy Rate Selected Is Supported by Substantial Evidence and in Accordance with Law

Commerce also acted reasonably when selecting an AFA subsidy rate of 6.55% for both factoring programs. Ternium failed to cooperate by not acting to the best of its ability in providing required information in a timely manner, and therefore Commerce used its established hierarchy to determine the applicable AFA rate. In CVD proceedings, Commerce may, in accordance with 19 U.S.C. § 1677e(d)(1)(A) and (d)(2) and 19 CFR 351.308(j)(1), select the highest program rate available using the prescribed hierarchy:

> (i) If there are cooperating respondents in the investigation, the Secretary will determine if a cooperating respondent used an identical program in the investigation and apply the highest calculated above-*de minimus* rate for the identical program;
>
> (ii) If no rate exists which the Secretary is able to apply under paragraph (j)(1)(i), the Secretary will determine if an identical program was used in another countervailing duty

proceeding involving the same country and apply the highest calculated above-*de minimus* rate for the identical program;

(iii)    If no rate exists which the Secretary is able to apply under paragraph (j)(1)(ii), the Secretary will determine if there is a similar or comparable program in any countervailing duty proceeding involving the same country and apply the highest calculated above-*de minimus* rate for the similar or comparable program; and

(iv)    If no rate exists which the Secretary is able to apply under paragraph (j)(1)(iii), the Secretary will apply the highest calculated above-*de minimus* rate from any non-company-specific program in a countervailing duty proceeding involving the same country that the Secretary considers the company's industry could possibly use.

*See also Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348 (Fed. Cir. 2021) (explaining that Commerce may "apply any rate {determined pursuant to 19 U.S.C. § 1677e(d)(1)}, including the highest such rate, as appropriate") (*Habas Sinai*).

Commerce is not required to make adjustments based on assumptions about information the interested party would have provided had it complied and need not prove that the selected facts available are the best alternative information. 19 U.S.C. § 1677e(b)(1)(B); Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 869-870. Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." *Id*. at 870. When selecting AFA rates from among the possible sources of information, Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide Commerce with complete and accurate information in a timely manner." *See e.g.*, *Pastificio Gentile S.r.L v. United States*, 798 F. Supp. 3d 1352, 1357 (Ct. Int'l Trade 2025).

30

Ternium contends that Commerce's application of a 6.55% rate for the factoring programs is not a "reasonably accurate estimate," of the actual subsidy rates for these programs, even if accounting for "some built-in increase intended as a deterrent to noncompliance," citing *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1268 (Fed Cir. 2012). However, Commerce's selection of a program rate is consistent with its regulation at 19 C.F.R. § 351.308(j)(1). First, in this investigation, the other cooperating respondent Galvasid did not use either the NAFIN or Bancomext programs. *See* IDM at 16. Therefore, Commerce was unable to apply the first prong of the countervailing duty AFA hierarchy under the regulation. Second, Commerce has not previously calculated an above-*de minimus* rate for the NAFIN factoring program or for the factoring financing provided under the Bancomext program. *See* IDM at 16. Therefore, Commerce was unable to apply the second prong of the hierarchy. However, Commerce has previously calculated an above-*de minimus* rate of 6.55 percent for the Bancomext loan program. *See Aluminum Extrusions from Mexico: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 80,496 (Dep't of Commerce October 3, 2024) (*Aluminum Extrusions from Mexico*), and accompanying IDM at Appendix, citing *Certain Cut-to-Length Carbon Steel Plate from Mexico: Final Results of Countervailing Duty Administrative Review*, 69 Fed. Reg. 1,972 (Dep't of Commerce January 13, 2004) (CTL Plate from Mexico), and accompanying IDM at Comment 4. Commerce found that the Bancomext loan program is similar and comparable to the factoring financing provided under the Bancomext and NAFIN programs. *See* IDM at 16. Therefore, Commerce reasonably applied an AFA subsidy rate of 6.55 percent to Ternium under the NAFIN and Bancomext financing programs consistent with the third prong of the countervailing duty hierarchy. 19 C.F.R. § 351.308(j)(1)(iii).

31

Ternium argues that "record information that Commerce accepted in this investigation supported Commerce applying a 180-day maximum discounting term under the factoring programs and calculating a *de minimus* subsidy rate." Ternium's Brief at 30. However, as noted above, Ternium failed to respond on two occasions to timely provide information on this program and Commerce has discretion to apply even the highest rate that comes from the prescribed hierarchy. *See* 19 C.F.R. § 351.308(j)(1); *Habas Sinai.*, 992 F.3d at 1353.

V.   **Commerce's Rejection and Removal of Ternium's Rebuttal Brief Was Supported by Substantial Evidence, in Accordance with Law, and Was Not an Abuse of Its Discretion**

Commerce properly rejected Ternium's Rebuttal Brief from the record because Ternium's rejected brief contained new affirmative arguments which exceeded the scope of those raised in the petitioners' case brief. Commerce's regulations provide that rebuttal briefs are limited to responses to arguments raised in case briefs and are not to include new affirmative arguments. *See* 19 C.F.R. § 351.309(d)(2). Here, Ternium exceeded the argument provided by petitioners regarding the [                              ] and offered expansive arguments beyond the scope of petitioners' case brief. *See* Rejection of Ternium Rebuttal Brief at 1.

a.   **Ternium Failed to Exhaust Administrative Remedies**

As an initial matter, Ternium failed to exhaust its administrative remedies by failing to raise the affirmative arguments it raised in its rejected rebuttal brief in its case brief. Congress has mandated that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute, "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502

32

F.3d 1370, 1379 (Fed. Cir. 2007)). Parties must exhaust administrative remedies before Commerce by raising all issues in their initial case briefs during administrative proceedings. *See Prime Time Commerce LLC v. United States*, 495 F. Supp. 3d 1308, 1313-14 (Ct. Int'l Trade 2021) (citing *Dorbest Ltd.*, 604 F.3d at 1375 (internal citation omitted); *ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008).

"Exhaustion serves two main purposes: 'to allow an administrative agency to perform functions within its special competence- to make a factual record, to apply its expertise, and to correct its own errors,' and to 'promot{e} judicial efficiency by enabling an agency to correct its own errors so as to moot judicial controversies.'" *Stanley Works (Langfang) Fastening Systems Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2021) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)); *see also Corus Staal*, 502 F.3d at 1379 (citing *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). As such, the Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal*, 502 F.3d at 1379 (*citing Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp 2d 1191, 1205 (Ct. Int'l Trade 2004)).

During CVD proceedings, Commerce's regulations allow parties the option to submit case briefs after the publication of the preliminary results. 19 C.F.R. § 351.309(c)(ii). If a party chooses to do so, "{t}he *case brief* must present all arguments" that would be relevant to the final results. 19 C.F.R. § 351.309(c)(2) (emphasis added). This Court has recognized that the failure to raise an argument in an administrative case brief, as required by 19 C.F.R. § 351.309, is an independent basis to decline to entertain a new argument. *See Corus Staal*, 502 F.3d at 1379 (explaining that in the context of 19 C.F.R. § 351.309, the exhaustion requirement is "a

33

requirement explicitly imposed by the agency as a prerequisite to judicial review"); *see also Samsung Electronics Co. Ltd. v. United States*, 72 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2015) ("a violation of Commerce's regulation, therefore, supplies an independent ground for determining that an argument has not been exhausted"); *NTSF Seafoods Joint Stock Co., Slip Op. 22-38*, 2022 WL 1375140, at \*10 ("Both Commerce and reviewing courts normally find an argument not presented in a party's case brief to be waived unless the argument could not have been raised in the case brief.").

Ternium argues that it had "no reason to present arguments regarding" the Mining Rights for LTAR program in its affirmative brief because neither the PDM or Post-Preliminary Determination "provided notice" to Ternium that arguments to the program "would be relevant." Ternium Brief at 32, 36-37.  This is incorrect.  Case briefs before Commerce are not limited to claims of error.  Under 19 C.F.R. § 351.309(c)(2) a case brief must present all arguments that remain relevant to the final determination or results, which includes arguments supporting Commerce's preliminary findings.  Commerce issued its Post-Preliminary Determination Calculations on July 31, 2025, seven days before Ternium filed its rejected case brief on August 8, 2025.  *See* Post-Preliminary Analysis; Ternium's Rejected Case Brief.  Commerce preliminarily determined that the mining rights for LTAR did not confer a benefit upon Ternium for the POI.  Post-Preliminary Analysis at 14.  The accompanying Post-Preliminary Determination Calculations memorandum provided Commerce's calculation methodology as applied to the program.  *See* Commerce's Memorandum, "Post-Preliminary Determination Calculations for Ternium," dated July 31, 2025 ("Post-Preliminary Determination Calculations") at 3-4 (C.R. 367).  Included in the Post-Preliminary Analysis Memorandum Commerce "invite{d} interested parties to include comments on the above programs with their case briefs."

Post-Preliminary Analysis at 17. Nothing required Ternium to limit its comments to programs it disputes. Indeed, if Ternium wished to preserve a position with respect to the manner in which Commerce calculated LTAR for Mining Rights in the Post-Preliminary Determination, Ternium was obligated to state so. *See Corus Staal*, 502 F.3d at 1379. If Ternium had done so, Commerce would have been on notice that any change in how it calculated LTAR for Mining Rights may be contested by Ternium. However, in the absence of any comments from Ternium on this issue, Commerce did not abuse its discretion in finding that Ternium failed to exhaust its administrative remedies.

**b. Commerce's Rejection and Removal of Ternium's Rebuttal Brief was Supported by Substantial Evidence, Lawful, and Not an Abuse of Discretion**

Commerce correctly rejected and removed Ternium's rebuttal brief because Ternium made affirmative arguments that were not raised in the petitioners' case brief. 19 C.F.R. § 351.309(d)(2) states that "the rebuttal brief may respond only to arguments raised in case briefs, should identify the arguments raised in case briefs, and should identify the arguments to which it is responding."

Petitioners filed a case brief on August 8, 2025. *See* Petitioners' Case Brief. On August 15, 2025, Ternium filed a rebuttal brief. *See* Ternium's Letter, "Rebuttal Brief," dated August 15, 2025. On August 19, 2025, Commerce issued a letter rejecting Ternium's August 15, 2025, rebuttal brief because it contained arguments that were not related to the petitioners' case brief. *See* Rejects Ternium Rebuttal Brief. The petitioners' case brief argued that Commerce erred in calculating the post-preliminary *ad valorem* CVD subsidy rate for the GOM Provision of Mining Rights for LTAR" program; specifically, the brief alleged narrowly that "Commerce unlawfully [

35

].” *See*

Petitioners' Case Brief at 1-2.

In response, Ternium made multiple affirmative arguments, which went beyond the scope of petitioners' arguments, such as which benchmark tier should be used in Commerce's benefit calculation for the Mining Rights for LTAR program. *See* Rejection of Ternium Rebuttal Brief at 1. Ternium's rebuttal brief proposed a revision of Commerce's LTAR benefit calculation to incorporate the weighted-average production costs across both mines, in addition to other affirmative arguments. *Id.* Ternium's own case brief acknowledges as much stating that "Ternium presented four arguments in response to the claims raised in *Petitioners' Case Brief*" discussing (1) fees charged by the GOM, (2) a lack of benefit from the mining rights for LTAR, (3) offering the weighted-average COP as an alternative, and (4) how Commerce should adjust the benefit calculation to reflect sales to an [                    ]. Ternium Brief at 34-35.

As Commerce explained, those arguments were not responsive to the narrow issue raised by petitioners regarding the [                    ]. *Id.* Commerce provided instructions on which portions of Ternium's brief were non-responsive and provided the opportunity to refile the brief with the responsive arguments intact. *Id.* at 1-2.

After Ternium resubmitted a redacted rebuttal brief with its affirmative arguments removed, Commerce accepted Ternium's arguments that were directly responsive to arguments previously raised by the petitioners. *See* Ternium's Rebuttal Brief. For example, Commerce did not reject Ternium's directly responsive argument that no changes should be made to the LTAR benefit calculation from the *Post-Preliminary Determination*. *Id.* As such, Ternium's arguments which were properly included in its rebuttal brief were permitted on the record and considered by Commerce.

36

Commerce possesses discretion to reject arguments made in submissions that are raised in an untimely fashion or are improperly presented. *Cf. Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002). Commerce explained how the arguments Ternium made in its response brief were improper because they both went beyond the scope of what petitioners raised. Accordingly, Commerce's rejection did not amount to an abuse of discretion.

## CONCLUSION

For these reasons, we respectfully request this Court deny Ternium's motion for judgment on the agency record and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:                              /s/ Brendan D. Jordan
Justin Merhar                            Brendan D. Jordan
Staff Attorney                           Trial Attorney
U.S. Department of Commerce              Commercial Litigation Branch
Office of the Chief Counsel for Trade    Civil Division
Enforcement and Compliance               United States Department of Justice
1401 Constitution Avenue, NW             P.O. Box 480
Washington, D.C. 20230                   Ben Franklin Station
Tel: (202) 956-8573                      Washington, D.C. 20530
Email: justin.merhar@trade.gov           Tel: (202) 616-0342
                                         Email: brendan.d.jordan@usdoj.gov

July 6, 2026                             Attorneys for Defendant, United States

37