**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LEO M. GORDON, JUDGE**

|  |  |
|---|---|
| TERNIUM MEXICO, S.A. DE C.V., | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES | ) |
| Defendant, | ) |
| and | ) Ct. No. 25-0236 |
| UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., AND THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) |
| Defendant-Intervenors, | ) |

**ORDER**

Upon consideration of the Rule 56.2 motion of Plaintiff Ternium Mexico, S.A. de C.V. ("Ternium"), supporting memorandum of law, all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED**, that Ternium's Rule 56.2 Motion for Judgment on the Agency Record is **DENIED**; and it is further

**ORDERED**, that the final determination of the United States Department of Commerce set forth in *Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 42,229 (Aug. 29, 2025), and the accompanying Issues and Decision Memorandum and calculation memoranda, is sustained in all challenged respects; and it is further

**ORDERED**, that the associated countervailing duty order set forth in *Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam:*

Consol. Ct. No. 25-00236

*Countervailing Duty Orders*, 90 Fed. Reg. 59,488 (Dec. 19, 2025), is sustained in all challenged respects.

**SO ORDERED.**

Date: _____        Signed:_____
       New York, New York               Leo M. Gordon, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LEO M. GORDON, JUDGE**

|  |  |  |
|---|---|---|
| TERNIUM MEXICO, S.A. DE C.V., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES | ) | |
| Defendant, | ) | Ct. No. 25-0236 |
| and | ) | |
| UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., AND THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) | **Nonconfidential Version** |
| | ) | **Confidential Information Removed from Square Brackets on Pages 12-14, 23-24, 29, 34-36.** |
| Defendant-Intervenors, | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF TERNIUM MEXICO, S.A. DE C.V.'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin
Jeffrey D. Gerrish
Nicholas C. Phillips

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Washington, D.C. 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc.*
*and the United Steel, Paper and Forestry,*
*Rubber, Manufacturing, Energy, Allied*
*Industrial and Service Workers*
*International Union, AFL-CIO, CLC*

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Avenue NW
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to United States Steel*
*Corporation*

Dated:   July 13, 2026

# **Table of Contents**

                                                                                                            Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................................... 1

    A.   Administrative Determination Under Review ................................................................. 1

    B.   Issues Presented ............................................................................................................ 2

    C.   Request for Relief .......................................................................................................... 2

ARGUMENT ................................................................................................................................... 3

I.    The Court Does Not Have Subject Matter Jurisdiction Over Ternium's Untimely
Case .............................................................................................................................................. 3

II.   Standard of Review for Commerce Determinations .............................................................. 7

III.  Commerce's Application of AFA With Respect to the Factoring Loan Programs
Was a Lawful Response to a Gap in the Record and Ternium's Failure to Cooperate .......... 8

    A.   After Ternium Omitted Requested Information from its Initial Questionnaire
Response, Commerce Provided an Opportunity to Remedy the Deficiency, and
Reasonably Rejected Subsequent Attempts to Belatedly Provide the
Information ..................................................................................................................... 9

        1.   Commerce Complied with the Requirements of 19 U.S.C. § 1677e(a) and
19 U.S.C. § 1677m(d) in Finding a Gap in the Administrative Record ................ 10

        2.   Commerce Reasonably Rejected Ternium's Untimely Attempts to Provide
Missing Information ............................................................................................. 14

            i.   Commerce Reasonably Rejected Ternium's Untimely Questionnaire
Response ...................................................................................................... 17

            ii.   Commerce Reasonably Found that the Factoring Program
Information Presented at Verification Was not a "Minor" Correction ......... 21

    B.   Having Found a Gap in the Record, Commerce Reasonably Determined that
Ternium Failed to Cooperate to the Best of Its Ability and Applied an Adverse
Inference in Applying Facts Otherwise Available ........................................................ 25

    C.   In Applying an Adverse Inference, Commerce Was Not Required to Credit
Ternium's Preferred Plug for the Gap in the Record .................................................... 27

    D.   Commerce Reasonably Applied the Statutory Framework to Assign Ternium an
Appropriate AFA Rate for the Factoring Programs ...................................................... 29

NONCONFIDENTIAL VERSION

IV.  Commerce Reasonably Rejected Ternium's Untimely Challenges to Commerce's Preliminary Mining Rights Program Findings ...................................................................... 32

    A.  Ternium Had Every Opportunity to Challenge Commerce's Findings in its Administrative Case Brief ......................................................................................... 33

    B.  Commerce's Determination that Ternium's Rebuttal Brief Did Not Contain "Rebuttal" Argument Was Reasonable ........................................................................ 35

CONCLUSION ............................................................................................................................ 36

NONCONFIDENTIAL VERSION

## Table of Authorities

Page(s)

Statute

19 U.S.C. § 1516a ................................................................................................................3, 5

19 U.S.C. § 1516a(a)(2) ....................................................................................................4, 6, 7

19 U.S.C. § 1516a(a)(2)(A) .....................................................................................................5

19 U.S.C. § 1516a(a)(2)(B)(i) ............................................................................................3, 4, 7

19 U.S.C. § 1516a(a)(2)(A)(i)(II) .....................................................................................3, 4, 5, 7

19 U.S.C. § 1516a(a)(5) .....................................................................................................3, 5, 6

19 U.S.C. § 1516a(a)(5)(A) .....................................................................................................4

19 U.S.C. § 1516a(b)(1)(B) .....................................................................................................7

19 U.S.C. § 1516a(g) .........................................................................................................3, 5

19 U.S.C. § 1516a(g)(3)(A)(i) .................................................................................................7

19 U.S.C. § 1671(a)(2) ............................................................................................................5

19 U.S.C. § 1671b(c)(1) ..........................................................................................................19

19 U.S.C. § 1671d .................................................................................................................3

19 U.S.C. § 1673b(c)(1) ..........................................................................................................19

19 U.S.C. § 1677(5) ................................................................................................................33

19 U.S.C. § 1677(5A) .............................................................................................................33

19 U.S.C. § 1677e ..................................................................................................................10

19 U.S.C. § 1677e(a) .......................................................................................................... *passim*

19 U.S.C. § 1677e(b) ...........................................................................................................8, 9

19 U.S.C. § 1677e(b)(1) ..........................................................................................................26

19 U.S.C. § 1677e(d) .......................................................................................................28, 29, 31

19 U.S.C. § 1677e(d)(1)(A)(i) .................................................................................................30

19 U.S.C. § 1677e(d)(3)................................................................................28, 30, 32

19 U.S.C. § 1677m(d)......................................................................................9, 10, 12

19 U.S.C. § 1677m(e) ............................................................................................15

28 U.S.C. § 1581(c) ............................................................................................3, 5

28 U.S.C. § 2636(c) ............................................................................................3, 5

Regulations

19 C.F.R. § 351.224(f)............................................................................................23

19 C.F.R. § 351.301 ............................................................................................15

19 C.F.R. § 351.301(c)(1)..................................................................................15, 18

19 C.F.R. § 351.301(c)(2)(iv)(A).............................................................................19

19 C.F.R. § 351.301(c)(5)..................................................................................14, 18

19 C.F.R. § 351.301(c)(5)(i) ...................................................................................15

19 C.F.R. § 351.302 ............................................................................................15

19 C.F.R. § 351.302(d)(1)(i)....................................................................................16

19 C.F.R. § 351.302(d)(1)(ii)...................................................................................16

19 C.F.R. § 351.308(j)(1)........................................................................................30

19 C.F.R. § 351.309(c)(2)..................................................................................28, 32

19 C.F.R. § 351.309(d)(2)..............................................................................32, 35, 36

19 C.F.R. § 351.505(a)............................................................................................11

Court Decisions

*Am. Alloys, Inc. v. United States*, 30 F.3d 1469 (Fed. Cir. 1994).................................24

*Am. Signature, Inc. v. United States*, 598 F.3d 816 (Fed. Cir. 2010) .....................16, 18

*Bethlehem Steel Corp. v. United States*, 742 F.2d 1405 (Fed. Cir. 1984) ......................5

*Bioparques De Occidente, S.A. de C.V. v. United States,* 31 F.4th 1336 (Fed. Cir. 2022) ................................................................................6, 7

*Bomont Industries v. United States,* 733 F.Supp. 1507 (Ct. Int'l Trade 1990) ............................ 22

*Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ..................................................................... 22

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) ................................. 15

*Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) ........................................................................................ 30, 31

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) .................................................. 32, 35

*Dynacraft Indus., Inc. v. United States*, 24 C.I.T. 987 (2000) .......................................................... 6

*Ex Parte McCardle*, 74 U.S. 506 (1869) ........................................................................................ 3

*Fujian Lianfu Forestry Co., Ltd. v. United States*, 33 C.I.T. 1056 (2009) .................................... 27

*Fischer S.A. v. United States*, 700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) ................................. 21

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ......................................................................................................................... 30, 31

*Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (1986) .................................................... 3

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) ................................. *passim*

*J.D. Irving, Ltd. v. United States*, 119 F.4th 48 (Fed. Cir. 2024) .................................................... 4

*Kisaan Die Tech Private Limited v. United States*, 665 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) .................................................................................................... 21

*Linyi Chengen Imp. & Exp. Co. v. United States*, 174 F.4th 1351 (Fed. Cir. 2026) ................................................................................................................... 16, 22

*Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244 (2024) ................................................................ 7

*Maui Pineapple Co. v. United States,* 264 F. Supp. 2d 1244 (Ct. Int'l Trade 2003) ......................................................................................................................... 24

*Micron Tech. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .............................................. 22, 24

*Nan Ya Plastics Corp., Ltd. v. United States,* 810 F.3d 1333 (Fed. Cir. 2016) ............................ 15

*Neimenggu Fufeng Biotechnologies Co. v. United States,* 741 F. Supp. 3d 1354 (Ct. Int'l Trade 2024*)* ........................................................................................... 34, 35

*Nippon Steel Corp. v. United States,* 219 F.3d 1348 (Fed. Cir. 2000*)* ............................................ 3

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)..........................................26

*NTN Bearing Corp. v. United States,* 74 F.3d 1204 (Fed. Cir. 1995)...........................................20

*Nucor Corp. v. United States,* 414 F.3d 1331 (Fed. Cir. 2005)* .....................................................8

*Oman Fasteners, LLC v. United States,* 125 F.4th 1068 (Fed. Cir. 2025)*..............................30, 31

*Prime Time Commerce LLC v. United States,* 396 F. Supp. 3d 1319 (Ct. Int'l
Trade 2019)...................................................................................................................................20

*PSC VSMPO-Avisma Corp. v. United States,* 688 F.3d 751 (Fed. Cir. 2012)..........................16, 28

*Qingdao Taifa Group Co. v. United States,* 637 F. Supp. 2d 1231 (Ct. Int'l
Trade 2009)* ..................................................................................................................................36

*QVD Food Co., Ltd. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011).........................................15

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed.Cir.1990)).........................................15

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) ...............................................................................7

*Stupp Corporation v. United States*, 5 F.4th 1341 (Fed. Cir. 2025) ........................................15, 20

*Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) ...........................................20

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) ...................................................16

*United States v. Mitchell*, 445 U.S. 535 (1980) ...............................................................................3

*United States Steel Corporation v. United States*, 348 F. Supp. 3d 1248 (Ct.
Int'l Trade 2018)...........................................................................................................................28

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................................................8

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense
Council, Inc.,* 435 U.S. 519 (1978)..............................................................................................16

*Wuhu Fenglian Co., Ltd. v. United States,* 37 C.I.T. 281 (2013) ..................................................20

Administrative Determinations

*Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico,
and the Socialist Republic of Vietnam: Countervailing Duty Orders,* 90 Fed.
Reg. 59,488 (Dec. 19, 2025).........................................................................................................5

*Certain Corrosion-Resistant Steel Products From Brazil, Canada, Mexico,
and the Socialist Republic of Vietnam: Postponement of Preliminary*

NONCONFIDENTIAL VERSION

*Determinations in the Countervailing Duty Investigations*, 89 Fed. Reg. 89,995 (Nov. 14, 2024) ................................................................................................18

*Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 42,229 (Aug. 29, 2025) ...................................1

*Definition of Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21,246 (Apr. 10, 2013).......................................................18, 19

Other Legislative Materials

2015 Trade Preferences Extension Act, Pub. L. 114-27, 129 Stat. 362........................................31

Other Administrative Materials

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1....................................................................................................26

Court Rules

USCIT Rule 12(h)(3) ....................................................................................................................3

USCIT Rule 56.2 ..........................................................................................................................1

NONCONFIDENTIAL VERSION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Defendant-Intervenors, United States Steel Corporation, Steel Dynamics, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (together collectively, "Defendant-Intervenors" or "Petitioners"), submit the following memorandum of law in opposition to the motion for judgment on the agency record and accompanying memorandum of law submitted by Ternium Mexico, S.A. de C.V. ("Ternium").  Memorandum of Points and Authorities in Support of Plaintiff's Rule 56.2 Motion for Judgment upon the Agency Record, ECF Doc. 38 (Apr. 6, 2026) ("Ternium Br.").

The Court should dismiss this case for lack of subject matter jurisdiction. Ternium's suit is time-barred.

On the substance, this case is about Ternium's flagrant and persistent disregard for Commerce's clearly stated rules governing the orderly development of the administrative record. Commerce reasonably applied its rules to reject months-late new factual information after closure of the administrative record in the context of a busy countervailing duty investigation involving three respondents and twenty-six unique subsidy programs. Contrary to Ternium's argument, Ternium's insistence on special treatment does not entitle it to a remand under this Court's standard of review. Ternium has identified no basis to disturb Commerce's Final Determination, which should be sustained in all challenged respects.

## STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determination Under Review

Ternium contests the final determination in Commerce's countervailing duty investigation of corrosion-resistant steel ("CORE") from Mexico. *Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 42,229 (Aug. 29, 2025) (CVD Inv. Final) (P.R. 431),

1

and accompanying Issues and Decision Memorandum ("Final IDM") (P.R. 426); Memorandum

from Commerce, "Final Determination Calculations for Ternium Mexico, S.A. de C.V." (Aug.

25, 2025) ("Final Analysis Memo") (C.R. 380-381) (together collectively, the *Final*

*Determination*").

### B.  Issues Presented

1.  Where the Customs Court Act provides that actions before this Court are "barred" unless commenced in accordance with the time periods set forth in 19 U.S.C. § 1516a, is Ternium's case barred for failure to commence this case within the statutory window for doing so?

2.  Was there a gap in the administrative record where Commerce twice instructed Ternium to complete loan templates for the Bancomext and NAFIN factoring programs, but Ternium's loan templates lacked requested information about loan duration and Ternium's method for calculating the interest rate?

2.  Did Commerce abuse its discretion in rejecting Ternium's submissions of missing information, months after closure of the administrative record, months after Commerce had requested the information a second time, weeks after the preliminary results, and in the context of a busy original investigation with three respondents, tight statutory timelines, and twenty-six subsidy programs including several newly alleged subsidies?

3.  Did Commerce reasonably find that Ternium, which had access to the necessary information but twice failed to timely provide it, had failed to cooperate to the best of its ability?

4.  Did Commerce comport with the statutory framework for AFA CVD rate selection for the programs affected by the gap in Ternium's reporting?

5.  Did Commerce abuse its discretion in rejecting challenges to Commerce's preliminary determination that Ternium omitted from its case brief and which were non-responsive to the discrete calculation issue raised in Petitioners' case brief?

### C.  Request for Relief

Defendant-Intervenors request that Commerce's *Final Determination* and CVD Order be

sustained in all challenged respects.

NONCONFIDENTIAL VERSION

## ARGUMENT

**I.    The Court Does Not Have Subject Matter Jurisdiction Over Ternium's Untimely Case**

"Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex Parte McCardle*, 74 U.S. 506, 514 (1869); *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1352 (Fed. Cir. 2000). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." USCIT R.12(h)(3). As a sovereign, the United States is immune from legal action in the courts except to the extent that it waives such immunity. *United States v. Mitchell,* 445 U.S. 535, 538 (1980). Furthermore, a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Id.*

Ternium's complaint asserts that 28 U.S.C. § 1581(c) confers jurisdiction upon this court. Compl. ¶2. That subsection grants jurisdiction over "civil action{s} **commenced under** {19 U.S.C. § 1516a}." 28 U.S.C. § 1581(c). Ternium commenced this action under 19 U.S.C. § 1516a(a)(2)(B)(i), Compl. ¶2, which enables judicial review of "{f}inal affirmative determinations by {Commerce}…under section 1671d," 19 U.S.C. § 1516a(a)(2)(B)(i).

Congress has provided that an action contesting a reviewable Commerce determination "**is barred unless commenced…within the time specified in {19 U.S.C. § 1516a}**." 28 U.S.C. § 2636(c); *see also Georgetown Steel Corp. v. United States*, 801 F.2d 1308, 1309-10 (1986) (holding that the CIT lacked jurisdiction over untimely filed case). Section 1516a(a)(2)(A)(i)(II) specifies the time for commencing action under Section 1516a(a)(2)(B)(i). Separately, where an action involves products from a country that is party to the United States-Mexico-Canada Agreement ("USMCA"), Section 1516a(a)(5) imposes a minimum waiting period to ensure that parties can, if desired, utilize binational panel review procedures. *See also id.* § 1516a(g).

3

The jurisdictional question presented boils down to this: was Ternium's action under Section 1516a(a)(2)(B)(i) premature when Ternium's summons was filed before publication of the CVD Order? The answer is yes. The statute permits suits under Section 1516a(a)(2)(B)(i) to be commenced "within thirty days **after** the date of publication in the Federal Register of a{} countervailing duty order based upon any determination described in {Section 1516a(a)(2)(B)(i)}." 19 U.S.C. § 1516a(a)(2)(A)(i)(II) (emphasis supplied). Ternium commenced suit before this date.

Separately, because Ternium's appeal involved merchandise from a USMCA country, the statute imposes a waiting period. Thus, an action under Section 1516a(a)(2)(B)(i) involving a USMCA country "may not be commenced, and the time limits for commencing an action under this subsection shall not begin to run until…the 31st day after the date on which the notice of the determination is published in the Federal Register," *id.* § 1516a(a)(5)(A) (emphasis supplied). As the Federal Circuit has recognized, the purpose of Section 1516a(a)(5)(A) is to ensure that "the time for requesting a panel has expired or the panel has dismissed its review for lack of jurisdiction (or, the operation of USMCA Article 10.12 has been suspended)," such that "judicial review by the CIT is unavailable unless and until" that time. *J.D. Irving, Ltd. v. United States*, 119 F.4th 48, 56 (Fed. Cir. 2024). Here, the "determination," *i.e.*, the *Final Determination*, was published on August 29, 2025. Thirty-one days later was September 29, 2025. Ternium filed its summons within thirty days thereafter, on October 28, 2025.

However, the USMCA waiting period does not *also* dictate an entirely new, accelerated time period that extinguishes the prerequisites of Section 1516a(a)(2). Relevant here, Section 1516a(a)(2)(A)(i)(II) dictates that "publication in the Federal Register of {a} countervailing duty order" must occur before the window opens to file a new action challenging Commerce's

affirmative determination in the investigation. *Id.* § 1516a(a)(2)(A)(i)(II) (cleaned up). This requirement is not country-specific. *See id.* In a USMCA case, Section 1516a(a)(5) merely ensures that, even if the preconditions set forth in Section 1516a(a)(2)(A) have already been satisfied, the window to file an action doesn't open, *i.e.*, "shall not **begin** to run," until after expiration of the period for requesting binational panel review. *Id.* § 1516a(a)(5); *see also id.* § 1516a(g) (describing binational panel review procedures). However, this waiting period does not change the fact that the window to file an action only opens "**after** the date of publication in the federal register of {a} countervailing duty order," *id.* § 1516a(a)(2)(A)(i)(II) (emphasis supplied). Here, that occurred on December 19, 2025. *See Countervailing Duty Orders*, 90 Fed. Reg. 59,488 (Dec. 19, 2025). Indeed, maintaining the integrity of Section 1516a(a)(2)(A)(i)(II)'s precondition serves an obvious practical purpose—were a countervailing duty order not issued because, *e.g.*, the U.S. International Trade Commission found no material injury, *see* 19 U.S.C. § 1671(a)(2), then the merits of Commerce's countervailing duty determination would be moot and would-be litigants could not satisfy Constitutional standing requirements. *See Bethlehem Steel Corp. v. United States*, 742 F.2d 1405, 1410 (Fed. Cir. 1984) (concluding that it is "highly unlikely that Congress would call for such a potentially useless appeal{}" in which an interested party could appeal an element of an affirmative countervailing duty investigation if "the whole question of duty assessment could become moot because the ITC found no domestic injury whatsoever."). This is true whether the merchandise originated in a USMCA country or elsewhere.

Ternium's suit "is barred" because Ternium's summons was not filed "within the time specified" in 19 U.S.C. § 1516a(a)(2)(A)(i)(II). *See* 28 U.S.C. § 2636(c). Viewed differently, the suit was not "commenced under" Section 1516a because the prerequisites set forth thereunder

NONCONFIDENTIAL VERSION

were not satisfied. *See id.* § 1581(c). Reaching a different conclusion, Ternium relies on

*Bioparques*, but Ternium's reliance is misplaced. *See* Ternium Br. at 3 (quoting *Bioparques De*

*Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336, 1347 (Fed. Cir. 2022)).

      *Bioparques* specifically states that "neither the government nor the {intervenor} has

offered evidence or argument that any jurisdictional prerequisite has not been met." 31 F.4th at

1347. Consequently, the jurisdictional timeline was largely undisputed and *Bioparques* does not

grapple with the distinction raised above—between a provision that creates a country-specific

tolling period (1516a(a)(5)), versus a provision that otherwise defines the window for initiating

an appeal for all countries (1516a(a)(2)). A court is "not bound by precedent when the issue is

not…discussed in the opinion of the court." *Dynacraft Indus., Inc. v. United States*, 24 C.I.T.

987, 994 (2000).

      It is understandable that *Bioparques* does not address this issue because it addressed a

unique—and dissimilar—set of facts. The following events led to *Bioparques*:

1. 1996: DOC begins LTFV Investigation.
2. 1996: Suspension Agreement suspends the LTFV investigation (renegotiated in 2002, 2008, 2013, and 2019).
3. 2019: Domestic producers ask Commerce to complete its LTFV investigation.
4. 2019: DOC Final Determination concludes LTFV investigation, but 2019 suspension agreement remains in effect and no AD Order is issued.
5. 2019: Plaintiffs file suit at the CIT challenging, in relevant part, the 2019 DOC LTFV Investigation Final Determination.

Thus, *Bioparques* concerned an appeal of a final determination in an investigation that, due to

the existence of a suspension agreement, had not yet produced an antidumping order. In that

case, the parties "dispute{d} only whether the {final determination} is a B(i) final affirmative

determination." 31 F.4th at 1347. The analysis revolved around the implications of the

investigation having been subject to a suspension agreement that was subsequently abrogated

and yielded the final determination. And the CAFC framed its conclusion regarding jurisdiction as applicable to "the determination at issue here," *id.* at 1339, holding only "that an affirmative final determination in a continued investigation that involves exports from an FTA country is reviewable under § 1516a(g)(3)(A)(i) as a determination under § 1516a(a)(2)(B)(i)…On the record before us, those provisions support Trade Court jurisdiction over Bioparques's challenge to the Final Determination," *id.* at 1348 (emphasis supplied). The Federal Circuit's *sui generis* treatment of a highly unusual suspension agreement fact pattern cannot narrow the operation of 19 U.S.C. § 1516a(a)(2)(A)(i)(II) for all USMCA cases. Permitting appeals to be filed before publication of an Order would raise mootness concerns for ordinary challenges to investigations, whether involving an USMCA country or not.

*Bioparques* does not provide an avenue for overriding the clear statutory prerequisites of 19 U.S.C. § 1516a(a)(2) in Ternium's factually distinct, and far more ordinary, circumstances. The court lacks subject matter jurisdiction because Ternium's suit was premature.

## II.    Standard of Review for Commerce Determinations

If the court reaches the substance of Ternium's challenge to the *Final Determination*, this Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  To determine whether Commerce's interpretation of a statute is "in accordance with law," *Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244, 2271 (2024), instructs courts reviewing administrative determinations to discern the statute's "best meaning" by "deploying its full interpretive toolkit."  Under this general rule, courts may not "defer" to the administrative interpretation, although the "thoroughness" and "validity" of Commerce's legal analysis may confer the "power to persuade," *see id.* at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

7

Next, the Court's substantial evidence review examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Substantial evidence is "more than a scintilla" and "must take into account whatever in the record fairly detracts from its weight." *Id*. at 477, 488. Even "{w}here an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).

### III. Commerce's Application of AFA With Respect to the Factoring Loan Programs Was a Lawful Response to a Gap in the Record and Ternium's Failure to Cooperate

Commerce found gaps in the administrative record with respect to data necessary to calculate the benefit amount associated with two loan programs—the National Bank of Foreign Trade ("Bancomext") and Nacional Financiera, S.N.C., Development Banking Institution ("NAFIN") Factoring Programs. Commerce rejected Ternium's various attempts to belatedly provide the information, all of which occurred both after Commerce first identified the relevant gap and well after the administrative record had closed. Commerce also found that Ternium's repeated failures to provide information available to Ternium constituted a failure to cooperate to the best of Ternium's ability. Notwithstanding Ternium's attempts to slice and dice these events into a mountain of decisions and sub-decisions, and to relitigate factual issues without record support, the scenario is a commonplace application of 19 U.S.C. § 1677e(a)-(b) and the Court's task on review is straightforward.

Applying AFA is a two-step analysis. First, Commerce must either identify "necessary information" missing from the record or determine that a party failed to adequately respond to Commerce's request for information by (1) withholding requested information, (2) failing to provide such information by deadlines set by Commerce or in the "form and manner requested,"

(3) significantly impeding the proceeding, or (4) providing such information in a way that cannot be verified. 19 U.S.C. § 1677e(a). "{T}o the extent practicable," Commerce must "provide…an opportunity to remedy or explain" such deficiencies, *id.* §§ 1677e(a), 1677m(d), but if the gap persists thereafter then the statute **<u>requires</u>** Commerce to "use the facts otherwise available in reaching the applicable determination," *id.* § 1677e(a). Second, Commerce may apply an adverse inference in applying facts otherwise available if it finds that the submitting party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b).

As detailed below, Ternium was given two opportunities to submit key information about benefits that it received under the Bancomext and NAFIN Factoring Programs, yet it omitted requested information and failed to explain unrequested information. Commerce's response to this gap and to Ternium's belated attempts to revise its reporting were reasonable and in line with the statute and Commerce's regulations. This Court should sustain Commerce's use of AFA to address Ternium's failure to cooperate to the best of its ability with regard to the Factoring Programs.

A. **After Ternium Omitted Requested Information from its Initial Questionnaire Response, Commerce Provided an Opportunity to Remedy the Deficiency, and Reasonably Rejected Subsequent Attempts to Belatedly Provide the Information**

Commerce was clearly facing a gap in the record due to Ternium's failure to submit information requested by Commerce concerning both the Bancomext and NAFIN Factoring Programs. Crucially, Ternium was given two opportunities to provide this information: once in response to Commerce's initial questionnaire and again in response to Commerce's second supplemental questionnaire. *See* Letter from Commerce; "Countervailing Duty Questionnaire" (Oct. 16, 2024) at III-8, III-10, III-25 ("Initial Questionnaire") (P.R. 111); Letter from Commerce, "Second Supplemental Section III Questionnaire for Ternium Mexico" (Jan. 10,

9

2025) at 5 ("Commerce 2Supp. Questionnaire") (C.R. 201). At both junctures, Ternium came up short, failing to supply key information about the Factoring Programs that would allow Commerce to fully calculate an accurate countervailing duty subsidy rate for both programs. As a result, Commerce was facing a gap in the record, requiring the use of facts otherwise available as contemplated by 19 U.S.C. § 1677e. The governing statute, regulations, and case law require nothing more of Commerce, especially not the acceptance of untimely new factual information from the very party who had multiple chances to ensure such information made its way to the record in the first place.

1.    *Commerce Complied with the Requirements of 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) in Finding a Gap in the Administrative Record*

Ternium's opening brief does not directly contest that there was a gap in the administrative record after Ternium's second supplemental questionnaire response, but Ternium repeatedly obfuscates and mischaracterizes the nature of the gap in an apparent effort to cast the issue as "minor" or "ministerial." *See* Ternium Br. at 8-23. That is incorrect. The administrative record contains **no data** concerning the duration of any of Ternium's Bancomext or NAFIN factoring loans and **no explanation** concerning how Ternium calculated its "effective interest rate charged." As Commerce explained, Ternium's omissions were substantive and cut to the core of Commerce's benefit calculation because:

> Commerce determines whether a government loan conferred a benefit by comparing the amount of interest paid on the government loan to the amount of interest paid on commercial benchmark loan. The number of days the government loan is outstanding, the interest rate charged, and the loan principal determine the amount of interest a respondent paid on its government loan. Further, Commerce uses the number days outstanding on the government loan to calculate the amount of interest the respondent would have paid on a comparable loan. Thus, the number of days outstanding and the interest rate are key components that Commerce uses to confirm the veracity of the respondent's reported interest payments and perform the loan benefit calculation.

10

NONCONFIDENTIAL VERSION

Memorandum from Commerce; "Post-Preliminary Analysis" (July 31, 2025) at 8 ("Post-Preliminary Decision Memo") (P.R. 405) (citing 19 C.F.R. § 351.505(a)); *see also* Final IDM at 11.

Commerce first instructed Ternium to provide detailed information on the Bancomext and NAFIN Factoring Programs in its initial questionnaire, identifying "Bancomext Financing" as a "Loans and Credit" program and directing Ternium to "respond to all questions in" the "Loan Template." Initial Questionnaire at III-8. In relevant part, the Loan Template included the following fields:

| Lender | Initial Loan Amount (Principal) (MxP and Original Currency) | Life of Loan (days if short-term, years if long-term) | Effective Interest Rate Charged |
| --- | --- | --- | --- |
| | | | |

**Attachment 1.**[1] With respect to the "Effective Interest Rate Charged," the template specifically instructed Ternium to "indicate how the effective interest rate was derived," provide "the prime rate and the spread" for any variable interest rates, and otherwise "report the actual, numerical interest rate charged during the payment period (e.g., 6%)" in the table itself. **Attachment 1.** For other assistance programs not specifically named, Commerce instructed Ternium to "describe such assistance in detail, including the amounts, date of receipt, purpose and terms, *and answer all questions in the appropriate appendices*." Initial Questionnaire at III-10.

Ternium's initial questionnaire response identified "Bancomext Factoring Agreement" as "Bancomext Financing" and otherwise stated that it "considers factoring to be a short-term loan." *See* Letter from Ternium, "Response to Section III of the Questionnaire" (Dec. 5, 2024) at 12

---

[1] **Attachment 1** contains a PDF printout of the Microsoft Excel® loan template attached to Commerce's initial questionnaire. *See* Initial Questionnaire at III-25.

("Ternium IQR – Program Specific Response") (C.R. 148, Barcode 4676134-50).[2] Despite

noting the questionnaire instruction to complete a "Loan Template" for all "Bancomext

Financing" programs," *id.* at 8, Ternium did not submit a Loan Template for the Bancomext

Factoring Agreement.  Ternium also reported a separate "factoring agreement with {NAFIN},"

*id.* at 44, whereby Ternium received funds "provided by NAFIN or other banks" that act as

"lenders," *id.* at 49.  Ternium did not submit a Loan Template for the NAFIN factoring program.

In accordance with 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d), Commerce both

"inform{ed Ternium} of the nature of the deficiency" and afforded Ternium "an opportunity to

remedy…the deficiency." Specifically, Commerce instructed Ternium as follows in a

supplemental questionnaire:

> you explain that Ternium Mexico had a [          ] agreement with Bancomext during the POI, which it considers to be a short-term loan. As originally instructed, complete a Loan Template in Excel format for all [               ] with Bancomext during the POI.

Commerce 2Supp. Questionnaire at Q.5.

> Please submit a Loan Template for any and all loans or other forms of financing (e.g., [                    ] financing) received in connection with the programs, including "other" subsidy programs, identified in Ternium Mexico's SIIIQR that were not fully repaid prior to the POI.

*Id.* at Q.13.

In response to Commerce's requests for information, Ternium submitted incomplete loan

templates for its factoring arrangements with Bancomext and NAFIN during the POI. Both left

the template column for "Life of Loan (days if short-term, years if long-term)" [

]. *See* Letter from Ternium, "Response to Second Supplemental Section III Questionnaire"

---

[2] This brief treats certain information as public that has been treated as such in the opening Rule 56.2 brief filed by Ternium. This includes, for example, references to "factoring" and "negative benefits."

(Jan. 21, 2025) at 6, Exs. Supp 2.10, Supp2. 17 ("Ternium 2SQR") (C.R. 210, 215-216, 227, Barcodes 4702303-01, 4702303-06, 4702303-07, 4702303-18). Neither provided the description requested by the template for "how the effective interest rate was derived" or the requested

[                                                 ], either in the template itself or in the associated

narrative. *See id.* at 6, 9, Exs. Supp2. 10, Supp2. 17.[3] Finally, for each row, Ternium reported

[

]. *See id.* at Exs. Supp2. 10, Supp2. 17.[4]

Commerce ultimately found that these omissions constituted a gap in the administrative record, noting that "despite being asked twice to do so," Ternium "did not provide the number of days outstanding as requested in the Loan Appendix" and "sought to change all the observations in the number of days outstanding and interest rate columns of its NAFIN {and Bancomext} loan worksheet{s}" at verification, "thereby indicating that all the data Ternium Mexico previously submitted for those fields for both programs were inaccurate." Final IDM at 11; *see also id.* at 13 (same for Bancomext program). The absence of this information prevented Commerce from calculating the benefit associated with these loans because, as Commerce explained, "{t}he number of days the government loan is outstanding, the interest rate charged, and the loan principal determine the amount of interest a respondent paid on its government loan. Further, Commerce uses the number of days outstanding on the government loan to calculate the amount

---

[3] Even Ternium's sample Bancomext Factoring documentation did not identify a row in the template to which it corresponded, and Ternium [                               ] from the loan template. *Compare id.* at 7, Ex. Supp2. 12, *with id.* at Ex. Supp2. 10.

[4] Separately, for the Bancomext Factoring Program Loan Template, Ternium provided only a PDF copy, which displays only the [

]. *See id.* at Ex. Supp2. 10. Consequently, a
[                    ] is missing from the record for these observations.

13

of interest the respondent would have paid on a comparable loan." *Id.* at 11-13. Commerce's identification of a gap and its explanation of why that gap was material to Commerce's calculation of the benefit associated with these loan programs was lawful and supported by substantial evidence.

  2.  *Commerce Reasonably Rejected Ternium's Untimely Attempts to Provide Missing Information*

Having found a gap, the statute required Commerce to "use facts otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a). Thus, in the preliminary results, Commerce devised a plug to fill the gap with respect to the life of Bancomext Factoring Program loans. *See* Memorandum from Commerce, "Preliminary Determination Calculations for Ternium Mexico" (Feb. 3, 2025) at 3 ("Preliminary Calculation Memo") (C.R. 235) (describing the role of the "number of days loan was outstanding" in the program benefit calculation); *id.* at Attachment II ([                                                                                    ]); *see also* Post-Preliminary Decision Memo at 12 (calculating a preliminary AFA rate of 6.55% for NAFIN Factoring Program).

Only after this, months after the deadline for Commerce's January 10 supplemental questionnaire, and months after expiration of the regulatory period for submission of other unsolicited factual information, *see* 19 C.F.R. § 351.301(c)(5), did Ternium belatedly proffer both the withheld loan duration information as well as revisions to interest rate information for both factoring programs. On appeal, Ternium dedicates its argument primarily to challenging Commerce's rejection of these belated submissions, *see* Ternium Br. at 8-23, and then argues by reference to the untimely information rejected from those submissions that there was no gap in the record after all, *see id.* at 26-27. Ternium's framing is backwards. In rejecting Ternium's months-late datasets, Commerce reasonably applied the agency's statutory and regulatory

14

authority, *see* 19 U.S.C. § 1677m(e); 19 C.F.R. §§ 351.301-351.302, and its "broad discretion regarding the manner in which it develops the record in an {original} investigation." *Stupp Corporation v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2025).

The burden of creating an accurate record lies with the respondent, which is in many cases the sole party in the possession of information necessary for Commerce's calculations, as was certainly the case with Ternium's loan information. *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) (quoting *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("In the course of an investigation or review, 'the burden of creating an adequate record lies with interested parties.'"); *see also Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990)) (explaining that "{t}he placement of the burden on interested parties stems from the fact that the International Trade Administration, the relevant agency within Commerce, has no subpoena power"). In satisfying this burden, a party must comply with regulatory time limits governing the submission of factual information. *See* 19 C.F.R. § 351.301. Relevant here, an interested party may submit factual information in response to questionnaires issued by Commerce within the deadline established by the agency for submitting a response. 19 C.F.R. § 351.301(c)(1). Interested parties may also submit certain "other" information absent a specific request from Commerce before closure of the administrative record, but acceptance or rejection of such information, even if timely, is a matter of Commerce discretion. *See id.* § 351.301(c)(5)(i).

Commerce found Ternium's belated submissions were inconsistent with these rules, *see* Final IDM at 25, 30-31 (referencing rejection memoranda), and Commerce's regulations otherwise provide that it "will not consider or retain in the official record of the proceeding:

15

untimely filed factual information" or "unsolicited questionnaire responses," *see id.* § 351.302(d)(1)(i)-(ii). Thus, Commerce's rejection of Ternium's untimely filings was not only lawful, *Am. Signature, Inc. v. United States*, 598 F.3d 816, 827 (Fed. Cir. 2010) ("{Commerce's} construction of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (internal cites and quotes omitted), it was required, *see Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) ("Commerce, like other agencies, must follow its own regulations.").

Ternium invokes Commerce's obligation to "determine CVD rates as accurately as possible," implying that Commerce's procedures are somehow subordinate. *See* Ternium Br. at 6, 8. The Federal Circuit has repeatedly rejected Ternium's position, holding that Commerce has clear authority to "apply its own procedures for the timely resolution of {AD/CVD proceedings}" and a "court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 546 (1978) (pursuit of "what the court perceives to be the 'best' or 'correct' result" would render judicial review "totally unpredictable.")). Similarly, "{i}t {i}s within Commerce's discretion to value finality, and deterrence of respondent noncompliance with document requests, over any potential reduction in accuracy that might result from rejecting the new, untimely {information} offered {at verification}." *Linyi Chengen Imp. & Exp. Co. v. United States*, 174 F.4th 1351, 1362 (Fed. Cir. 2026).  Plainly, Ternium attempts to stretch the accuracy obligation past its breaking point. Allowing a respondent to flaunt deadlines and force

16

Commerce to accept new information months later—as Ternium seeks to do here—would be unfair to Commerce, Petitioners, and all other interested parties.

          i.    *Commerce Reasonably Rejected Ternium's Untimely Questionnaire Response*

Ternium attempted to submit untimely information on the record regarding both the Bancomext and NAFIN Factoring Programs in responses to post-preliminary supplemental questionnaires, **nearly five months** after the both the original supplemental questionnaire deadline and the closure of the administrative record. *Compare* Ternium Letter from Ternium, "Response to New Subsidy Allegation Supplemental Questionnaire" (June 16, 2025) at 5, Supp NSA-3 ("Ternium NSA SQR") (C.R. 315, 321) (belated data for Bancomext Factoring program), *and* Letter from Ternium, "Response to the Supplemental Questionnaire" (July 1, 2025) at 5-7, Ex. Supp3.-2 ("Ternium 3SQR") (C.R. 323, 326-327) (belated data for NAFIN Factoring program), *with* Ternium 2SQR at 1 (submitted on Jan. 21, 2025). Commerce rejected this information on the basis that the "new factual information…was not requested by Commerce" as Commerce "did not ask questions regarding this program and did not otherwise request information regarding Bancomext." Letter from Commerce, "New Subsidy Allegation Supplemental Questionnaire for Ternium Mexico" (July 10, 2025) at 1 ("Commerce NSA SQR Rejection Memo") (P.R. 392); *see also* Memorandum from Commerce, "Rejection of Ternium Mexico Submission" (Aug. 12, 2025) at 1 ("Commerce 3SQR Rejection Memo") (P.R. 412) (same for NAFIN factoring program). Commerce characterized this as "untimely filed factual information and an unsolicited questionnaire response." Final IDM at 25, 31. Before this Court, Ternium concedes that the supplemental questionnaires "related to other issues," but nonetheless argues that Commerce should have accepted the information because it "was still accepting {other} information and the record was open." Ternium Br. at 15.

17

Ternium cites no support for its theory, *see id.* at 15-16, which contravenes both the regulatory requirement that parties submit any new factual information not expressly requested by Commerce at least 30 days before the scheduled date of the preliminary determination; here, January 4, 2025, 19 C.F.R. § 351.301(c)(5); *see Postponement of Preliminary Determinations in the Countervailing Duty Investigations*, 89 Fed. Reg. 89,995 (Nov. 14, 2024) (P.R. 138) (scheduling preliminary results for February 3, 2025), and the principle that "{Commerce's} construction of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation," *Am. Signature*, 598 F.3d at 827. It is Ternium's construction that is "plainly erroneous" as its unsolicited information was submitted five months after the regulatory deadline. Indeed, the January 10 supplemental questionnaire wherein Commerce requested loan templates for the factoring programs a second time was issued (and thus due) after the deadline for "other" information, so Ternium had no reason to expect that Commerce would accept unsolicited additions to the administrative record thereafter. Commerce's rejection comported with its regulatory obligation to "not consider or retain in the official record of the proceeding unsolicited questionnaire responses…or untimely filed questionnaire responses." 19 C.F.R. § 351.301(c)(1); *see* Final IDM at 25, 31.

Ternium emphasizes two contextual points: Commerce's post-preliminary inquiries into other programs and the fact that Ternium's unsolicited information lurked for weeks before Commerce's eventual rejection. *See* Ternium Br. at 15-16. Again, however, Ternium fails to identify any support that would transform these points into a basis for overturning Commerce's straightforward application of its regulations in response to a submission that was nearly five months late. *See id.* Neither is a reasonable basis for upending Commerce's application of longstanding procedures established through notice-and-comment. *See, e.g.*, *Definition of*

*Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21,246 (Apr. 10, 2013). Indeed, Commerce's level of activity merely underscores the reasonableness of rejecting Ternium's attempt to wrest control of record development from Commerce.

Original countervailing duty investigations occur on an especially tight statutory timeline. *Compare* 19 U.S.C. § 1671b(c)(1) (extended deadline for preliminary CVD determinations is 130 days after initiation), *with id.* § 1673b(c)(1) (extended deadline for preliminary AD determinations is 190 days after initiation). This tight statutory timeline is combined with the additional churn associated with additional mandatory respondents, *e.g.*, the foreign government. *See* Initial Questionnaire at Cover Page. Moreover, Petitioners can—and here did—allege entirely new subsidies up until 40 days before the preliminary determination. *See* 19 C.F.R. § 351.301(c)(2)(iv)(A); Letter from Petitioners, "Petitioners' New Subsidy Allegations" (Jan. 2, 2025) at 1-24 ("Petitioners' NSA") (C.R. 191). Indeed, Ternium's own summary of post-preliminary supplemental questionnaires demonstrates that Commerce was almost entirely focused on developing the record arising out of these new subsidy allegations ("NSAs"). *See* Ternium Br. at 15. Indeed, Ternium omits several additional post-preliminary questionnaires, including a March 10 NSA supplemental questionnaire directed to Petitioners, initial NSA questionnaires to Ternium, Galvasid, and the GOM dated April 24, and a June 5 NSA supplemental questionnaire directed to the GOM. *See* Letter from Commerce, "Petitioners' New Subsidy Allegations Second Supplemental Questions" (Mar. 10, 2025) (P.R. 302); Letter from Commerce to Ternium, "New Subsidy Allegation Questionnaire" (Apr. 24, 2025) (P.R. 317); Letter from Commerce to Galvasid, "New Subsidy Allegation Questionnaire" (Apr. 24, 2025) (P.R. 316); Letter from Commerce to the GOM, "New Subsidy Allegation Questionnaire" (Apr.

19

NONCONFIDENTIAL VERSION

24, 2025) (P.R. 318); Letter from Commerce, "New Subsidy Allegation Supplemental Questionnaire" (June 5, 2025) (P.R. 368).

Simply put, Commerce has "broad discretion regarding the manner in which it develops the record in an {original} investigation," *Stupp*, 5 F.4th at 1350; *see also Prime Time Commerce LLC v. United States*, 396 F. Supp. 3d 1319, 1328 (Ct. Int'l Trade 2019) ("Commerce, as the administrator of the review process, can structure the receipt of factual information and specify the parties who are eligible to respond to its questionnaires."), and the fact that it was busily working to fulfil its statutory obligations with respect to all parties does not oblige Commerce to divert its attention to an issue that Ternium itself couldn't be bothered to address when Commerce posed the question directly. Ultimately, Commerce had to develop, evaluate, and verify three different respondents' submissions concerning twenty-six subsidy programs. Commerce's regulations are designed to keep this process manageable, and Commerce reasonably applied its rules here.

Ternium misconstrues the relevant standard of review of Commerce's rejection of untimely corrective information. *NTN Bearing* remanded Commerce's refusal to accept an untimely clerical error correction, *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995), but Ternium asserts that *NTN Bearing*'s holding was not limited to the correction of clerical errors. *See* Ternium Br. at 8-9 (also citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006)). In fact, the "*NTN/Timken* doctrine" is "limited to the correction of mistakes in timely factual submissions to ensure an accurate assessment at the final determination stage" and the decision whether to accept such corrections is a function of Commerce's discretion and turns on whether the information is clerical or methodological. *Wuhu Fenglian Co., Ltd. v. United States*, 37 C.I.T. 281, 287-88 (2013); *see also Goodluck India*, 11

20

F.4th at 1342-43. Further confirming *NTN Bearing*'s and *Timken*'s inapplicability here, those cases "did not involve the use of facts otherwise available or adverse inferences. Both involved situations in which a respondent brought an error to the Department's attention." *Kisaan Die Tech Private Limited v. United States*, 665 F. Supp. 3d 1364, 1374 (Ct. Int'l Trade 2023). The same is true of *Fischer*, on which Ternium also relies, Ternium Br. at 9-10, which likewise distinguishes other cases sustaining "Commerce's rejection of untimely fact submissions and Commerce's consequent application of adverse facts available" where "the information the plaintiffs offered did not correct a mistaken previous submission, but instead attempted to fill the gap caused by failure to provide a questionnaire response or evidence requested during verification," *Fischer S.A. v. United States*, 700 F. Supp. 2d 1364, 1377 (Ct. Int'l Trade 2010). That is precisely what occurred here, and Commerce acted within its discretion in rejecting Ternium's belated, unsolicited submission of missing information.

        ii.    *Commerce Reasonably Found that the Factoring Program Information Presented at Verification Was not a "Minor" Correction*

When Commerce rejected the untimely portions of Ternium's response to Commerce's post-preliminary questionnaire, Ternium attempted to introduce the same information under the guise of a "minor correction" at verification. *See* Final IDM at 25. Specifically, "an entirely new column of information in the loan worksheet containing the number of days outstanding for its Bancomext {and NAFIN} loans as well as a column of information containing revised effective interest rates for most Bancomext {and all NAFIN} loans on which it paid interest during the POI." *Id.* at 25, 31. Commerce rejected this information on the basis that it was not minor, explaining that it "included changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate." Verification Report at 2-3. Ternium characterizes Commerce's description as "incorrect," Ternium Br. at 18-19, and

attempts to fault Commerce for not quoting the standard for a "minor correction," *id.* at 20-22. However, the record confirms Commerce's characterizations and Commerce expressly invoked the *Goodluck* standard on which Ternium relies. *Compare* Final IDM at 25 n.123 (citing *Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021)), *with* Ternium Br. at 20-21.

Verification is "an effort to ensure the information that was provided in response to the questionnaires is complete and accurate. Verification is meant to be a 'test' of the information already in the administrative record." *Linyi Chengen Imp. & Exp. Co. v. United States*, 174 F.4th 1351, 1356 (Fed. Cir. 2026) (internal citations omitted); *see also Bomont Industries v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990) ("{V}erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness."). When conducting verification, Commerce generally has the latitude to "derive {its} verification procedures *ad hoc*," subject to review for abuse of discretion. *Micron Tech. v. United States*, 117 F.3d 1386, 1395-96 (Fed. Cir. 1997). Here, as is Commerce's standard practice, its verification agenda stated, in relevant part, that "verification is not intended to be an opportunity for the submission of new factual information" and "{i}nformation will be accepted at verification only when the information makes minor corrections to information already on the record." Letter from Commerce, "Verification of Ternium Mexico's Questionnaire Responses" (July 3, 2025) at 2 ("Verification Agenda") (C.R. 328); *see also Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l Trade 2015) (verification is not a forum for interested parties to provide new factual information). The Federal Circuit has affirmed this approach as a reasonable balance of finality and accuracy. *Goodluck India*, 11 F.4th at 1342.

To assess whether a proposed correction is "minor," Commerce assesses whether it resolves "minor mistakes in addition, subtraction, or other arithmetic function, minor data entry

22

mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, {or} minor classification errors." *Goodluck India*, 11 F.4th at 1343.[5] "Minor corrections" do not include methodological errors or changes. *Id.*

As an initial factual matter, Commerce's characterization of Ternium's proposed corrections as involving "changes to every observation in the columns indicating the number of days the loan was outstanding and the effective interest rate" is accurate. Memorandum from Commerce, "Verification of the Questionnaire Responses of the Ternium Mexico" (July 24, 2025) at 2-3 ("Verification Report") (C.R. 365). Ternium claims that the former involved "add{ing} the difference between the day Ternium's invoice was issued and the day Ternium received payment." Ternium Br. at 18. Yet, the loan templates included in Ternium's January 21, 2025, SQR provided [          ] about the number of days the loan was outstanding, and only [

          ]. *See* Ternium 2SQR at Exs. Supp2. 10, Supp2. 17.

Consequently, Ternium's "addition" required introducing entirely new data that could not be derived from the preexisting record, consistent with Commerce's observation that it "change{d} every observation in the columns indicating the number of days the loan was outstanding." Ternium Br. at 18; *see also* Verification Report at 2-3. As for the interest rate, Ternium's describes its proffered corrections as "amend{ing} the title of one column to clarify that the figure reported was the ratio of interest to the capital of the invoice." Ternium Br. at 19. Yet, because Ternium's January 21, 2025, SQR provided [                    ] "effective interest rate" column and omitted the requested description of "how the effective interest rate was derived," *see* Ternium 2SQR at 6, 10, Exs. Supp2. 10, Supp2. 17, recharacterizing the entire

---

[5] This standard is akin to the standard by which Commerce reviews whether an alleged ministerial error is truly "ministerial," as opposed to substantive or methodological. *See* 19 C.F.R. § 351.224(f).

column [                ] from "effective interest rate" to "ratio of interest to the capital of the invoice" is, as Commerce found, "chang{ing} every observation in the columns indicating the…effective interest rate." *Compare* Verification Report at 2, *with* Ternium Br. at 19. Thus, there is no material disagreement about the nature of the corrections presented.

Ternium nevertheless argues that Commerce "never examined Ternium's corrections; nor did it determine whether they were minor based on the factors" enunciated in *Maui Pineapple*. Ternium Br. at 20-21 (citing *Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1261 (Ct. Int'l Trade 2003) (describing six factors)). As discussed above, the notion that Commerce "never examined Ternium's corrections" is belied by the specificity of Commerce's rationale for rejecting those materials, which Ternium does not meaningfully contest. *See* Verification Report at 2. Moreover, Commerce had *already* considered—and rejected—the same Bancomext materials in connection with Ternium's June 16, 2025, NSA SQR. *See* Commerce NSA SQR Rejection Memo at 1-2.

As for the *Maui Pineapple* factors, while instructive, they are not an established test that Commerce is required to announce and apply. *See Micron Tech.*, 117 F.3d at 1396 ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures *ad hoc*."); *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("{T}he statute{s} give{ } Commerce wide latitude in its verification procedures."). Here, as Commerce explained, in its Verification Agenda, corrections proffered at verification would be rejected unless they "make{} minor corrections to information already on the record." Verification Agenda at 2. The Federal Circuit has held that limiting corrective information at verification "only for 'minor corrections to information already on the record'…strikes an appropriate balance between finality and accuracy. And, importantly, it is within Commerce's discretion to decide which interest

24

outweighs the other on a case-by-case basis." *Goodluck India*, 11 F.4th at 1342-43. Here, Ternium provided completely new data on loan duration for every single instance of two different subsidy programs and provided new information that changed the interest rate for every single instance of those same subsidy programs. *See* Verification Report at 2-3. Commerce reasonably found that was not a "minor correction to information already on the record," Verification Agenda at 2, insofar as it involved "new data" and "changes to every observation" that are "broad {in} scope," Verification Report at 2-3; *see also* Final IDM at 11-13, 25, 31.

Comparing the facts presented in *Goodluck India* further supports Commerce's determination here. There, the respondent prepared CONNUM values using a set of nine wall thickness codes Commerce had provided at the outset of the proceeding, rather than the set of fourteen codes the agency later provided, resulting in inaccurate CONNUMs for 682 sales database observations. *See* 11 F.4th at 1343. The Federal Circuit reasoned that Commerce did not abuse its discretion in rejecting this revision because the respondent's revisions were a "systemic change to the entire reported database{}" and "were not singular, such as a missing word or an error in arithmetic." *Id.* Here, likewise, as Commerce found, Tenrium's proffered corrections were "broad {in} scope" and "change{d} every observation" for two subsidy programs. Verification Report at 2-3; *see also* Final IDM at 11-13, 25, 31.

In sum, Commerce did not abuse its discretion in rejecting Ternium's efforts to correct for its earlier omission at verification.

**B.  Having Found a Gap in the Record, Commerce Reasonably Determined that Ternium Failed to Cooperate to the Best of Its Ability and Applied an Adverse Inference in Applying Facts Otherwise Available**

Commerce reasonably found that Ternium's failure to timely supply the requested loan information satisfied the statutory standard for applying an adverse inference in selecting facts otherwise available. Final IDM at 11, 13, 25-26, 31-32. Commerce may invoke AFA when it

finds that an interested party "failed to cooperate by not acting to the best of its ability to comply with a request for information from {Commerce}." 19 U.S.C. § 1677e(b)(1). As explained by the Federal Circuit, the "ordinary meaning of 'best' means 'one's maximum effort,' as in 'do your best,'" therefore "the statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). This standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* Rather, "the statutory trigger for {Commerce's} consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* at 1383. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, as reprinted in 1994 U.S.C.C.A.N. at 4177 ("SAA") at 870.

Here, Commerce twice requested that Ternium complete loan templates for the Bancomext and NAFIN factoring programs, and Ternium twice failed to do so. Ternium argues that it was not reasonable for Commerce "to expect that more forthcoming responses should have been made." Ternium Br. at 28 (citing *Nippon Steel*, 337 F.3d at 1383). Ternium's position is absurd. A complete, *timely* response to questions repeatedly and explicitly posed is the gold standard for "circumstances when it is reasonable" for Commerce to expect "forthcoming responses." *Nippon Steel*, 337 F.3d at 1383. Ternium did not claim, then or now, *see* Ternium Br. at 28, that it was somehow prevented from timely preparing the requested information. Rather, whether through inattentiveness or carelessness, Ternium left entire columns of blank and unexplained data, contrary to Commerce's instructions.

26

NONCONFIDENTIAL VERSION

Ternium attempts to turn its frantic, months-late efforts to respond to Commerce's questions into a shield, *see* Ternium Br. at 28, but, as Commerce found, Ternium's conduct "makes it clear that the information had been available to Ternium Mexico" and furthermore "indicated to Commerce that the record information regarding the NAFIN program was unreliable and inaccurate." Final IDM at 31-32; *see also id.* at 25-26 (similar observations with respect to Bancomext Factoring program). As in *Goodluck India*, "the record clearly supports a finding that Goodluck failed to follow instructions" despite the information having been "addressed by Commerce on two occasions prior to verification." 11 F.4th at 1344; *see also Fujian Lianfu Forestry Co., Ltd. v. United States*, 33 C.I.T. 1056, 1063-64 (2009) (sustaining the use of AFA despite the respondent's claims that it went to "extraordinary lengths" to meet Commerce's requests for information due to the respondent's failure to submit information clearly requested across multiple questionnaires). That Ternium reacted after Commerce's adverse preliminary finding on the Bancomext Program does not undermine the reasonableness of Commerce's expectation that Ternium would have provided timely answers to Commerce's questions. Commerce's determination that Ternium did not cooperate to the best of its ability and application of an adverse inference was lawful and reasonable.

## C.    In Applying an Adverse Inference, Commerce Was Not Required to Credit Ternium's Preferred Plug for the Gap in the Record

Ternium challenges Commerce's treatment of the arguments proffered in Ternium's Ministerial Error Allegation. *See* Ternium Br. at 13-14, 30. But Ternium acknowledged that its Ministerial Error Allegation "d{id} not contain any new factual information," Letter from Ternium, "Allegation of Significant Ministerial Error Contained in the Preliminary Determination" (Feb. 18, 2025) at 6 ("Ministerial Error Allegation") (C.R. 236), so this is not an issue of record development. Rather, it is a question of how Commerce filled the gap in the

27

administrative record; specifically, whether Commerce was obliged to rely on Ternium's preferred plug, derived from other evidence on the record, to fill the gap with respect to the actual duration of Ternium's Bancomext and NAFIN factoring program loans. *See* Ternium Br. at 13-14, 30. In this context, the Ministerial Error Allegation itself is irrelevant for purposes of judicial review, because Commerce's regulations require a respondent to present all arguments that continue to be relevant in their administrative case brief. *See* 19 C.F.R. § 351.309(c)(2); *United States Steel Corporation v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018).

The record does not contain information concerning the ***actual*** duration of ***any*** of Ternium's loans or the method by which Ternium determined the reported interest rates. *See* Section III.A.1, *supra*. Commerce explained that these missing data were critical to both its calculation of Ternium's benefit amount and the identification of a suitable benchmark. *See* Final IDM at 11. Commerce furthermore reasonably found that this gap, and others, represented a failure by Ternium to cooperate to the best of its ability. *See* Section III.B. Thus, Commerce applied an adverse inference in selecting among facts otherwise available to fill the gap in the record. Final IDM at 25, 31. For this purpose, the statute expressly permits Commerce to select from a specified hierarchy of CVD rates, rather than attempting to plug holes in this specific benefit calculation. Final IDM at 13-16; *see* 19 U.S.C. § 1677e(d). Under these circumstances, contrary to Ternium's argument, *see* Ternium Br. at 30, Commerce reasonably declined to treat other information on the record as a credible approximation of data that Ternium failed to provide in the first place, *see* Final IDM at 28. Commerce was not required to do otherwise. *See* 19 U.S.C. § 1677e(d)(3) (precluding obligation to approximate "true" subsidy rate); *PSC VSMPO-Avisma*, 688 F.3d at 761 ("court cannot set aside application of a proper administrative

28

procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.").[6]

### D.  Commerce Reasonably Applied the Statutory Framework to Assign Ternium an Appropriate AFA Rate for the Factoring Programs

For the *Final Determination*, Commerce applied the same rate for the Bancomext and NAFIN Factoring Programs that it had selected for the NAFIN Factoring Program in the post-preliminary results. *Compare* Final IDM at 13-16, *with* Post-Preliminary Decision Memo at 9-12. In doing so, Commerce applied the hierarchy for selection of AFA CVD rates set forth in 19 U.S.C. § 1677e(d). Final IDM at 13. Ternium asserts that the rate selected is "aberrational and punitive" because it relates to "export loans" and was calculated "more than twenty years prior."

---

[6] On the merits, moreover, Ternium's presentation of the facts is inaccurate and only relates to one of the programs for which Commerce applied AFA. Ternium proffers a *post hoc* interpretation of sample Bancomext documentation that appears nowhere in Ternium's actual questionnaire response. *Compare* Ternium Br. at 13, 30 (arguing that record materials establish a maximum loan period of 180 days), *with* Ternium 2SQR at 5-8 (making no mention of a maximum loan duration). Even accepting Ternium's interpretation at face value, it explains nothing about how Ternium calculated the interest rate in the loan template or Ternium's reporting for the NAFIN factoring program.

Upon scrutiny, as Petitioners explained in their administrative rebuttal brief, Ternium's story falls apart. *See* Letter from Petitioners, "Rebuttal Brief" (Aug. 15, 2025) at 9-10 (C.R. 377). Ternium itself merely characterized the 180-day period as "typical{}," not immutable. Ternium Admin Case Br. at 31. The documentation on which Ternium relies merely states that the "maximum term for payment of invoices under this program was 180 days (not 365)." Ternium Br. at 30; Ternium 2SQR at Ex. Supp2. 13. But the term of payment on the invoice (*i.e.*, the number of days the buyer has to pay the invoice to Ternium per the invoice due date) **is different from** the term of the loan received by Ternium from Bancomext (*i.e.*, the number of days between when Bancomext provided Ternium the funding and when Ternium's customer actually paid the outstanding invoice balance). The record contains no indication that the latter period was limited to 180 days for all invoices for which Ternium reported factoring with Bancomext during the POI. Indeed, insofar as the factoring program's existence is an effort to [          ] on Ternium, *see* Ternium IQR—Program-Specific Response at p.12 ("The {factoring} arrangement provides Ternium Mexico with [          ]"), it would be illogical to assume that repayment was made [          ] in all cases.

Ternium Br. at 29, 31. Ternium otherwise relies on opinions reviewing Commerce's selection of antidumping AFA rates to argue that the CVD rate selected here was excessive. *See id.* at 29-32 (discussing *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021); *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324-25 (Fed. Cir. 2010); *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1078, 1085 (Fed. Cir. 2025)). Ternium's arguments are skeletal and omit to connect its critiques to the statutory framework that Commerce reasonably applied to select the CVD rate here.

In a countervailing duty investigation, the statute expressly permits Commerce to "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country" as AFA. 19 U.S.C. § 1677e(d)(1)(A)(i). To implement this authority, Commerce has created a regulatory hierarchy for selecting AFA subsidy rates, 19 C.F.R. § 351.308(j)(1), which it applied here, explaining that the overarching factors driving its analysis were "inducement, industry relevancy, and program relevancy." Final IDM at 13-15. Commerce explained that no subsidy rate was available for consideration pursuant to the first two prongs of the hierarchy, but that "Commerce has previously calculated an above-de minimis rate of 6.55 percent for the Bancomext loan program, which we find is a program that is similar and comparable to the NAFIN loan program and the factoring financing provided under the Bancomext program." Final IDM at 16. Commerce noted that it "is not required," in selecting an AFA rate, "to estimate what the countervailable subsidy rate…would have been if the interested party found to have failed to cooperate…had cooperated" or demonstrate that the AFA rate "reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3); Final IDM at 16-17. Nevertheless, Commerce confirmed that the selected program "is comparable" to the Bancomext and NAFIN factoring programs and is "an actual calculated CVD rate for a

30

subsidy program in Mexico from which Ternium Mexico could actually receive a benefit." Final IDM at 17, 22. Commerce noted that other factual information on which Ternium relies in challenging the rate was not verifiable. *Id.* at 22-23.

Ternium does not argue that Commerce misapplied its regulatory hierarchy nor does it propose an alternative rate that would be more recent or non-export-related. Ternium Br. at 29-32. Indeed, Ternium never explains why "export loans" are dissimilar to the Bancomext and NAFIN factoring programs. *See id.* Commerce found both programs to be export-specific, *see* Final IDM at 5, 18, 33-34, and Ternium has not addressed Commerce's analysis on appeal, *see* Ternium Br. at 29-32.

Ternium's argument boils down to flawed analogies to cases in which Commerce selected an AFA dumping rate. All are distinguishable. *Gallant Ocean* was decided years before 19 U.S.C. § 1677e(d) was introduced. *Compare* 602 F.3d at 1324-25, *with* 2015 Trade Preferences Extension Act, Pub. L. 114-27, 129 Stat. 362, 384. *Diamond Sawblades* took issue with Commerce's finding of a gap in the administrative record under Section 1677e(a), and thus did not analyze the AFA dumping rate or address Section 1677e(d). *See* 986 F.3d at 1365. Finally, *Oman Fasteners* concerned "a 154.33% rate based on a 16-minute delay in submitting the requested information" and juxtaposed this with the 0.00%-1.65% rates calculated over five preceding administrative reviews. 125 F.4th at 1086. Here, Commerce has never before calculated a subsidy rate for Ternium, leaving nothing to which the AFA subsidy rate might meaningfully be compared. Ternium itself juxtaposes the so-called "actual subsidy rates" for the factoring programs, Ternium Br. at 31, but these are Ternium's own invention, predicated on its 180-day plug for the unreported loan duration information. *See id.*; Section III.C. Commerce found that information unverifiable, *see* Final IDM at 22-23, and constraining Commerce's AFA

31

rate selection by reference to Ternium's rogue gap filling would violate the statutory proscription against mandating that Commerce "estimate what the countervailable subsidy rate…would have been," 19 U.S.C. § 1677e(d)(3). Commerce's AFA rate selection was lawful and reasonable.

## IV.  Commerce Reasonably Rejected Ternium's Untimely Challenges to Commerce's Preliminary Mining Rights Program Findings

Turning to the Mining Rights Program, it is an outgrowth of Petitioners' allegations that a variety of irregularities ultimately lower Ternium's iron ore costs, including cheap mining concessions, the GOM's failure to enforce property rights, and tax payments to organized criminal cartels in lieu of the GOM. *See* Petitioners' NSA at 1-18, Exs. 1-17. Under the particular program countervailed by Commerce, Ternium's affiliates receive the right to mine iron ore, a key steel input, at below-market rates. *See* Memorandum from Commerce; "New Subsidy Allegation" (Apr. 14, 2025) at 2-6 ("NSA Initiation Memo") (P.R. 314).

Ternium challenges Commerce's partial rejection of Ternium's administrative rebuttal brief, arguing that Commerce erred in determining that Ternium's arguments were not "rebuttal" arguments. Ternium Br. at 32-38. At base, Ternium asks this Court to hold that, where one party challenges a discrete aspect of Commerce's subsidy benefit calculation in a case brief, Commerce must accept arguments concerning any aspect of that subsidy program as rebuttal. *See id.* Ternium's proposition—and its administrative conduct—trample the orderly briefing procedures set forth in 19 C.F.R. §§ 351.309(c)(2), (d)(2) and the related rule that "failure to raise its issue in its administrative case brief constituted a failure to exhaust administrative remedies." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010). The Court should sustain Commerce's rejection of Ternium's untimely arguments, which Ternium could have raised in its case brief and which do not fall within a reasonable understanding of "rebuttal."

32

### A.    Ternium Had Every Opportunity to Challenge Commerce's Findings in its Administrative Case Brief

Consistent with the requirements of the countervailing duty statute, *see* 19 U.S.C. §§ 1677(5)-(5A), Commerce's preliminary Mining Rights for LTAR analysis made findings with respect to whether the GOM made a financial contribution in connection with the program, and whether the program was specific. Post-Preliminary Decision Memo at 14. Commerce also assessed which benchmark to use for purposes of measuring the program's benefit, settling on a "tier-three benchmark" for imported iron ore, and formulated a methodology for comparing benchmark prices against Ternium's reported costs. *Id.* at 4-5, 14. Commerce discussed which elements it included in Ternium's cost buildup. *Id.* at 14. Commerce also provided supporting calculations demonstrating each step of its benefit calculation and the amounts treated as a benefit. *See* Letter from Commerce, "Post-Preliminary Determination Calculations for Ternium" (July 31, 2025) at Attachment II ("Post-Prelim Calc. Memo") (C.R. 367-368). Ternium concedes as much. *See* Ternium Br. at 33-34 (describing Commerce's preliminary cost buildup and use of benchmark).

Addressing Commerce's Mining Rights for LTAR analysis, Petitioners' short administrative case brief raised a single issue: whether Commerce had erred in offsetting Ternium's mining rights benefits with so-called "negative benefits." Petitioners, "Petitioners' Case Brief for Issues Related to Ternium" (Aug. 8, 2025) at 1-5 ("{c}ontrary to Commerce's well-established and court-affirmed practice, Commerce unlawfully offset benefits Ternium received from iron ore extraction in one location with so-called 'negative benefits' associated with iron ore extraction in a completely separate location.") (C.R. 372); Compl., ECF Doc. 8 (Nov. 26, 2025) at 19. The argument required less than four pages and concerned a single line of Commerce's calculation. *See id.*

Ternium's case brief made no reference to Commerce's Mining Rights for LTAR analysis. *See generally* Letter from Ternium, "Redacted Version of Case Brief" (Aug. 14, 2025) ("Ternium Case Brief") (C.R. 373). Instead, Ternium exclusively challenged various aspects of how Commerce treated the Bancomext and NAFIN factoring programs and asked Commerce to "issue the final determination in this investigation consistent with the above comments." *Id.* at 36. To be sure, Ternium *could* have challenged the very same aspects of Commerce's preliminary Mining Rights for LTAR analysis which Ternium subsequently raised in its rebuttal brief. Nothing prevented Ternium from challenging Commerce's selection and use of the benchmark, Ternium Br. at Attachment 1, p.3-7, the cost buildup calculation, *id.* at Attachment 1, p.7-10, and asking Commerce to omit sales to [          ] from the calculation, *id.* at Attachment 1, p.10. Contrary to Ternium's suggestion before this court, *see* Ternium Br. at 32, everything that Ternium needed to brief these issues and proffer alternatives to Commerce's preliminary analytical framework was available to Ternium at the case briefing stage. *See* Post-Preliminary Decision Memo at 4-5, 14; Post-Prelim Calc. Memo at Attachment II.

Ternium relies on *Neimenggu Fufeng* for the proposition that it "had no reason to suspect that the{se} arguments would be relevant until after the regulatory case brief deadline" and thus "the administrative case brief forum…proved unavailable." Ternium Br. at 36 (quoting *Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1375 (Ct. Int'l Trade 2024)). In *Neimenggu Fufeng*, Commerce's preliminary determination "d{id} not even propose to value {respondent's} coal under…subheading {2701.12.9000}." *Id.* at 1373. Thus, the respondent "at the time of the case brief deadline, had no reason to expect that Commerce would directly value {its} coal at all." *Id.* The Petitioner argued in favor of direct valuation using HTS 2701.12.9000 in its case brief. *Id.* at 1374. In rebuttal, the respondent argued against

34

NONCONFIDENTIAL VERSION

assigning HTS 2701.12.9000 to its coal. *Id.* at 1375. Unlike *Neimenggu Fufeng*, however, the agency findings and methodologies that Ternium belatedly challenged in rebuttal had all been expressly adopted in Commerce's *Preliminary Determination*, well before the deadline for case briefs. *See* 741 F. Supp. 3d at 1373; Post-Preliminary Decision Memo at 4-5, 14. Thus, the narrow exception of *Neimenggu Fufeng* confirms that Ternium's situation is covered by the ordinary rule that "failure to raise its issue in its administrative case brief constitute{s} a failure to exhaust administrative remedies" and "the rebuttal brief is an inappropriate place to raise an issue for the first time." *Dorbest*, 604 F.3d at 1375 (Fed. Cir. 2010) (citing 19 C.F.R. § 351.309(d)(2)).

**B.   Commerce's Determination that Ternium's Rebuttal Brief Did Not Contain "Rebuttal" Argument Was Reasonable**

Commerce rejected portions of Ternium's rebuttal brief on the basis that it "contains affirmative arguments that do not comport with 19 CFR § 351.309(d)(2), which provides that a 'rebuttal brief may respond only to arguments raised in case briefs'" because Ternium had "argued the broader issue of how to conduct the overall benefit calculation for the Mining Rights for LTAR program and the specificity of the program" instead of addressing Petitioners' arguments "regarding the [                                        ]." Letter from Commerce, "Rejection of Ternium Mexico's Rebuttal Brief" (Aug. 19, 2025) at 1 ("Rebuttal Brief Rejection Memo") (C.R. 378). As evidence for this conclusion, Commerce identified the flawed portions of Ternium's rebuttal brief. *Id.* at 1-2. Ternium does not challenge the lawfulness of Commerce's regulation, but argues that Commerce misapplied the regulatory standard. *See* Ternium Br. at 37-38. Ternium is incorrect.

Ternium does not articulate a standard for what constitutes "rebuttal," *see id.*, but Commerce's regulation defines it as "respon{sive} only to arguments raised in case briefs," 19

35

C.F.R. § 351.309(d)(2). Commerce's determination that Ternium's arguments that did not respond to Petitioners' proposal to [                                    ] was supported by substantial evidence. Ternium does not identify any "response" to Petitioners' proposal to eliminate [                        ] in its own case brief. *See* Ternium Br. at 37-38; *id.* at Attachment. Instead, Ternium raises a variety of unrelated arguments and asked Commerce to "disregard Petitioners' argument regarding zeroing negative benefits." Ternium Br. at Attachment, p.3.

Finally, while Ternium invokes *Qingdao Taifa* for the proposition that exhaustion requirements "cannot compel an outcome that would deprive a party of 'a full and fair opportunity to raise an issue,'" Ternium Br. at 37 (quoting *Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1236 (Ct. Int'l Trade 2009)), this only underscores the need for Commerce's regulation and the reasonableness of Commerce's application here. Had Commerce accepted Ternium's new arguments in a rebuttal brief, the consequence would have been to deprive Petitioners of a "full and fair opportunity" to contest those issues. *Cf. Qingdao Taifa*, 637 F. Supp. 3d at 1236. The Court should sustain Commerce's rejection, which was lawful and supported by the record.

## CONCLUSION

For the reasons set forth above, Defendant-Intervenors respectfully request that this Court sustain Commerce's *Final Determination* and CVD Order.

*    *    *

36

NONCONFIDENTIAL VERSION

Respectfully submitted,

/s/ Jeffrey D. Gerrish                          /s/ James E. Ransdell

Roger B. Schagrin                              James E. Ransdell
Jeffrey D. Gerrish                             Thomas M. Beline
Nicholas C. Phillips                           Myles S. Getlan
                                               Margaret E. Monday

**SCHAGRIN ASSOCIATES**                        **CASSIDY LEVY KENT (USA) LLP**
900 Seventh Street, NW                         2112 Pennsylvania Avenue NW
Washington, D.C. 20001                         Suite 300
(202) 223-1700                                 Washington, D.C. 20037
                                               (202) 567-2300
*Counsel to Steel Dynamics, Inc.*
*and the United Steel, Paper and Forestry,*    *Counsel to United States Steel*
*Rubber, Manufacturing, Energy, Allied*        *Corporation*
*Industrial and Service Workers*
*International Union, AFL-CIO, CLC*


   July 13, 2026

37

NONCONFIDENTIAL VERSION

**Certificate of Compliance with Chambers Procedures 2(B)(2)**

The undersigned hereby certifies that the foregoing memorandum of law contains 11,029 words, exclusive of the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ James E. Ransdell
James E. Ransdell

# Attachment 1

**Template for Reporting Loans**

| Make This Field Public | | Make These Fields Business Proprietary, As Necessary | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan Control Number | | Lender | Date of Loan Agreement | Date of Loan Receipt | Purpose of Loan | Collateral | Guarantor | Initial Loan Amount (Principal) (MxP and Original Currency) | Life of Loan (days if short-term, years if long-term) | Fixed or Variable Rate Loan | Date(s) of Principal Payment(s) | Amount of Principal Payment(s) | Effective Interest Rate Charged | Date(s) of Interest Payment(s) | Amount(s) of Interest Paid | Total Amount(s) Paid |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |
| | [ | | | | | | | | | | | | | | | ] |

**NOTES:**

**Please indicate whether any fees were charged on the loan and, if so, the manner in which they were paid (I.e., in a lump sum, attached to certain loan payments, or allocated in equal payments over life of loan).**

**Report only those loans for which interest payments were oustanding during the POI.  If you have any questions, contact the officials in charge.**

When reporting the principal and interest payments made, please indicate how the payments were calculated (e.g., for interest payments, (principal * interest * (180 days/365 days)).

Please indicate how the effective interest rate was derived.  When reporting variable interest rates, include in the notes section the prime rate and the spread (e.g., LIBOR + 6%).  However, when providing the interest in the table, please report the actual, numerical interest rate charged during the payment period (e.g., 6%).

Please indicate the currency of any monetary values.

Please add rows to the table as necessary.

Please submit an electronic version of the chart using the Microsoft Excel spreadsheet program.

Please provide a hard copy print out that is identical to the electronic version.