**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON**

| |
|---|
| TERNIUM MEXICO, S.A. DE C.V., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC. <br><br> Defendant-Intervenors. |

Court No. 25-00236

**NON-CONFIDENTIAL VERSION**

Bracketing of confidential information has been deleted from pages 21-23.

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600

*Counsel to Ternium Mexico, S.A. de C.V.*

August 6, 2026

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT.........................................................................................................2

     A.      This Court Has Jurisdiction over this Action.........................................................2

     B.      Commerce's Rejection of Clarifying Record Information and Minor
          Corrections Regarding the Factoring Programs Was an Abuse of Discretion,
          Unsupported by Substantial Evidence, and Not in Accordance with Law ..............5

     C.      Commerce's Use of Adverse Facts Available Regarding the Factoring
          Programs Was Unsupported by Substantial Evidence, and Not in
          Accordance with Law .......................................................................................16

     D.      Commerce's Rejection of Ternium's Rebuttal Brief Was an Abuse of
          Discretion, Unsupported by Substantial Evidence, and Not in Accordance
          with Law ..........................................................................................................20

          1.      Ternium's Rebuttal Brief Should Not Have Been Rejected .....................21

          2.      The Exhaustion Claims Should Be Dismissed.........................................24

III.    CONCLUSION....................................................................................................28

## TABLE OF AUTHORITIES

### CASES

*Am. Cast Iron Pipe Co. v. United States*,
405 F. Supp. 3d 1378 (Ct. Int'l Trade 2019) ........................................................................4

*Bioparques De Occidente, S.A. de C.V. v. United States,*
31 F.4th 1336 (Fed. Cir. 2022) ................................................................................... 3-4

*Canadian Solar Inc. v. United States*,
537 F. Supp. 3d 1380, 1394-95 (Ct. Int'l Trade 2021) ......................................................11

*Chaparral Steel Co. v. United States,*
901 F.2d 1097 (Fed. Cir. 1990)...........................................................................................11

*China Steel Corp. v. United States*,
393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019) ..............................................................18, 19

*Galvasid S.A. de C.V. v. United States*,
Slip Op. 26-80, Court No. 25-00235 (Ct. Int'l Trade July 24, 2026) ......................... 1, 3-4

*Goodluck India Ltd. v. United States*,
11 F.4th 1335 (Fed. Cir. 2021) ...........................................................................................19

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ......................................................................11

*Neimenggu Fufeng Biotechnologies Co. v. United States*,
741 F. Supp. 3d 1354 (Ct. Int'l Trade 2024) ......................................................................27

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)................................................................................. 13, 17-18

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995).................................................................................... 10-12

*NTSF Seafoods Joint Stock Co. v. United States*,
Nos. 20-00104, 20-00105, 2022 Ct. Int'l Trade LEXIS 40, at *24 (Ct. Int'l Trade
Apr. 25, 2022) .....................................................................................................................25

*Pakfood Pub. Co. v. United States*,
724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) .....................................................................25

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016)...........................................................................................13

*Qingdao Taifa Group Co. v. United States*,
637 F. Supp. 2d 1231(Ct. Int'l Trade 2009) ......................................................................26

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ...............................................................................11

*Saha Thai Steel Pipe Co. v. United States*,
    828 F. Supp. 57 (Ct. Int'l Trade 1993) ...................................................................26

*Timken U.S. Corp. v. United States*,
    434 F.3d 1345 (Fed. Cir. 2006)........................................................................ 10-11

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ..............................................................................11

*Zhaoqing Tifo New Fibre Co. v. United States*,
    60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ....................................................25

## STATUTES & REGULATIONS

19 U.S.C. § 1516a(f)(9)(B)...........................................................................................4

19 U.S.C. § 1516a(g) ....................................................................................................4

## ADMINISTRATIVE DETERMINATIONS

*Certain Corrosion-Resistant Steel Products From Mexico: Preliminary Affirmative
    Countervailing Duty Determination, and Alignment of Final Determination With
    Final Antidumping Duty Determination*,
    90 Fed. Reg. 9,226 (Dep't of Commerce Feb. 10, 2025),
    and accompanying Preliminary Decision Memorandum................................. 7-8

*Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative
    Countervailing Duty Determination*
    90 Fed. Reg. 42,229 (Aug. 25, 2025)
    and accompanying Issues & Decision Memorandum.......................................3, 8

*Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative
    Countervailing Duty Determination*,
    85 Fed. Reg. 76,522 (Nov. 30, 2020)
    and accompanying Preliminary Calculation Memorandum ....................... 22-23

**NON-CONFIDENTIAL VERSION**

## I.     INTRODUCTION

Plaintiff Ternium Mexico, S.A. de C.V. ("Ternium"), a Mexican producer and exporter of corrosion-resistant steel products ("CORE"), replies to Defendant's Response Brief (ECF No. 46) ("*Def.Resp.Br.*") and Defendant-Intervenors' Response Brief (ECF No. 48) ("*Def-Inv.Resp.Br.*"), which respond to the claims raised by Ternium in its Rule 56.2 motion (ECF No. 38) ("*Pl.Br.*").

*First*, contrary to the claim by Defendant-Intervenor, and consistent with this Court's recent holding in *Galvasid S.A. de C.V. v. United States*, Slip Op. 26-80, Court No. 25-00235 (Ct. Int'l Trade July 24, 2026) ("*Galvasid*"), this Court has jurisdiction over this action.

*Second*, Commerce improperly rejected clarifying information regarding the Bancomext financial factoring program ("Bancomext Factoring Program") and the NAFIN financial factoring program ("NAFIN Factoring Program") (collectively, "Factoring Programs") that Ternium submitted months before the final determination.  The chronology in the investigation demonstrates that Ternium sought to correct information regarding these programs that was already on the record.  The corrected information would have enabled Commerce to calculate the countervailing duty ("CVD") margin as accurately as possible.  Notably, Defendant and Defendant-Intervenors do not address the events that took place before and at verification as described in the affidavit placed on the record by Ternium's counsel.  Commerce's decision to reject the clarifying information was an abuse of discretion, unsupported by substantial evidence, and not in accordance with law.

*Third*, Commerce's decision to use adverse facts available ("AFA") regarding the Factoring Programs was not appropriate.  Ternium affirmatively tried to correct the information with ample time left in the investigation.  Commerce's unwillingness to solicit the information itself and to accept clarifying information submitted by Ternium caused the problem in this case;

1

not a lack of cooperation by Ternium.  Given Ternium's efforts to fully cooperate by providing clarifying information regarding the Factoring Programs, Commerce's use of AFA regarding these programs was unsupported by substantial evidence and not in accordance with law.

Finally, Commerce's decision to reject the arguments regarding the mining rights for less-than-adequate remuneration ("LTAR") program ("Mining Rights for LTAR Program") in Ternium's rebuttal brief was an abuse of discretion, unsupported by substantial evidence, and not in accordance with law.  Ternium's arguments were rebuttal arguments addressing Petitioners' proposal to change Commerce's decision in the post-preliminary determination and eliminate the offset for negative benefits (*i.e.*, "zeroing").  Commerce's decision to reject significant portions of Ternium's rebuttal brief improperly deprived Ternium of the opportunity to raise rebuttal arguments relating to the benefit calculation of the Mining Rights for LTAR Program at the administrative level.

Accordingly, Ternium respectfully requests that the Court hold that these decisions in Commerce's final determination in the CVD investigation of CORE from Mexico were unsupported by substantial evidence, and were otherwise not in accordance with law.  The Court should also find that Commerce abused its discretion in rejecting information submitted by Ternium.  *See Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 42,229 (Dep't of Commerce Aug. 29, 2025) ("*Final Determination*").

## II.    ARGUMENT

### A.    This Court Has Jurisdiction over this Action

Defendant-Intervenors challenge Ternium's jurisdictional statement, contending that Ternium prematurely initiated this action by filing its Summons and Complaint before the CVD order was published.  *See Def-Inv.Resp.Br.* at 3-7.  Notably, the Defendant did not challenge this

NON-CONFIDENTIAL VERSION

Court's jurisdiction, and for good reasons. *See generally Def.Resp.Br.* Defendant-Intervenors' argument is contrary to the plain meaning of the statute, as confirmed by the Court of Appeals for the Federal Circuit ("Federal Circuit"). *See Bioparques De Occidente, S.A. de C.V. v. United States,* 31 F.4th 1336, 1347 (Fed. Cir. 2022) ("*Bioparques*"). Moreover, in a decision issued on July 24, 2026, this Court rejected the identical argument made by the same defendant-intervenors in the companion antidumping duty ("ADD") case on CORE from Mexico. *See Galvasid* at 5-8. Consistent with the statute and court precedent, the Court should reject Defendant-Intervenors' claim and determine that this action was timely filed and that this Court has jurisdiction over this action.

Defendant-Intervenors' reading of the statute is contrary to the ordinary meaning of the statutory text. The statute establishes that the time limit for appealing a decision involving merchandise from free trade area ("FTA") countries (such as Mexico) is tied to the publication of the final determination: "the time limits for commencing an action under this subsection shall not begin to run . . . {f}or a determination described in . . . clause (i) . . . of paragraph (2)(B), the 31st day after the date on which notice of the ***determination*** is published in the Federal Register." 19 U.S.C. § 1516a(a)(5)(A) (emphasis added). In contrast, for the time limit for appealing decisions involving merchandise from non-FTA countries the statute refers to the publication of the order: "Within thirty days after . . . the date of publication in the Federal Register of . . . a{} . . . ***countervailing duty order*** based upon any determination described in clause (i) of subparagraph (B){.}" § 1516a(a)(2)(A)(i)(II) (emphasis added).

The Federal Circuit has confirmed that parties may appeal a final determination involving an FTA country ***before the order is published***. *See Bioparques,* 31 F.4th at 1347 (emphasis added). Defendant-Intervenors attempt to dismiss the relevance of the holding in *Bioparques* arguing that

3

it represents a "*sui generis* treatment of a highly unusual suspension agreement fact pattern," is misplaced. *Def-Inv.Resp.Br.* at 7. In fact, the same argument that the same Defendant-Intervenors offer in this case was recently rejected by this Court in the appeal of Commerce's ADD final determination involving CORE from Mexico. *Galvasid* at 6. In that appeal, as in this case, Defendant did not raise this issue. *Galvasid* at 6. The Court relied on the *Bioparques* finding that "{t}he prescribed deadline {in 19 U.S.C. § 1516a(a)(5)(A)} makes no reference to publication of an antidumping duty order." *Galvasid* at 7 (citing *Bioparques* at 31 F.4th at 1347). Further, the Court cited to a prior decision explaining that the reason that "19 U.S.C. § 1516a(g) permits review of final . . . determinations involving USMCA countries before the antidumping duty order is published" is "to permit time for a party to provide notice that it is selecting judicial review instead of the binational forum and to permit other parties time to opt for binational panel review." *Galvasid* at 7 (citing *Am. Cast Iron Pipe Co. v. United States*, 405 F. Supp. 3d 1378, 1383 (Ct. Int'l Trade 2019)). Therefore, the Court held that parties "have 30 days after 31 days have passed since the publication of the final determination in the Federal Register to file a summons and 30 days thereafter to file a complaint." *Galvasid* at 8.

Consistent with the statute, as confirmed by the case law, Ternium timely filed this appeal. This case involves merchandise from Mexico, an FTA country. *See* 19 U.S.C. § 1516a(f)(9)(B) and § 1516a(g). The *Final Determination* was published in the *Federal Register* on August 29, 2025. *See Final Determination* Ternium timely filed its Notice of Intent to Seek Judicial Review on September 18, 2025 – 20 days after the publication of the *Final Determination*. *See* Letter from Ternium Mexico, S.A. de C.V.; to Vidya Desai, United States Secretary, USMCA Secretariat, and Luis Gutierrez Reyes, Mexico Secretary, TMEC Secretariat; re: *Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination – Notice of Intent to*

4

NON-CONFIDENTIAL VERSION

*Commence Judicial Review* (Sep. 18, 2025).  Ternium timely filed the Summons on October 28, 2025 – 30 days from the 31st day after the publication of the *Final Determination*.  *See* Summons, ECF No. 1.  Finally, Ternium timely filed its Complaint on November 26, 2025 – 30 days after the Summons.  *See* Compl., ECF No. 8.  Accordingly, the Court has jurisdiction over this action.

> **B.    Commerce's Rejection of Clarifying Record Information and Minor Corrections Regarding the Factoring Programs Was an Abuse of Discretion, Unsupported by Substantial Evidence, and Not in Accordance with Law**

Defendant and Defendant-Intervenors argue that Commerce reasonably rejected Ternium's submission of clarifying information and minor corrections regarding the Factoring Programs.  *See Def.Resp.Br.* at 20-25; *see also Def-Inv.Resp.Br.* at 9-25.  They incorrectly assert that "{t}he administrative record contains no data concerning the duration of any of Ternium's Bancomext or NAFIN factoring loans and no explanation concerning how Ternium calculated its 'effective interest rate charged.'"  *Def-Inv.Resp.Br.* at 10 (emphasis omitted).  These claims should be rejected.  They mischaracterize the record and ignore the repeated efforts made by Ternium to correct the information regarding the Factoring Programs that it submitted.  Notably, Defendant and Defendant-Intervenors do not address the events that took place before and at verification as described in the affidavit on the record.  When the record is properly considered, it supports a finding that Commerce's rejection of the record evidence was an abuse of discretion, unsupported by substantial evidence, and not in accordance with law.

As a preliminary matter, the record shows that information about the duration of the Bancomext Factoring Program credit period, or the calculation of the improperly named "effective interest rate," was in fact made available to Commerce.  *See Initial Response to Section III*, PD 184/CD 100, Barcode 4676264-02/4676134-02 at Program-Specific Questions at 9, 49 (Dec. 5, 2024) ("*Initial Response*"); *see also Response to Second Supplemental Questionnaire*, PD 257/CD

NON-CONFIDENTIAL VERSION

210, 215, 216, Barcode 4702341-01/4702303-01, 4702393-06, 47023030-07 at 8, Ex. Supp2. 10, Ex. Supp2. 12, Ex. Supp2. 13 at 7, 18 (Jan. 21, 2025) ("*2nd Supp. QR*").  This information was brought to Commerce's attention in the ministerial error allegation that Ternium filed immediately after the *Preliminary Determination*, when it understood how Commerce had interpreted the information that Ternium provided.  *See Allegation of Ministerial Error*, PD 299/CD 236-37, Barcode 4715621-01/4715619-01-02 (Feb. 18, 2025) at 4 ("*Ministerial Error Allegation*").  Ternium pointed to record evidence – including a sample transaction and a government informational brochure about the Bancomext Factoring Program – demonstrating that the 365-day period chosen by Commerce was incorrect.  *See id.* at 4.  Ternium also explained the manner in which the interest rate had been calculated, and that, when properly understood, it was a ratio of actual financing costs to the initial invoice.  *See id.* at 4.

In addition, contrary to the claims of Defendant and Defendant-Intervenors, the record also demonstrates that Ternium made multiple attempts to submit complete and correct information regarding the Factoring Programs.  The chronology below confirms that Ternium submitted information on the Factoring Programs in its questionnaire responses (##1-2 below) and then repeatedly tried to correct and clarify this information on at least *six occasions* thereafter (##4, 6-10 below).  It also shows that Ternium's efforts to correct the information were thwarted by Commerce at every step.  Commerce rejected the clarifying information submitted as a *Ministerial Error Allegation* and in supplemental questionnaires, and denied Ternium the opportunity to present it as a minor correction at verification.

**Chronology of Ternium's Factoring Programs Submissions and Commerce Decisions:**

1. *December 5, 2024*:  Ternium explained how the Factoring Programs operated.  *See Initial Response* at Program-Specific Questions at 9, 49.

**NON-CONFIDENTIAL VERSION**

2. *January 21, 2025*:  Ternium provided loan templates for both Factoring Programs, as well as documentation demonstrating that the maximum payment term under the Bancomext Factoring Program was 180 days.  *See 2nd Supp. QR at Ex. Supp2. 10, Ex. Supp2. 12, Ex. Supp2. 13.*

3. *February 3, 2025*:  Commerce determined that "the interest payment charged by Bancomext reflected a payment period of 365 days."  Commerce did not analyze the NAFIN Factoring Program and certain other alleged programs.  *See Certain Corrosion-Resistant Steel Products from Mexico*, 90 Fed. Reg. 9,226 (Dep't of Commerce Feb. 10, 2025) at 9-10 ("*Preliminary Determination*"); see also *Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (Feb. 3, 2025) at 3-4 (discussing "Issues for Post-Preliminary Analysis") ("*PDM*").

4. *February 18, 2025*:  Ternium explained that column *"% importe de intereses entre el importe factura"* in the Bancomext loan template reported the financial cost that was discounted from the invoiced amount (*i.e.*, the ratio of the financial cost to the invoice value), not the annual interest rate.  *See Ministerial Error Allegation at 4.*

5. *February 19 through July 31, 2025*:  Commerce did not ask Ternium for additional information about NAFIN Factoring Program after the *Preliminary Determination* despite Commerce's intention to "continue to examine" the program.  *See Pl.Br.* at 15; *see also Def-Inv.Resp.Br.* at 19-20.

6. *June 4 and 9, 2025*:  Ternium's counsel repeatedly sought guidance on how to provide clarifying information on the Factoring Programs.  *See Original Case Brief*, PD 410 / CD 369-71, Barcode 4808246-01/4808243-01-03 (Aug. 8, 2025) ("*Original Case Br.*") at Attachment 1 at Attachment 5 ("*Aff.L.Bertazzo*").

7. *June 16, 2025*:  Ternium submitted clarifying information (*i.e.*, an amended loan template) on the Bancomext Factoring Program.  *See NSA Supplemental Questionnaire Response*, PD 375/CD 315-21, Barcode 4779644-01/4779627-01-07 at Ex. Supp. NSA-3 (June 16, 2025) ("*NSA Supp. QR*").

8. *July 1, 2025*:  Ternium submitted clarifying information (*i.e.*, an amended loan template) on NAFIN Factoring Program.  *See Response to Third Supplemental Questionnaire*, PD 387/CD 323-27, Barcode 4786595-01/4786589-01-05 at 5-7, Ex. Supp3-2 (July 1, 2025) ("*3rd Supp. QR*").  On the same day, the Government of Mexico ("GOM") submitted its supplemental questionnaire response regarding NAFIN Factoring Program.  *See Response to the 4th supplemental Questionnaire*, PD 384/CD 322, Barcode 4785741-01/4785738-01 (July 1, 2025) ("*GOM NAFIN Response*").

9. *July 10, 2025*:  At verification, after Ternium had presented its minor corrections, Commerce rejected the clarifying information on the Bancomext Factoring Program.  *See Aff.L.Bertazzo* at para. 4; *see also Rejection Memorandum Regarding*

7

*Bancomext*, PD 396, Barcode 4796037-01 (July 18, 2025) ("*Bancomext Rejection Memo*"). Ternium's counsel contacted Commerce officials, who indicated that Ternium would be given an opportunity to present information on the Factoring Programs. *See Aff.L.Bertazzo* at para. 6.

10. *July 11, 2025 (second (and last) day of verification)*: Despite its prior assurances, Commerce indicated that it would not review or accept any minor corrections related to the Factoring Programs. *See id.* at para. 12. Commerce did not verify any information related to the Factoring Programs.

11. *July 31, 2025*: Commerce applied AFA with respect to NAFIN Factoring Program. *See Post-Preliminary Analysis Memorandum*, PD 405/CD 367-68, Barcode 4804214-01/4804655-01-02 (July 31, 2025) at 13 ("*Post-Preliminary Analysis*").

12. *August 8, 2025*: Ternium filed its case brief. *See generally Original Case Br.*

13. *August 12, 2025*: Commerce rejected Ternium's case brief, as well as the clarifying information on NAFIN Factoring Program. *See Letter Rejecting Ternium Mexico's Original Case Brief*, PD 414, Barcode 4809415-01 (Aug. 12, 2025) ("*Case Brief Rejection Letter*"); *see also Memorandum Rejecting Response to the Third Supplemental Questionnaire*, PD 412, Barcode 4809401-01 (Aug. 12, 2025) ("*NAFIN Rejection Memo*").

14. *August 29, 2025*: Commerce determined to apply AFA with respect to the Factoring Programs. *See Issues and Decisions Memorandum for the Final Affirmative Determination of Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (Aug. 25, 2025) at 22-23, Barcode 4815870-02 ("*Final I&D Memo*").

In its initial and supplemental questionnaire responses (##1-2), Ternium explained how the Factoring Programs operated, and submitted loan templates for both Factoring Programs. Once Ternium realized that the information in column "*% importe de intereses entre el importe factura*" of the Bancomext loan template was the cause of Commerce's erroneous calculation regarding the Bancomext Factoring Program in the *Preliminary Determination*, it filed a *Ministerial Error Allegation* putting Commerce on notice of the mistake (#4). Ternium explained that the loan template reported the financial cost that was discounted from the invoiced amount (*i.e.*, the ratio of the financial cost to the invoice value), rather than the annual interest rate. Although Ternium informed Commerce of the error and the record remained open for more than six months after the

8

**NON-CONFIDENTIAL VERSION**

*Preliminary Determination*, Commerce refused to ask Ternium any questions about the Factoring Programs (#5). Commerce did not respond to the repeated attempts of Ternium's counsel to discuss the issue (#6).

Given the lack of response from Commerce, and in an effort to correct the information at the earliest opportunity, Ternium filed clarifying information regarding the Factoring Programs (*i.e.*, the amended loan templates) weeks before the on-site verification (##7-8). Ternium explained that the information corrected (1) the number of days in which the "loan" was outstanding; (2) the interest rate charged; and (3) the applicable currency; and it clarified that Ternium reported the ratio of interest to the capital of the loan/invoice (not the "interest rate" charged). Ternium did not provide unsolicited ***new*** information, *see Def.Resp.Br.* at 21, rather it provided clarifying documentation to correct information that was already on the record. The record contained both data concerning the Factoring Programs (such as invoice dates and principal amounts) and an explanation of how Ternium calculated the reported financial costs, as well as support demonstrating that the maximum term for payment of invoices under this program was 180 days (not 365).

In addition, only after verification had started, Commerce rejected the amended Bancomext loan template (#9), which had been on the record for almost a month. And, despite its prior assurances that Ternium would be given an opportunity to present information on the Factoring Programs (#9), on the second (and last) day of verification, Commerce indicated that it would not review or accept any minor corrections related to the Factoring Programs (#10). Moreover, Commerce did not verify any information related to the Factoring Programs (#10).

The Federal Circuit determined in the *Timken* and *NTN Bearing* cases that Commerce abuses its discretion when it rejects information to correct data already on the record. *See Pl.Br.*

at 8-9 (citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("*Timken*");

*NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208-09 (Fed. Cir. 1995) ("*NTN Bearing*")).

In *NTN Bearing*, the Federal Circuit held that "{Commerce's} refusal to consider NTN's request

for correction of clerical errors . . . constituted an abuse of discretion." *Id.* at 1208-09. In *Timken*,

the Federal Circuit clarified that its holding in *NTN Bearing* was not limited to Commerce's

correction of "clerical" errors. *See Timken U.S.*, 434 F.3d at 1353. Rather, "Commerce is free to

correct ***any type of importer error*** -- clerical, methodology, substantive, or one in judgment -- in

the context of making {a} determination{.}" *Id.* (emphasis added). As detailed above, correcting

data already on the record was precisely what Ternium sought to do in the underlying investigation.

Indeed, the information Ternium provided addressed the exact deficiencies in Ternium's initial

information that Defendant and Defendant-Intervenors criticize. *See Def.Resp.Br.* at 19 (claiming

that Ternium "omitted whole columns of pertinent loan data"); *Def-Inv.Resp.Br.* at 13 (asserting

that Ternium did not explain "how the effective interest rate was derived").

Defendant and Defendant-Intervenors fail in their attempt to distinguish the *NTN Bearing*

and *Timken* cases. Defendant argues that the cases are inapplicable because they "address

circumstances in which a respondent sought to correct inaccurate information already submitted

on the record" rather than "as here, instances where a respondent failed to provide information

after being twice solicited to do so." *Def.Resp.Br.* at 19. In fact, contrary to Defendant's claim,

the chronology above confirms that Ternium first submitted the information on the record and then

sought repeatedly to correct that information. Defendant-Intervenors claim that the "'*NTN/Timken*

doctrine' is limited to the correction of mistakes in timely factual submissions to ensure an accurate

assessment at the final determination stage' and the decision whether to accept such corrections is

a function of Commerce's discretion and turns on whether the information is clerical or

10

methodological." *Def-Inv.Resp.Br.* at 20.  However, as discussed above, *Timken* clarified that its holding in *NTN Bearing* was not limited to Commerce's correction of "clerical" errors.  Defendant also claims that "Commerce's conclusion that Ternium's ministerial error allegations following the *Preliminary Determination* did not meet the definition of a ministerial error was supported by substantial evidence and in accordance with law."  *Def.Resp.Br.* at 15.  This argument is not relevant because Ternium has not appealed Commerce's decision that its *Ministerial Error Allegation* did not meet the definition of a ministerial error.  *See generally Pl.Br.*

Ternium also explained in its Rule 56.2 motion that the corrected information was necessary in order to achieve what this Court has recognized as "Commerce's principal obligation{} and 'overriding purpose'{:}"  to calculate subsidy rates as accurately as possible. *Pl.Br.* at 6 (quoting *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1394-95 (Ct. Int'l Trade 2021) (citing *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1103 (Fed. Cir. 1990); *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2021); *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("*Rhone Poulenc*")).  Defendant-Intervenors attempt to rebut the importance of this goal by claiming that "'{i}t {i}s within Commerce's discretion to value finality{.}'" *Def-Inv.Resp.Br.* at 16 (quoting *Linyi Chengen Imp. & Exp. Co. v. United States*, 174 F.4th 1351, 1362 (Fed. Cir. 2026)).  However, while the Federal Circuit stated in *Timken* that it must "balance{} the desire for accuracy in . . . determinations with the need for finality at the final results stage," *Timken*, 434 F.3d at 1353, the *NTN Bearing* court clarified that "the tension between finality and correctness simply did not exist at the time NTN requested correction" as "preliminary determinations are 'preliminary' precisely because they are subject to change." *NTN Bearing*, 74

11

F.3d at 1208.  Here, as in *NTN Bearing*, there was no tension between finality and correctness. Commerce's *Preliminary Determination*. was incorrect for the reasons explained in the *Ministerial Error Allegation*.  Ternium provided updated information to correct information already on the record.  Moreover, the clarifying information was provided almost six months (from February 18 to July 31, 2025) before the *Final Determination*.  Commerce had plenty of time to consider it and the information was available for verification.  Despite all of this, Commerce ignored Ternium's repeated requests to correct the information.  Instead, it rejected the corrected information, purging all traces of it from the record, and consequently continued to knowingly calculate inaccurate margins*. See Pl.Br.* at 19.

Defendant and Defendant-Intervenors make several additional arguments to attempt to excuse Commerce's failure to either seek information or to accept the information that Ternium provided to correct the information already submitted on the record regarding the Factoring Programs.

*First*, they assert that Ternium had **two** opportunities to provide information (*i.e.*, the initial and the supplemental questionnaires), and then it waited five months – and after the administrative record was closed – to correct its submissions regarding the Factoring Programs.  *See Def.Resp.Br.* at 21; *see also Def-Inv.Resp.Br.* at 17.  They disregard the events that took place between the filing of the initial and supplemental questionnaire responses and the submission of the corrected loan templates.  As shown above, after the *Preliminary Determination*, Ternium timely filed a *Ministerial Error Allegation* (#4) and then repeatedly contacted Commerce and asked for its guidance on how to provide clarifying information regarding the Factoring Programs (#6). Ternium was aware that it had "the burden of creating an adequate record," and tried to the best of

12

its abilities to clarify the information on the record.  *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381-1382 (Fed. Cir. 2003) ("*Nippon Steel*").

*Second*, they claim that "Ternium . . . appears to imply that the number of days between Commerce's rejection of NFI and the date Ternium introduced the NFI to Commerce poses a problem."  *Def.Resp.Br.* at 24-25; *see also Def-Inv.Resp.Br.* at 18.  They mischaracterize Ternium's argument that Commerce had ample time to consider the information and ignore the precedent cited in support.  Ternium relied on *Papierfabrik*, in which the Federal Circuit stated that "Commerce abused its discretion in refusing to accept updated data ***when there was plenty of time for Commerce to verify or consider it***{.}"  *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (internal quotations and citations omitted) (emphasis added). Notably, neither Defendant nor Defendant-Intervenors address this case in their response briefs. *See generally Def.Resp.Br.*; *see also Def-Inv.Resp.Br.*   The amended loan templates were corrections in order to "update" information on the record.  Nonetheless, Commerce removed and rejected Ternium's clarifying information and explanations about the Factoring Programs although they had been first presented almost five months before verification (***142 days*** – from February 18 to July 10) and more than six months before the *Final Determination* (***192 days*** – from February 18 to August 29)*.  See Pl.Br.* at 19.

*Third*, Defendant and Defendant-Intervenors argue that "{w}hen Commerce rejected the untimely portions of Ternium's response to Commerce's post-preliminary questionnaire, Ternium attempted to introduce the same information under the guise of a 'minor correction' at verification."  *Def-Inv.Resp.Br.* at 21; *see also Def.Resp.Br.* at 22-25.  Specifically, they claim that "Ternium submitted four proposed minor corrections to their questionnaire responses" and regarding the "proposed changes to the NAFIN and Bancomext loan information{,} . . . Commerce

NON-CONFIDENTIAL VERSION

. . . conclude{d) that these submissions were not 'minor' for the purposes of verification." *Def.Resp.Br.* at 24; *see also Def-Inv.Resp.Br.* at 21-25.  Notably, Defendant and Defendant-Intervenors do not address the events that took place at verification as described in the *Aff.L.Bertazzo*.  *See* generally *Def.Resp.Br.*; *see also Def-Inv.Resp.Br.*

As the affidavit states, the manner in which Ternium sought to present its minor corrections is the pivotal issue.  On the morning of the first day of verification (*i.e.*, July 10), Ternium's counsel presented two minor corrections unrelated to the Factoring Programs (*i.e.*, (1) total sales values, and (2) the benchmark calculation for the Mining Rights for LTAR Program).  *See Aff.L.Bertazzo* para. 2-3, Attachment 3.  Ternium's minor corrections were based on its understanding of the administrative record at that time.  In the afternoon of the same day, Commerce informed Ternium that it was rejecting the updated Bancomext loan template.  *See Aff.L.Bertazzo* para. 4, Attachment 1.  Consequently, Commerce altered the administrative record ***during*** verification.  Ternium's counsel contacted Commerce officials in Washington, D.C. and was assured that Ternium would have another opportunity to present minor corrections regarding the Factoring Programs.  *See Aff.L.Bertazzo* para. 6, Attachment 2.  Based on Commerce's assurances, Ternium prepared a revised version of its minor corrections to include a ***third*** revision regarding the Factoring Programs.  *See Aff.L.Bertazzo* para. 9, Attachment 3.  This third minor correction included two changes to the Factoring Programs loan templates (highlighted in red font in the attachments):  (1) the number of days in which the "loan" was outstanding; and (2) a revision to the title of one column to clarify that the figures reported therein represented the ratio of interest to the capital of the loan/invoice (not the "interest rate" charged).  Despite its prior assurances and Ternium's repeated attempts to present this third minor correction during the second (and last) day of verification (*i.e.*, July 11), Commerce refused (1) to provide Ternium an opportunity to present it,

14

and refused (2) to verify any information related to the Factoring Programs.  *See Aff.L.Bertazzo* paras. 12-13, Attachments 4-6; *see also Pl.Br.* at 18.

*Fourth*, Defendant-Intervenor argues that "{o}riginal countervailing duty investigations occur on an especially tight statutory timeline . . . with {an} additional mandatory respondent{}, *e.g.*, the foreign government." *Def-Inv.Resp.Br.* at 19.  They assert that Ternium's account of the *Post-Preliminary Determination* supplemental questionnaire "omits several additional post-preliminary questionnaires," including those Commerce issued to Petitioners and the Mexican government, and that this "demonstrates that Commerce was entirely focused on developing the record arising out of these new subsidy allegations ('NSAs')." *Def-Inv.Resp.Br.* at 19.  In fact, this confirms that the administrative record was still open when Ternium submitted the rejected information on the Factoring Programs.  In the *Preliminary Determination*, Commerce did not analyze the NAFIN Factoring Program, as well as other alleged programs.  *See PDM* at 3-4 (discussing "Issues for Post-Preliminary Analysis").  Instead, it stated that it would "continue to examine the loan and . . . include an analysis of the program in a post-preliminary determination memorandum." *PDM* at 4.  Commerce was aware that there were several issues – unrelated to the NSAs – that were not analyzed in the *Preliminary Determination* and required the record to be further developed.  Notably, on the same day Ternium filed the amended NAFIN loan template (*i.e.*, July 1, 2025), GOM submitted its supplemental questionnaire response regarding the NAFIN Factoring Program.  See *generally GOM NAFIN Response*.  Contrary to Defendant-Intervenors' assertions that the record was closed and Commerce was "entirely focused" on the NSAs, Commerce was requesting information on the Factoring Programs from other respondents **at the same time** Ternium was seeking to update the record.  Accordingly, Commerce abused its

**NON-CONFIDENTIAL VERSION**

discretion in refusing to accept the updated loan templates although it had months to consider this updated information while it was still "developing the record." *Def-Inv.Resp.Br.* at 19.

Finally, Defendant-Intervenors claim that "the notion that Commerce 'never examined Ternium's corrections is belied by the specificity of Commerce's rationale for rejecting those materials" and that "Commerce had *already* considered—and rejected—the same Bancomext materials in connection with Ternium's" rejected loan templates. *Def-Inv.Resp.Br.* at 24. These assertions are contradicted by the record. Ternium's counsel placed on the record a sworn affidavit, which had been drafted and signed before the verification report was issued, demonstrating that Commerce did not review, nor consider the third minor correction discussed above. In their brief, Defendant-Intervenors (and Defendant) did not rebut any of the statements in the affidavit, and yet they doubt the record evidence without citing support, solely pointing to "the specificity of Commerce's rationale for rejecting those materials" in the verification report. *Def-Inv.Resp.Br.* at 24. Moreover, as discussed above, the revisions in the spreadsheet in support of the third minor correction were limited to (1) the number of days in which the "loan" was outstanding; and (2) the title of one column.

> **C.** **Commerce's Use of Adverse Facts Available Regarding the Factoring Programs Was Unsupported by Substantial Evidence, and Not in Accordance with Law**

Defendant and Defendant-Intervenors claim that Ternium failed to cooperate by not acting to the best of its ability regarding its reporting of the Factoring Programs, and Commerce properly applied AFA regarding these programs. *Def.Resp.Br.* at 25-29; *see also Def-Inv.Resp.Br.* at 25-32. Contrary to their arguments, the record demonstrates that Ternium fully cooperated and sought to provide complete and correct information regarding the Factoring Programs once it recognized issues related to the information as a result of Commerce's interpretation of that information in the

16

*Preliminary Determination*.  Commerce did not ask for the information to correct the issues that Ternium pointed out in the *Ministerial Error Allegation*, and then rejected clarifying information when Ternium had no other option than to submit the information with other questionnaire responses.  Commerce's resort to facts available ("FA") – let alone AFA – was unsupported by substantial evidence and not in accordance with law.

FA may be applied only with respect to information that is missing from the record because the respondent "withholds" it, "significantly impedes" the proceeding, or provides information that "cannot be verified{.}" 19 U.S.C. § 1677e(a).  An adverse inference in choosing FA (*i.e.*, the application of AFA) may be used only if the respondent "failed to cooperate by not acting to the best of its ability to comply with" Commerce's requests for information.  19 U.S.C. § 1677e(b)(1).  Thus, Commerce's use of FA and adverse inferences are subject to important statutory limitations and qualifications – none of which is applicable in this investigation.

Defendant incorrectly argues that Ternium did not act to the best of its ability because it "did not provide the number of days the{} loans were outstanding" and "{i}nstead . . . tried to provide this information as 'minor' corrections at verification, . . . which frustrated Commerce's verification attempts." *Def.Resp.Br.* at 25; *see also Def-Inv.Resp.Br.* at 26-27.  Relying on *Nippon Steel*, Defendant claims that Ternium "did not exert maximum effort to provide responses to the required sections of the loan template." *Def.Resp.Br.* at 28; *see also Def-Inv.Resp.Br.* at 26-27.  In *Nippon Steel*, the Federal Circuit held that the "'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382.  Notably, the court recognized that "the standard does not require perfection and recognizes that mistakes sometimes occur." *Id.* at 1382.

17

In Section II.B above, Ternium provides a chronology and description of the record evidence to show the efforts Ternium made to submit information regarding the Factoring Programs and to subsequently correct the information during the investigation. The record reflects that Ternium repeatedly attempted to provide clarifying information about the Factoring Programs, in the *Ministerial Error Allegation*, in supplemental questionnaires, and at verification. The efforts also included attempted conversations with Commerce officials to receive guidance on how this information could be submitted, presented, and verified.

While Ternium's initial loan templates reported the financial cost that was discounted from the invoiced amount (*i.e.*, the ratio of the financial cost to the invoice value), rather than the annual interest rate, this was a "mistake" that Ternium sought to correct rather than "inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. Further, Ternium made every possible effort to ensure Commerce had a correct understanding of the functioning of the Bancomext Factoring Program as applied in the *Preliminary Determination* and to assist Commerce officials in accurately calculating subsidy rates for the Factoring Programs in the *Final Determination*. Finally, Ternium fully participated in the verification, and the clarifying information and minor corrections that Ternium attempted to submit to Commerce were readily verifiable. The evidence on the record regarding Ternium's efforts and actions supports a finding that Ternium "has put forth its maximum effort."

In addition, Defendant's reliance on *China Steel* for its inaccurate claim that "Ternium did not provide requested information by the deadline" is misplaced. *Def.Resp.Br.* at 28. In that case, "Commerce relied on {adverse} facts available for certain incorrect CONNUMS and inaccurately reported quality codes, where China Steel's failure to timely correct errors and clarify its cost data resulted in the Department's alleged inability to verify the data." *China Steel Corp. v. United*

**NON-CONFIDENTIAL VERSION**

*States*, 393 F. Supp. 3d 1322, 1340-41 (Ct. Int'l Trade 2019) ("*China Steel*").  The basis for applying AFA in that case was Commerce's determination that "China Steel did not provide enough information to the Department to indicate that its reporting methodology for these CONNUMs might be deficient ***until verification***.  It was not until {cost} verification that the Department was aware of these errors.  By this time, it was too late to notify China Steel of any deficiencies, obtain the new data, and examine the methodologies and data for deficiencies." *China Steel*, 393 F. Supp. 3d at 1341 (emphasis added).  Similarly, Defendant-Intervenors' dependence on *Goodluck India* is misguided.  *See Def-Inv.Resp.Br.* at 25 (citing *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) ("*Goodluck India*")).  In that case, Commerce rejected information provided by the respondent "on the day of verification" because the "revisions were not minor."  *Goodluck India*, 11 F.4th at 1343.

Unlike in both *China Steel* and in *Goodluck India*, Ternium did not wait until verification to notify Commerce of the errors.  *See Def.Resp.Br.* at 29.  Rather, Ternium made Commerce aware of the issue regarding the incorrect calculation for the Bancomext Factoring Program in its *Ministerial Error Allegation* immediately after the *Preliminary Determination* – almost five months before verification (***142 days*** – from February 18 to July 10).  Ternium also contacted Commerce and asked for guidance about how to provide clarifying information regarding the Factoring Programs.  *See Aff.L.Bertazzo*.  Ternium provided clarifying information about the Factoring Programs weeks before the start of verification.  *See NSA Supp. QR* at Ex. Supp. NSA-3; *see also 3rd Supp. QR* at Ex. Supp3-2.  Ternium attempted to provide Commerce officials with minor corrections regarding the Factoring Programs at Ternium's verification once Commerce changed the administrative record during verification.  *See Aff.L.Bertazzo* at Attachment 5.

**NON-CONFIDENTIAL VERSION**

Finally, Defendant-Intervenors' assertion that "Ternium reacted after Commerce's adverse preliminary finding on the Bancomext Program" is also baseless. *Def-Inv.Resp.Br.* at 27. The reason Ternium sought to correct the mistake was not the adverse finding, but the fact that the information was incorrect and had to be fixed for Commerce to calculate an accurate margin. Ternium actively and repeatedly attempted to correct the loan templates once it realized that the information in column "*% importe de intereses entre el importe factura*" of the Bancomext loan template was the cause of Commerce's erroneous calculation regarding the Bancomext Factoring Program in the *Preliminary Determination*. The first action it took was to file a *Ministerial Error Allegation* putting Commerce on notice of the mistake over 6 months before the *Final Determination*.

Commerce's resort to FA – let alone AFA – in this instance is unwarranted because Ternium did not withhold information, did not significantly impede the proceeding, and did not provide information that could not be verified. Instead, it acted to the best of its ability. Therefore, Commerce's application of FA and an adverse inference is unsupported by substantial evidence and otherwise not in accordance with law.

> **D.    Commerce's Rejection of Ternium's Rebuttal Brief Was an Abuse of Discretion, Unsupported by Substantial Evidence, and Not in Accordance with Law**

Defendant and Defendant-Intervenors challenge Ternium's argument that Commerce improperly rejected and removed the majority of arguments regarding the Mining Rights at LTAR made in Ternium's rebuttal brief. Defendant argues that Commerce "correctly rejected and removed Ternium's rebuttal brief because Ternium made affirmative arguments that were not raised in the petitioners' case brief." *Def.Resp.Br.* at 35. Likewise, Defendant-Intervenors claim that Commerce's rejection should be sustained because "of untimely arguments which Ternium

20

NON-CONFIDENTIAL VERSION

could have raised in its case brief and which do not fall within a reasonable understanding of 'rebuttal.'" *Def-Inv.Resp.Br.* at 32. These arguments fail to recognize that Ternium's arguments were properly offered as rebuttal because they addressed Petitioners' proposal that Commerce change its decision in the *Post-Prel.Determ.* and eliminate the offset for negative benefits (*i.e.*, "zeroing"). They also improperly claim that Ternium failed to exhaust administrative remedies by not raising its rebuttal arguments in its case brief, ignoring that Commerce's decision to reject significant portions of Ternium's rebuttal brief improperly deprived Ternium of the opportunity to raise rebuttal arguments relating to the benefit calculation under the Mining Rights for LTAR Program at the administrative level.

### 1.    Ternium's Rebuttal Brief Should Not Have Been Rejected

The arguments in Ternium's rebuttal brief were all offered in rebuttal to the argument in Petitioners' case brief. A comparison between the Petitioners' case brief and Ternium's rebuttal brief demonstrates that Ternium's key rebuttal arguments responded to Petitioners' claims regarding the "zeroing" of negative benefits in their case brief. *See Petitioners' Case Brief*, PD 411/CD 372, Barcode 4808326-01/4808320-01 (Aug. 8, 2025) at 2-5 ("*Pet.Case.Br.*"); *see also Pl.Br.* at 34-35, Attachment 1.

In the case brief, Petitioners argued that Commerce's calculation of the benefit conferred to Ternium under the Mining Rights for LTAR Program was wrong because Commerce offset the benefits received for the [          ] mine by the negative benefit received by the [

] mine. *See Pet.Case.Br.* at 2-5. Petitioners asserted that "Commerce's benefit calculation was erroneous" because it "unlawfully offset benefits that Ternium received from iron ore extraction in one location with so-called 'negative benefits' associated with iron ore extraction in a completely separate location." *Pet.Case.Br.* at 2 (bracketing omitted). Petitioners also provided

a revised calculation of the subsidy rate ([      ]% instead of [   ]%) aimed at removing the impact of the negative benefit attributed to [                ] mine.  Petitioners' argument and supporting calculation related to "zeroing" any negative benefit.  *See Pet.Case.Br.* at 3.  Finally, Petitioners claimed that this approach was consistent with Commerce precedent and case law.  *See Pet.Case.Br.* at 3-4.

In Section II.A. of Ternium's rebuttal brief, Ternium directly responded to these claims regarding "zeroing" any negative benefit and the proffered calculation.  This is clear from Ternium's request that "Commerce should continue to {recognize that the Mexican mining laws did not provide Ternium a countervailable subsidy and Ternium did not receive a cost advantage} ***and disregard Petitioners' argument regarding zeroing negative benefits.***"  *See Pl.Br.* at Attachment 1 at 3 (emphasis added).  In direct response to Petitioners' argument, Ternium explained that "Commerce properly determined that there was no benefit under the mining rights for {LTAR} program" and, thus, the revision to the benefit calculation requested by Petitioners was unnecessary and their "argument regarding negative benefits would be moot."  *See Pl.Br.* at Attachment 1 at 1-4 (citing *Pet.Case.Br.* at 2-5).

In Section III of Ternium's rebuttal brief, in direct response to Petitioners' proposed calculation, Ternium proposed that, if Commerce agreed with Petitioners that a revision to the calculation was needed, instead of "zeroing" the negative benefits received by one of the two mines, Commerce should use "the weighted-average production cost across both Mines" and "calculat{e} one production cost for the input (*i.e.*, iron ore) for Ternium as a whole."  *See Pl.Br.* at Attachment 1 at 7-10.  In response to the case cited by Petitioners, Ternium countered that the methodology it proposed was consistent with Commerce's determination in *Phosphate Fertilizers from Morocco*, where Commerce relied on respondent's "total reported mining costs" during the

22

POI across all of respondent's mines, and then Commerce made necessary adjustments to derive a weighted-average production cost across all of respondent's mines that was then compared to the benchmark. *See id.* at Attachment 1 at 7-8 (citing *Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 76,522 (Nov. 30, 2020), accompanying Preliminary Calculation Memorandum at 7-8). Ternium also provided a sample calculation worksheet illustrating the adjusted calculation. *See Pl.Br.* at Attachment 1 at 9, Attachment 1. Ternium concluded that, by using the proper methodology (*i.e.,* the weighted-average production cost across both mines), the benefit for Ternium as a whole would have been negative and, thus, "Petitioners' argument regarding the zeroing of negative benefits becomes irrelevant." *See Pl.Br.* at Attachment 1 at 10. As a consequence of Ternium's proposed calculation, it also explained that, if Commerce decided to adjust the benefit calculation by using the weighted-average production cost across both mines, it should also reflect the fact that only [   ]% of [                ]'s production of iron ore pellets was sold to Ternium and, thus, only [   ]% of the benefit related to [                ] should be assigned to Ternium. *See Pl.Br.* at Attachment 1 at 10. Ternium provided all relevant information for the most accurate subsidy calculation in Commerce's *Final Determination.*

The record also confirms that what Defendant describes as "arguments beyond the scope" were also proper rebuttal rather than "affirmative" arguments. Defendant describes the argument made in Petitioners' case brief and claims that "Ternium made multiple affirmative arguments, which went beyond the scope of petitioners' arguments, such as which benchmark tier should be used in Commerce's benefit calculation for the Mining Rights for LTAR program" and argues that "those arguments were not responsive to the narrow issue raised by petitioners regarding the [                        ]." *Def.Resp.Br.* at 36 (emphasis added); *see also Def-Inv.Resp.Br.*

23

**NON-CONFIDENTIAL VERSION**

at 35-36.  However, Petitioners' "zeroing" argument did not challenge "a discrete aspect of Commerce's subsidy benefit calculation," *Def-Inv.Resp.Br.* at 32, but it implicitly challenged the entirety of Commerce's determination that Ternium received no benefits under the Mining Rights for LTAR Program.  *See Post-Preliminary Determination* at 14.  Ternium's rebuttal arguments in Sections II.A and III on the fees charged by the GOM for mining rights and Commerce's Tier 3 benchmark were in response to Petitioners' attempt to modify the *Preliminary Determination* in Ternium's favor on Ternium's use of the Mining Rights for LTAR Program.  As shown in the *Final Determination*, by accepting Petitioners' arguments, Commerce issued an affirmative determination on this program.  In addition, both arguments on the fees for mining rights and the benchmark were necessary to make ***in response to*** Petitioners' argument because these issues would have been moot if Commerce had continued to find in Ternium's favor.

Therefore, Commerce's removal and rejection of the Ternium's rebuttal brief constitute an abuse of discretion because Ternium's arguments offered in rebuttal to the argument in Petitioners' case brief.  Commerce's rejection of its rebuttal brief deprived Ternium of any opportunity to present arguments relating to the Mining Rights for LTAR Program, and was unsupported by substantial evidence and not in accordance with law.

### 2.    The Exhaustion Claims Should Be Dismissed

The exhaustion arguments raised by Defendant and Defendant-Intervenors also must be rejected.  Defendant claims that "Ternium failed to exhaust its administrative remedies by failing to raise the affirmative arguments it raised in its rejected rebuttal brief in its case brief," *Def.Resp.Br.* at 32; *see also Def-Inv.Resp.Br.* at 33-35.  Their exhaustion arguments do not apply and fail to address Ternium's argument that Commerce's removal and rejection of Ternium's rebuttal brief deprived Ternium of the chance to raise rebuttal arguments relating to the benefit

calculation of the Mining Rights for LTAR Program at the administrative level.  *See Pl.Br.* at 32-37.

This Court held that a "case brief must present *all* arguments that *continue* in the submitter's view to be relevant to Commerce's final determination or final results."  *Pl.Br.* at 36 (citing *NTSF Seafoods Joint Stock Co. v. United States*, Nos. 20-00104, 20-00105, 2022 Ct. Int'l Trade LEXIS 40, at *24 (Ct. Int'l Trade Apr. 25, 2022) (emphasis in original) (quoting *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1350 (Ct. Int'l Trade 2010)).  *First*, in its *Post-Preliminary Determination*, Commerce found that the program did not confer a benefit upon Ternium during the POI and correctly reflected the absence of any benefit.  *See Post-Preliminary Analysis* at 14.  Therefore, Ternium had no reason to argue in its case brief against this finding because it was in Ternium's favor.

Defendant also advances the absurd argument that Ternium could have made arguments "supporting Commerce's preliminary findings" and that "{n}othing required Ternium to limit its comments to programs it disputes," which nonsensically imposes a burden on parties to brief not only all issues of concern, but also all non-issues as well.  *Def.Resp.Br.* at 34-35.  For their part, Defendant-Intervenors also incorrectly claim that "the agency findings and methodologies that Ternium belatedly challenged in rebuttal had all been expressly adopted in Commerce's *Preliminary Determination*, well before the deadline for case briefs" and that in its case brief Ternium "could have challenged the very same aspects of Commerce's preliminary Mining Rights for LTAR Program analysis which Ternium subsequently raised in its rebuttal brief."  *Def-Int.Resp.Br.* at 34, 35.  These arguments make no sense.  As Ternium explained, it had no reason to raise affirmative arguments regarding this issue in its case brief because Commerce's decision was in Ternium's favor.  *See Pl.Br.* at 33; *see also Zhaoqing Tifo New Fibre Co. v. United States*,

60 F. Supp. 3d 1328, 1347, 1350 n.23, 27 (Ct. Int'l Trade 2015) (citing *Saha Thai Steel Pipe Co. v. United States*, 828 F. Supp. 57, 59-60 (Ct. Int'l Trade 1993) ("*Saha Thai*") (holding that a party was not required to file a case brief or rebuttal brief to exhaust its administrative remedies, and rejecting the argument that exhaustion doctrine requires parties to anticipate issues and to "motivate all interested parties to an administrative review to brief and litigate *every possible issue*" because such an approach would lead to "wasteful litigation") (emphasis added)).  The fact that Ternium had no basis to expect that Commerce might revise the benefit calculation in the *Final Determination* until Petitioners argued in their case brief for Commerce to reverse its decision explains why Ternium's rebuttal brief, rather than its case brief, addressed Petitioners' argument and the related implications that flowed from it.  Once Petitioners objected to Commerce's decision in its case brief, Ternium responded in its rebuttal brief.

Defendant-Intervenor also cites *Qingdao Taifa* arguing that, if Commerce had accepted Ternium's rebuttal brief, "the consequence would have been to deprive Petitioners of a 'full and fair opportunity' to contest those issues." *Def-Int.Resp.Br.* at 36 (citing *Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1236 (Ct. Int'l Trade 2009) ("*Qingdao Taifa*")).  This ignores that this case states the opposite and supports Ternium's position:  "{respondent} is not required to predict that Commerce would accept other parties' arguments and change its decision. The exhaustion doctrine therefore does not preclude the court's review of "{respondent}'s claims." *Qingdao Taifa Grp. Co.*, 637 F. Supp. 2d at 1237 (citing *Saha Thai*, 828 F. Supp. at 59-60).  Consistent with this holding, Ternium – not Petitioners – was deprived of an opportunity to rebut the arguments raised in *Pet.Case.Br.* and, thus, it did not have a fair opportunity to challenge these issues at the administrative level.

26

**NON-CONFIDENTIAL VERSION**

Finally, as this Court held in *Neimenggu Fufeng*, "{o}ne of the circumstances that warrant the court's excusal of non-exhaustion is where a 'party ha{s} no opportunity to raise {an} issue before the agency,'" including where "'the agency change{s} its position . . . after the party's case brief would have been filed.'" *Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1372 (Ct. Int'l Trade 2024) ("*Neimenggu Fufeng*").  Contrary to Defendant-Intervenors' attempt to distinguish *Neimenggu Fufeng*, that case squarely applies here where Commerce changed its position on "zeroing" the negative benefit of one of the mines in the *FinFinal Determination*, **after** Ternium's case brief was filed.  *See Def-Inv.Resp.Br.* at 35.

Given the circumstances of the investigation – including Commerce's decision in the *Post-Preliminary Determination* in Ternium's favor that it reversed only in the *Final Determination*, and the rejection of Ternium's rebuttal brief – Ternium's arguments regarding the benefit calculation of the Mining Rights for the LTAR in this appeal should not be dismissed for failure to exhaust administrative remedies.

NON-CONFIDENTIAL VERSION

III.    CONCLUSION

For the reasons discussed above and in their initial brief, Ternium respectfully requests that the Court enter judgment in favor of Ternium.

Respectfully submitted,

WHITE & CASE LLP

/s/ Gregory J. Spak
Gregory J. Spak
Kristina Zissis
Luca Bertazzo
C. Alex Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600

*Counsel to Ternium Mexico, S.A. de C.V.*

Date:  August 6, 2026

28

## CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the February 5, 2026, Scheduling Order.  The word count for Plaintiff's Reply Brief, as computed by the White & Case word processing system (Microsoft® Word for Microsoft 365 MSO), is 8,231.

/s/ Gregory J. Spak

Gregory J. Spak

1

## CERTIFICATE OF SERVICE

I, Gregory J. Spak, of the law firm White & Case LLP, hereby certify that on August 6, 2026, copies of the foregoing document were delivered to the following parties by secure electronic mail:

***On behalf of Defendant United States:***

Brendan David Jordan
U.S. Department of Justice
Civil Division - Commercial Litigation
Branch
P.O. Box 480
Ben Franklin Station
Washington, DC  20530
Email: brendan.d.jordan@usdoj.gov

Sapna Sharma
Of Counsel
U.S. Department of Commerce
1401 Constitution Avenue, NW
Library Room 1894
Washington, DC  20230-0001
Email: sapna.sharma@trade.gov

Shanni Alon
Of Counsel
U.S. Department of Commerce
1401 Constitution Avenue, NW.
Suite 4416
Washington, DC  20230-0001
Email: shanni.alon@trade.gov

***On behalf of Defendant-Intervenor United States Steel Corporation:***

James Edward Ransdell, IV
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC  20037
Email: jransdell@cassidylevy.com

Margaret Eline Monday
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC  20037
Email: mmonday@cassidylevy.com

Myles Samuel Getlan
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC  20037
Email: mgetlan@cassidylevy.com

Thomas Martin Beline
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC  20037
Email: tbeline@cassidylevy.com

***On behalf of Defendant-Intervenors Steel Dynamics, Inc and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.:***

Alessandra A. Palazzolo
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC  20001
Email: apalazzolo@schagrinassociates.com

Christopher Todd Cloutier
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC  20001
Email: ccloutier@schagrinassociates.com

1

Elizabeth Jackson Drake
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: edrake@schagrinassociates.com

Jeffrey David Gerrish
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: jgerrish@schagrinassociates.com

Justin M. Neuman
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: jneuman@schagrinassociates.com

Luke Anthony Meisner
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: lmeisner@schagrinassociates.com

Nicholas Joel Birch
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: nbirch@schagrinassociates.com

Roger Brian Schagrin
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: rschagrin@schagrinassociates.com

Saad Younus Chalchal
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: schalchal@schagrinassociates.com

William A. Fennell
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: wfennell@schagrinassociates.com

/s/ Gregory J. Spak
Gregory J. Spak
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600

2