**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE KARA M. WESTERCAMP, JUDGE**

TERNIUM MEXICO, S.A. DE C.V.,
Plaintiff,

v.

UNITED STATES
Defendant,

and

UNITED STATES STEEL CORPORATION, STEEL DYNAMICS, INC., and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,
Defendant-Intervenors.

Ct. No. 25-00236

# DEFENDANT-INTERVENORS' SUPPLEMENTAL POSTHEARING BRIEF

Roger B. Schagrin
Jeffrey D. Gerrish
Nicholas C. Phillips

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Washington, D.C. 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc. and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Avenue NW
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to United States Steel Corporation*

Dated: November 20, 2026

Pursuant to the Court's post-hearing Order, ECF Doc. 65 (Nov. 18, 2026), we hereby submit this supplemental brief on behalf of Defendant-Intervenors to rebut Plaintiff's inaccurate assertion that the U.S. Department of Commerce ("Commerce") has a practice of generally accepting unsolicited corrections during administrative proceedings. Much like the "minor correction" standard that Commerce faithfully applied during verification here, *see* Defendant-Intervenors' Response Brief, ECF Doc. 48 (July 13, 2026) at 21-25, Commerce *may* accept the unsolicited correction of a minor error in a prior submission, but—consistent with Commerce's rejection of Ternium's various post-preliminary submissions—Commerce will *reject* entirely new, unsolicited factual information.

A respondent's obligation to provide information requested in a questionnaire by the deadline applicable to that questionnaire is fundamental to Commerce's orderly administration of investigations. Allowing belated submissions "undermines the Department's ability to conduct a proper CVD investigation" and deprives Commerce of a "meaningful opportunity to analyze the response and determine whether it contain{s} all necessary information." *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 Fed. Reg. 57,444 (September 21, 2010) (CVD Inv. Final), and accompanying IDM at Comment 22.a (*Seamless Pipe from China* IDM, excerpt attached for convenience as **Exhibit 1**).

For example, in *Steel Sinks from China*, Commerce gave respondent Superte two opportunities to submit information regarding its input suppliers, but Superte twice failed to submit a complete response. *Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 13,017 (Feb. 26, 2013) (CVD Inv. Final), and accompanying IDM at Comment 11 (excerpt attached for convenience as **Exhibit 2**). Much like Ternium, Superte only attempted to remedy its omission ***after*** Commerce addressed the gap in the record by applying adverse facts

available in the preliminary determination. Superte's belated submission fell within the general, catch-all factual information deadline, and was thus relatively better positioned than Ternium's even later submission. *See id.* Nevertheless, Commerce rejected Superte's attempt to submit the list of its input suppliers in a separate, unrelated submission, reasoning that Superte's conduct had interfered with Commerce's ability to seek corroborating information from the Government respondent, request supplemental information, make preliminary findings, and verify the data. *Id.*; *see also Seamless Pipe from China* IDM at 5 n.9, Comment 22.a (same basic fact pattern).

Even after *NTN* and *Timken*, this Court has endorsed Commerce's approach. *An Giang Fisheries* sustained Commerce's rejection of data originally sought in an April 2014 questionnaire. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1287 (Ct. Int'l Trade 2017). Respondent initially failed to provide the data, then belatedly attempted to include it in a separate May 2014 supplemental questionnaire response. *Id.* The CIT agreed this was untimely, reasoning that "just because Commerce's initial questionnaire asked for fingerling size data does not mean that Commerce's supplemental questionnaires implicitly invited any further response to Commerce's initial questionnaire other than those items for which Commerce specifically requested clarification." *Id.* Here, the Court should likewise sustain Commerce's rejection of Ternium's even more belated attempt to undo its omission.

Finally, neither Ternium's administrative case brief nor its moving brief argued that Commerce has a practice of accepting new information in response to unrelated supplemental questionnaires. *See* Ternium Admin Case Br., C.R.373 (Aug. 14, 2025) at 11-13, 17-18; Ternium R.56.2 Motion, ECF Doc. 38 (Apr. 6, 2026). The Court should decline to consider such arguments for want of administrative exhaustion, *see* 28 U.S.C. § 2637(d), and for Ternium's waiver in Court, *see Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

* * *

Respectfully submitted,

/s/ Jeffrey D. Gerrish

Roger B. Schagrin
Jeffrey D. Gerrish
Nicholas C. Phillips

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Washington, D.C. 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc. and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

/s/ James E. Ransdell

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Avenue NW
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to United States Steel Corporation*

November 20, 2026

**Certificate of Compliance**

The undersigned hereby certifies that the foregoing posthearing supplemental brief contains no more than two pages of double-spaced text, exclusive of any table of contents, table of authorities, addendum containing statutes, rules or regulations, certificates of counsel, and counsel's signature block and therefore complies with the maximum page limitation set forth in the Court's Order, ECF Doc. 65 (Nov. 18, 2026), as interpreted by reference to the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ James E. Ransdell
James E. Ransdell

# EXHIBIT 1
# Seamless Pipe from the P.R. China IDM

C-570-957
Investigation
POI: 1/1/08 - 12/31/08
**Public Document**
Office 1

DATE: September 10, 2010

MEMORANDUM TO: Paul Piquado
Acting Deputy Assistant Secretary
for Import Administration

FROM: Susan H. Kuhbach
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

SUBJECT: Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe ("Seamless Pipe") from the People's Republic of China

---

**Background**

On March 1, 2010, the Department of Commerce ("the Department") published the Preliminary Determination of this investigation.[1] On August 13, 2010, the Department released the Hengyang Post-Preliminary Analysis and the TPCO Post-Preliminary Analysis. The "Analysis of Programs" and "Subsidies Valuation Information" sections below describe the subsidy programs and the methodologies used to calculate benefits from the programs under investigation. We have analyzed the comments submitted by the interested parties in their case and rebuttal briefs in the "Analysis of Comments" section below, which also contains the Department's responses to the issues raised in the briefs. We recommend that you approve the positions in this memorandum. Below is a complete list of the issues in this investigation for which we received comments and rebuttal comments from parties:

**General Issues**

**Comment 1** Application of CVD Law to the PRC
**Comment 2** Whether Application of the CVD Law to NMEs Violates the Administrative Protection Act
**Comment 3** Double Counting/Overlapping Remedies
**Comment 4** Cutoff Date for Identifying Subsidies
**Comment 5** Scope of the Investigation

[1] For this Issues and Decision Memorandum, we are using short cites to various references, including administrative determinations, court cases, acronyms, and documents submitted and issued during the course of this proceeding, throughout the document. We have appended to this memorandum a table of authorities, which includes these short cites as well as a guide to the acronyms.



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

information by the submission deadline. Accordingly, the use of facts otherwise available is appropriate. See sections 776(a)(1) and (2)(B) of the Act. Also, we determine that the GOC has failed to cooperate by not acting to the best of its ability to comply with our request for information as it did not respond by the deadline dates, nor did it explain why it was unable to provide the requested information. As a result, we determine that an adverse inference is warranted in the application of facts available. See section 776(b) of the Act.

We determine that these subsidies are a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act, providing a benefit in the amount of the grant. See 19 CFR 351.504(a). We determine, in the absence of a response from the GOC, that the subsidies received under this program are limited to TPCO. Hence, we find that these subsidies are specific under section 771(5A)(D)(i) of the Act.

*CRC China*: In the Hengyang Post-Preliminary Analysis, we found that the GOC, and Hengyang, failed to provide complete information on CRC China or its subsidiaries.[8] Thus, we had no information to determine the ownership structure of CRC China or its subsidiaries, or to determine whether CRC China or its subsidiaries received countervailable subsidies. We also could not determine whether CRC China and/or its subsidiaries have other cross-owned affiliates (e.g., producers of seamless pipe) that received countervailable subsidies. We received no timely filed information since the Hengyang Post-Preliminary Analysis.[9]

With respect to CRC China and its subsidiaries, we determine that necessary information is not on the record, that Hengyang and the GOC have not provided necessary information, and, thus, that we must rely on "facts available." See sections 776(a)(1) and (a)(2)(A) and (B) of the Act. Moreover, we determine that the GOC has failed to cooperate by not acting to the best of its ability to comply with our request for information because the GOC withheld requested information about CRC China, its subsidiaries, and their participation in subsidy programs. Consequently, an adverse inference is warranted in the application of facts available. See section 776(b) of the Act.

In applying an adverse inference, the statute permits the Department to rely on information derived from: (1) the petition; (2) a final determination in the investigation under subtitle IV; (3) any previous review under section 751 of the Act or determination under section 753 of the Act; or (4) any other information placed on the record. See section 776(b)(4) of the Act.

With respect to the GOC's failure to provide responses to questions from the original questionnaire about CRC China's ownership structure, we are assuming adversely that CRC China and its subsidiaries identified by Hengyang are cross owned with Hengyang. We are basing this on Hengyang's statements on the record that CRC China is the ultimate owner of the subsidiaries that have directly owned stakes in the responding Hengyang companies.[10]

---

8 See Hengyang Post-Preliminary Analysis at 3, 5-8.

9 As we discuss below in Comment 22, on June 2, 2010, Hengyang attempted to submit information on CRC China in response to the Hengyang First Supplemental Questionnaire. We rejected this submission because it was untimely.

10 See HQR at Volume 5, pages 5-6.

> and/or (normal value). Thus, whether a subsidy is attributed to the various products produced by both companies based upon cross-ownership is not determinative of whether price and/or production are subject to manipulation as a result of affiliation.[408]

As we explain above, we find cross-ownership between the Hengyang Companies and Xigang Companies within the meaning of 19 CFR 351.525(b)(6)(vi). Therefore, subsidies to the Xigang Companies are attributable to the Hengyang Companies. This is separate from the issue of whether the Hengyang Companies or Xigang Companies could shift manufacturing or sales activity to manipulate U.S. price or normal value in the AD context.

**Comment 22 Application of AFA to CRC China and Subsidiaries**

Hengyang argues that the Department's calculation of a subsidy rate of 32.92 percent for CRC China was inconsistent with the Act, the Preliminary Determination, and the case record. Hengyang claims that its February 23 Response showed that any connection between the Xigang Companies and CRC China was largely prior to the POI.

Citing SKF, Hengyang contends that the Department must consider sections 776(a) and 782(e) of the Act when applying facts available.[409] Hengyang argues that the conditions of section 776(a) do not apply in this case. Hengyang contends that it responded to the best of its ability and supplied the information available to it concerning CRC China. Moreover, Hengyang argues that the Department unlawfully rejected additional information Hengyang attempted to provide. Therefore, Hengyang argues that necessary information was available on the record, and the Department should not have applied facts available in the first place.

Further, citing Ta Chen I,[410] Hengyang contests the Department's statement on page 8 of the Hengyang Post-Preliminary Analysis that Hengyang failed to provide requested information. Hengyang argues that it provided information to it regarding CRC China in the February 23 Response and in a June 2, 2010, submission that the Department rejected. Citing Acciai, Usinor, and Hebei Minerals, Hengyang argues that the Department must provide a respondent with the opportunity to correct any discrepancies before applying AFA.[411] Hengyang contends that the Department not only failed to do so in this case, but rejected information when Hengyang offered it. Citing China Steel, Hengyang argues that the Department did not provide a meaningful opportunity for Hengyang to remedy flaws in the data.

Regarding the Department's decision at page 9 of the Hengyang Post-Preliminary Analysis to use the highest rate for every program in this investigation as the AFA rate, Hengyang argues that the Department failed to corroborate the rate as required by section 776(c) of the Act. Hengyang argues that because the rates used by the Department in this case were derived from previous administrative reviews, by definition they represent secondary information that the Department must corroborate. Moreover, citing Gallant, Hengyang argues that the Department

---

[408] See LWTP from the PRC AD IDM at Comment 8.
[409] See SKF at 1334.
[410] See Ta Chen I at 13 (citing Bowe-Passat at 343).
[411] See Accai at 169; see also Usinor 1995 at 1142; see also Hebei Minerals at 1271.



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

did nothing to ensure that the AFA rate reflects economic reality.[412] Hengyang also argues that the Department made no attempt to show that the AFA rate for Hengyang had probative value, as defined by the SAA.[413] Hengyang argues that the CAFC, in Ta Chen II, stated that a rational relationship must exist between the margin chosen by the Department and the party to whom it is applied.[414] Hengyang argues that the Department's selected AFA rate has no rational relationship to Hengyang.

Hengyang argues that the Department assumed the highest previous margin in this case simply because it was most prejudicial. Hengyang cites China Steel[415] and Ferro Union[416] as cases in which the courts have criticized this practice. Finally, Hengyang claims that the rate that the Department selected is punitive. Hengyang cites American Silicon as a case, among others, where the courts have affirmed that the Department must not apply a punitive rate in an AFA situation.[417]

U.S. Steel responds that the statutory requirements for AFA are met in this case. U.S. Steel claims that Hengyang provided no response on behalf of CRC China despite instructions in the original questionnaire for Hengyang to respond on behalf of its parent companies. U.S. Steel also notes that in response to the Department's instructions in a supplemental questionnaire to respond on behalf of CRC China, Hengyang simply stated that it could not do so.[418] U.S. Steel argues that this meets the statutory requirements for the application of AFA because Hengyang repeatedly failed to provide the requested information and did not act to the best of its ability.

Regarding Hengyang's claim that the Department unlawfully rejected information on CRC China that Hengyang tried to provide, U.S. Steel claims that the Department specifically requested this information earlier in the investigation and, thus, that this information was subject to the deadline for that request for information (i.e., February 23, 2010). U.S. Steel argues that this information was not subject to the general time limit for submitting new factual information and was, therefore, untimely. Citing HRS from Japan, U.S. Steel argues that this rejection was consistent with the Department's practice and regulations.[419]

In response to Hengyang's argument that the Department must corroborate the AFA rate, U.S. Steel argues that the rates are reliable and relevant to Hengyang because the Department based the calculation on information that Hengyang and TPCO reported on this record for different subsidy programs. U.S. Steel contends that the Department lacked any other information that could be used to corroborate the rates applied to CRC China because of the failure of Hengyang and the GOC to respond to the Department's requests for information concerning CRC China. Citing HRS from India, U.S. Steel argues that a lack of company-specific information when a respondent fails to cooperate severely limits the Department's ability to further corroborate AFA

---

412 See Gallant at1319.
413 See SAA at 870.
414 See Ta Chen II at 1340.
415 See China Steel at 1311.
416 See Ferro Union at 1334.
417 See American Silicon at 1306, 1308, 1312-13.
418 See February 23 Response at 3.
419 See HRS from Japan at 24357-61.

rates in CVD proceedings because no independent sources for data on company-specific benefits typically exist.[420]

Further, U.S. Steel rejects Hengyang's allegation that the Department did not tie the AFA rate to Hengyang or show how Hengyang would have received a subsidy through CRC China. U.S. Steel notes that the Department, in the Hengyang Post-Preliminary Analysis, set forth at length an analysis of the relationship between CRC China and the responding Hengyang companies based on the information available. U.S. Steel contends that the Department properly assumed adversely that CRC China and its subsidiaries identified by Hengyang are cross-owned with Hengyang because of the failure of the GOC and Hengyang to provide responses on CRC China's ownership structure.

Finally, U.S. Steel rejects Hengyang's argument that the AFA rates applied to CRC China are punitive and have no relationship to Hengyang. U.S. Steel argues that the AFA rates clearly meet the requirements for being non-punitive because they are a reasonably accurate estimate of Hengyang's actual rates, along with a built-in increase as a deterrent to future non-compliance. Citing KYD and De Cecco, U.S. Steel argues that the highest verified rate applicable to cooperative respondents, which is what the Department applied in this case, is one source of AFA rates that the CIT and the CIT have determined to be corroborated and non-punitive.[421]

**Department's Position**

We note initially that both Hengyang and U.S. Steel have characterized the decision from the Hengyang Post-Preliminary Analysis as the application of AFA to Hengyang.[422] In the Hengyang Post-Preliminary Analysis, however, we found that an adverse inference was warranted in the application of facts available because the GOC failed to cooperate by not acting to the best of its ability to comply with our requests for information.[423]

We continue to find that that we must rely on "facts available" within the meaning of sections 776(a)(1) and (a)(2)(A) of the Act because Hengyang and the GOC have not provided necessary information on CRC China. Furthermore, we continue to find that the GOC failed to cooperate by not acting to the best of its ability to comply with our request for information because the GOC withheld requested information about CRC China, its subsidiaries, and their participation in subsidy programs. Consequently, we find that an adverse inference is warranted in the application of facts available within the meaning of 776(b) of the Act.

In the sections below, we address Hengyang's arguments.

a. An AFA Determination Was Not Appropriate

Hengyang claims that the conditions for applying facts available under section 776(a) of the Act are not met in this case. Hengyang also contends that it responded to the best of its ability and

---

420 See HRS from India IDM at 8.
421 See KYD at 756; see also De Cecco at 1032.
422 See, e.g., Hengyang Case Brief at 14; see also Petitioner Rebuttal Brief at 5.
423 See Hengyang Post-Preliminary Analysis at 8.



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

supplied the information available to it concerning CRC China. Further, Hengyang claims that the Department unlawfully rejected information Hengyang attempted to provide.

At Section III, page 2 of the InitQ to Hengyang, we instructed Hengyang to provide a complete questionnaire response for any cross-owned affiliate that was a "holding company or parent company (with its own operations) of your company." Hengyang did not provide a questionnaire response on behalf of CRC China or its subsidiaries in the HQR.

In the Hengyang First Supplemental Questionnaire, we requested a response from Hengyang for CRC China and its subsidiaries because the HQR showed that these companies were parent companies of Xigang Group and Resources Steel.[424] Xigang Group and Resources Steel, together with subject merchandise producers Xigang Seamless and Special Pipe, compose the cross-owned "Xigang Companies." As we explain above in Comment 21, cross-ownership exists between the Henygang Companies and the Xigang Companies. Thus, subsidies to a parent company of the individual Xigang Companies are part of our analysis.

In the February 23 Response, Hengyang acknowledged that certain CRC China subsidiaries were parent companies of Xigang Group and Resources Steel. Hengyang stated, however, that it could not provide a response on behalf of CRC China or its subsidiaries because these companies were no longer parent companies of Xigang Group or Resources Steel. Hengyang did not request an extension of time for submitting a questionnaire response for CRC China.[425]

Therefore, Hengyang's claim that we did not provide an opportunity for it to correct flaws in its submissions is wrong. Hengyang did not provide a response on behalf of CRC China in the HQR, in accordance with the instructions in the questionnaire. When we provided Hengyang another opportunity to provide a response on behalf of CRC China, Hengyang stated that it could not do so. Thus, these circumstances meet the requirements for the application of facts available under section 776(a)(1) of the Act because necessary information on CRC China and its subsidiaries was not on the record, and because Hengyang could not provide the information within the established deadline.

Hengyang also claims that we unlawfully rejected information that Hengyang attempted to provide on CRC China. Hengyang did not submit a response on behalf of CRC China and its subsidiaries in the HQR. In the Hengyang First Supplemental Questionnaire, we requested this response from Hengyang. The final deadline for providing this response was February 23, 2010. In the February 23 Response, Hengyang stated that it could not respond on behalf of CRC China or its subsidiaries, but did not request an extension for providing this questionnaire response. On June 2, 2010, which was more than three months after the February 23, 2010, deadline and one week before the start of verification, Hengyang attempted to submit information on CRC China directly in response to our questionnaire. In the June 3, 2010, Letter, we rejected Hengyang's submission because it was it was untimely.

---

424 See Hengyang First Supplemental Questionnaire at 4.
425 See February 23 Response at 2-3.



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

Hengyang claims that its submission was within the deadline for submitting new factual information. As the Department has established, information that we specifically request in a questionnaire to a respondent is not subject to general factual information deadlines.[426] Under Hengyang's interpretation, respondents may freely disregard our deadlines by designating any information that we request as "factual information" and submitting the information well after the deadlines we establish. Such an interpretation undermines the Department's ability to conduct a proper CVD investigation.

Furthermore, Hengyang states the following:

> Hengyang has responded to the best of its ability in this case and supplied the information available to it concerning CRC Conic. Moreover, when it attempted to provide additional information, the Department unlawfully rejected that information…Therefore, because 'the necessary information' was 'available on the record,' (Section 776(1) of the Act) was not triggered and the Department should not have applied facts available in the first place.[427]

Hengyang also claims that it submitted necessary information by the applicable deadline, that the Department verified the information, and that the information indicates Hengyang did not receive subsidies via CRC China.[428]

Hengyang's claims contradict the facts on the record. First, in the Hengyang First Supplemental Questionnaire, we requested a complete questionnaire response from Hengyang on behalf of CRC China because Hengyang did not provide this response in the HQR. Hengyang answered that it could not provide this information. Although Hengyang claims that it provided necessary information on CRC China and its subsidiaries, the only information Hengyang provided on CRC China in the February 23 Response was a website printout on CRC China.[429] The printout showed a corporate structure chart of CRC China and its first tier subsidiaries, but did not identify the Xigang Companies or CRC China subsidiaries that Hengyang identified as direct owners of the Xigang Companies. This did not satisfy our request for a complete questionnaire response, which would have provided necessary information on the Xigang Companies' place in CRC China's corporate structure, subsidies to CRC China and its subsidiaries, and supporting documentation (e.g., financial statements). Therefore, contrary to Hengyang's claims, necessary information on CRC China, its subsidiaries, and subsidies any of these companies received was not on the record.

Second, Hengyang attempted to provide additional information on CRC China more than three months after the deadline for Hengyang to submit this information. Thus, Hengyang's claim that it submitted necessary information by the applicable deadline is incorrect. Accordingly,

---

426 See, e.g., HRS from Japan at 24361 ("{w}hen requesting information pursuant to a questionnaire, the Department will specify the deadlines by which the information is to be provided by the parties...Any information submitted after the deadline specified in the questionnaire is untimely, regardless of whether the general deadline in section 351.301(b)(I) has passed."). See also 19 CFR 351.301(c)(2).
427 See Hengyang Case Brief at 12.
428 Id.
429 See February 23 Response at POCVD-1.



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

Hengyang's June 2, 2010, submission did not satisfy the requirements of section 782(e) of the Act for the Department to consider the submission. Specifically, Hengyang did not submit the information requested information by the February 23, 2010 deadline that the Department had established.[430]

Nevertheless, Hengyang is also asserting that the Department should have accepted its untimely submission because it contained all necessary information for the Department's analysis. However, the Department, not a respondent, determines whether all necessary information is on the record after reviewing the details of a questionnaire response, such as financial statements, internal records, and other supporting documentation. Because Hengyang attempted to submit its response at the factual information submission deadline instead of at the actual deadline for filing the response, the Department had no meaningful opportunity to analyze the response and determine whether it contained all necessary information. Thus, we disagree with Hengyang's assertion that all necessary information was on the record or would have been on the record if we had accepted Hengyang's untimely submission. We also disagree with Hengyang's contention that we verified all necessary information because the necessary information was not on the record prior to verification.

As we state above in the first paragraph of this section, we found in the Hengyang Post-Preliminary Analysis that an adverse inference was warranted in the application of facts available within the meaning of section 776(b) of the Act because the GOC failed to cooperate with regard to our requests for information on CRC China. In addition to our request in the InitQ[431] for the GOC to provide subsidy information for cross-owned companies, which includes CRC China, we requested a response from the GOC on behalf of CRC China two additional times – in the February 16 Letter and the April 16 Letter. As we detail in the Hengyang Post-Preliminary Analysis, the GOC did not address the request from the February 16 Letter and refused to respond to the request in the April 16 Letter.[432] Therefore, we continue to find that GOC failed to cooperate by not acting to the best of its ability to comply with our requests for information, thereby warranting an adverse inference in the application of facts available within the meaning of 776(b) of the Act.

b. Corroboration

Hengyang claims that the Department must corroborate the AFA rate in accordance with section 776(c) of the Act. Hengyang also states, "As the rates used by the Department in this case were derived from previous administrative reviews, by definition they represent secondary information."[433]

Section 776(c) of the Act states the following:

> When the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the

[430] See section 782(e)(1) of the Act.
[431] See InitQ at Section II, pages 1 and 2.
[432] See Hengyang Post-Preliminary Analysis at 4.
[433] See Hengyang Case Brief at 18.

> administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

Hengyang's claim that we used information from "previous administrative reviews" is incorrect. The Hengyang Post-Preliminary Analysis at 9 stated the following:

> we recommend preliminarily determining that CRC China together with its subsidiaries benefitted from all countervailable programs that at least one respondent in this investigation has used because we do not have information on the record concerning which programs CRC China and its subsidiaries actually used, but do have information that exporters or producers of seamless pipe and their cross-owned companies did use and benefit from these programs.

We based the AFA rate for CRC China and its subsidiaries on information obtained in the course of this investigation. Therefore, the requirement to corroborate secondary information obtained outside of the investigation does not apply.

Hengyang also states, "{t}he Department never ties the AFA rate used to Hengyang and to how Hengyang would have received a subsidy through CRC China."[434] Hengyang also states, "{t}he Department made zero effort to explain how the rate selected for CRC China could apply to Hengyang."[435] Hengyang, however, disregards the analysis at pages 5-8 of the Hengyang Post-Preliminary Analysis. This analysis explains how cross-ownership existed between the Xigang Companies and CRC China, including its subsidiaries, during and prior to the POI. As we found in the Preliminary Determination and explained above in Comment 21, the Xigang Companies are cross-owned with the Hengyang Companies. Therefore, subsidies to CRC China and its subsidiaries benefit the cross-owned Hengyang Companies and Xigang Companies. Therefore, contrary to Hengyang's assertion, the Hengyang Post-Preliminary Analysis and Preliminary Determination show the connection between CRC China and the cross-owned Hengyang Companies and Xigang Companies. The Hengyang Post-Preliminary Analysis and Preliminary Determination also show how the responding Hengyang companies would have benefited from subsidies to CRC China and its subsidiaries.

c. Selected AFA Rate – Punitive and Prejudicial

Hengyang states, "{i}n this case, the Department assumed the highest previous margin (nineteen times) simply because it was most prejudicial."[436] In support, Hengyang cites Ferro Union. Both Hengyang's argument and Ferro Union, however, deal with prior calculated margins.[437] As we explain above, we based the AFA rate on information obtained in the course of this investigation. Thus, Hengyang's allegation and reference to Ferro Union are incorrect.

---

434 Id. at 19.
435 Id.
436 Id. at 20.
437 See Ferro Union at 1334 ("{u}nder the URAA Commerce cannot assume the highest previous margin applies simply because it is the one most prejudicial to the respondent.").



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

Finally, Hengyang argues that the AFA rate is punitive. In addition to citing American Silicon, Hengyang cites Timken. In Timken, the CIT stated that in choosing an AFA rate, the Department must "appropriately balance {the} goal of accuracy against the risk of creating a punitive margin."[438] This is the analysis we undertook in assigning an AFA rate to CRC China. At page 9 of the Hengyang Post-Preliminary Analysis, we recognized the application of a total AFA rate to Hengyang was not warranted under the unique facts and circumstances of this investigation, including Hengyang's level of participation in this investigation.

However, the SAA guides the Department to ensure "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[439] Because necessary information on CRC China and its subsidiaries is not on the record, we are missing a potentially large universe of additional cross-owned companies and countervailable subsidies from our analysis. Further, the missing universe of subsidies is not limited to CRC China and the subsidiaries that Hengyang identified. For example, CRC China could be cross-owned with additional producers of subject merchandise. This would expand the universe of cross-owned companies and subsidies that are part of our analysis. Furthermore, because the GOC provided no information at all on CRC China and its subsidiaries, we have no basis to conclude that CRC China and its subsidiaries could not have benefited from certain subsidy programs, such as programs to companies in a specific province.

Finally, Hengyang states the following: "It defies logic that a past owner of an affiliated company received a subsidy of 32.93%."[440] This statement disregards our whole analysis at pages 5-8 of the Hengyang Post-Preliminary Analysis, in which we showed how CRC China was not only affiliated, but cross-owned with the four responding cross-owned Xigang Companies both prior to and during the POI. Further, with its statement, Hengyang attempts to minimize the importance of the missing information, but offers no support for its assertion that the AFA rate "defies logic." As we state in the previous paragraph, we are missing information on subsidies for entire cross-owned companies. Because the GOC provided no information at all on CRC China and its subsidiaries, we cannot make a judgment on the number of cross-owned companies or the extent of subsidies for which we have no information. Therefore, we find that the AFA methodology we selected balances the goal of accuracy against creating a punitive margin.

**Comment 23 Finding that the GOC Did Not Cooperate With Respect to CRC China**

The GOC contests the Department's finding in the Hengyang Post-Preliminary Analysis that the GOC failed to cooperate by not acting to the best of its ability to comply with the Department's request for information regarding CRC China.[441] The GOC argues that a company's decision to cooperate in an investigation is responsibility of the company, not the government, and that it, the GOC, was fully prepared to cooperate. Further, the GOC argues that the Department is assuming the GOC was in a position to respond for CRC China simply because the company is state-owned. The Department, the GOC contends, falsely assumes that all SOEs are government authorities and that the GOC is directly engaged in their operational activities.

---

[438] See Timken at 1234.
[439] See SAA at 870.
[440] See Hengyang Case Brief at 21.
[441] See Hengyang Post-Preliminary Analysis at 8.



Filed By: larissa johnson, Filed Date: 8/1/11 12:00 AM, Submission Status: Approved

# EXHIBIT 2
# Steel Sinks from the P.R. China IDM

Barcode: 3120228-02 C-570-984 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-570-984
Investigation
POI: 1/1/11 - 12/31/11
**Public Document**
Office 1: SS/AR/SK

DATE: February 19, 2013

MEMORANDUM TO: Paul Piquado
Assistant Secretary
for Import Administration

THROUGH: Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

Susan Kuhbach
Office Director
AD/CVD Operations, Office 1

FROM: Shane Subler and Austin Redington
International Trade Compliance Analysts
AD/CVD Operations, Office 1

SUBJECT: Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Drawn Stainless Steel Sinks from the People's Republic of China

---

## I. Summary[1]

On August 6, 2012, the Department published the *Preliminary Determination* in this investigation. We conducted verification of the questionnaire responses submitted by the GOC, Yingao, and Superte between November 7 and November 16, 2012, and released verification reports on December 4, 2012 (for Yingao and the GOC) and December 12, 2012 (for Superte). On January 8, 2013, the Department issued its post-preliminary analyses, which described our findings regarding three programs: Land for LTAR to Companies Located in Industrial or Other Special Economic Zones, Preferential Export Financing, and Shunde Intensive Industrial Zone Administrative Fee Exemptions and Reductions.

[1] For this Issues and Decision Memorandum, we are using short cites to various references, including administrative determinations, court cases, acronyms, and documents submitted and issued during the course of this proceeding, throughout the document. We have appended to this memorandum a table of authorities, which includes these short cites as well as a guide to the acronyms.

Filed By: shane subler, Filed Date: 2/20/13 5:14 PM, Submission Status: Approved

Barcode: 3120228-02 C-570-984 INV - Investigation

questions, the GOC withheld information that was requested of it regarding the CCP's role in the ownership and management of the input producers and significantly impeded the proceeding. As such, we are finding that all of the producers of SSC for which the GOC failed to provide ownership information or failed to identify whether the owners were CCP officials are "authorities" within the meaning of section 771(5)(B) of the Act, as described under the "Use of Facts Otherwise Available and Adverse Inferences - GOC - Government Authorities Under Provision of SSC for LTAR" section, above.

Regarding the arguments concerning the *WTO AB Decision*, that decision involved an "as applied" challenge to the eight AD and CVD determinations at issue in that case, and the Department's recent implementation applied only to those eight AD and CVD determinations. *See Section 129 Implementation*. Neither the decision nor the implementation applies to this investigation. In any event, the Federal Circuit has held that WTO reports are without effect under U.S. law, "unless and until such a {report} has been adopted pursuant to the specified statutory scheme" established in the *URAA*.[216]

**Comment 11: Superte's Additional Stainless Steel Coil Producer Information**

*Superte's Affirmative Arguments*

- On August 10, 2012, Superte filed additional SSC producer information. The Department rejected this information.[217] The Department should allow the information to remain on the record and be fully considered for the final determination.

- The Department's rejection of the information contravenes the submission of factual information permitted under 19 CFR 351.301(b)(1).

- The rejection is inconsistent with past CVD proceedings in which the Department has routinely accepted submissions of factual information under 19 CFR 351.301(b)(1).[218]

- Superte indicated that it was unable to obtain some of the producer information because it was not in the direct control of the information.[219] Therefore, the Department's position that Superte should have requested an extension to submit the information was unrealistic.

*Petitioner's Rebuttal Arguments*

- The Department provided Superte two opportunities to submit information regarding its input suppliers. Superte failed to provide a complete response to the Department's

assist Commerce's determinations").

[216] *See Corus I*, 395 F.3d at 1347-49; *Corus II*, 502 F.3d at 1375; and *NSK Fed. Cir.*, 510 F.3d at 1380.
[217] *See* Superte SS Coil Rejection Letter.
[218] *See, e.g., LWS from the PRC IDM* at Comment 18.
[219] *See* Superte's July 23, 2012 SQR at 32.



Filed By: shane subler, Filed Date: 2/20/13 5:14 PM, Submission Status: Approved

request on both occasions.[220] The Department's rejection of Superte's information was, therefore, appropriate.

- The Department also did not verify the rejected information and, therefore, cannot rely on it for the final determination.

**Department's Position**

We agree with Petitioner. The Department provided Superte with two opportunities to submit information regarding its input producers, and Superte failed to provide a complete response to the Department's request on both occasions. Only after the Department used AFA in the *Preliminary Determination* based on Superte's failure to provide the information did Superte come forward and attempt to submit some of the requested information. In the Superte SS Coil Rejection Letter, we explained the reasons for rejecting Superte's additional SSC producer information. Specifically, we explained the following:

> Upon review of your August 10, 2012, submission, we find that you have provided the names of producers of stainless steel coil that you previously indicated you were unable to provide. This information is untimely because it was filed after the initial questionnaire deadline of June 28, 2012, and the supplemental questionnaire deadline of July 23, 2012. Further, you did not submit an extension request for providing this information, in accordance with 19 CFR 351.302(c) and the instructions in the Questionnaire. Moreover, you have not provided the Department with good cause to extend the deadline pursuant to 19 CFR 351.302(b) of the Department's regulations.[221]

Superte claims that our rejection of the producer information contravenes the submission of factual information permitted under 19 CFR 351.301(b)(1). In past cases, however, we have explained why general factual information deadlines do not apply to information we request in our questionnaires. For example, in *Seamless Pipe from the PRC*, we stated the following:

> {Respondent} claims that its submission was within the deadline for submitting new factual information. As the Department has established, information that we specifically request in a questionnaire to a respondent is not subject to general factual information deadlines. Under {Respondent}'s interpretation, respondents may freely disregard our deadlines by designating any information that we request as "factual information" and submitting the information well after the deadlines we establish. Such an interpretation undermines the Department's ability to conduct a proper CVD investigation.[222]

---

[220] *See* SQR at Exhibit 13 and Superte's July 23, 2012 SQR at Exhibit SQ1-18.
[221] *See* Superte SS Coil Rejection Letter at 2.
[222] *See Seamless Pipe from the PRC* IDM at Comment 22, citing *HRS from Japan*, 64 FR at 24361 ("{w}hen requesting information pursuant to a questionnaire, the Department will specify the deadlines by which the information is to be provided by the parties...Any information submitted after the deadline specified in the questionnaire is untimely, regardless of whether the general deadline in section 351.301(b)(I) has passed.") and 19 CFR 351.301(c)(2).



Filed By: shane subler, Filed Date: 2/20/13 5:14 PM, Submission Status: Approved

Barcode: 3120228-02 C-570-984 INV - Investigation

The same position applies to the circumstances of Superte's submission. The identification of Superte's producers within questionnaire response deadlines was necessary because the GOC also must provide necessary information on these producers. Further, we may need to request supplemental information from the GOC on these producers, make preliminary findings regarding the producers, and verify the information. If parties submitted this information by the deadline for factual information (as opposed to the deadlines for questionnaire responses), the Department would be unable to carry out a proper CVD investigation within statutory deadlines. Finally, although Superte argues that it was unrealistic to request an extension for submitting the information, nothing prevented Superte from making an extension request citing difficulties in obtaining or collecting the information. The record shows that the Department granted several extensions in this proceeding, and there is no evidence that Superte made any effort to request an extension of the deadlines to get additional time for obtaining and submitting the information. Therefore, for the reasons explained in the Superte SS Coil Rejection Letter, we have not accepted Superte's producer information and have not incorporated it into this final determination.

**Comment 12: Stainless Steel Quality Differences Between Benchmark and Superte's Purchases**

*Superte's Affirmative Arguments*

- Superte uses Grade 304 and Grade 201 stainless steel for the production of SS sinks.

- Grades 304 and 201 differ significantly in their physical and chemical properties.[223] As shown in POI pricing data from AK Steel and SBB, the prices of Grade 201 SSC are significantly lower than Grade 304.[224]

- The Department should adjust the SSC benchmark to account for these differences.

*Petitioner's Rebuttal Arguments*

- The Department should make not revise the benchmark because information on Superte's SSC purchases is not on the record.[225]

**Department's Position**

We agree with Superte. The Department's regulations at 19 CFR 351.511(a)(2)(ii) state that, in using a world market price as a benchmark, the Department will "mak{e} due allowance for factors affecting comparability." The information Superte provided from AK Steel and ASTM in the Superte SS Coil Submission shows significant differences between Grades 201 and 304 (*e.g.*, differences in nickel and manganese content).[226]

---

223 *See* Superte SS Coil Submission at Exhibits 2 and 3.
224 *Id.* at Exhibits 4 and 5.
225 Petitioner's argument is business proprietary. *See* Petitioner's Rebuttal Brief at 17.
226 *See* Superte SS Coil Submission at Exhibits 2 and 3.



Filed By: shane subler, Filed Date: 2/20/13 5:14 PM, Submission Status: Approved